MSG



75

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| SARAH BEHNKE, | . | Case No. 2:14-cv-00824-MSG |
| | . | |
| Plaintiff, | . | |
| | . | U.S. Courthouse |
| v. | . | 601 Market Street |
| | . | Philadelphia, PA 19106 |
| CVS CARMARK CORPORATION, | . | |
| et al., | . | |
| | . | |
| Defendant. | . | |
| | . | May 9, 2019 |
| . . . . . . . . . . . . . | . . | 10:04 a.m. |

TRANSCRIPT OF ORAL ARGUMENTS
BEFORE HONORABLE MITCHELL S. GOLDBERG
UNITED STATES DISTRICT JUDGE

FILED

MAY 2 0 2019

KATE BARKMAN, Clerk
By _____ Dep. Clerk

APPEARANCES:

For Sarah Behnke:           SUSAN SCHNEIDER THOMAS, ESQ.
                            BERGER MONTAGUE, PC
                            1818 Market Street
                            Suite 3600
                            Philadelphia, PA 19103
                            (215) 875-3000

For CVS Carmark Corp.:      DANIEL M. DOCKERY, ESQ.
                            WILLIAMS & CONNOLLY, LLP
                            725 Twelfth Street NW
                            Washington, DC 20005
                            (202) 434-5698

For Movant Aetna:           FREDERICK P. SANTARELLI, ESQ.
                            ELLIOTT GREENLEAF, PC
                            925 Harvest Drive, Suite 300
                            P.O. Box 3010
                            Blue Bell, PA 19422
                            (215) 977-1024

Audio Operator:             STEPHEN SONNIE

TRANSCRIBED BY:             ASC SERVICES LLC
                            1304 Concourse Dr, Suite 120
                            Linthicum, MD 21090
                            (410) 694-9333

DH

Proceedings recorded by electronic sound
recording, transcript produced by transcription service.

APPEARANCES (continued):

For Susan Behnke:                WILLIAM ELLERBE, ESQ.
                                 BERGER MONTAGUE, PC
                                 1818 Market Street
                                 Suite 3600
                                 Philadelphia, PA 19103

For Carmark Corp.:               CRAIG D. SINGER, ESQ.
                                 WILLIAMS & CONNOLLY, LLP
                                 725 Twelfth Street NW
                                 Washington, DC 20005
                                 (202) 434-5964

# I N D E X

**PAGE**

**WITNESS FOR THE DEFENDANT**

(none.)

**WITNESS FOR THE PLAINTIFF**

(none.)

**CLOSING ARGUMENTS**

(none.)

**EXHIBITS**                                    **ID.**   **EVD.**

(none.)

THE CLERK:  All rise.  The Court is now in session.
The Honorable Mitchell S. Goldberg presiding.

THE COURT:  Good morning.

MS. THOMAS:  Good morning, Your Honor.

MR. SINGER:  Good morning, Your Honor.

THE COURT:  Have a seat.  All right.  This is the
matter of Behnke v. CVS Carmark.  And who is here on behalf of
the Plaintiff?

MS. THOMAS:  Susan Thomas, Your Honor, from Berger
Montague.  My colleague Will Ellerbe is with me, and I'd also
like to introduce my client, Sarah Behnke --

THE COURT:  Good morning.

MS. THOMAS:  -- who is here as well.

THE COURT:  Good morning.

And who is here for CVS Carmark?

MR. SINGER:  Your Honor, Craig Singer and Daniel
Dockery for the defendants.  And as an administrative matter,
Your Honor, Mr. Dockery's motion for pro hac vice admission is
pending and we would ask that Your Honor grant that --

THE COURT:  Okay.

MR. SINGER:  -- so that he can argue to that point.

THE COURT:  Okay.  Has it been filed?

MR. SINGER:  It was filed about a week ago, Your
Honor.

THE COURT:  Okay.  Well, we'll -- I'm sure we'll find

it.  Either I signed it or it hasn't crossed my desk but he's permitted to argue.  I'm sure it won't be a problem, yeah.

    MR. SINGER:  Thank you, Your Honor.

    MR. DOCKERY:  Thank you.

    THE COURT:  Okay.  And then is someone here for Aetna?

    MR. SANTARELLI:  Yes, Your Honor, Fred Santarelli.

    THE COURT:  Okay.

    MR. SANTARELLI:  And you can -- you can -- someone give Mr. Santarelli a seat at counsel table, either side or sit back there because I want to talk to you first, Mr. Santarelli.

    MR. SANTARELLI:  Sure.

    THE COURT:  So we're here for a couple reasons.  The first is I want to just engage in a discussion about a process by which we can -- I can assess what, if any, documents I'm going to order are returned to Aetna.  I've allowed Aetna to intervene for purposes of that issue.

    We reissued an order with some direction, hopefully helpful direction, on what we thought was lacking in that process by the way of information.  And so we can -- we can kick that around, but I do have a couple questions to -- that I think it will inform my decision about that.

    So I'll ask is it Thomas or Schneider Thomas?  I'm sorry.  How do you use your last name?

    MS. THOMAS:  Thomas, Your Honor, Susan Thomas.

THE COURT:  Thomas, okay.  Ms. Thomas, could you tell me the circumstances -- circumstances surrounding the taking of the documents at issue, how many documents we're talking about and just generally, you'll have to sort of walk a little bit of a fine line, but just generally what categories these documents fit into?

MS. THOMAS:  Certainly, Your Honor.  So Ms. Behnke, while working at Aetna for whom Carmark was serving as the PBM --

THE COURT:  And what was her title?

MS. THOMAS:  Chief -- at some point at least it was Chief Actuary for Medicare Part D --

THE COURT:  Okay.

MS. THOMAS:  -- at Aetna.  I don't recall if that was throughout the time period, but it's close.  Observed what she initially thought was a financial issue for Aetna that it was not, in fact, being given or charged by its PBM Caremark appropriate prices.

