IN THE UNITED STATES DISTRICT COURT FOR
THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,** *ex rel.* **SARAH  BEHNKE,**<br><br>**Plaintiff-Relator,**<br><br>**v.**<br><br>**CVS CAREMARK CORPORATION,** *et al.,*<br><br>**Defendants.** | **Civil Action No. 2:14-cv-00824 MSG** |

## JOINT STATUS REPORT

Pursuant to this Court's Order entered on January 4, 2021, Dkt. No. 131, the parties hereby jointly submit this status report regarding the status of discovery.  Positions of only one party are clearly identified as such.

**I.      Discovery Directed to Relator**

On October 23, 2020, Caremark served its First Set of RFPs to Relator.  Relator served objections and responses to the Requests on November 23, 2020, and produced 52 PDF files on December 31, 2020, including documents that Relator had obtained from Aetna and various employment-related documents from Aetna.  Additionally, Relator has provided to Caremark all documents she obtained pursuant to a subpoena served on non-party, Pharmaceutical Care Management Association (a PBM trade group).  Although Relator has outstanding subpoenas to many other entities, including pharmacy chains like Walgreens and Rite Aid, she has not received any documents in response to these requests.

Relator has complied with producing documents responsive to Caremark's First Set of

RFPs, with two limited exceptions. There are only two types of responsive documents that Relator has not produced.  Initially, Relator has not produced certain of the Aetna documents as to which Aetna, at some point and with varying degrees of specificity, has claimed privilege.  Relator has informed Caremark that she will produce any withheld documents if Caremark receives permission from Aetna for Relator to do so. Second, Relator had inadvertently remained in possession of a document that the government had obtained from non-parties during the course of its investigation. Relator and Caremark have been directed by the Department of Justice to consult with counsel for the non-party if Caremark wishes to pursue that discovery.  The document in question is a Caremark contract in any event.

## II.    Discovery Directed to Defendants

Pursuant to a Stipulation between the Parties, Caremark produced to Relator in May 2019 all documents Caremark had previously provided to the Government during the course of the Government's investigation related to this matter, in response to a CID that the Government issued on October 15, 2015.  As the Court has previously been informed, Caremark's production included 15,688 documents (inclusive of native data files) comprising 189,855 pages (counting native data files as each a single page).

On May 21, 2020, following the acquisition of Aetna by CVS Health, Relator served a First Request for the Production of Documents ("Relators First RFP") on Caremark.  As the Court has previously been informed, these requests were substantively identical to requests Relator had included in her August 2018 subpoena to Aetna, and Aetna is responding to that subpoena on its own behalf.

On September 4, 2020, Relator served a Second Request for Production of Documents ("Relator's Second RFP") on Caremark.  Caremark served responses and objections to Relator's Second RFP on October 7, 2020.  The parties subsequently exchanged correspondence and have

met and conferred regarding disputed objections, custodians, and search terms.  The parties have reached agreement as to nearly all custodians and search strings, and are continuing to meet and confer regarding portions of three search strings.  As of this status report, Defendants have made four productions in response to Relator's Second RFP totaling 39,740 documents (inclusive of native data files) and 271,131 pages (counting native data files as each a single page).[1]  Defendants will continue producing documents in response to Relator's Second RFP on a rolling basis.

On November 6, 2020, Relator served a Third Request for Production of Documents ("Relator's Third RFP") on Caremark.  Caremark served their responses and objections to Relator's Third RFP on December 2, 2020.  The parties subsequently exchanged correspondence and have met and conferred regarding Caremark's responses and objections.  On December 22, 2020, Caremark offered a proposal to resolve the parties' disputes regarding Relator's Third RFP.  Caremark stands ready to produce in accordance with that proposal if Relator confirms that it is sufficient to resolve the parties' disputes.

On December 31, 2020, Relator served a Fourth Request for Production of Documents ("Relator's Fourth RFP") on Caremark.  Caremark served responses and objections to Relator's Fourth RFP on February 1, 2021.  The parties met and conferred regarding Caremark's responses and objections on February 18, 2021.

On January 15, 2021, Relator served Caremark with Requests for Admission.  Caremark will serve responses and objections to on February 19, 2021.

