UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

```
SARAH BEHNKE HILL                 :
UNITED STATES OF AMERICA, EX REL. : Case No. 14-cv-824
                                  :
                    Plaintiffs,   : U.S. District Court
                                  : ED of PA
          vs.                     : 601 Market Street
                                  : Philadelphia, PA  19106
CVS CAREMARK CORPORATION, ET AL., :
                                  :
                    Defendants.   : April 26, 2021
                                  : 12:58 p.m.
. . . . . . . . . . . . . . . . . :
```

TRANSCRIPT OF TELEPHONIC DISCOVERY HEARING
BEFORE THE HONORABLE MITCHELL S. GOLDBERG
UNITED STATES DISTRICT JUDGE

<u>APPEARANCES</u>:

For Plaintiffs:                   SUSAN SCHNEIDER THOMAS, ESQ.
                                  JOY P. CLAIRMONT, ESQ.
                                  BERGER MONTAGUE
                                  1818 Market Street, Suite 3600
                                  Philadelphia, PA 19103
                                  sthomas@bm.net
                                  jclairmont@bm.net
                                  (215) 875-3000

                                  JAYNE A. GOLDSTEIN, ESQ.
                                  MILLER SHAH, LLP
                                  1845 Walnut Street, Suite 806
                                  Philadelphia, PA  19103
                                  jagoldstein@millershah.com

<u>APPEARANCES</u>: (Continued)

For the Defendants:              DANIEL M. DOCKERY, ESQ.
                                 HOLLY M. CONLEY, ESQ.
                                 CRAIG D. SINGER, ESQ.
                                 WILLIAMS & CONNOLLY, LLP
                                 725 12th Street NW
                                 Ed Bennett Williams Building
                                 Washington, DC  20005
                                 ddockery@wc.com
                                 hconley@wc.com
                                 csinger@wc.com
                                 (202) 434-5698

Court Recorder:                  Carl Hauger

Transcription Service:           Weber Reporting Corporation
                                 (970) 405-3643

```
 1              THE COURT:  Who is on the phone for the Realtor?

 2              MS. THOMAS:  Susan Thomas, Your Honor, with my

 3   partner, Joy Clairmont, and my colleague, Jane Goldstein.

 4              THE COURT:  Good afternoon.

 5              And who is on the phone for the Defendant?

 6              MR. DOCKERY:  Good afternoon, Your Honor.  This is

 7   Dan Dockery of Williams & Connolly.  And also with me on the

 8   line is my colleague, Holly Conley.

 9              THE COURT:  Hi.

10              MR. SINGER:  Craig Singer.  I'm also on for CVS, the

11   Defendant.

12              THE COURT:  Okay.  So if you're not talking, could

13   you mute, please.  There's some background noise.  There you

14   go.  No.  Still there.  All right, that's better, I guess.

15              All right.  So understanding the discovery disputes

16   in this case -- let me go back even further.  My impression

17   thus far is that everyone's being reasonable and working

18   together, and I don't have any sense whatsoever that there's

19   any games being played or some bad faith discovery vexatious

20   things going on, stuff that judges hate, and I used to hate

21   when I was practicing civil law.  So I'm not -- there's not in

22   the column of complaint at all.

23              But understanding discovery disputes in this case is

24   very time consuming because I find, full transparency, I find

25   understanding the Realtor's cause of action and understanding
```

1    the layers of payment and repayment and who covers what and who

2    gets reimbursement here and how that all works, vis-a-vis the

3    Medicaid program and Caremark's place in all of that, it's

4    complicated.

5         So it's a big investment of time for me, and every

6    time I understand the scheme, unfortunately, for my law clerk,

7    she has to re-explain it to me, then she has to learn it first

8    so.  She's has to relearn it, then she has to explain it to me,

9    and I have to read up on a lot of stuff.

10         So all that is to say my overview of the most recent

11    letters is that, and this is a very superficial overview, is

12    that there is the discussion as to whether the disclosures as

13    it relates to Walgreens and Rite Aid, is really a closed

14    discussion because there's an agreement that the discovery has

15    been complied with and that the Realtor keeps pressing to say

16    there's more information from other entities other than

17    Walgreens and Rite Aid that fit into the fraudulent scheme

18    which we're entitled to.

19         And that I said through an order, okay, fair enough,

20    show me documents that show that, and I'll consider ordering

21    further discovery on the part of Caremark.  And that's sort of

22    where we are now, as I understand it, through the reading of

23    the letters and here I'm really going to get superficial.

24         Is that a compromise for more information was

25    proposed by Defendant Caremark and that compromise, in theory,

1   has been accepted by the Realtor and if that's the case, I

2   would very much prefer not to spend a lot of energy getting

3   into it and just say sounds good to me, you know, I bluffed

4   that.  I'm happy to do that, but I would much rather -- I would

5   much prefer if there's a compromise that's been reached, try

6   the compromise, and I'm saying this to Ms. Thomas -- Schneider

7   Thomas, go ahead with the compromise, see if it's in your view

8   then compliant with what you think you're entitled to under the

9   discovery rules and if it is, my services are not needed.

10          If it is not compliant after you review the

11   compromise information, then come back and see me.  I've been

12   pretty available to you folks.  I would prefer to go that

13   route.  So, Ms. Schneider, is that acceptable, or am I -- did I

14   -- I said a lot, feel free to comment on anything I've said.

15          MS. SCHNEIDER THOMAS:  Okay.  Thank you, Your Honor.

16          We do appreciate your willingness to allow us to come

17   back if this production is not sufficient.  And as we laid out

18   in our letter, we have a number of reasons to have significant

19   skepticism.  I suppose the one thing that I most took issue

20   with of what you said was the notion that there has been an

21   agreement that production is completed as to Walgreens and Rite

22   Aid, and that is not at all the case, Your Honor.

23          The instant dispute not only concerns the fact that

24   CVS pharmacy was largely cut out from the production, but also

25   the insufficiency of the production with respect to Walgreens

 1  and Rite Aid.  Some of that pertains to data, some of which is,

 2  we believe, yet to be produced.  But some of it pertains to

 3  more the manner in which Caremark set and managed the prices to

 4  Walgreens and Rite Aid.  And we believe that the productions

 5  there have been sorely deficient.