As they began to investigate that --

THE COURT:  Who's they?

MS. THOMAS:  She and others in her -- in her group, Teri Swanson's (ph.) name comes to mind.  Ms. Behnke in particular thought that there were Part D price reporting requirements that were being violated because Carmark was not appropriately reporting prices to Aetna.

When she came to us there were somewhere between 50 and 55 documents, if I recall from memory, and all of those documents pertain very directly to what she believed to be a fraud.

So we reviewed the documents.  There were some that we thought might legitimately be subject to a claim of attorney-client privilege by Aetna, so those documents we did not use in the preparation of our complaint.  We did not produce them to the Government.

There was subsequently one additional document that Ms. Behnke provided to us which, and I apologize, it's just a little bit of a story here.  When she provided it to us it was faxed to us as I recall.

We understood it to have been an opinion letter by Carmark's counsel that had been provided to Aetna.  So we didn't really think it was privileged but we weren't 100 percent comfortable with that assessment.  I mean, we didn't think it was privileged because they had given it to Aetna.

But we weren't totally comfortable with that conclusion so we just put it aside, and truthfully, over the course of the next year we researched it.  We talked to ethics counsel about it.  We tried to decide what, if anything, we should do with the document, but we did not look at it.

At some point --

THE COURT:  It was a -- it was a communication

between Carmark's counsel and Carmark that had been provided to
Aetna?

        MS. THOMAS:  That was our understanding.

        THE COURT::  Right, so then they --

        MS. THOMAS:  We were wrong, Your Honor.  It was not
Carmark's counsel.  It was Aetna's counsel that we, the lawyers
on my team, we just had misunderstood that from the beginning.
And since we didn't look at the letter we spent a lot of time
trying to decide whether Carmark had waived its privilege.  And
then at some point as we became more familiar with defense
counsel and the name of the firm, it became clear to us that it
was actually an opinion written by Aetna's outside counsel.

        THE COURT:  To?

        MS. THOMAS:  To Aetna, I believe.

        THE COURT:  Someone in-house in Aetna.

        MS. THOMAS;  Yes.

        THE COURT:  Okay.

        MS. THOMAS:  That had been -- a copy of which had
been given to my client --

        THE COURT:  Right.

        MS. THOMAS:  -- but at that point, once we realized
it, quite frankly, we sort of pulled our hands back and, like -
-

        THE COURT:  Okay.

        MS. THOMAS:  -- we're not looking at this.  And so

none of us ever read that.

       Once the case was unsealed --

       THE COURT:  So at the outset are you acknowledging and conceding that that communication should not be read and returned to Aetna?

       MS. THOMAS:  We did return that, Your Honor.

       THE COURT:  So it's not at issue.

       MS. THOMAS:  Correct.

       THE COURT:  I don't have to -- I don't have to grapple with that.

       MS. THOMAS:  We -- we did -- we did not read it.

       THE COURT:  Okay.

       MS. THOMAS:  We did return it.

       THE COURT:  Okay.

       MS. THOMAS:  And as I said, the --

       THE COURT:  So the 52 --

       MS. THOMAS:  -- only reason that we even had question about it was because we had simply misunderstood.

       THE COURT:  All right.  So you're telling me that's not a document I have to decide.  You're just telling me that by --

       MS. THOMAS:  Correct.

       THE COURT:  -- way of background.  And if --

       MS. THOMAS:  There are --

       THE COURT:  And did you say 52 documents at issue?

MS. THOMAS:  I --

MR. SANTARELLI:  Your Honor --

MS. THOMAS:  -- believe that number is correct.

THE COURT:  Give me a round number.

MR. SANTARELLI:  Yeah, it's -- I think it's 54.

THE COURT:  All right.  Let's just say 54 for sake of discussion.  So can you -- are you comfortable explaining how those 54 documents, how that set of documents establishes or could be used to establish what you believe is fraudulent conduct?

MS. THOMAS:  Yes, Your Honor, absolutely.

THE COURT:  Go ahead.

MS. THOMAS:  So first of all, of that 54, there were 10 or 15 that we did believe had possible attorney-client privilege issues for Aetna, and so we did not utilize those documents in the complaint.  We did not as part of our pre-filing disclosure to the Government produce those documents.  And once the complaint was unsealed we have returned those documents and not kept copies, the ones that we believe there is a legitimate privilege issue about.

THE COURT:  Okay.  So this is --

MS. THOMAS:  What -- what remains --

THE COURT:  This is -- so now we're down to 39 documents at issue, right?

MS. THOMAS:  Don't hold me to the numbers, but --

THE COURT:  We're just talking.

MS. THOMAS:  -- something like that, yes.

THE COURT:  Around that.

MS. THOMAS:  Yes.

THE COURT:  I won't hold you to numbers.  Agreed.

MS. THOMAS:  So yes, some number like that.

THE COURT:  Okay.

MS. THOMAS:  And of those documents Aetna in its motion to Your Honor, somewhat non-specifically claimed either business confidentiality or attorney-client privilege.  We do not believe those documents are privileged.  They are absolutely --

THE COURT:  But my -- what I ask you to do before we get to that, because that will help inform me, is explain to me how those 39 documents establish alleged fraudulent conduct on the part of Carmark.

MS. THOMAS:  Okay.  So those are the documents, Your Honor, that basically form the backbone of our complaint.

THE COURT:  Okay.

MS. THOMAS:  They are the documents that talk about Aetna discussing what it believed to be a spread that was being retained by Carmark.  They are documents discussing --

THE COURT:  What does that mean, a spread?

MS. THOMAS:  A spread would be the difference between -- well, let me back up a second.  There's basically a three-

part structure.  A PBM is the middleman between the Part D plans, which are essentially insurers, and pharmacies.