---

[1] These figures include only documents Caremark has produced to Relator within the past three months specifically in response to Relator's requests.  Many of the documents previously produced during the Government investigation and reproduced to Relator in 2019 were also responsive to Relator's Second Request for Production.  In total, Caremark has produced to Relator more than 55,000 documents totaling more than 460,000 pages.

**Defendants' Additional Position:**

At the status conference on January 4, 2021, Caremark projected that it could substantially produce the documents on which the parties then had agreement by March 30, 2021.  Since that status conference, the parties' further negotiations regarding search terms have resulted in a 25 percent increase to the agreed universe of documents Caremark must review for production. Caremark has committed additional resources to the review process to account for that increase, and continues to expect that production of the documents on which the parties are currently agreed will be substantially complete as of March 30, 2021.

**Relator's Additional Position:**

In addition to ongoing negotiations about document productions, Relator has informed Caremark about the subject matters of a Rule 30(b)(6) deposition.  Relator has requested that Caremark begin responding with identification of its designated witnesses and with tentative dates.

With respect to Caremark's proposed responses to the Third RFP, Relator is willing to accept Caremark's proposed production but does not agree that, in exchange, she must outright waive any future ability to seek the documents that Caremark is not willing to produce.

Additionally, on December 31, 2020, as previously agreed, Caremark notified counsel about its intentions regarding assertion of reliance on advice of counsel.  Caremark stated that it does not presently intend to assert reliance on advice of counsel as an affirmative defense.  Relator has followed up for assurances that this representation is not limited to "affirmative defenses," but rather is a representation that Caremark will not be asserting reliance on advice of counsel with respect to any issue in the case.  Caremark has not responded to these requests for clarification.

III.     **Relator's Issues Regarding Defendants' and Related Entities'[2] Discovery Responses**

*Relator's Position*:

Because there is some overlap among Relator's various RFPs, as well as information that could be obtained either from Caremark or one of the related parties (SilverScript, Aetna or CVS Pharmacy), and the current issues are not neatly categorized by a particular discovery request, Relator will address the overall issues that she is bringing to the Court's attention at this time.

A.     Limitation of certain discovery to only Rite Aid and Walgreens

*Relator's Position*:

Although Caremark is considering agreeing to search terms that extend beyond Walgreens and Rite Aid for certain document requests and it has confirmed that it will produce claims data for Aetna and SilverScript Medicare Part D beneficiaries for all pharmacies, not just Rite Aid and Walgreens, it is refusing to produce pharmacy reconciliations from other pharmacies, including, but not limited to, its wholly-owned pharmacy chain, CVS. Additionally, Caremark is refusing to produce any claims adjudication data for commercial claims, although Relator understands that such data is readily producible even though voluminous. Relator's allegations encompass prescription drug claims dispensed by any pharmacies with which Caremark (as a PBM) had pharmacy discount price terms akin to those described in the Complaint that allowed Caremark to allegedly hide a spread from CMS. The pharmacy reconciliations and combined Medicare Part D and commercial claims adjudication data illustrate and quantify the mechanics of the fraudulent scheme that Relator alleges. It is either (or both) the reconciliation documents or the underlying Medicare Part D *and* commercial claims adjudication documentation that will reveal the alleged misconduct.

---

[2] Relator has served Rule 45 subpoenas on CVS Pharmacy, Aetna, and SilverScript, which are corporate affiliates of Caremark, but are not parties to this case.

Caremark uses different terms to describe similar pricing arrangements with different pharmacies, as shown in documents where there are references to a CAP rate, an AWP Effective Rate guarantee or a GER Cap.  Additionally, it appears that GERs or CAPs are sometimes spelled out only in attachments or addenda to the contract documents. For example, the clearest delineation of Caremark's GER with Rite Aid shows up in a document called a Network Reimbursement Addendum, *which was not produced by Caremark to the government or to Relator*[3] but was produced by Rite Aid in response to a subpoena from OIG in connection with the government's investigation.  Relator is aware that there are GERs or CAPs in place with pharmacies other than Rite Aid (RAD) and Walgreens (WAG), from documents *specifically listing CVS Pharmacy* and sometimes referencing particular other pharmacies or even "all other pharmacies."  Further, from Relator's own knowledge, when Aetna began direct contracting with pharmacies following the Aetna-Caremark dispute, Aetna was able to procure substantially more favorable prices from CVS Pharmacy (and pass them through to CMS), suggesting that Caremark had similarly favorable price terms with CVS that were not being passed through to CMS.  Caremark's insistence that Relator identify specific contractual provisions is unfair, since Relator has no ability to ascertain what other documents or related party agreements between Caremark and CVS Pharmacy, for example, could address price terms.  Again, there are multiple documents in the productions that *directly refer* to WAG/RAD/CVS CAPs.