 6          For example, this offer of these budget files really

 7  took us aback because we have been trying for months now to get

 8  some clarity from Caremark about what type of share files and

 9  group document repositories exists where there could be

10  relevant documents, and this has never --

11          THE COURT:  Ms. Schneider, in order -- I promise you,

12  I'm happy to do this.  In order to take the four steps into the

13  weeds that you're now, you're on step two maybe, in my mind

14  you're in step four, I'm going to -- if we're going to have a

15  full blown discovery conference, it's going to start with you

16  reviewing and making sure I fully understand your cause of

17  action.

18          So it's either let's do that, which I'm fine to do,

19  or it's, Judge, I am willing to try the compromise offered by

20  Caremark with the understanding that I can always knock on your

21  door if the compromise doesn't work.  So pick one or the other;

22  what do you want to do?

23          MS. SCHNEIDER THOMAS:  I guess what I'm saying with

24  all due respect, Your Honor, is that I'm not sure there is as

25  clear a choice as you're saying because we still feel that the

 1    production for Rite Aid and Walgreens has not been sufficient.

 2    Now we can take the time, look at what they're proposing and as

 3    long as it's clear that we still retain our rights to come back

 4    to you on Rite Aid and Walgreens, as well as CVS.

 5              THE COURT:  You always -- if the discovery in the

 6    case is deficient, and you can convince me of that, and

 7    everyone's working to get to the point where discovery is

 8    compliant, you don't have to thank me for coming back to me,

 9    and you can always knock on my door.  That's my job.  So it's

10    okay.  All I'm asking is, do you want to get into this now, or

11    do you want to explore their compromise?

12              MS. SCHNEIDER THOMAS:  If you're willing --

13              THE COURT:  I'll make the decision.  Let's get into

14    it now.  Okay.  I got you on the phone, let's do it.

15              So I think I am pretty sure that I have a good handle

16    on your cause of action, but without giving me like a half hour

17    opening statement, explain to me your theory of the case

18    succinctly as you can.

19              MS. SCHNEIDER THOMAS:  Okay, Your Honor.  Thank you.

20              The case turns on whether or not Caremark as a PBM

21    accurately reported the prices that it paid to pharmacies for

22    Med D claims through the Part D plans, Aetna and SilverScript.

23    The payment process takes place at two levels, essentially a

24    point of sale, which is called PDE in the lingo, prescription

25    drug event, and then also a trailing reconciliation called DIR,

1    direct and indirect remuneration.

2         In order for us to have visibility into the prices

3    that Caremark actually paid the pharmacies, we need to see,

4    first of all, what they purport to have paid at point of sale

5    and then the DIR is meant to cover adjustments and

6    reconciliations and other compromises as to price that may have

7    taken place after the point of sale.

8         THE COURT:  And two of the pharmacies are Walgreens

9    and Rite Aid, correct?

10        MS. SCHNEIDER THOMAS:  That is correct, Your Honor.

11        THE COURT:  All right.  So take me through -- it's

12   easiest for me to understand is I am a insured of Aetna and I'm

13   at the pharmacy counter and take me through and explain to me

14   how Caremark is involved in that?

15        MS. SCHNEIDER THOMAS:  Okay.  So Joe Sr. goes up to

16   Rite Aid as a Medicare Part D beneficiary and submits a

17   prescription from his doctor for a generic drug, and Rite Aid,

18   the pharmacy, is on a data platform with Caremark, the PBM,

19   that allows Rite Aid to enter this prescription to see whether

20   Joe Sr. is really entitled to Med D, to see whether there is a

21   co-pay, to see whether he's in the donut hole, to see all kinds

22   of things that are managed by Caremark the PBM.

23        Caremark stands between say SilverScript, a part D

24   plan, and Rite Aid, the pharmacy, essentially as the middle

25   man.  And so rather than SilverScript who provides the

 1   insurance to Joe Sr. doing all that --

 2           THE COURT:  I thought Joe Sr.'s insurance company was

 3   Aetna.

 4           MS. SCHNEIDER THOMAS:  Well it could be either, Your

 5   Honor.  It doesn't matter.

 6           THE COURT:  Keep it simple.  Don't make other

 7   entities -- it's Aetna.  I just want to understand the process.

 8   So Joe Sr. goes to Rite Aid --

 9           MS. SCHNEIDER THOMAS:  Okay.  Before you --

10           THE COURT:  You've got to let me ask my questions.

11   Joe Sr. goes to Rite Aid, hi, I'm an Aetna insured and here's

12    -- I need to pick up my prescription, and Rite Aid goes into

13   some data bank that Caremark manages and Caremark figures out

14   what kind of co-pay and what Medicare is going to pay and what

15   Aetna's going to pay, right?

16           MS. SCHNEIDER THOMAS:  Correct.

17           THE COURT:  Okay.  And so the fraud occurs, as I

18   understand it, in that Caremark is manipulating the numbers in

19   what way?

20           MS. SCHNEIDER THOMAS:  So Caremark and if Your Honor

21   would indulge me and look at page 12 of our appendix, or I'm

22   sorry, page 9 of our appendix, Caremark has an agreement with

23   Rite Aid for all of the business for which Caremark, you know,

24   is helping to facilitate claims on behalf of commercial

25   insurers, on behalf of Med D insurers, so it's on behalf of

1   Aetna Med D, it's on behalf of SilverScript Med D, it's on

2   behalf of multiple commercial insurers.

3          Caremark has a contract with Rite Aid and as you'll

4   see on page 9, Caremark has an overall generic effective rate

5   and what that means that is a discount off of AWP, AWP

6   essentially being the list price for pharmaceutical products.

7          As you'll see in that slide, the discount that had

8   been negotiated between Caremark and Rite Aid was 77.1 percent

9   off of AWP.  And what that means is that on average, Caremark

10  was going to pay Rite Aid, whether it was Med D insureds or

11  commercial insureds, SilverScript or Blue Cross, it doesn't

12  matter, Caremark was going to pay Rite Aid at the rate of

13  $22.90 on average.  That's hypothesizing a $100 AWP drug.

14         I find it easier sometimes to think about what

15  they're paying instead of the discount rate because it helps

16  explain the extent of the differential.  But as you'll see on

17  that page 9, and I do apologize, Your Honor, this isn't like

18  going on with the beneficiary who's standing there, but this is

19  what's driving the prices that show up when Rite Aid goes into

20  that database to figure out what the cost of the drug is going

21  to be.