   THE COURT:  Carmark is a PBM.

   MS. THOMAS:  Carmark is the PBM, correct.

   THE COURT:  Mm-hm.

   MS. THOMAS:  And as a middleman, in some industries a middleman is permitted to put a markup.  An interior decorator, for example, may well be allowed to mark up the sofa that the interior decorator puts into the client house, as long as that's made clear one way or the other.

   In Medicare Part D, effective 2010, CMS said no markups, no spread.  We want the actual cost that is paid to the pharmacy, the price actually and ultimately received by the pharmacy reported to CMS.  So the documents that our client provided --

   THE COURT:  Excuse me one second.  So in your interior designer analogy the interior designer, who marks up the sofa in that analogy, that's Carmark, right?

   MS. THOMAS:  Correct.

   THE COURT:  Okay.  So go ahead.

   MS. THOMAS:  And the markup on the sofa would be the markup on the drug prices.

   THE COURT:  Right.

   MS. THOMAS:  And again, in some industries and in some situations that is permissible.

THE COURT:  Okay.

MS. THOMAS:  And CMS could have allowed that to be the way it operated in Part D also.

THE COURT:  If they -- if they were -- if they were transparent about it that that's what they were doing, right?

MS. THOMAS:  CMS could have required transparency. CMS could have not required transparency.

THE COURT:  Okay.

MS. THOMAS:  They could have simply required that the price that the plan paid the PBM is all that CMS cared about and if the PBM has a spread versus what it pays the pharmacy, so be it.  That's how the PBM makes it money.

THE COURT:  Right.

MS. THOMAS:  And CMS could have said that's fine.

THE COURT:  So the fraud charge --

MS. THOMAS:  It's just not what CMS said.

THE COURT:  So what's the fraud?

MS. THOMAS:  The fraud is that Carmark as the PBM, as the middleman, was paying lower prices to the pharmacies than the prices that Carmark was reporting to the Government and charging Aetna.

THE COURT:  And how do the 39 documents establish that?

MS. THOMAS:  So the documents discuss how it was that our client and others on her team came to suspect that this

spread existed.  And that was in part because by looking at the prices that are publicly available that other Part D plans were charging they saw that the prices that Carmark said it was paying the pharmacies and therefore charging Aetna and reporting to the government, those prices were more than 25 percent above what other Part D plans were charging.

That didn't make any business sense.  Carmark is a huge player and it seemed highly unlikely that Carmark would not have been able to be a better negotiator with the pharmacies.  So there --

THE COURT:  Is that 25 percent the major red flag that alerted your client?

MS. THOMAS:  That was one of them, Your Honor.

THE COURT:  Mm-hm.

MS. THOMAS:  The other one, and again, these are part of the documents and this is how she substantiated this to us.

THE COURT:  Mm-hm.

MS. THOMAS:  During the time leading up to Aetna's investigation, Carmark was raising the prices on particular drugs to Aetna and it was saying that it had to do that to make sure that Carmark essentially was charging Aetna as much as it was possibly permitted to do under the Carmark and Aetna contract.

So they marked up these prices.  It had nothing to do with the pharmacy having upped its prices and so the fact that

Carmark was upping the prices that it was charging Aetna and those are always the prices -- the only prices that are being reported to CMS.

So the fact that Carmark was upping those prices not based on any actual increase by the pharmacy in the prices, but simply to make sure that under the contract Carmark was charging Aetna as much as it possibly could.  So that was also a huge red flag.

THE COURT:  Okay.  And is it your position presently that you do not have to return, not holding you to this number, the 39 documents to Aetna?

MS. THOMAS:  That is basically our position, but we have been speaking with Mr. Santarelli and I think we are making a lot of progress towards narrowing down any documents that are in dispute.

THE COURT:  Okay.  And logistically, this is a brass tacks basic question, logistically what we're talking about and -- and chime in just on these logistics, if you want, what we're talking about when we say return, that means you're going to not keep a copy if -- let me ask it another way.

If I were to determine that it's completely privileged and under case law, under the qui tam case law, you don't get to keep them.  You're not going to keep copies.  It's not just to return the original.  You return everything that you've -- your client has received, right?

MS. THOMAS:  That -- that's correct, Your Honor.

THE COURT:  Okay.

MS. THOMAS:  What's at issue here --

THE COURT:  Okay.

MS. THOMAS:  -- is not originals.

THE COURT:  Video.

MS. THOMAS:  It's not, like, physical property that was taken.

THE COURT:  And how does your client -- how did your client, another basic question, just make copies of these 39 documents, not holding you to that number, and show them to you?  Is that how this works?  Or did she keep the originals or what happened?

MS. THOMAS:  No, none of this has to do with originals.

THE COURT:  All right.  These are copies that she made.

MS. THOMAS:  These are all copies.  I -- I believe many of them had come to her electronically.

THE COURT:  All right.

MS. THOMAS:  When she printed them out to give us the copies I don't --

THE COURT:  She just --

MS. THOMAS:  -- I don't recall --

THE COURT:  -- kept them and took them --

MS. THOMAS:  -- the specific details.

THE COURT:  -- out of the workplace.

MS. THOMAS:  Correct.

THE COURT:  Okay.

MS. THOMAS:  Provided them to us for the purpose of reporting fraud --

THE COURT:  Okay.

MS. THOMAS:  -- what she believed to be a fraud --

THE COURT:  Okay.

MS. THOMAS:  -- to the government.

THE COURT::  And I -- and I --

MS. THOMAS:  These were all documents, by the way, that she had access to in the legitimate course of her business.

THE COURT:  Right.

MS. THOMAS:  She was an integral part of the discussions between Aetna and Carmark --

THE COURT:  Sure.

MS. THOMAS:  -- about what they perceived to be problems.

THE COURT:  Well, that's how she -- that's how she came about the information.