**Defendants' Position**:

Relator's contention that Caremark has refused to provide claims adjudication data for pharmacies other than RiteAid and Walgreens is simply inaccurate; Caremark has agreed to

---

[3]   Caremark has recently confirmed that the document in question had not, in fact, been produced previously.

produce claims data for Aetna and SilverScript Medicare Part D beneficiaries for <u>all</u> pharmacies, not just RiteAid and Walgreens.

Caremark is producing reconciliations only for RiteAid and Walgreens because those are the two retail pharmacies that contracted with Caremark for GER guarantees applicable to Medicare Part D prescriptions during the agreed discovery time period.  Contrary to Relator's speculation, this is not a matter of whether contractual provisions are "precisely-enumerated" as GER guarantees, or whether contractual provisions appear in an addendum versus a supplement. Relator hasn't identified *any* contract provision for any other pharmacy that is functionally equivalent to a GER guarantee, despite having access to the same contract files that the Government obtained during its investigation (including contracts for CVS and a number of other pharmacies).  Relator notes that through the Government she even had access to documents beyond those produced by Caremark, including a RiteAid document that Caremark inadvertently omitted from its own production.  But RiteAid of course is one of the pharmacies for which Caremark has *agreed* to produce reconciliations.

To the extent Caremark has not responded to all of Relator's arguments, that is because Relator continued to add new (and argumentative) language in each successive draft provided to Defendants.  For example, Relator added her arguments regarding commercial claims data at 2:30 p.m. on the afternoon this report was due, and her position on that issue contained arguments that were not made during the parties' meet-and-confer about that topic.[4]  Caremark does not believe it is appropriate (for either party) to attempt to raise unripe discovery disputes through iterative

---

[4] Caremark disagrees that claims adjudication data for beneficiaries of commercial plans—i.e., beneficiaries not covered by *any* Medicare Part D Plan—is relevant at all.  Caremark also notes that Relator's assumption that claims adjudication data for all commercial claims, over a six-year time period, is "readily producible even though voluminous" is completely wrong.  Such a production would require an enormous amount of bandwidth and time simply to perform the extraction itself, let alone the necessary quality control checks before the data can be produced.

revisions of a joint status report, but is prepared to thoroughly address these and any other issues

via the meet-and-confer process, and (if necessary) in the context of the discovery briefing

procedure established by the Court.

        B.      <u>Productions of complete contract documents</u>

***Relator's Position:***

As noted above, there are parts of pharmacy contracts that have not been produced, despite

having been clearly requested.  More specifically, it is apparent that agreements between Caremark

and pharmacies may include, among other documents, the agreements themselves, Network

Enrollment Forms, amendments, Provider Manuals, Network Reimbursement Addenda and

addenda to the provider agreements.  Similarly, Caremark's contracts with its Part D plan clients

are often in multiple parts, with attachments, schedules and amendments, and Relator seeks

assurances that all contracts required to have been produced have been produced in their entirety.

***Defendants' Position:***

Caremark has reviewed its production and agrees with Relator that three RiteAid addenda

were inadvertently omitted from the production.  We regret that mistake, and have rectified it by

producing the documents (although Relator already had access to some or all through the

Government's independent investigation).  Notably, however, our mistake did not prevent Relator

from learning about the GER guarantee RiteAid had contracted for, in part because Caremark has

made known from the outset that the RiteAid contract contained such a provision.

With respect to the issue of contracts more generally, Relator notes that contracts can consist

of a variety of different documents.  Caremark agrees, and has produced a variety of such

documents; as just one example, Caremark has produced pharmacy network enrollment forms for

the networks utilized by Aetna and SilverScript Medicare Part D plans.  Relator has not explained

why Provider Manuals would be relevant to the case, but Caremark is willing to produce them to

avoid unnecessary dispute.  Caremark will also review the pharmacy contract files it produced to confirm they contain all amendments, addenda, network reimbursement addenda, or the like that could have been applicable to prescriptions dispensed to Aetna and SilverScript Part D beneficiaries.  Caremark will do the same for Caremark's pharmacy benefit management contracts with Aetna and SilverScript.