22         So the fraud is that Caremark specifically and

23  deliberately has this global GER with Rite Aid the

24  pharmacy --

25              THE COURT:  Please don't use acronyms.

1          MS. SCHNEIDER THOMAS:  Okay.  Has a global discount

2     rate, the generic effective rate, and that is the first column

3     of this chart that you're looking at, that says that Caremark

4     will pay to Rite Aid for all the drugs that Rite Aid dispenses

5     to beneficiaries of any types of plans for which Caremark is

6     the PBM, so they will pay Rite Aid at the rate of AWP minus

7     77.1.

8          But Caremark refines that.  It's not of any

9     particular significance to Rite Aid, but Caremark actually

10    plans, and that's why this is an update on network strategy,

11    that it will pay Rite Aid for Med D claims at a discount rate

12    of AWP minus 75.8 percent.

13         In other words, it will pay Rite Aid $24.20 on

14    average for that hundred dollar drug.  It will pay Rite Aid on

15    commercial claims $22.10.  So Caremark is choosing to pay Rite

16    Aid in the aggregate different amounts, higher for Med D, than

17    it is going to pay Rite Aid for commercial, you know, clients,

18    you know, patients that show up.  So that is the gist of the

19    fraud.

20         THE COURT:  Why is that fraudulent?

21         MS. SCHNEIDER THOMAS:  Because the price that gets

22    reported to CMS is only the $24.20 that Caremark is ostensibly

23    paying Rite Aid for Med D claims, but at the end of the year,

24    and if you -- again, if you would indulge me and look to page

25    13 of the power point, at the end of the year, Caremark will

1    have -- and these numbers are slightly different because these

2    are actual numbers from 2014.  Caremark will have paid Rite Aid

3    for Medicare claims, $22.40, it will have paid Rite Aid for

4    commercial or non Medicare claims, $18, but if you look in

5    column D, the effective discount rate, the actual discount

6    rate, was the same across Medicare and non-Medicare.

7            And at the end of the year, Caremark just screws up

8    with Rite Aid so that it ends up paying Rite Aid at that 80.4

9    percent discount rate.  So it doesn't really pay Rite Aid the

10   amount that it purports to pay at point of sale on the CMS, you

11   know, on the Med D claim, but the only price that it reports

12   through to CMS is that price.  Caremark does not allow --

13   Caremark does not itself report and it does not allow the plans

14   to report because the plans don't even have this information.

15           The fact that there is this true up with the pharmacy

16   such that that price that was paid initially is either -- can

17   be looked at as a sham price at the beginning or --

18           THE COURT:  Who's the victim?  Who's the victim?

19           MS. SCHNEIDER THOMAS:  CMS.

20           THE COURT:  The Government entity?

21           MS. SCHNEIDER THOMAS:  So in 2010 --

22           THE COURT:  CMS.  Please don't use acronyms.

23           MS. SCHNEIDER THOMAS:  I'm sorry.  The Center for

24   Medicare and Medicare Services that runs Part D.

25           THE COURT:  All right.  So say it -- I feel like it's

1   a Socratic method.  I apologize.  Say it -- say the fraud

2   without giving me all the acronyms and all of the numbers.  The

3   fraud is perpetuated -- I'll give it a shot and you can tell me

4   if I've got it.

5          The fraud is perpetuated by Caremark who manages this

6   whole system and the system is the insured, the senior insured,

7   the pharmacy and then the insurance company for the insured and

8   the Medicare system.  Caremark is in that whole chain, they're

9   a manager, and what they do is, they represent one percentage

10   of payment to the pharmacy here, Rite Aid, so that -- which is

11   not accurate so that they can collect more from Medicare who is

12   the victim, is that close?

13          MS. SCHNEIDER THOMAS:  That is absolutely correct,

14   Your Honor.  There's another step to it, but as far as you went

15   that is absolutely correct.