MS. THOMAS:  Yeah, she -- she did not access someone else's email.  She did not --

THE COURT:  And I read this --

MS. THOMAS:  -- look in another file cabinet.

THE COURT::  -- I read this over but I forget what the answer is.  Present -- she's no longer an employee of the company, right?

MS. THOMAS:  Well, that's a good question.  She remains on paid administrative leave --

THE COURT:  Okay.

MS. THOMAS:  -- although paid is a base salary.

THE COURT:  Okay.

MS. THOMAS:  It's not bonus, whatever.

THE COURT:  So I want to hear from Mr. Santarelli, but I have a couple more questions of you, which is here's -- here's what I thought, and now I can amend my original thinking.  So you're telling me, I assume Mr. Santarelli will confirm, that you're in some productive meet-and-confers with Aetna and Mr. Santarelli.

MS. THOMAS:  Correct.

THE COURT:  And you will come to agreements and, you know, I'm not going to stick my nose into your agreements unless there's a reason for me to do that.  So let's just say for sake of discussion it's whittled down to 15 documents -- I just picked that number out of the air -- that you can't agree on.

What I would suggest, which I'd like your input on and then Mr. Santarelli's, is whittle it down to the number and

then submit -- I'm sort of making this up as I go along -- but submit a joint, something joint that I can look at where Mr. Santarelli can tell me something like a privilege log, but something with a little more teeth.

I mean, actually you know what they say and he knows what they say, so maybe instead of going through that dance maybe you just give them to me.  If there's only 15 of them for my number, I can read them and understand them and you can then tell me why you get to keep them and he can tell me why you don't.

MS. THOMAS:  I think that makes perfect sense, Your Honor.

THE COURT:  Okay.

MS. THOMAS:  And I believe, based on our discussion --

THE COURT:  I don't even think we need a privilege on that.

MS. THOMAS:  -- I think we're down to five perhaps?

THE COURT:  Yeah, all right, so I can read five documents.  Okay.

All right, what do you think?

MR. SANTARELLI:  Your Honor, yeah, I was going to say earlier that Ms. Thomas and I have had discussion prior to Your Honor's order and since that time.

THE COURT:  Mm-hm.

MR. SANTARELLI:  And that I think we are making progress.  I don't -- I'm hopeful that we will move the need to refile the motion --

THE COURT:  Okay, great.

MR. SANTARELLI:  -- based on the discussions.  And -- and as to what the documents say and the characterizations that were made today, I mean, our whole position has been that it's confidential, proprietary but most importantly the privileged documents.

THE COURT:  Mm-hm.

MR. SANTARELLI:  There were privileged conversations throughout --

THE COURT:  Okay.

MR. SANTARELLI:  -- the set of documents.  We're very concerned about the privilege that they -- especially the privileged documents be returned.

THE COURT:  Okay.

MR. SANTARELLI:  And as to the other documents, that's what discovery's for.

THE COURT:  Okay.

MR. SANTARELLI:  And we have protective orders on that.

THE COURT:  Okay, so are you saying -- I hear you saying, Judge, we don't even -- we'll let you know if we need you.

MR. SANTARELLI:  That's it.

THE COURT:  And you'll do that by --

MS. THOMAS:  I think so.

THE COURT:  -- you'll do that by way of a renewed motion, clawback motion?

MR. SANTARELLI:  That's right, Your Honor.

THE COURT:  Okay.

MR. SANTARELLI:  We'll just keep --

THE COURT:  Done.

MR. SANTARELLI:  -- with it.

THE COURT:  Done.  So I'm not going to do anything. I'm going to assume it's worked out unless I hear from your otherwise.  Okay.  thank you, Mr. Santarelli.

MR. SANTARELLI:  Thank you.

MS. THOMAS:  Okay.

THE COURT:  Okay, now while we're here --

MS. THOMAS:  Yes.

THE COURT:  -- Carmark has two motions to dismiss so I thought it would be productive to let them, I mean, give me a quick, you know, overview and argument on those motions.  You can respond and then, you know, we'll -- I'll go back and look at them and give everyone a ruling on this.

So counsel?

MR. DOCKERY:  Your Honor?  Your Honor, we have two motions today.  One of them is a motion to dismiss.  The other

is actually a motion to seal the claim.  We filed -- it's actually a motion to partial seal in the sense that the original non-redacted complaint would be sealed and we submitted a very lightly redacted copy of the complaint that we submitted be publicly filed instead.

       THE COURT:  Proposed.

       MR. DOCKERY;  That's -- that's right.

       THE COURT:  Proposed, okay.

       MR. DOCKERY:  And --

       THE COURT:  All right?

       MR. DOCKERY:  -- so that's -- that's the motion to seal.  And then we have the motion to dismiss.  Which would you like us to address first?

       THE COURT:  It's up to you.

       MR. DOCKERY:  Okay.  Why don't we, since we were just talking about confidentiality and privileged documents perhaps we can just get the motion to seal out of the way.

       THE COURT:  Okay.

       MR. DOCKERY:  So at a very high level, Your Honor, as you know, there was a complaint that was filed under seal by the relator.  And when that complaint was unsealed and -- and we got a look at it, we realized immediately that there were items of information in there, specific details regarding the confidential business guarantees and pricing that existed between Carmark and Aetna.

And so we filed a motion, an emergency motion to temporarily seal the complaint.  It was unopposed and with the understanding that a further motion would be filed that would address specifically what should be redacted from the complaint.  And Your Honor granted that motion so the complaint is currently under seal.

We then filed our motion to seal which specified the portions of the complaint that we're concerned about. Supported it with a declaration from CVS employee Edward Baynie (ph), who explained precisely why the very limited amount of information that we were asking be redacted was competitively sensitive.

To say it, put it at a very high level, Your Honor, the information that we proposed be redacted that subject or the subjects of our motion have to do with financial guarantees and the actual numbers associated with these financial guarantees.  Not the existence of them, but the precise details of those financial guarantees.