      C.     <u>Information about document sources</u>

***Relator's Position:***

The Parties' Order Regarding The Search For And Production Of Discovery Material ("ESI Protocol") (ECF 100) provides that the parties would discuss, and the producing party would identify, appropriate custodial and non-custodial data sources.  The ESI Protocol specifically provides in Section C.1(a) for the producing party within 14 days after service of document requests to provide "a list of the sources of data that the Producing Party intends to search for responsive ESI." Caremark has not agreed to identify non-custodial sources or to specify and make the non-custodial and custodial sources clear to Relator.  From the productions to date, Relator has identified a number of shared drives, network drives or other non-custodial repositories of documents that appear to exist, but Caremark has only been willing to "ask appropriate custodians" if they maintained documents anywhere other than their email files. With respect to Caremark's comments below, Relator's identification of shared drives was to identify them as potentially relevant sources of documents, but Relator has never requested that Caremark or Aetna produce or review all documents contained therein. Relator's requests for information about non-custodial data sources have been denied, contrary to the ESI Protocol, and Relator is still unaware of potential non-custodial data sources.  Further, Caremark has persisted in a number of burdensomeness objections, which Relator cannot probe without information about the identification of non-custodial sources of documents. For one example, although Caremark agreed to provide the instant messaging

program used by Caremark in support of counsel's assertion that the technology used does not generate a record of the instant message unless it was saved to email, no information has been provided.

   ***Defendants' Position***:

   On October 15, 2020, and October 23, 2020, Caremark's counsel met and conferred with Relator's counsel as required by the ESI Protocol, and have followed up on those discussions in subsequent meet & confer calls and correspondence. Caremark's counsel have never taken the position that "only email files of agreed-upon custodians will be searched for responsive documents." Although Caremark does believe that *most* of the responsive material in this case will be identified and produced via e-mail searches, Caremark has also confirmed that it will produce from sources other than e-mail that are likely to contain responsive material (including but not limited to shared drives). Caremark has already made productions from such sources and will continue to do so; the same is true for non-party Aetna.

   Indeed, Relator contends that they have already been able to identify "shared drives, network drives or other non-custodial repositories of documents that appear to exist" based on productions made to date. Caremark and Aetna are willing to meet and confer with Relator regarding any such locations Relator wishes to discuss, but reserve the right to object if Relator's requests are overbroad or disproportionate to the needs of the case (e.g., a request by Relator that Aetna consider pulling all share drives associated with three entire department teams within Aetna (Part D Actuarial, Part D Business Team and Pharmacy Finance)).[5]

---

[5] As noted in the last section also, Relator inappropriately added new (and argumentative) language to their position above after Defendants provided this response language for this portion of the joint report.

D.    Possible additional issues

***Relator's Position:***

There are several areas where Relator has agreed, without prejudice, to certain limitations in order to have discovery proceed expeditiously.  These include the time period for discovery, which Relator has agreed can be limited for present purposes to an end date of 12/31/2016 (and earlier for much of the Aetna discovery).  Depending upon what discovery shows in terms of the continuing nature of the alleged fraud, however, Relator has reserved her right to seek a later end period for discovery.  Additionally, the parties have not reached any resolution about discovery that Relator has sought regarding other Part D plans that Caremark serviced as a PBM that appear to have raised some similar concerns as those at issue in the action.

***Defendants' Position***:

Caremark objected to the time period Relator asserted in her discovery requests.  During the meet & confer process, the parties offered proposals and counterproposals on this issue, and ultimately compromised on the time period that currently governs discovery.  There is no current dispute on this subject, so it is unclear why Relator raises it.  Relator asserts that she "reserved her rights" to abandon the parties' compromise position and seek a later end to discovery; should Relator do so in the future, Caremark has reserved its objection that a proper time period would have been even shorter than the agreed-upon compromise time period.  Caremark also has objected to Relator's efforts to expand the scope of discovery to Part D Plans beyond those that are the subject of the Second Amended Complaint; Caremark believes that objection is well-founded and stands on it.