16          THE COURT:  One step at a time.  So I have another

17   question then.  So you've alleged that they've done that with

18   Rite Aid and you've alleged that they've done that with

19   Walgreens.

20          And as I understand this discovery dispute here, you

21   want to -- or one of the discovery disputes, you requested, and

22   I do know that Defense counsel is on the line so I haven't

23   forgotten you, you've requested a lot of information about

24   those two entities, that is Walgreens and Rite Aid, you've

25   received, according to Defense counsel, millions of documents,

 1  and they've done a good job explaining how much effort they've
 2  put into this, and as I understand the latest dispute, you are
 3  now saying it's just -- it's not just -- this fraud is not just
 4  Walgreens and Rite Aid, it's other pharmacies to which I said
 5  -- to which Defendant said, there's no proof of that, we don't
 6  do business with other entities.  To which I said, okay, unless
 7  and until you can show me, you Plaintiff's counsel, can show me
 8  that you do business, that Caremark, I'm sorry, does business
 9  with other entities, I'm not going to force them to produce
10  documents.  I thought that's where we were.  No?
11          MS. SCHNEIDER THOMAS:  That -- Your Honor, that is
12  close to where we are except first, we did not allege this
13  fraud just as to Rite Aid and Walgreens.  There is no
14  limitation to just several pharmacies in our claim.
15          THE COURT:  Okay.  That's fine.  Show me then a
16  document that proves to me that there is the type of fraudulent
17  scheme that you've just described with an entity other than
18  Rite Aid and Walgreens, such that I would force Caremark to go
19  in and produce documents.  And that proof has to be, in my view
20  presently, as you've explained and you've said, there's a
21  contractual business relationship between Caremark and Rite Aid
22  and Caremark and Walgreens and Defendants have said she's
23  right, Judge, and that's why we're being so compliant.  Show me
24  where there are other business relationships like that.
25          MS. SCHNEIDER THOMAS:  Okay.  Happy to, Your Honor.

```
 1   So pages 1 through 9 of our appendix --

 2          THE COURT:  Okay.

 3          MS. SCHNEIDER THOMAS:  -- all of which are Caremark's

 4   documents, all of which refer to the fact that Caremark in its

 5   own terminology --

 6          THE COURT:  All right.  Well take me through it

 7   and --

 8          MS. SCHNEIDER THOMAS:  Okay.

 9          THE COURT:  You know, I mean 1 through 9, a lot of

10   information.  Point out, give me specifics.  Go ahead.

11          MS. SCHNEIDER THOMAS:  Okay.  So on page 1, Your

12   Honor, this is an email from Brian Janusik (phonetic) at

13   Caremark, he is the head of the industry analytics group, which

14   by the way is the group who's share file they are now belated

15   offering to us, and he is explaining how these GER, the generic

16   effective rate caps that we've just been talking about, he's

17   explaining how they work.  And it says point blank, Caremark's

18   documents, Caremark's language, caps, who has them and in what

19   networks.  I'm hoping your set shows the highlighting but it's

20   like just about where it starts to indent.

21          THE COURT:  It does.

22          MS. SCHNEIDER THOMAS:  Okay.  And it says CVS,

23   meaning CVS pharmacy --

24          THE COURT:  Okay.

25          MS. SCHNEIDER THOMAS:  RAD, Rite Aid, and WAG,
```

```
 1   Walgreens, have caps in all our networks.  A network is a
 2   collection of pharmacies with which the PBM has contracted on
 3   behalf of a Med D or commercial plan.  So any time you see
 4   networks, they're talking about pharmacies.
 5              THE COURT:  All right.  Small point of confusion on
 6   my part.  Isn't Caremark part of CVS?
 7              MS. SCHNEIDER THOMAS:  I think it's the other way
 8   around.  At least the way we use the word Caremark, Caremark is
 9   the PBM, CVS is the pharmacy and then there is an entity that's
10   above them all.
11              THE COURT:  All right.  And what's RAD?
12              MS. SCHNEIDER THOMAS:  RAD is Rite-Aid.
13              THE COURT:  And WAG is Walgreens?
14              MS. SCHNEIDER THOMAS:  Correct.
15              THE COURT:  So CVS is part of your client and we have
16   Rite Aid and Walgreens, and my question was show me an
17   additional entity; where's the additional entity?
18              MS. SCHNEIDER THOMAS:  CVS, Your Honor.
19              THE COURT:  That's you.  I thought you said --
20              MS. SCHNEIDER THOMAS:  Caremark --
21              THE COURT:  I thought you just said that that's your
22   client?
23              MS. SCHNEIDER THOMAS:  No sir, that's Defendant's
24   client.
25              THE COURT:  That's what I meant.
```

```
 1                    MS. SCHNEIDER THOMAS:  Okay.

 2                    THE COURT:  I'm sorry.  That's what I meant.

 3                    MS. SCHNEIDER THOMAS:  Caremark -- I mean it's kind

 4     of not our fault that Caremark owns one of the biggest pharmacy

 5     chains, but what we allege and what these documents demonstrate

 6     is that Caremark, perhaps not surprisingly, was committing this

 7     same fraudulent behavior through its own pharmacy, CVS.  In

 8     other words, it was overpaying on Med D claims and then not

 9     accurately reporting to the Centers for Medicare, Medicaid

10     Services, MMS.

11                    THE COURT:  All right.  Let me ask you a couple

12     questions again.  So your view, and I'd rather not get into the

13     whole org chart, but for simplicity's sake, Caremark's the

14     principal and there's a bunch of subsidiaries.  Caremark is the

15     pharmacy management entity and CVS is an actual pharmacy, and

16     you're claiming that this whole scheme was purported through

17     CVS, as well, right?

18                    MS. SCHNEIDER THOMAS:  Correct.  That is correct,

19     Your Honor.

20                    THE COURT:  And you're telling me, and I'm sure that

21     you've requested discovery from the Defendants regarding this

22     scheme from CVS, right?

23                    MS. SCHNEIDER THOMAS:  That is correct, Your Honor.

24                    THE COURT:  And you're telling me that that discovery

25     is deficient.
```

```
 1            MS. SCHNEIDER THOMAS:  I'm sorry, is?

 2            THE COURT:  Deficient.  Is that your position?

 3            MS. SCHNEIDER THOMAS:  Well, essentially, Defendants

 4   have told us that they don't think CVS pharmacy is part of this

 5   case and therefore they don't really have to produce discovery

 6   at all about CVS pharmacy.  But there's certainly various

 7   documents, including the nine that start off our appendix, you

 8   know, where CVS is mentioned because it was clearly grouped

 9   with Walgreens and Rite Aid in terms of how these discount

10   rates were managed.

11            And then we also have documents that are more towards

12   the second half of our appendix which show that even though

13   there was not the clean-cut reconciliation that we were just

14   talking about on pages 9 and 13, I think it was, as exists with

15   Rite Aid and also with Walgreens although we didn't include all

16   that here.

17            But even though the reconciliation at the end of the

18   day to bring the prices down to a lower rate than what was

19   ostensibly being paid at point of sale and what was the only

20   price reported through to the government.  Even though they

21   don't have clear cut a reconciliation, that is because CVS

22   pharmacy is a related in the family company where not

23   everything needs to be documented that way.  And we see

24   starting on pages 14 through 18, I think it is --

25            THE COURT:  So the answer to my question, you've
```

1  requested similar information from Caremark that you requested

2  for Rite Aid and Walgreens as it relates to CVS and the

3  Defendant's responses have been we don't have to produce any of

4  that, is that what you're telling me?

5       MS. SCHNEIDER THOMAS:  Essentially.  They have slowly

6  over time begun to give us little bits and pieces.  They have,

7  as is evidenced by some of our documents that mention CVS

8  pharmacy, they obviously have produced some documents that

9  mention CVS pharmacy, but their big picture position has been

10 that this didn't happen through CVS pharmacy and we don't have

11 to give you, basically, discovery about CVS pharmacy.

12      THE COURT:  Is that -- Mr. Dockery, understanding a

13 lot of things have been said, but please answer my specific

14 question.  What is your client's position regarding discovery

15 as it relates to CVS pharmacy?

16      MR. DOCKERY:  Thank you, Your Honor.

17      Putting aside the compromised offer that we've made

18 and putting aside the way that discovery was structured --

19      THE COURT:  I just -- Mr. Dockery, I asked you to

20 answer a very specific question.

21      MR. DOCKERY:  And that's what I am doing.  There's a

22 one --

23      THE COURT:  No, you're not.  You're saying what

24 you're putting aside.  I'm asking you a very specific question.