As -- and then there are some, again, you know, details of specific prices, not the existence of the prices or the general features of the pricing but the very specific numbers associated with the prices.

And that's what our proposed complaint would -- would redact.

THE COURT:  And I have your proposed redaction.  And

just thumbing through it it does look like it's -- it's not
overwhelming and you're just talking about pricing, right?

MR. DOCKERY:  WE were very sensitive, Your Honor, to
the fact that redactions of a complaint in a matter are -- are
not favored and so we were as limited as possible --

THE COURT:  Yeah.

MR. DOCKERY:  -- in doing --

THE COURT:  What's the Plaintiff's position on the
proposed redacted complaint?

MS. THOMAS:  Your Honor, we would actually agree to
the redactions in Paragraphs 119 and 155.  Beyond that it is
our position, first of all, that defendant did not take
appropriate steps to protect the information.  We alerted them
to the fact that the complaint was coming out from under seal.
 They had had an extensive PowerPoint presentation suggesting
what might be in the complaint, and there was no willingness on
their part to discuss matters with us.

THE COURT:  What do you mean a PowerPoint
presentation?  What do you mean?

MS. THOMAS:  During the course of the Government's
investigation, Your Honor, there was a maybe two-hour
PowerPoint presentation of the allegations with documents, with
charts explaining the nature of the case and the claims.

THE COURT:  Who -- who prepared and presented the
PowerPoint?

MS. THOMAS:  That was presented by us, by relator's counsel.  It was --

THE COURT:  To who?

MS. THOMAS:  To Carmark --

THE COURT:  Right.

MS. THOMAS:  -- in DOJ's office.  I mean --

THE COURT:  Right.

MS. THOMAS:  -- DOJ was a participant at that meeting.  It was still their investigation --

THE COURT:  Okay.

MS. THOMAS:  -- but we were the presenter.  And --

THE COURT:  And they were there?

MS. THOMAS:  Correct.

THE COURT:  Okay.

MS. THOMAS:  Mr. Dockery, Ms. Mininji (ph), Ms. Conley and I believe somebody --

THE COURT:  Counsel for Carmark were there.

MS. THOMAS:  And I believe an internal --

THE COURT:  Okay.

MS. THOMAS:  -- Carmark.

THE COURT:  Let -- that's a meeting between DOJ, Carmark and you so how does that -- what does that have to do with the redaction of the complaint?

MS. THOMAS:  The only point there, Your Honor, is prior to the complaint becoming unsealed we had told them it

was going to be unsealed.

THE COURT:  Right.

MS. THOMAS:  And it strikes that had they had significant concerns about what might be in the complaint they would have addressed those concerns with us initially rather than allow the complaint to be unsealed.

THE COURT:  So it's sort of like a waiver argument? It's too late to -- to redact.

MS. THOMAS:  Yes.

THE COURT:  Okay.

MS. THOMAS:  I -- I think it impacts on the seriousness and the, you know, sincerity of their concerns that they --

THE COURT:  But what's the harm?  The harm is -- is the harm just the public saw you standing here and saying, well, the public has the right to know and that's the harm?

MS. THOMAS:  Well, the complaint was put out there. It was then picked up by private services and posted.  I mean, the complaint was out there and then it disappeared.  So however that impacts Your Honor's thinking, but substantively in terms of the nature of the information, we agree.  Carmark did not go hog wild in attempting to redact huge amounts of this case.

But this case is all about pricing and what we foresee going forward is just an ongoing battle if any time

there needs to be reference to particular prices we're going to have these issues.  Most of this information, Your Honor, is really quite stale at this point.

These were prices from 2011, 2012, 2013.  Drug pricing for generic drugs is a very dynamic field.  The discount rates have gone up considerably.  We don't actually think this information has particular business confidential significance to Carmark at this point.

And of course, our allegations are that Carmark was charging and reporting prices that were too high, which doesn't really provide a competitive advantage to the other parties.

And then the other point, Your Honor, and we detail this in our -- on our briefing, is that much of this information is, in fact, publicly available like the ability to compare the prices that Aetna was being forced to charge to the prices that other Part D plans were charging, that's all public information.  And that is detailed in Ms. Behnke's declaration.

You know, the -- the prices under Med D for each plan for every drug for every ZIP code, I believe it is, is public information.  And then --

THE COURT:  Okay.  I --

MS. THOMAS:  -- so basically we just --

THE COURT:  -- understand your --

MS. THOMAS:  -- don't think this is confidential.  We think it's stale and we don't believe --

THE COURT:  I understand your position.

MS. THOMAS:  -- they appropriately protected it.

THE COURT:  Okay.  Do you want to summarize your motion to dismiss?  Let's move on to the next topic.

MR. DOCKERY:  Sure, sure.  So the motion to dismiss is a motion that the defendants have filed that has a few components to it, and we want to focus on whatever Your Honor believes is most important, but if -- if it works for Your Honor the way that we'll go through it is to start off by just addressing kind of a fundamental dispute between the parties as to what's even pled.

It's significant actually, in part -- in connection with that meeting that Ms. Thomas was just talking about.  And then talk about whether or not what is pled in the complaint actually meets the pleading standards.

And then there's a couple of items that we'll point out that --

THE COURT:  Well, I'm going to read --

MR. DOCKERY:  -- we could actually argue them as well.

THE COURT:  -- I'm going to -- you don't have to regurgitate your motion.

MR. DOCKERY:  Sure.

THE COURT:  Just I'm giving you -- 'm going to read it and read their response, and since we're here I'm giving you

a brief, concise time to summarize your arguments.