## IV.    OTHER NON-PARTY DISCOVERY

Relator has subpoenaed documents from various pharmacies, notices of which were timely provided to Caremark.  Relator has not yet received any documents from any of those parties.

***Relator's Additional Position Relating to Discovery from CMS:***

As the Court is aware, Relator alleges that Caremark submitted or caused to be submitted false pricing information to CMS for Medicare Part D beneficiaries.  In an effort to avoid burdening the government with requests for data that Relator believes is fully available from Caremark, Relator has sought such data from Caremark through both her Second and Fourth RFPs, the latter of which was served on December 31, 2020. Those requests are outstanding and are the subject of ongoing meet and confer efforts.   Due to the short discovery period and awareness that procuring data from CMS can be a lengthy endeavor, however, Relator believed she needed to start the process with CMS.   Relator attempted to work with Caremark before subpoenaing CMS to either get agreement by Caremark to produce the data or to have Caremark indicate anything that it could not provide. Relator's efforts to discuss the scope of the subpoena or even the necessity *vel non* for the subpoena were unavailing, however, since Caremark chose not to acknowledge or respond to the request for consultation.  As a result, on January 28, 2021, Relator served a document subpoena on CMS requesting certain Medicare Part D data and served a notice by email on Caremark on that date.  On February 17, CMS responded and objected in part to the subpoena stating that it creates "an inappropriate and undue burden on CMS" because, inter alia, it seeks "a large amount of data which is available from the defendant in the case."

***Defendants' Additional Position***:

Caremark disagrees with Relator's characterization of the parties' discussions about discovery from CMS.  On December 22, 2020, the parties met and conferred regarding potential coordination of discovery requests to CMS.  During that call, Relator's counsel acknowledged that Relator had not yet served any RFPs relating to damages.  Relator first did so on December 31, 2020, in her Fourth Set of RFPs to Caremark.  On January 20, 2021, Relator sent Caremark a draft subpoena to CMS requesting eight different types of Medicare Part D data and reports, many of

which Relator had requested for the first time in her Fourth Set of RFPs.  Caremark's responses to those RFPs, which identified the data and documents in Caremark's possession, were due on February 1.  But instead of waiting to review Caremark's responses, which could have obviated some of her requests to CMS, Relator served her subpoena to CMS on January 28.  Caremark does not challenge the propriety of Relator's decisions regarding when to serve the Fourth Set of RFPs on Caremark and when to serve a subpoena on CMS, but objects to any insinuation that Caremark is somehow to blame for Relator's decisions and timing.

BERGER  MONTAGUE, P.C.

/s_____
Susan Schneider Thomas (PA 32799)
Joy P. Clairmont (PA 82775)
1818 Market St, Suite 3600
Philadelphia, PA 19103
Telephone: (215)875-5711
Email: sthomas@bm.net

Natalie Finkelman Bennett
Heidi Wendel
Bruce Parke
Michael Ols
SHEPHERD, FINKELMAN MILLER &
SHAH, LLP
1845 Walnut Street, Suite 806
Philadelphia, PA 19103
Telephone: (610) 891-9880
Facsimile: (866) 300-7367
E-mail: nfinkelman@sfmslaw.com
           hwendel@sfmslaw.com
           bparke@sfmslaw.com
           mols@sfmslaw.com

James E. Miller
SHEPHERD, FINKELMAN, MILLER &
SHAH, LLP
65 Main Street
Chester, CT 06412
Telephone: (860) 526-1100
Facsimile: (866) 300-7367
Email:  jmiller@sfmslaw.com

*Counsel for Relator*

Dated:  February 19, 2021

WILLIAMS & CONNOLLY LLP

/s_____
Enu Mainigi (*pro hac vice*)
Craig D. Singer (PA 71394)
Holly M. Conley (*pro hac vice*)
Daniel M. Dockery (*pro hac vice*)
David J. Park (*pro hac vice*)
725 Twelfth Street, N.W.
Washington, DC 20005
Telephone: (202) 434-5000
Facsimile: (202) 434-5029
E-mail: emainigi@wc.com
           csinger@wc.com
           hconley@wc.com
           ddockery@wc.com
           dpark@wc.com

*Counsel for Defendants*