25 I'm not concerned right now with what you're putting aside.

1          MR. DOCKERY:  Okay.

2          THE COURT:  I'm asking you, what is your position

3    regarding the requested discovery as it relates to CVS

4    pharmacy?

5          MR. DOCKERY:  Our position, Your Honor, has been that

6    the requested discovery as to CVS pharmacy was inappropriate

7    and over burdensome and is not relevant because (audio skips)

8    an agreement with Caremark the way that Rite Aid and Walgreens

9    did have an agreement with Caremark that guarantees.

10          THE COURT:  Say that again.  You cut out a little

11    bit.

12          MR. DOCKERY:  Sorry.  I think there was a phone call

13    coming in on my line and probably beeped me out.

14          Our position has been that the discovery as to CVS,

15    as a general matter, is not appropriate in this case.  It is

16    over burdensome, it is irrelevant because the agreement between

17    CVS and Caremark did not contain a GER guarantee which is what

18    Rite Aid and Walgreens had in their contract with Caremark.

19    That's been our general position.

20          THE COURT:  And explain -- you probably just did, but

21    explain and expand how the relationship between Caremark and

22    CVS is different than the relationship between Walgreens and

23    Rite Aid.

24          MR. DOCKERY:  (Indiscernible) actually take a look at

25    the documents that were later provided.  And if you take a look

1   at page 1 of their appendix.

2           THE COURT:  I'm there.

3           MR. DOCKERY:  Okay.  Now, this part isn't highlighted

4   but that definition under GER caps, the first two sentences are

5   the GER caps are used to limit the generic effective rate and

6   that GER caps are generally contractually set.  Okay.  So you

7   can set a GER guarantee in a client contract or in a pharmacy

8   contract they will operate in different ways, but you can have

9   a contractual guarantee.

10          But a cap for purposes of this document is something

11  that is a limit, an internally set limit that you can measure

12  against, and it need not originate from a contract.  And just

13  because you have a GER cap, does not mean you have any kind of

14  contractual guarantee.  The

15  two are often associated, but not always associated.  And if

16  you take a look at page 6 of their appendix, you can see how

17  this distinction applies to Walgreens, Rite Aid, and CVS.

18          So if you look at page 6, there is a reference to

19  pharmacy guarantee management, and the very first bullet reads:

20  IA -- that's industry analytics -- currently tracks RAD, Rite

21  Aid, and WAGS, Walgreens, to an overall GER, BER, and

22  (indiscernible) guarantee.  We also measure FEP, Amerigroup,

23  and Med D for specific WAGS, Walgreens guarantees.  Okay.  So

24  that is referencing the contractual guarantees with Walgreens

25  and Rite Aid that are being tracked.  Then second, IA, industry

1   analytics, tracks and reports a CVS GER and manages the overall

2   budget.

3          So your observation that the two entities are related

4   has an important consequence.  Entities, regardless of whether

5   or not they had any kind of contractual obligations, even if

6   they were completely separate and had no contractual

7   obligations, they would need to budget for things like this.

8   They would need to be able to budget and forecast and project

9   what GER they expected to get, and then they would need to

10  measure to see whether they're above that, below that,

11         And with respect to CVS and Caremark, both of which

12  are under the same ultimate parent company, even though they

13  have different groups of people that are running the business

14  on each side, they were measuring -- Caremark was measuring

15  issues are with respect to CVS to a budgeted number and

16  managing it, but they had no obligation to CVS, and

17  importantly, whether they were above that number or below that

18  number at the end of the year, and they, you know, could be on

19  either side, there was no ultimate reconciliation in the form

20  of a payment.

21         With Walgreens and Rite Aid, you know, Ms. Thomas is

22  incorrect in saying that there was a true-up at the end of the

23  year.

24         THE COURT:  Let me ask you this.  What is on page 6

25  where Plaintiff has it highlighted?  What's IA mean?

1           MR. DOCKERY:  That's industry analytics.

2           THE COURT:  Okay.  Was -- second question, was

3    Caremark the pharmacy manager for CVS?

4           MR. DOCKERY:  Your Honor, it's a little bit

5    different.  We're the pharmacy manager, the PBM, for clients,

6    and we have contracts with pharmacies as providers, so the CVS

7    was one of many pharmacies that was a provider, and CVS

8    contracted with -- or Caremark contracted with CVS Pharmacy so

9    that it's client beneficiaries, Aetna for example, could go to

10   a CVS pharmacy or lots of other different kinds of pharmacies,

11   and get their prescriptions filled there.

12          THE COURT:  And how is it -- sounds like that's very

13   similar to Rite Aid and Walgreens.

14          MR. DOCKERY:  Well, in the sense it -- the question

15   is, is there a contract with them?  The answer, of course, is

16   yes.  In fact, we produced that contract.

17          THE COURT:  Okay.

18          MR. DOCKERY:  And there's contracts, many, many other

19   pharmacies.

20          THE COURT:  So then if there's a contract, like

21   there's a contract with Rite Aid and Walgreens, and Caremark is

22   in the pharmacy management mix for submission of claims like

23   Rite Aid and Walgreens scenarios, and you've acknowledged that

24   you -- that discovery is fair game on Rite Aid and Walgreens.

25   The difference is there's no written -- what's the difference?

```
 1  I'm missing the difference between Walgreens, Rite Aid, and CVS

 2  Pharmacy.

 3          And you're drawing a pretty big line in the sand

 4  saying we will produce and have produced all these -- all this

 5  information for Walgreens or Rite Aid and not CVS, and the

 6  touchpoint I think has to be, I think has to be, well, you've

 7  got to prove to me, you've got to convince me, Mr. Dockery,

 8  that because of the difference, there's no chance that the

 9  fraud as alleged could be perpetrated vis a vis CVS.

10          MR. DOCKERY:  Okay.

11          THE COURT:  So go ahead, convince me.

12          MR. DOCKERY:  Sure.  So Your Honor, let's take a

13  quick look at an example, or it's not actually an example, but

14  it will help you sort of understand the difference, if we take

15  a look at 13.

16          THE COURT:  Okay.

17          MR. DOCKERY:  A document that's later made up.  This

18  document is not a CVS document, okay?

19          THE COURT:  Uh-huh.

20          MR. DOCKERY:  A Caremark document, a document they

21  made up, and here, what they're saying is that there is a

22  negotiated discount, and an effective paid discount, and an

23  underpayment to Rite Aid, and then they over on the right-hand

24  side, they basically make up numbers for a drug using those

25  discounts.  This is again, made-up numbers for them.  For Rite
```

1    Aid and for Caremark, and for Walgreens, the price that's going

2    to be reported for an individual drug will be based on their

3    contracts, and it will be based on a formula known as the

4    lowest formula, it will have nothing to do with these

5    guarantees, and that number gets reported, and that number is

6    accurate?