MR. DOCKERY:  So to summarize the argument, Your Honor, if Your Honor looks at the complaint you'll see that the complaint focuses on the concept of whether or not CVS and Carmark were accurately reporting negotiating price.  And negotiated price, as it's stated many time in the complaint, is associated with PDE records, which are records that are transaction-specific that reflect the negotiated price for a particular drug.

And there's one for each claim that is filed.  And this -- this PDE theory was the theory that was in the complaint and we filed a motion to dismiss because there -- at sort of the highest level there's a fundamental element of information that is not alleged anywhere in the complaint that is essential to alleging fraud with respect to those PDEs.

The allegation that Plaintiffs are making is that when Carmark submitted these PDEs they included a MAC (ph) price on them, the MAC price that it was showing to Aetna.  And so the question then becomes what was the price for those individual drugs, for those particular drugs that the pharmacy was required to pay?

And there is nothing in the complaint that answers that.  In fact, Plaintiffs say, at least as of that point, that relator had never seen those contracts, had no idea what was in those contracts, so there is nothing to show what the correct

price should have been for those PDE records that were being submitted.

And, Your Honor, just to loop this back to something that Ms. Thomas was -- was talking about a few moments ago, we did attend a presentation.

THE COURT:  May I interrupt you for a second?

MR. DOCKERY:  Sure.

THE COURT:  I'll come back to you.  Could you do me a favor?  Could you take -- give me an example using a round number as to how you believe the fraud worked.  I'm asking Plaintiff's counsel to do that.

MS. THOMAS:  I'm happy to do that.  I would like, with Your Honor's permission, to hand up a graphic which appears in our --

THE COURT:  I want to keep it simple so just explain it to me.

MS. THOMAS:  It's not that simple.

THE COURT:  Do your best.

MS. THOMAS:  So there are pricing on both sides of the table between the PBM and the pharmacy and between the PBM and the plans --

THE COURT:  Mm-hm.

MS. THOMAS:  -- takes place on basically two levels.

THE COURT:  Mm-hm.

MS. THOMAS:  One, there is an aggregate price

guarantee.  Prescription drugs have a list, essentially a list price called the AWP, the average wholesale price.  The negotiations between the PBM and the pharmacy are done on the basis of this aggregate discount guarantee.

THE COURT:  Okay.

MS. THOMAS:  The pharmacy agrees that it will accept 80 percent off of AWP.

THE COURT:  Got it.

MS. THOMAS:  So that's a discount off of the AWP price.  It's the discount rate to which the pharmacy has agreed.

THE COURT:  Go ahead.

MS. THOMAS:  On the plan side there is similarly the negotiation between the PBM and the plan proceeds on the basis of what that aggregate discount will be.

THE COURT:  The plan being Aetna?

MS. THOMAS:  Aetna.

THE COURT:  Go ahead.

MS. THOMAS:  Yes, the Part D plan.  That aggregate discount rate, according to our allegations and we believe as admitted by Carmark, the discount rate off of AWP that was agreed to between the PBM and Aetna was a lower discount than the amount to the pharmacies.

In other words, so if the pharmacies got an 80 percent discount Aetna was only getting a 77 percent discount

so on average for a drug that costs, that has an AWP of $100

the pharmacy was getting paid $20, 80 percent off the $100 --

      THE COURT:  Mm-hm.

      MS. THOMAS:  -- and Aetna was being charged $23.

      THE COURT:  Okay.  So the --

      MS. THOMAS:  However --

      THE COURT:  -- the 20 that --

      MS. THOMAS:  Okay.

      THE COURT:  -- that was paid to the pharmacy I

believe counsel's saying you didn't allege those numbers with

sufficient specificity under Wickbold Twombly (ph).  Is that --

is that your argument?

      MS. THOMAS:  There's another --

      MR. DOCKERY:  No, Your Honor.

      THE COURT:  I'm asking him.

      MS. THOMAS:  -- piece if I might?

      MR. DOCKERY:  That's actually not my --

      THE COURT:  Excuse me, excuse me --

      MR. DOCKERY:  That's not our argument.

      THE COURT:  -- I'm asking him.  Is that your

argument?

      MR. DOCKERY:  No.

      THE COURT:  Okay.  Continue with it --

      MS. THOMAS:  Because there's anther --

      THE COURT:  -- (inaudible).

MS. THOMAS:  -- piece to this.

THE COURT:  Go ahead.

MS. THOMAS:  Although the negotiations are on this aggregate discount rate, in fact transactionally pricing operates quite differently.  There might, for example, be three generic manufacturers that have the same drug.  They might all have different AWPs so if the payment for each and every drug was going to be at 80 percent off of AWP it would be different for all three of those equivalent drugs.

THE COURT:  Understood.

MS. THOMAS:  So transactional pricing is handled differently.

THE COURT:  Mm-hmm.

MS. THOMAS:  What we have visibility into is the way Carmark handled its transactional pricing with Aetna.  So in addition to Aetna having a guarantee that it will be charged no more than that aggregate discount rate, but on a transactional basis there were prices for specific drugs.

And part of what alerted Ms. Behnke to suspicions about Carmark was that Carmark raised the particular drug prices and said it was doing that to make sure that it was charging Aetna as much as it could under that aggregate umbrella rate.

In other words, on an individual drug price basis Carmark said we need to raise your price --

THE COURT:  Right, okay.

MS. THOMAS:  -- because when we look at the overall utilization of the drugs, which manufacturer's generic is being used, how often a particular drug is being prescribed, whether a particular drug's AWP has gone up or down because that's set by the manufacturer, not by the PBM or -- or the Part D plan.

So Carmark does a very sophisticated analysis trying to make sure that at the end of the day Aetna is paying as much as Carmark can charge Aetna but still keeping Aetna within its aggregate guarantee.

THE COURT:  Okay.  I'm going to let him finish. Thank you.  that was very helpful.

Go ahead.

MR. DOCKERY:  Thanks, Your Honor.  So that structure, as you can see, it has two pieces on the Aetna side.  It has an aggregate guarantee and it has the individual pricing.