7              THE COURT:  Because of the contract.

8              MR. DOCKERY:  Right.  It is the correct number under

9    the contract.

10             THE COURT:  Go ahead.

11             MR. DOCKERY:  Rite Aid and Walgreens have a provision

12   that's separate from how you calculate the price for an

13   individual drug, included a guarantee to the pharmacy that said

14   if average (indiscernible) Caremark as to the pharmacy were

15   below a certain amount, that Caremark would make up the

16   difference to the pharmacy.  This was a one-way guarantee.

17   Under no circumstances would the pharmacy pay Caremark.  So

18   Caremark only had a downside here, okay?  And it was aggregate

19   done at the end of the year based on all prescriptions.  Okay?

20             So under those circumstances, there is a -- at least

21   a scenario where at the end of the year, a payment might be

22   made by Caremark to the pharmacy on a guarantee.  That is a

23   possibility under the Rite Aid and Walgreens contracts.  We

24   don't think that affects what price needs to be reported, but

25   it is a possibility under the contracts, and if Relator's going

```
 1    to argue that that possibility somehow affects what price --

 2               THE COURT:  Yeah, I got that.  So that's different

 3    than the CVS situation how?

 4               MR. DOCKERY:  There's no possibility that there is a

 5    payment by Caremark to CVS at the end of the year based on some

 6    guarantee because there is none, and --

 7               THE COURT:  And that's reflected in the contract

 8    between Caremark and CVS which you've turned over?

 9               MR. DOCKERY:  That's correct.  And that's also true

10    of most contracts from that era.  From that era, the -- it was

11    actually unusual that the Rite Aid and Walgreens contract

12    contained a GER guarantee.  That was not the norm that --

13               THE COURT:  Say it again.  So because there's no

14    contractual language regarding fill in the blank, it's

15    impossible for the same type of fraud alleged with Walgreens

16    and Rite Aid to have been perpetrated, therefore, discovery

17    shouldn't be allowed.  Fill in those blanks for me, please.

18               MR. DOCKERY:  Right.  I'm sorry, Your Honor, that

19    typically is correct.  However, part of why we offered to

20    make -- I proposed that not only do the contracts back up our

21    explanation and our understanding of how the CVS contracts are

22    sort of different from Walgreens and Rite Aid here, and by the

23    way, it's not a fraud as to Walgreens and Rite Aid, it's not

24    even close.

25               THE COURT:  I know, I know, I know, I know, I know.
```

```
1    I know you're not conceding for it, but I'm asking you to say
2    again what is missing in the contract with CVS that's in the
3    contract with Rite Aid and Walgreens which makes discovery not
4    necessary as it relates to CVS?  Say it again.
5              MR. DOCKERY:  A guarantee.  Any type of aggregate
6    pricing term that is a guarantee, a minimum guarantee on
7    generic effective rights.  You know --
8              THE COURT:  Okay.  Why does the guarantee take the
9    idea, understanding you're not conceding a fraud, why does the
10   guarantee make a difference?
11             MR. DOCKERY:  The guarantee makes a difference
12   because Plaintiff's entire argument -- entire argument is
13   premised on aggregate discount rates that are guaranteed and
14   later attempts to recast those as the prices, despite the fact
15   that the prices for the drugs (indiscernible) individual prices
16   that are ultimately, if you have such a guarantee, averaged up
17   into that guarantee.
18             So in other words, if you have a guarantee in a
19   contract, even though Relator's argument is wrong, you at least
20   then have an aggregate term, some term of an agreement, that
21   you can say, look, there's an aggregate term, and the aggregate
22   term is different than this particular individual transaction
23   that occurred on a Tuesday, you know, of a particular drug.
24             THE COURT:  Okay.  Ms. -- let me interrupt you for a
25   second.
```

1          Ms. Schneider, please respond to Mr. Dockery's

2     recitation -- well, please respond in this specific issue.

3     He's differentiated the CVS contract and the Rite Aid,

4     Walgreens' contract, and has explained to me, and I'm pretty

5     sure I understand it, why that makes the CVS materials non-

6     discoverable.  Please respond to that specific issue.

7          MS. SCHNEIDER THOMAS:  Yes.  Yes, certainly, Your

8     Honor.  So initially, Caremark was arguing that CVS did not

9     even have an effective rate.  Then when we came back with the

10    documents showing that, indeed, there is this effective rate,

11    they said well, it wasn't contractual.  Then when we came back

12    and said, but it operated in the same way and Caremark

13    consistently treated these three pharmacies as a group.  Then

14    they came back and they said well, there's no reconciliation at

15    the end of the day.

16          So regardless how Caremark may have characterized its

17    relationship with CVS Pharmacy, and even if individuals at

18    Caremark referred to it as a GER cap, which does have a similar

19    meaning as a guarantee, it's like this is the most, or

20    sometimes it's the least that we will be paying you.  So --

21          THE COURT:  That's what I heard him say.  I heard him

22    say CVS contract.  I heard him say there is a CVS contract,

23    clearly.  So whatever's said in the past, he's on record saying

24    there was, and he said he's --

25          MS. SCHNEIDER THOMAS:  Oh, no, there's definitely a

1    contract.

2              THE COURT:  Yeah, and I heard him say that there's no

3    guarantee payments in the CVS contract, therefore, the fraud

4    can't be perpetrated.  That's what I want you to respond to.

5              MS. SCHNEIDER THOMAS:  Okay.  Basically, the fact

6    that there is no guarantee is largely irrelevant to the fraud

7    that we allege.  This case is not about generic effective rates

8    or guarantees for reconciliations, it is about improper price

9    reporting, and even without a spelled-out reconciliation with

10   its, you know, family member, CVS Pharmacy, there was still

11   benefit value being taken to the enterprise, which is the term

12   that Caremark uses for the big corporate entity encompassing

13   the PBM and the pharmacy, they were still taking profit,

14   essentially, value from overpaying CVS Pharmacy on the Med D

15   claims, and I would say that is best stated on page 18.