And there are -- there are some kinds of transactions out there, Your Honor, for example, brand drugs where there aren't two pieces.  There's just one.  There's a discount off of AWP, 17 percent off AWP.

And so if you have a brand drug that is where, just to bring this back to the idea of spread pricing, that is what spread pricing was, where that opportunity existed.  And, you know, if you have a discount rate for pricing particular drugs for the plan that was different than the rate for pricing

particular drugs for the pharmacy there would be a spread on each individual prescription that was filled.

We are not talking about that situation.  We're talking about something called MAC pricing, MAC-priced drugs. And MAC pricing is much different because in MAC pricing the price for the drug is what the PBM sets as the price for the drug.

And so with respect to this aggregate guarantee, the aggregate guarantee is calculated based on all of those individual transactions.  It will get to a different result than the individual transactions because it's an average, right?

So an average, you know, if somebody says they have a GPA of a B it doesn't mean every grade is a B.  The grades can be all over the place.  It means that the average is a B.  And similarly, the fact that you have a discount rate that is part of an aggregate guarantee doesn't tell you what any of those individual prices were.

So we know on the Aetna side of the ledger there's the aggregate guarantee and there are the individual prices that can be averaged out and compared against the aggregate guarantee with potential liability to CVS if it's not satisfied.  Okay?

So on the other side of the ledger what do we have? Well, Plaintiffs allege that there's an aggregate guarantee

over there.  And they say that the aggregate guarantee to --
that was agreed to between Carmark and the pharmacy is
different from the aggregate guarantee that was agreed to with
Aetna.

Now, just to point out here, these are guarantees
made by Carmark, both of them.  Carmark made -- a guarantee
made by Carmark to Aetna, a guarantee made by Carmark to the
pharmacy, okay?  So these are liabilities to Carmark.  They're
not guarantees of what the price will be.  They're financial
guarantees that if the price, the average price doesn't hit a
certain level that Carmark will -- will essentially make whole
on that.  Okay?

And here's why this is important, Your Honor.

THE COURT:  and you're going to soon tie this into
how their complaint's deficient?

MR. DOCKERY:  That's right.  Their complaint says
that we misreported those individual drug prices that are
submitted on each PDE --

THE COURT:  Okay, haven't said what --

MR. DOCKERY:  -- for each transaction.

THE COURT -- what those -- you haven't given me the
specifics on that.

MR. DOCKERY:  No, it's not about the specific
numbers, Your Honor.  It's that there's an entire section of
this chart missing.  If you think in your mind the Aetna side

we know the aggregate numbers and we know the individual
numbers.

THE COURT:  Is the best result you could get from me
that I allow them to amend?

MR. DOCKERY:  Your Honor, we think that that's the --
probably the likely result on a first motion to dismiss, and
particularly given how --

THE COURT:  Have you discussed that with Plaintiff's
counsel to see whether she would be amenable to that?

MR. DOCKERY:  We -- we did.  Before bringing the
motion we discussed with them whether they intended to amend.

THE COURT:  Okay.

MR. DOCKERY:  And we were told that they didn't.

THE COURT:  Okay.

MR. DOCKERY:  And, Your Honor, the -- the big missing
piece here is that they provide no information whatsoever that
tells you what the agreement was between Carmark and the
pharmacies about the pricing of individual transactions.  They
talk about an aggregate, but there has to be some rule --

THE COURT:  Okay.

MR. DOCKERY:  -- for pricing the individual
transactions.  And whatever that rule is, you know, that would
be a comparator for an allegation of fraud, and there is
nothing in their complaint about that.

THE COURT:  Okay.

MR. DOCKERY:  And so that -- that's our argument
primarily.

THE COURT:  Here's -- thank you.

MR. DOCKERY:  Yes.

THE COURT:  I understand.  I want to get her to
respond and then I'll go back and then I'll go back and dig
into it on the papers.

What's generally the summary of your response and why
won't you agree to amend?

MS. THOMAS:  So, Your Honor, we did not choose to
amend because we do not believe that the hole that defense
counsel is pointing to is significant and as defense counsel
knows, we do not have access to those pharmacy contracts.  They
are uniquely --

THE COURT:  (Inaudible).

MS. THOMAS:  -- within the control of defendants.

THE COURT:  Okay.

MS. THOMAS:  What we do know --

THE COURT:  Even if we could amend we don't have the
information to amend.

MS. THOMAS:  We don't have that information.  We have
lots of information that we could add.  What we do know about,
you know, it is not true to say that we did not allege anything
about the nature of the pricing for the pharmacy.  We allege
that the pricing to the pharmacy was lower.

We allege that Carmark admitted that.

THE COURT:  Right.  And of course Wickbold Twombly don't require you to prove your case in your pleading with that kind of specificity.

MS. THOMAS:  Precisely, particularly when the information is in the exclusive -- exclusive control of the defendants.

Additionally, where I have talked about the notion that Carmark raised the transactional prices to Aetna we did allege that those increases had nothing to do with pharmacy price increases.  So at a minimum, there is specificity as to those increases for those particular drugs.

We did not attach the email to the complaint.  We referenced a particular email which I would be happy to hand up if Your Honor --

THE COURT:  Is it in your papers, your response papers?

MS. THOMAS:  It is pled in the complaint --

THE COURT:  Okay.

MS. THOMAS:  -- at Paragraph 114.  But the specifics --

THE COURT:  We'll -- we'll look at it.  If I have it we'll look at it.

MS. THOMAS:  Or you don't have it.

THE COURT:  Okay.

MS. THOMAS:  That -- that's my point.  We could obviously allege those specifics .

THE COURT:  Okay.

MS. THOMAS:  Carmark knows precisely what map list we're talking about, what drugs they were --

THE COURT:  Right.