16             So page 18 is sort of little added comments that were

17   in the spreadsheet that is page 17, and what it says is even on

18   a transparent retail client, transparent means pass-through,

19   which is what CMS ordered for Medicare Part D, effective 2010,

20   that there be pass-through pricing such that there's no profit

21   or spread built into the drug price, a PBM will make its money

22   through administrative costs, but not by marking up the drug

23   cost.

24             And so what they're saying on page 18 is the higher

25   the retail GER, that's guaranteed effective rate that we've

 1  been talking about, on a transparent or pass-through client,

 2  ultimately impacts us as an enterprise, that's the overall

 3  corporation.

 4          If they give better prices to pass-through clients,

 5  in other words, they give better drug prices to someplace like

 6  Aetna, and they should be giving them the actual prices they're

 7  paying the pharmacy at the end of the day, but if they give

 8  better prices, like if they pass-through to Aetna the better

 9  prices, the lower prices that they've been able negotiate with

10  a pharmacy, here CVS, they are saying that impacts the

11  enterprise, the big corporate Daddy, to equal less margin for

12  them.

13          So is it a game?  Yes, we would say so.  Is it better

14  disguised and camouflaged with their wholly-owned entity, CVS

15  Pharmacy?  We would say absolutely.

16          THE COURT:  Are there other entities besides CVS,

17  Walgreens, and Rite Aid that you are pursuing?

18          MS. SCHNEIDER THOMAS:  Your Honor, at this point we

19  have decided not to, although there certainly are references in

20  the documents to --

21          THE COURT:  So the answer's no.

22          MS. SCHNEIDER THOMAS:  -- naming GER -- the answer is

23  no because again, if you look back at the documents we

24  presented, you know, like on page 2, Caremark has capped

25  agreements with CVS, Walgreens, and Rite Aid.

```
1              THE COURT:  Right.

2              MS. SCHNEIDER THOMAS:  Maximum GER's.

3              THE COURT:  Okay.  Mr. Dockery?

4              MS. SCHNEIDER THOMAS:  And it is on and on.

5              THE COURT:  Okay.  Mr. Dockery, what's your

6  compromise?

7              MR. DOCKERY:  Our compromise is -- was actually

8  designed, Your Honor, to avoid you even having to get into all

9  of this.  We're basically giving them everything on CVS, in the

10 industry analytics drive for these years.  Industry analytics,

11 you may recall from that, you know, a few of these pages,

12 covers both the tracking of the budget with respect to CVS and

13 Caremark, and also the guarantees as to Walgreens and Rite Aid.

14 Now, the --

15             THE COURT:  Wait, wait, hold that thought.  Hold that

16 thought.  Ms. Thomas, why is that not sufficient?

17             MS. SCHNEIDER THOMAS:  We hope that it would be

18 sufficient, Your Honor, our reasons for severe skepticism are

19 that because we do not believe or understand that the game was

20 played in precisely the same way with their wholly-owned CVS

21 subsidiary as it was with the unrelated Walgreens and Rite Aid,

22 we accept their representation that the balancing and the value

23 that Caremark, the overall entity was able to pull out of those

24 inflated payments that it procured from Part D, took place in a

25 somewhat different manner, likely higher up the chain or
```

1   through this enterprise value, or through the balancing that we

2   were just talking about on slide 18 I think I was.

3             THE COURT:  Do you want full -- full circle, do you

4   want, not a trick question, no hidden agenda, I'm very

5   interested in your views and judgment, Ms. Thomas.  Do you want

6   me to decide whether CVS's information is discoverable to the

7   extent that the other two entities are, Walgreens and Rite Aid?

8   Or do you want to review the documents that Mr. Dockery has

9   proposed to produce as it relates to CVS and then decide what

10  you want to do?

11            MS. SCHNEIDER THOMAS:  I wish I had a clear answer to

12  that question, Your Honor.

13            THE COURT:  I actually -- actually, a lot of this

14  isn't that clear in my head but I thought that was a very clear

15  question, so --

16            MS. SCHNEIDER THOMAS:  It's a very clear question.

17            THE COURT:  You got to answer it.

18            MS. SCHNEIDER THOMAS:  And my answer --

19            THE COURT:  What is it?

20            MS. SCHNEIDER THOMAS:  It's my ability to answer that

21  is less clear.

22            THE COURT:  Okay.

23            MS. SCHNEIDER THOMAS:  Because we would like, I mean,

24  we would like to play fair and attempt to compromise.  We would

25  like to show our experts the additional information that's

```
 1   being provided.  We don't think it's going to be sufficient,

 2   but if Your Honor is okay from a --

 3            THE COURT:  How do you know --

 4            MS. SCHNEIDER THOMAS:  -- timing perspective --

 5            THE COURT:  How do you know that something you

 6   haven't seen is deficient?

 7            MS. SCHNEIDER THOMAS:  I can only tell you what we

 8   believe, Your Honor.  So what Caremark has described this as is

 9   the place where the reconciliations with Walgreens and Rite Aid

10   are spelled out and documented and papered and whatever.

11            Caremark has also said that that same type of

12   reconciliation does not happen with CVS Pharmacy, and that's

13   why we're concerned that in this folder, this isn't where the

14   true-up or the balancing with CVS Pharmacy, it's wholly-owned

15   entity, would have taken place, which was why in our discovery

16   requests, we asked for documents pertaining to intercorporate

17   arrangements, revenue recognition, that was achieved through

18   Caremark's pricing practices regarding CVS Pharmacy.

19            THE COURT:  Okay.  Here's what we're going to do.

20            MS. SCHNEIDER THOMAS:  And they said it's not --

21            THE COURT:  Here's what we're going to do.

22            MS. SCHNEIDER THOMAS:  -- going to be here.

23            THE COURT:  Here's what we're going to do.

24            MS. SCHNEIDER THOMAS:  Okay.

25            THE COURT:  I could have had -- I could have the wool
```

1   being pulled over my eyes, or whatever expression you want to

2   pick, but my impression is that Caremark is -- has not been

3   hiding the ball, that they have been pretty fair and diligent

4   in their discovery production.  As a good litigator, you

5   always, you know, want to have a healthy amount of skepticism,

6   Ms. Thomas.

7           My impression is that care -- you know, other than

8   it's a big case and it's complicated and you're dealing with

9   big numbers and giant companies and all that, again, my

10  impression is that Caremark is not trying to hide ball.  I

11  could be wrong, I could be naïve, but that's my impression thus

12  far.  So the choice is then do I decide now and just sort of

13  bite the bullet and decide -- I think there are my choices --

14  decide now whether the CVS materials are discoverable or not,

15  or go with the compromise position offered by Mr. Dockery?