MS. THOMAS:  -- what the increases were.  And indeed, I'm sure they would object if we attached it because we would be revealing price information, so at a minimum if we were to attach it it would be redacted.

THE COURT:  Yeah, then we'd be back to our first conversation.

MS. THOMAS:  But we don't think that's necessary in light of the overwhelming evidence, including Carmark's admission, that the pricing to the pharmacies was lower.  And in the course of discussions with Carmark, and this is alleged quite specifically in our complaint, Carmark stated repeatedly, well, Aetna, if we give you better prices, if you, you know, push us down on the prices we're giving you that's going to hurt our, Carmark's, bottom line.

Because of our contracting methodology with the pharmacy, if we lower our prices to you that's coming out of our pocket.  If the prices are being passed through from the pharmacies it doesn't come out of Carmark's pocket.  So that was also substantiation of the fact that Carmark -- that the

prices were lower.

Can we identify precisely what the prices were?  We cannot.  Can we identify --

THE COURT:  Because they have the information.

MS. THOMAS:  Correct.

THE COURT:  Mm-hm, okay.  Okay.

MS. THOMAS:  Can we say sufficiently that some of the prices must have been lower?  For sure.  If -- if you want to use Mr. Dockery's great analogy if the pharmacies ended up with a GPA of 4.0 and Aetna ended up with a GPA of 2.5, it may well be in geometry Aetna got a better grade than Rite-Aid, the pharmacy.  But overall, mathematically there have to be instances in order for the average GPA to be different.  There have to be instances where the pricing was lower on one side than the other.

And that more than meets the standard under Foglia (ph) where you don't have to, particularly when you're unable to, allege precise specifics as long as there is, we would say, an overwhelming inference of fraud and an overwhelming inference that at least some false claims were submitted.

And we believe the detailed information about the random increases in Aetna's MAC prices also provide specificity that we don't even need to have provided.  But if there is -- you know, Aetna -- Carmark said to Aetna, yes, we have negotiated better prices with the pharmacies on your behalf, so

don't trouble us with the fact that you think your prices are too high.

Like, we -- we know that your prices are high.  Your study doesn't help us get better prices from the pharmacies because we already have better prices from the pharmacies.  But we don't have to pass them on to you.

And the prices that were being passed to Aetna were the only prices being submitted to CMS.  So neither in the particular transaction prices where Carmark we contend could have calculated out the particular transaction price that it was paying the pharmacy, and we suspect that they did, in fact, do that internally.

But also the second component of price reporting is DIR, which is direct and indirect renumeration and it is intended as a trailing reconciliation in the event there are price factors that cannot be calculated initially on a transaction basis.  Those get reported in the aggregate at year-end through DIR.

Carmark contends that we didn't plead DIR in our complaint.  But we did.  We have more specificity about PDEs because, quite frankly, it's a little bit more complicated dealing with the aggregate guarantees and the transactional prices.

The DIR allegations, Your Honor, are actually fairly simple and straightforward.  The Part D participant is required

to report in the aggregate at year-end this trailing reconciliation, anything that is needed to make sure that the prices that were reported to Carmark are, indeed, the prices that were paid to the pharmacies.

There's little doubt even on the face of the complaint that they say doesn't raise DIR, if Carmark had reported the price differentials that we are talking about as DIR, there's no doubt that they would be telling Your Honor that. That they would be saying, hey, you know, the complaint's only talking about PDE, but we reported all that stuff through DIR. It -- there's not a problem because it was brought to CMS' attention.

The problem is that it was not, not in the initial reporting of transactional level prices and not in the aggregate DIR reporting. That is alleged in the complaint. What Carmark is apparently arguing is that because there is no verbiage in the regulations that expressly lists aggregate price guarantee, therefore that does not need to be reported.

But as is typically the case with regulations, Your Honor, the agency identifies a number of types of elements of prices that need to be reported and then they say, "and others like it." The definition for what needs to be reported is all price concessions, discounts. There's a whole list of them that exist between the PBM and the pharmacy.

It is true in that list it does not say aggregate

discount guarantees.  But it talks about discounts.  It talks about price concessions.  And those are exactly what we have alleged are at issue here.

So particularly on a motion to dismiss and in terms of giving notice to the defendants, we -- we believe that they were more than fairly put on -- put on notice by the specific references to DIR in the complaint at Paragraphs roughly 61 to 68.  We allege what DIR is.  We allege that CMS bases its payments on the amounts actually and ultimately received by the pharmacy, which could only be made clear both through the transactional --

THE COURT:  I'll go back.  I'll go back and -- and -- I'm going to go back and obviously study the complaint.

MS. THOMAS:  Okay.

THE COURT:  I have to stop now.  And I understand your position and I understand your position.  It was very helpful the whole time we spent together so thank you for your time.

MS. THOMAS:  Okay.  If I might, Your Honor, could I take one minute?  One simple matter I believe that is pending before Your Honor is -- is the entry of the stipulated confidentiality order.

THE COURT:  Okay.

MS. THOMAS:  We did come to an agreement --

THE COURT:  With --

MS. THOMAS:  -- with the defendants as to certain discovery that should take place.  Not Aetna, Carmark --

THE COURT:  Yeah, okay.

MS. THOMAS:  -- as to certain discovery that both sides have agreed can take place while the motion to dismiss is pending.

THE COURT:  Okay.

MS. THOMAS:  And quite frankly, it's simply waiting Your Honor's execution of the stipulated protective order that we submitted.

THE COURT:  I'll look at it today.

MS. THOMAS:  That would be awesome.

THE COURT:  Okay, done.

MS. THOMAS:  Thank you, Your Honor.

THE COURT:  Okay, thank you.

* * * * *

## C E R T I F I C A T I O N

We, ASC Services LLC, court approved transcribers, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of our ability.

Elizabeth Pennell

DATE:  May 13, 2019