16          The downside of that in my view is that, you know,

17  we've been on the phone now an hour and I feel like I'm

18  proficient enough to make some decision, sort of, and I worry

19  if I go with the compromised view, you still won't be satisfied

20  and we'll have to do this all over again.  But I don't mind.

21  It's interesting.  It's challenging to figure it out.  So am I

22  right, Mr. Dockery?  So I'm going to go with the compromise.

23  That's what we're going to do.

24          So Mr. Dockery, have any of the -- do you have

25  additional discovery, and I'm putting all the -- that discovery

```
 1   in the bucket of the compromised position; has that been turned

 2   over or it's about to be turned over?

 3          MR. DOCKERY:  Your Honor, it's about to be.  It's

 4   a -- there's actually a lot of files there --

 5          THE COURT:  Okay.

 6          MR. DOCKERY:   -- and a lot of volume, so we're going

 7   to be in the process of reviewing that.

 8          THE COURT:  Okay.

 9          MR. DOCKERY:  (Indiscernible.).

10          THE COURT:  And what are we calling that for purposes

11   of my order?  The additional discovery is called CVS -- what

12   are we calling it?

13          MR. DOCKERY:  Well, that's a good question.  So I

14   think you could call it the CVS industry analytic share drive

15   material.

16          THE COURT:  Okay.  And how much time do you need to

17   produce it?

18          MR. DOCKERY:  I think we need -- I think we've said

19   we can produce it in two weeks.

20          THE COURT:  Two weeks.  My order will say it will be

21   produced in two weeks.  If you need a couple more days, don't

22   worry about it, just -- but let's keep it, you know, if you

23   need a couple more days, I'm going to have to amend my order,

24   so I don't want to do anything like, you know, a wink and a nod

25   here.  If you need a couple of days I'll give it to you, but
```

 1    try to -- the order's going to say two weeks.

 2            And then Ms. Schneider, how much time do you need to

 3    then review the additional discovery to determine whether in

 4    your judgment that discovery is still deficient?

 5            MS. SCHNEIDER THOMAS:  Your Honor, we are hoping to

 6    do it as quickly as possible, again, as you noted, without

 7    knowing what we're getting.

 8            THE COURT:  Yup.

 9            MS. SCHNEIDER THOMAS:  We've been told it's hundreds

10    of files and --

11            THE COURT:  Yup.

12            MS. SCHNEIDER THOMAS:  -- gigabytes of data.  I just

13    don't know how to answer that.

14            THE COURT:  Give me your best estimate, understanding

15    that if you come back to me and say we've gotten too much

16    information and the number I gave you is not doable, can I have

17    more time, I'm likely going to say yes.  So don't worry.

18            MS. SCHNEIDER THOMAS:  WE will make -- we will make a

19    very good faith effort working with our experts and everything

20    else to --

21            THE COURT:  Yeah.

22            MS. SCHNEIDER THOMAS:  -- to have a sense of this

23    within three weeks of production.

24            THE COURT:  Three weeks with a big fat asterisk, that

25    if you make a good-faith effort, as you've done from the second

```
 1  we've interacted, and you need more time, you'll get it, okay?
 2         MS. SCHNEIDER THOMAS:  Okay.
 3         THE COURT:  Okay.  So that's what our order will say,
 4  and then I'm not sure where we are, all of this dispute.  My
 5  sense is that if this dispute gets resolved either by way of
 6  this compromise or I have to, you know, ultimately make a
 7  ruling on where to draw the line on the CVS material, once
 8  that's resolved, I think then we can sort of step back and
 9  reconfigure the discovery process.
10         So I think the smart thing to do is just to put a
11  stay on all the discovery until we resolve this, what seems to
12  me to be a central discovery dispute.  Are you good with that,
13  Ms. Thomas?
14         MS. SCHNEIDER THOMAS:  In general, yes, Your Honor,
15  although we really would like to start our 30(b)6 deposition,
16  which Defendants have not --
17         THE COURT:  Now, why would you want to do that?  Why
18  are you saying you want more information, but yet you want to
19  start deposing people without that information?
20         MS. SCHNEIDER THOMAS:  Because Defendants keep
21  arguing that we have not been able to identify with sufficient
22  specificity what we need, for example, with respect to the
23  share files, which I did want to address briefly
24  (indiscernible) --
25         THE COURT:  Yeah, let's take it one step at a time.
```

1   You're going to -- I think it's -- I don't mean to second-guess

2   your litigation strategy, but I don't want to do 30(b)

3   depositions and then suppose you get all this information and

4   you convince me, well, this is a goldmine, I need more, and

5   then you've got to do another 30(b) with the new information.

6   One step at a time.

7            So I'm going to stay all discovery pending the

8   resolution of this dispute, and you'll get your 30(b)'s, don't

9   worry.  Okay, Ms. Thomas?  And that's what we're going to do.

10            MS. SCHNEIDER THOMAS:  Okay.  Thank you, Your Honor.

11            THE COURT:  Okay.  Mr. Dockery, anything else?

12            MR. DOCKERY:  No, Your Honor.

13            THE COURT:  Okay.  Thank you both for your time.

14   Take care.  We'll issue that order and we'll go --

15            MS. SCHNEIDER THOMAS:  Thank you, Your Honor.

16            THE COURT:  -- and we'll go from there and we'll stay

17   the discovery.  Thank you.

18            (Proceedings adjourned at 2:02 p.m.)

19

20

21

22

23

24

25

# **C E R T I F I C A T I O N**

        I, Valori Weber, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of my ability.


_____

Valori Weber

Date: May 19, 2021