```
                    UNITED STATES DISTRICT COURT

            FOR THE EASTERN DISTRICT OF PENNSYLVANIA

SARAH BEHNKE, et al.,          :
                               : Case No.  14-cv-824
                  Plaintiffs,  :
                               : U.S. District Court
         vs.                   : ED of PA
                               : 601 Market Street
CVS CAREMARK CORPORATION, et al., : Philadelphia, Pennsylvania
                               :
                  Defendants.  : July 28, 2021
                               : 10:11 a.m.
. . . . . . . . . . . . . . . . .


                  TRANSCRIPT OF DISCOVERY HEARING
            BEFORE THE HONORABLE MITCHELL S. GOLDBERG
                  UNITED STATES DISTRICT JUDGE


APPEARANCES:

For Plaintiffs:               SUSAN SCHNEIDER THOMAS, ESQ.
                              BERGER MONTAGUE
                              1818 Market Street, Suite 3600
                              Philadelphia, PA  19103
                              sthomas@bm.net
                              (215) 875-3000

For Defendants:               DANIEL M. DOCKERY, ESQ.
                              WILLIAMS CONNOLLY LLP
                              725 12th Street NW
                              Ed Bennett Williams Building
                              Washington, D.C. 20005
                              ddockery@wc.com
                              (202) 434-5698

Court Recorder:               Jimmy Cruz

Transcription Service:        Weber Reporting Corporation
                              (970) 405-3643


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.
```
1

```
 1              THE CLERK:  All rise.  The Court is now in session.
 2   The Honorable Mitchell Goldberg presiding.
 3              THE COURT:  Have a seat.  I don't think we've ever
 4   been in person on the case, have we?  I think it's been all on
 5   the phone.
 6              MS. THOMAS:  Back on the motion to dismiss, Your
 7   Honor.
 8              THE COURT:  What's that?
 9              MS. THOMAS:  On the motion to dismiss, Your Honor.
10              THE COURT:  Oh, we were in court?  Okay.
11              All right.  So this is the Behnke v. CVS Caremark
12   matter, 14-824.  It's a 2014 case, I guess it was under seal
13   for a while, right?
14              MS. THOMAS:  It was.
15              THE COURT:  Yeah, okay.  So we're going to try to
16   resolve some discovery matters.  Everyone on this side of the
17   podium is fully vaccinated.  Is everyone on that side of the
18   podium fully vaccinated?  Is there anyone who's not fully
19   vaccinated.
20              Okay.  So my typical refresher, because it puts into
21   context for me, the discovery dispute, so bear with me, and I
22   know we do this every time we get together, but I'll make
23   better decisions.  Senior gets a prescription for a $50 bottle
24   of nasal spray.  Senior goes to one of the -- the notes that I
25   have you back, could I have those back again.  Yeah.  Thanks.
```

1          If you let me do it, I make my own mistakes I'll

2   learn it better, okay.  Senior goes to Rite-Aid, but there's

3   another pharmacy involved, it's Walgreens.  Senior asked for

4   the $50 nose spray and shows the Aetna Insurance card.  The

5   pharmacy charges the senior $10 on a co-pay.  The $40, because

6   it's Aetna, and by extension, Caremark, the Defendant in this

7   case who is the administrator, and I think there's a term of

8   art, a PBM, I believe?  Is that right, PBM?

9          MS. THOMAS:  That's correct, Your Honor.

10          THE COURT:  The fraud alleged is that Caremark tells

11   Medicare, that -- they tell Aetna to reimburse for 50, and tell

12   Medicare it was 50, so they've overcharged by 10, instead of

13   the 40 that was owed.  So that's where the fraud is, the

14   alleged fraud is, that Caremark is miscalculating the remainder

15   of the cost of that nasal spray; generally, right.

16          MS. THOMAS:  Not exactly, Your Honor.

17          THE COURT:  One of these days I'll get it right.

18   Go ahead, not exactly?

19          MS. THOMAS:  So it's not the $10 co-pay that's at

20   issue, we actually have --

21          THE COURT:  I didn't say it was a $10 co-pay, I said

22   it was the overcharge on the -- it's a $50 item, and so there's

23   a remainder of 40 left, and Caremark reports -- they make a

24   claim for Medicare for more than the 40 owed; $10 in my

25   example?

1                    MS. THOMAS:  That is sort of correct, Your Honor.  We

2      actually have a very nice short one-page graphic that might be

3      helpful.

4                    THE COURT:  Just tell me where I'm off?

5                    MS. THOMAS:  Pardon?

6                    THE COURT:  Explain where I'm off.

7                    MS. THOMAS:  Okay.  May I hand this up?

8                    THE COURT:  Okay.

9                    MS. THOMAS:  And how do we do that these days?

10                   THE COURT:  Give it to my law clerk.

11                   MS. THOMAS:  Okay.  Your Honor, do you prefer that we

12     leave the masks on --

13                   THE COURT:  Yes.

14                   MS. THOMAS:  -- or take them off when we talk?

15                   THE COURT:  Leave them on.  I thought it was one

16     page?

17                   MS. THOMAS:  Well, I only have to talk about the

18     first page, unless Your Honor wants to go further.

19                   THE COURT:  Let me read what you've got here.

20                   Okay.  We need to go through this using my $50

21     example of the nose spray, okay?  Senior goes into the Rite

22     Aid, what happens then?

23                   MS. THOMAS:  So the Rite Aid charges the senior, the

24     Medicare Part D beneficiary, an amount that has been set by

25     Caremark, the PBM, as the point of sale price for that drug,

1    the senior only pays a co-pay for any other portion that the

2    senior is responsible for.

3            Where the fraud is, is that Caremark is paying Rite

4    Aid, Caremark, the PBM, the intermediary is paying Rite Aid

5    based on a global discount rate of AWP, which is a list price,

6    minus 80.4 percent.  So on a hypothetical $100 drug, if Your

7    Honor will indulge me, because our slides go that way, Caremark

8    is paying Rite Aid $19.60.  Caremark charges Aetna, pursuant to

9    a generic discount rate that has been negotiated between

10   Caremark and Aetna, at AWP, again the list price, minus --

11           THE COURT:  What's AWP?

12           MS. THOMAS:  Average wholesale price, and it pains me

13   to say it, after litigated that issue for 12 years, but it's

14   essentially a list price.  The discount rate that Caremark has

15   Aetna, is AWP minus 77.6 percent, which averages $22.40 on that

16   same $100 drug.  The fraud comes in because Caremark only

17   reports to CMS, and this the bottom box on that re-boxed chart

18   there.  Caremark only reports to CMS what it charged Aetna; the

19   $22.40.

20           Effective in 2010 when the price reporting rules

21   changed Caremark was required to report what it had actually

22   paid Rite Aid, which on this chart would be $19.60.  Prior to

23   2010 Caremark could have reported the 22.40 and taken the

24   spread, and that was fine, but CMS, shortly into the Part D

25   program, which only started in 2006, by 2008, and in place by

1  2010 CMS had changed the price reporting regulations, such that

2  what was to be reported to CMS, and CMS again is the Federal

3  Agency administering that D, what was to be reported to CMS was

4  the price that the PBM would actually pay the pharmacy; and our

5  allegation is that Caremark did not report that price.

6          THE COURT:  So the fraud is the difference between

7  $22.40 and $19.60?

8          MS. THOMAS:  That is correct, Your Honor.

9          THE COURT:  All right.  So in a --

10          MS. THOMAS:  It's --

11          THE COURT:  -- general sense, it's just misreporting

12  to the CMS?

13          MS. THOMAS:  Correct.

14          THE COURT:  Okay.  So -- thanks.

15          MS. THOMAS:  And on the second page --

16          THE COURT:  That's good --

17          MS. THOMAS:  -- if I could try --

18          THE COURT:  That's good enough.

19          MS. THOMAS:  -- Your Honor's patience --

20          THE COURT:  No, I'm good.  I'm good.

21          The second thing I wanted to observe, is that, and

22  it's not a criticism, just an observation, I think a pattern,

23  and I think you and I are  having a disconnect and I'm

24  having -- I'm more than happy for you to push back on my

25  thinking on this.  I think in the history of discovery disputes

1    in this case we've had consistent responses from Defendant that

2    they have looked and they don't have the information that you

3    are requesting, and you'll come back and say, and I think we

4    have some of this today, and I'm just saying this as an

5    overview, well, I think they should have it, based on this

6    research.

7              And my view, which you're free, I'm inviting you to

8    disagree with me, and tell me is a bad way to look at it is.

9    My view, when you have a lawyer say to a judge, any judge, I

10   understand the request.  My client has done a diligent search,

11   we don't have that, that ends the dispute.

12             Unless you can s how me, not by way of theory or

13   supposition or gut instinct, unless you can show me that that's

14   a complete representation the discovery dispute's resolved, in

15   my view.  And more times than not, if there is a

16   misrepresentation that you can't show me right here at the

17   podium, sophisticated lawyers and Defendants, like Caremark in

18   this case, it either -- it will come to light later in

19   depositions, if they're playing games, and their

20   representations to me are not accurate.

21             And I'm sure these folks understand, if that's the

22   case and they've told me, they don't have it, and it comes to

23   light that you can prove that that's a false statement the

24   repercussions are going to be terrible for them, which could

25   include judgment against them.

1          So I think -- let's go through this, let's just SOR

2    of -- but I just want to give you my impression on how this has

3    sort of gone.  So as my way of looking at resolution of the

4    discovery dispute, do you disagree with it?

5          MS. THOMAS:  Respectfully, Your Honor, we do.  And

6    the reason for that is, we are not claiming, because we have no

7    basis to, that Caremark has found responsive documents and

8    decided not to produce them.

9          Our problem with the way the discovery has unfolded

10   in this case, is that Caremark has primarily looked only in

11   email files of named custodians, and has not, to our mind, done

12   an adequate search for the documents.  There are various --

13         THE COURT:  Let's go through them.  Let's just go --

14   let's take them point-by-point, okay?

15         MS. THOMAS:  Okay.

16         THE COURT:  So I understand, I'll frame the issue and

17   you can fill me in on where I'm off.  You are -- what is

18   deficient as we've digested your communications with us, of

19   what you think is deficient is; 1) communications with CMS, the

20   Medicare Federal Agency.  So why don't you explain to me -- and

21   by the way, you need to identify yourself and your team, I'm

22   sorry, I didn't give you a chance to do that, why don't you

23   explain to me what your request is, what has been produced, and

24   what you think is deficient?

25         MS. THOMAS:  Okay.  Should I introduce --

1          THE COURT:  Yeah.  Right now.

2          MS. THOMAS:  -- for the record.

3          THE COURT:  We forgot to do that, I'm sorry.

4          MS. THOMAS:  Yes.  Susan Thomas, Berger Montague,

5   appearing for the Plaintiff/Relator.  With me at counsel table

6   is David Sorenson, and Joy Clairmont.

7          THE COURT:  Good morning.

8          MS. CLAIRMONT:  Good morning.

9          MS. THOMAS:  And there are other people here, as

10  well.

11         THE COURT:  Who are they, Somer (phonetic) people?

12         MS. THOMAS:  No.  We have William Fedullo, Caitlin

13  Coslett, and Natalie Finkelman who is from Miller Shah.

14         THE COURT:  And you're lawyers on this team?  Okay.

15  Good morning.  Why doesn't Defendant's counsel identify

16  themselves, while we're doing this?

17         MR. DOCKERY:  Good morning, Your Honor.  Dan Dockery,

18  of Williams & Connolly, for the Defendants, and with me at

19  counsel table is Holly Connolly, also of Williams & Connolly.

20         THE COURT:  Good morning.

21         MS. CONNOLLY:  Good morning.  Okay.  Go ahead.

22         MS. THOMAS:  So CMS Communications, Your Honor, what

23  we were seeking, and we have asked for this in a multitude of

24  ways were essentially non-public communications between

25  Caremark and CMS, in which Caremark might have raised

1   questions; how do we report a GER?  Do we have to account for

2   this in the DIR, or do we have to allocate these twice --

3              THE COURT:  Please --

4              MS. THOMAS:  -- these twice --

5              THE COURT:  -- I'm begging, I'm begging you, please,

6   no acronyms.  I can't --

7              MS. THOMAS:  I actually was leaving them --

8              THE COURT:  I can't understand what you're saying,

9   you used like three acronyms --

10             MS. THOMAS:  Various prices.

11             THE COURT:  -- in one sentence.

12             MS. THOMAS:  I, in some ways -- excuse me, I was sort

13  of doing that on purpose, that there are these complicated

14  price reporting mechanisms.  There are disputes as to how

15  things should be reported, and in a regulated industry one

16  would expect there to have been communications, if, as Caremark

17  argues, they found the regulations to be ambiguous, confusing,

18  if they believe their approach was in accordance with industry

19  practices, if, as they claim, the Government knew what they

20  were doing.

21             We would expect there to have been some

22  communications, so --

23             THE COURT:  What time period are we talking about?

24             MS. THOMAS:  2010 to 2016.

25             THE COURT:  Uh-huh.  Okay.  So what --

1          MS. THOMAS:  And I can be --

2          THE COURT:  Your communications --

3          MS. THOMAS:  -- more specific.

4          THE COURT:  Yeah.  The communications are between

5    Caremark, and remember, you're way submerged in this case, I

6    haven't thought about this case up until this morning, when I

7    tried to come court since the last time we talked.  So keep it

8    basic for me, okay.

9          MS. THOMAS:  Will do.

10          THE COURT:  So the Defendant is interfacing with CMS

11   to seek reimbursement from CMS, and you want more

12   communications between Caremark and CMS?

13          MS. THOMAS:  The Defendant, PBM, the pharmacy benefit

14   manager, that stands between --

15          THE COURT:  Just say "Defendant," I got it.

16          MS. THOMAS:  Okay.  The reimbursement actually goes

17   to the plans, but Caremark is essentially the administrator --

18          THE COURT:  Right.

19          MS. THOMAS:  -- so it is submitted information and --

20          THE COURT:  Right.

21          MS. THOMAS:  -- and interacting with CMS, the

22   regulatory --

23          THE COURT:  Okay.

24          MS. THOMAS:  -- agency.

25          THE COURT:  I'm sure you've gotten some

1   communications between those two entities for that time period,

2   yes?

3           MS. THOMAS:  So what we have gotten, Your Honor, and

4   Defendants say that they've produced over 7,000 documents, what

5   we have gotten have been the public communications.  CMS issues

6   letters multiple times a year about various elements of its

7   price reporting, that they go to the industry --

8           THE COURT:  Sure.

9           MS. THOMAS:  -- broadly, maybe it's Part D plan

10  sponsors, maybe it's the PBMs.  The vast majority of what has

11  been produced by Defendants have been these industry documents,

12  and incidentally, although they says there's been 7,000, most

13  of the CMS letters have been produced in multiples of 20, or 30

14  copies --

15          THE COURT:  You know, I think I've said it before --

16          MS. THOMAS:  -- because they were circulated.  So --

17          THE COURT:  -- the quantity -- lawyer saying, well, I

18  produced 200,000 documents, so therefore I'm going to sit down,

19  that's enough, Judge.  I mean, that's enough for me.

20          MS. THOMAS:  Okay.

21          THE COURT:  I want to know what's in the documents

22  and are they responsive --

23          MS. THOMAS:  Thank you, Your Honor.

24          THE COURT:  -- so numbers aren't going to wow me.

25          MS. THOMAS:  So what we are seeking are any Caremark

 1  specific communications, and back in our second request for

 2  production we asked for documents that had been generated or

 3  received, for example -- or reviewed, I'm sorry, by the

 4  compliance team, or other teams, we ask for non-public

 5  communications to and from CMS about the drug price reporting

 6  requirements, and we didn't see much of anything in the

 7  production other than these --

 8              THE COURT:  Uh-huh.

 9              MS. THOMAS:  -- industry letters.  So --

10              THE COURT:  And in your meet and confer, what was the

11  response from Dockery?  Mr. Dockery, is that right, am I saying

12  the right?

13              MR. DOCKERY:  Yes, Your Honor.

14              THE COURT:  What's his response?

15              MS. THOMAS:  That they had done an appropriate

16  search, and if there was anything to produce they produced it.

17  So we followed up, then, Your Honor, with RFAs, with requests

18  for submission, and asked for Caremark to admit that they had

19  not sought specific guidance or interpretation from CMS as to

20  how to report A through K.

21              THE COURT:  Uh-huh.

22              MS. THOMAS:   They largely rebuffed those RFAs.

23              They largely rebuffed those RFAs --

24              THE COURT:  You're using an acronym again, but go

25  ahead, that one I knew.

1          MS. THOMAS:  Request for admission, I'm sorry.

2          THE COURT:  That one I knew.  Go ahead.

3          MS. THOMAS:  Okay.  They largely rebuffed those,

4   asserted all sorts of objections, and said on the basis of

5   their objections they were denying those; so then we tried

6   again.

7          THE COURT:  Denying that they had --

8          MS. THOMAS:  They refused to admit that they had not

9   sought guidance.  So then we tried again, we served our fifth

10  request for production, in which we tailored the request more

11  specifically, any communications to or from CMS, the regulatory

12  agency about these points, A through K, how you report this

13  price, that price; they produced nothing.

14         We have one document that we have located, and

15  Defendants have in their brief to this Court, cited one

16  document that actually demonstrates some back and forth type of

17  discussion with CMS.  It's not a complete document, it pertains

18  to after the time period, it refers to meetings that we don't

19  have addressed, but that's it.

20         THE COURT:  Can you subpoena CMS?

21         MS. THOMAS:  We can.

22         THE COURT:  Have you thought about -- I'm just sort

23  spit-balling with you.  Have you thought about, if you're still

24  -- if you still don't have a comfort level that this area of

25  communication's been produced, couldn't you go that way and

1   issue a subpoena on CMS, and see if they've received

2   communications from Caremark, during that time period?

3            MS. THOMAS:  Theoretically we could, Your Honor --

4            THE COURT:  But?

5            MS. THOMAS:  It's an immense hurdle to get a Federal

6   agency to respond to a request like that.

7            THE COURT:  Okay.  Let's --

8            MS. THOMAS:  And they would --

9            THE COURT:  -- table that --

10           MS. THOMAS:  They would certainly tell us to go get

11  it from the Defendant.

12           THE COURT:  Right.  And --

13           MS. THOMAS:  But --

14           THE COURT:  And let's table that, because I want to

15  hear, first, what Mr. Dockery has to say about it.  It probably

16  wouldn't be, and I'm not puffing my robe power out here, but it

17  probably would be more of assistance if I would issue an order,

18  if I think it would come to that, a specific order, if I think

19  it would be necessary, in a moment I'd do that.

20           But how about just a plain statement, right now, on

21  the record, from Mr. Dockery, that he's done what he needs to

22  do, and he doesn't have -- there were no communications during

23  that time period; let's have it.  You're up, Mr. Dockery.

24           MR. DOCKERY:  May I approach?

25           THE COURT:  Yeah.  You can -- both counsel can stay

```
 1   at the counsel table if you want, wherever you're comfortable.

 2            THE COURT:  Yeah.  Right there is good.

 3            MR. DOCKERY:  I'm happy -- I'm happy to talk from

 4   here.

 5            THE COURT:  Yeah.

 6            MR. DOCKERY:  Oh, may I take my mask off, is that --

 7            THE COURT:  No.

 8            MR. DOCKERY:  Okay.

 9            THE COURT:  I know I'm really far away, but I can

10   hear you, and --

11            MR. DOCKERY:  Happy to do it however you wish.

12            THE COURT:  -- I'm cheating too, and will put mine

13   back on.

14            MS. THOMAS:  And I do apologize.  I'm going to stay

15   here only, because I can't really see my notes if I'm back

16   there.

17            THE COURT:  Yeah.  That's fine, okay.

18            MR. DOCKERY:  It's not a problem.

19            So, thank, Your Honor, Dan Dockery of Williams &

20   Connelly for Defendants.

21            So what we have done, and what we have told them we

22   have done, and it's actually what she represented to you, is

23   that we have conducted a reasonable search, and we have

24   discussed the parameters of that search with them.  We

25   discussed who the custodians were.
```

1          We, at length, negotiated a set of search codes,

2     including a search terms intended to capture this kind of

3     communication, and we know that it was successful at capturing

4     at least some of these communications.

5          Now the nature of a search, and agreed search, is

6     that we can never be absolutely certainly everything has been

7     captured, instead we'll come up with a reasonable search, and

8     it's the search that you look at, and whatever it produces is

9     what you get.

10          So that's what we've done.  We haven't withheld

11     anything, we have a search, we've told them what we've done,

12     and what we have also told them, during the meet and confer

13     process, in numerous areas, and this is just one of them, where

14     they asked us to try to go further, we said, okay, we will try

15     to figure out ways to go further than what we already --

16          THE COURT:  Excuse me one second.

17          MR. DOCKERY:  -- did and agreed to.

18          THE COURT:  Sorry to interrupt.

19          So, Ms. Thomas, its communications from 2010 to 2016,

20     between Caremark and CMS, and you said there's -- the types of

21     communications are how many categories?

22          MS. THOMAS:  We broke it down, Your Honor, into as

23     many as we could think of, to be honest, because when we gave a

24     general request saying --

25          THE COURT:  My question was how many --

1          MS. THOMAS:  -- communications about these price

2   reporting --

3          THE COURT:  My question is, how many categories?

4          MS. THOMAS:  I think it might have been seven or

5   eight, I'd have to go back and look --

6          THE COURT:  It's okay.  Did --

7          MS. THOMAS:  -- at the request.

8          THE COURT:  Did you take those categories, Mr.

9   Dockery, and put those into the search terms?

10          MR. DOCKERY:  So the search terms are search terms we

11   agreed on, and we believe --

12          THE COURT:  That's not my question.  Did you take her

13   categories and put those into the search terms?

14          MR. DOCKERY:  So, Your Honor, the categories, one has

15   to come up with search terms that try to capture the

16   information --

17          THE COURT:  Right.

18          MR. DOCKERY:  -- that would be in a category.

19          THE COURT:  Which I assume would be in the

20   categories.

21          MR. DOCKERY:  We negotiated a set of search terms

22   that were intended to capture this kind of information.

23          THE COURT:  Okay.

24          MR. DOCKERY:  And we have search terms.  In fact we

25   cited them in a letter --

```
 1              THE COURT:  Ms. Thomas, is that --

 2              MR. DOCKERY:  -- and put them in the footnote.

 3              THE COURT:  Ms. Thomas, is that right?  For your

 4    categories did you and Mr. Dockery negotiate search terms that

 5    would capture your categories?

 6              MS. THOMAS:  No, sir.

 7              THE COURT:  Well, he just said --

 8              MS. THOMAS:  The --

 9              THE COURT:  -- you did?

10              MS. THOMAS:  The negotiations were with respect to

11    the second set of request for production, the custodians, the

12    search terms, were all tailored to that request.  Because the

13    fifth request, as well as the --

14              THE COURT:  Can I see the --

15              MS. THOMAS:  -- request for submission --

16              THE COURT:  Can I see the categories, please?

17              MS. THOMAS:  Yes, Your Honor.

18              Request 57 is probably the best summation of the

19    categories; there may be others.

20              THE COURT:  Have counsel met and conferred to see if

21    they could agree on search terms that would capture the

22    information in Request 57A through F, and I'm asking that

23    question of Mr. Dockery?

24              MR. DOCKERY:  Counsel, we -- or we, counsel,

25    negotiated search terms for months, after they issued the fifth
```

1   one --

2          THE COURT:  She just said you didn't.

3          MR. DOCKERY:  I can't tell you that -- what she seems

4   to be saying is, well, we never sat down and negotiated with

5   you, search terms specific to this request.  What they did was,

6   they negotiated a global set of search terms.  That negotiation

7   continued for months after they issued these RFPs, and they

8   never once asked us for any additional search terms.

9          We said we believe those search terms were adequate.

10          THE COURT:  Okay.  All right.  I would --

11          MR. DOCKERY:  No search term has been --

12          THE COURT:  I would really appreciate if --

13          MR. DOCKERY:  -- proposed to us that's different --

14          THE COURT:  -- both counsel would just answer my very

15   basic questions.  And the basic question of you, Mr. Dockery,

16   is, have you and Plaintiffs' counsel negotiated search terms

17   that would encapsulate requests 57A through F.  It's a yes, or

18   no answer.

19          MR. DOCKERY:  We believe we have.

20          THE COURT:  That's a yes.

21          MR. DOCKERY:  Yes.

22          THE COURT:  And you say, no?

23          MS. THOMAS:  Absolutely not, Your Honor.

24          THE COURT:  Now can you booth --

25          MS. THOMAS:  Indeed --

1              THE COURT:  Can you both understand my slight

2    frustration that you two can't agree on a very basic question;

3    is my question complicated?

4              MS. THOMAS:  Your question is not complicated --

5              THE COURT:  It's not.

6              MS. THOMAS:  -- Your Honor.  I have some facts --

7              THE COURT:  So you say you have --

8              MS. THOMAS:  -- I would like to tell you.

9              THE COURT:  You have not negotiated, and you say,

10   yeah.  So since you can't agree I'm ordering you forthwith to

11   sit down with request number 57A through F, and see if you can

12   agree on search terms.  And if Mr. Dockery, if you are sure

13   that you've already done that, I apologize for making you do it

14   again, but I've got counsel here saying you haven't.  I can't

15   mediate your dispute here, I don't know what you talked about.

16   I'm not going to go back and look at your billing records.

17             You say he didn't do it, you say he did.

18             MS. THOMAS:  Your Honor --

19             THE COURT:  Go back --

20             MS. THOMAS:  -- if I might --

21             THE COURT:  -- and do it again, okay.

22             MS. THOMAS:  We finalized the search terms on March

23   24th, the fifth set of RFPs was not even served until after

24   that.

25             THE COURT:  Can we just --

1           MS. THOMAS:  So it is not --

2           THE COURT:  Can I --

3           MS. THOMAS:  -- yes, the one that --

4           THE COURT:  Can you --

5           MS. THOMAS:  -- we're talking about.

6           THE COURT:  Can you just indulge me and go back and

7   do it again?

8           MS. THOMAS:  We will be happy --

9           THE COURT:  You say, yes.

10          MS. THOMAS:  -- to do that.

11          THE COURT:  You say it hasn't been done.  Mr.

12  Dockery, I'm not doubting, it's probably a miscommunication,

13  sit down and do it again; that's my order.  Okay.

14          MR. DOCKERY:  Understood, Your Honor.

15          MS. THOMAS:  And one --

16          THE COURT:  I will put this into a long form order so

17  everyone has clear direction.  All right?

18          MS. THOMAS:  One clarification, if I might, Your

19  Honor --

20          THE COURT:  Sure.

21          MS. THOMAS:  -- I may have misspoken.

22          When you asked for the time period, I told you the

23  time period that is at issue in terms of liability, but the

24  communications with CMS should actually go back through 2008,

25  because it was in 2008 --

1          THE COURT:  Okay.  All right.

2          MS. THOMAS:  -- that CMS first proposed --

3          THE COURT:  Any objection --

4          MS. THOMAS:  -- this rule.

5          THE COURT:  -- to that time period, Mr. Dockery?

6          MR. DOCKERY:  No, Your Honor.

7          THE COURT:  Okay.

8          MR. DOCKERY:  The --

9          THE COURT:  Okay.  And, Mr. Dockery --

10         MR. DOCKERY:  I'm sorry.

11         THE COURT:  -- you reserve your right --

12         MR. DOCKERY:  Yes.

13         THE COURT:  -- if when you agree on the search terms

14  -- first of all, if you can't agree, all right, I'll -- I mean,

15  I looked at the first one and thought, I could probably draft

16  something, but you two would do it better.  If you can't agree,

17  let's get back together, and I'll try to draft something

18  myself.  But you two are both way more immersed in this case,

19  and probably way smarter, so you do it.

20         If you need my assistance, Mr. Dockery, if you -- if

21  you were to come back to me and say, Judge, this is -- you're

22  pushing the envelope, and this is going to cost a lot of money,

23  you are free to do that.  The civil rules of procedure, as you

24  know have fee-sharing for discovery requests if necessary, if

25  burdensome.  So I'm open to hear your pitch that, you know,

```
 1   this is starting to get too expensive and they should share in

 2   the cost.

 3                MR. DOCKERY:  Your Honor, if I could just --

 4                THE COURT:  That's what we're going to do for this

 5   one.  We're going to keep this, if that's okay; 57, so I can

 6   just say, Samantha, you hold onto this 57A through F in

 7   Defendants' objections to request for production.

 8                MS. THOMAS:  Plaintiffs' request, Your Honor.

 9                THE COURT:  Well, yeah.  What was handed up --

10                MS. THOMAS:  I know.

11                THE COURT:  -- is the objections.

12                MS. THOMAS:  We just wanted to save paper.

13                MR. DOCKERY:  Your Honor, just --

14                THE COURT:  Yes.

15                MR. DOCKERY:  -- to make sure something is clear --

16                THE COURT:  Uh-huh.

17                MR. DOCKERY:  -- what she tacked on at the end there,

18   about the time period, we have told them we would talk about an

19   extended time period --

20                THE COURT:  Okay.

21                MR. DOCKERY:  -- we had not agreed that that is the

22   appropriate time period.  Generally we have agreed that the

23   discovery period is 2010 through 2016.  We will discuss with

24   them the burdens associated with going back before that.

25                THE COURT:  Understood.  Understood, okay.
```

1          So that's -- it doesn't resolve this dispute, but it

2    at least has -- I put hopefully a plan in place to resolve it.

3    All right.  So let me just look at my notes, and characterize

4    what I think is the next dispute.

5          So the next dispute, as I understand it, is all the

6    reconciliation files, price submissions and pharmacy contracts

7    specifically, and I understand it that Ms. Thomas is reporting

8    she expects that this will be completed and received this week.

9    Do you need me to put my attention to this issue, Ms. Thomas?

10   I'm happy to do that, if you want?

11          MS. THOMAS:  Your Honor, we have prepared a list, a

12   chart, for Your Honor's convenience, and Defendants, about what

13   is missing, in terms of what we referred to as the go-get

14   documents, like they're easy, they're contracts, they're

15   reconciliations, they're the priced submissions that were done

16   through -- to CMS.  And if I might, Your Honor, I could hand

17   you this chart, which actually identifies what we say is

18   missing.

19          THE COURT:  Have you reviewed this with Defense

20   counsel?

21          MS. THOMAS:  We have over the course of various of

22   meet and confers, and letters.  I have not previously provided

23   this chart, because we didn't finish it until yesterday.  But

24   we've been trying to get these documents since October of 2020.

25   The contracts that are pertinent to this case, the

1    reconciliations that are pertinent to this case, the

2    submissions of various types of price data to CMS, that are

3    going to be the false claims, and that are going to drive any

4    calculation of damages.  And we simply don't have a lot of the

5    stuff that's missing.

6            THE COURT:  All right.

7            MS. THOMAS:  And I'd like to call out --

8            THE COURT:  Excuse me.

9            MS. THOMAS:  -- if I might?

10           THE COURT:  Excuse me.  So what we're going to do

11   then, is I'm going to use your chart.  I'm going to ask --

12   you're to go through each one, and I'm going to ask

13   Mr. Dockery, when, whether he objects, and if he doesn't why

14   hasn't it been produced and when it will be produced, and we're

15   going to go through it one at a time.

16           Number 1.  Plan contracts between SilverScript and

17   Caremark 2010 to 2016.  Plaintiff, Mr. Dockery, indicates that

18   you haven't produced 2010 and 2011; true or false?

19           MR. DOCKERY:  We've produced everything that covers

20   that time period, that we know of.

21           THE COURT:  Why is it under the missing category,

22   then, Ms. Thomas?

23           MS. THOMAS:  Because we did not see a contract that

24   appeared to be in effect for those years.

25           THE COURT:  Okay.

 1               MS. THOMAS:  We've spent a lot of time --

 2               THE COURT:  Okay.  So hold on, let's --

 3               MS. THOMAS:  -- looking and cataloging.

 4               THE COURT:  Let's capture where we are, where I think

 5     we are.  You've made a request for these contracts, you say,

 6     Defense counsel says he's given them to you, and you say he

 7     hasn't.  Now put yourself in my chair, and tell me how am I

 8     going resolve that dispute?

 9               MS. THOMAS:  One way, Your Honor, we would

10     respectfully suggest would be for them to give us the Bates

11     numbers of the documents they say are responsive.

12               THE COURT:  Or a transmittal letter.  Did you send

13     them in a transmittal letter; Dear Ms. Thomas.  Please find

14     enclosed contracts in effect from 2010 to 2011, between

15     SilverScript and Caremark, Bates numbers blah-blah.  Can you do

16     that?

17               MR. DOCKERY:  Your Honor, is the question did we do

18     it, or can we identify them?

19               THE COURT:  Well, you say you did do it --

20               MR. DOCKERY:  Right.

21               THE COURT:  -- so we're past that.

22               MR. DOCKERY:  Well, we did -- no, I'm sorry --

23               THE COURT:  I'm trying to figure out how I resolve

24     these disputes?

25               MR. DOCKERY:  With the transmittal letters, our

1  transmittal letters identified that we are producing documents,

2  but the documents, the volume of documents in this case, given

3  we've produce, you know, $1.8 million pages, we haven't, you

4  know, sat there and listed every single document we're

5  producing; we said, here is our production of documents.

6         So can we identify where particular documents are?

7  Your Honor, we can, but I will note that there's a volume

8  problem here.  You know, this right here is a very long list of

9  like, you know, sort of everything they want, and to go through

10  this and try to identify for them, every single document,

11  exactly where it is, would be very time consuming.

12         We can certainly do that for the contracts, and we

13  may be able to do it for some of the other categories, but we

14  have produced the contracts for both Aetna and SilverScript,

15  and also for Caremark -- for the other pharmacies.

16         THE COURT:  Which she says you haven't.  She just

17  said you haven't.

18         MS. THOMAS:  Well, I said we have not been able to

19  locate it, and we have looked --

20         THE COURT:  Okay.  So how are they --

21         MS. THOMAS:  -- very diligently --

22         THE COURT:  How are they going to locate it?  I mean,

23  when you're -- you can't just do a U-Haul dump on them, and say

24  I've complied.  So I'm sure you're more sophisticated than

25  that, and so how can you help Ms. Smith locate this?

1          MR. DOCKERY:  Well, there's a number of techniques;

2    looking at file names, and file paths, which are key metadata,

3    or a way that sophisticated counsel always identify this kind

4    of material.  There's also searching techniques that are

5    typically applied that enable us to find them, as well as them

6    find them.  So those would be the standard ways of identifying

7    them.

8          THE COURT:  Okay.  Can you -- do you mind getting

9    together and try to figure it out?  Do you want me to do it?

10         MS. THOMAS:  We have looked, Your Honor, we have.  We

11   do consider ourselves to be --

12         THE COURT:  Okay.  So --

13         MS. THOMAS:  -- sophisticated counsel --

14         THE COURT:  So here's what we're going to do --

15         MS. THOMAS:  -- we have data resources, we cannot

16   find them.

17         THE COURT:  If I accept Ms. Thomas' word that she's

18   looked, it's a lot of documents, according to Mr. Dockery.

19   Mr. Dockery, as part of my order on -- all of these documents,

20   we're going to mark this as Court Exhibit, Discovery Hearing,

21   on this date, Number 1.

22         On all these documents that Ms. Thomas claims are

23   missing, Caremark is ordered to provide direction.  To the

24   extent that they are produced, it is Caremark's obligation to

25   provide direction to where they can find these documents within

1    the massive amounts of documents that have been produced.  So

2    that'll be in my order, okay.  And so, Samantha take this,

3    that's -- I'm sorry, that's the Exhibit Number 1.

4              Okay, Ms. Thomas?

5              MS. THOMAS:  Yes.  Thank you, Your Honor.

6              THE COURT:  Okay.

7              MS. THOMAS:  There are a few things listed here, to

8    be fair to Defense counsel, where Caremark has said that they

9    do not have some of the documents, and we may need to go back

10   to Aetna and SilverScript.  We will discuss that further with

11   them, and if needed we will do that.

12             THE COURT:  Okay.  All right.  So next on my list,

13   then, let me just review my notes.

14             Relator is seeking Caremark's aggregate discount

15   rates with pharmacies that combine Medicare and commercial

16   claim payments, because the manner and amount by which Caremark

17   paid pharmacies on those claims is relevant, and Caremark says

18   they're not relevant, because it's -- these type of rates are

19   distinct from the transactions at issue.

20             Do you want to explain this issue to me a little

21   more?

22             MS. THOMAS:  Yes, sir.

23             THE COURT:  Uh-huh.

24             MS. THOMAS:  So what we are referring to there that

25   is dispute, is whether and to what extent discovery should

1  encompass claims pertaining to commercial transactions.  In

2  other words, drugs that were dispensed by CVS Pharmacy, or Rite

3  Aid Pharmacy, to someone who does not have Med-D coverage, but

4  just has Blue Cross, a private commercial insurance.

5          The reason why that would be important, even though

6  on the face of it one might think otherwise, is because

7  Caremark, and if Your Honor would look back at the initial

8  chart that we gave you with the green picture frames, which I

9  can't find, but I know it by heart --

10          THE COURT:  I have it in front of me.

11          MS. THOMAS:  The aggregate discount rate that we

12  listed of AWP, list price minus 80.4, Caremark negotiated that

13  with the pharmacies, to include both commercial and Med-D

14  claims.  So it was Caremark's aggregate or global discount rate

15  that provides the reason why we need to look at what was done

16  on the commercial side.  We didn't just pull in the commercial

17  claims out nowhere.  Caremark negotiated and combined, or we

18  typically call it a "global discount rate" with the pharmacies,

19  that encompasses both Med-D and commercial claims.

20          THE COURT:  When you go before the jury, how is the

21  commercial part going to be part of your fraud proof?

22          MS. THOMAS:  If Your Honor could look at page 4, of

23  what I handed up with the green picture frames, there's a

24  spreadsheet that says "Rite Aid."  You probably can't read it

25  very well, and for that I sincerely apologize, it's very small,

1   but it was taken from an Excel, you know, in the computer.

2           What this shows, Your Honor, and the reason why the

3   commercial claims will be important, is if you look at the

4   bottom, overall line, and if you look over to column N, the

5   generic effective rate, which is the GER that we've been

6   talking about, that's essentially the discount rate off of AWP,

7   Caremark negotiated with Rite Aid a global, encompassing both

8   commercial and Med-D discount rate of an 80.4 percent discount;

9   that's what's in the picture frame on the first page.

10          If Your Honor will look at the overall commercial

11  line, up near the top, in that same column, it shows that

12  Caremark ended up paying the pharmacy, here Rite Aid, at a

13  discount rate of AWP minus 82, which would be the equivalent of

14  $18 on a $100 drug.  And if you look down to the next bottom

15  line, about Med-D, Caremark paid Rite Aid at the rate of 77.6

16  percent for Med-D, which would be the $22.40 that's on the

17  picture frame.

18          And consistently Caremark took its global -- it's

19  combined Medicare and commercial discount rate with the

20  pharmacy, and paid the pharmacy below that rate on commercial

21  claims, paid the pharmacy above that rate on Med-D claims,

22  where CMS would pay the costs, as long as it all averaged out

23  to the pharmacy's global rate.

24          And that is essential what we say was not permitted

25  under the pass-through price reporting, because the price that

1   Caremark really paid the pharmacy was to that global rate.

2   At point of sale they might have handed them more, but they

3   essentially take it back at the end of the year.  They don't

4   get a check because they've underpaid so much on commercial, so

5   they balance it out.  And again, with Your Honor's indulgence,

6   this is, I think, pretty nicely spelled out in the chart on

7   page 3.

8           And we stuck to all the same numbers and these are

9   from 2014.  So what page 3 shows, again for Rite Aid, for 214,

10  column D is the negotiated discount rate, 80.4 percent, or the

11  equivalent of $19.60 for a $100 drug.  Column E shows what

12  Caremark at point of sale paid the pharmacies, and it paid the

13  pharmacy, and you can either look at the discount rates that

14  are in column E, or the dollar amounts that are in columns' H

15  and I, Caremark paid the pharmacies at the rate of $22.40,

16  that's column I, on Medicare claims, $18 on commercial claims,

17  that's what none Medicare means, and only reported to CMS the

18  $22.40, and never acknowledged the fact that Caremark's real

19  rate with Rite Aid was $19.60, in the aggregate, overall.

20          THE COURT:  Is this a non-Medicare case?

21          MS. THOMAS:  It is not a non-Medicare case, Your

22  Honor.  It is just about Medicare, because the case is brought

23  on behalf of the Federal Government, for fraud to the Medicare

24  program, but the way in which this fraud was implemented, was

25  to skew the payments to the pharmacies as between commercial

```
 1  and Med-D, not to tell the Government that, to claim that the
 2  only thing that needed to be reported were those initial prices
 3  paid on Med-D.
 4          THE COURT:  It's not a commercial case, and it's not
 5  a non-medical case, agree?
 6          MS. THOMAS:  Correct.
 7          THE COURT:  And yet -- but, yet, based on your theory
 8  you want the Defendant to produce what, that relates to those
 9  two buckets.
10          MS. THOMAS:  A good question, Your Honor.  So the
11  non-Medicare or commercial, we're using these terms
12  interchangeably.  We would be looking to negotiate with
13  Defendants, some appropriate same of commercial claims data
14  that would show these skewed payments that we think
15  demonstrates that the economic reality of the transaction, as
16  the economists like to say, is that the price that Caremark was
17  really paying Rite Aid was $19.60, not $22.40.
18          THE COURT:  Is this a damages' issue, or is this
19  discovery relevant to prove your fraud?
20          MS. THOMAS:  I wish that were an easier question to
21  answer, Your Honor.  We believe it would be both, because --
22          THE COURT:  How does it go to liability, how does it
23  go to prove fraud --
24          MS. THOMAS:  Because --
25          THE COURT:  -- on the Medicare scenario?
```

1          MS. THOMAS:  Because our argument, Your Honor, is

2     that the $22.40 price, that's in column I, and it's in the

3     green picture frame, that Caremark reported two CMS and caused

4     CMS to pay, is essentially a sham price.  It is not -- it does

5     not reflect the economic reality of the transaction as --

6          THE COURT:  That's the Medicare price, correct?

7          MS. THOMAS:  Correct.

8          THE COURT:  So what does it have to do with the

9     commercial transactions?

10          MS. THOMAS:  Because the reason that 22.40 is not the

11     true price that was actually paid, is because Caremark had

12     negotiated a global rate that encompassed both commercial and

13     Med-D and Caremark chose to --

14          THE COURT:  With who?

15          MS. THOMAS:  -- skew its payments.

16          THE COURT:  Negotiated a global rate with who?

17          MS. THOMAS:  With the pharmacy.

18          THE COURT:  With the pharmacy?

19          MS. THOMAS:  Yes.

20          THE COURT:  Uh-huh.

21          MS. THOMAS:  This is all on the pharmacy side, Your

22     Honor.  Caremark chose to combine those different lines of

23     business, commercial and Med-D, into one global averaged

24     aggravated discount rate, and then skewed the payments to make

25     the Med-D payments higher, where CMS would have to pay it.

```
 1              THE COURT:  I'm not going to say this as good as you.

 2   So even though you can see it's a Medicare case and it's not a

 3   commercial case -- Medic -- the commercial part of this is

 4   somehow relevant, I'm not talking about damages, and

 5   discoverable, because the overall fraudulent negotiation

 6   included both the Medicare and the commercial, and therefore

 7   let's get into the commercial part, because it will help me

 8   prove the Medicare; is that what you're saying?

 9              MS. THOMAS:  Yes, Your Honor.

10              THE COURT:  Okay.  And then are you --

11              MS. THOMAS:  Because Caremark chose --

12              THE COURT:  -- is it you?  Are you really -- I mean,

13   you're going to have a very hard time, and we're talking trial

14   now, but I think you're going to have a very hard time

15   explaining this fraud to the jury on a Medicare scenario; so

16   just observation, and I've got the luxury sitting here, I'm not

17   trying the case.

18              Do you also want to try to explain the commercial

19   part to a jury, so that will help your Medicare part; I don't

20   know.  Good luck with that.  So --

21              MS. THOMAS:  Your Honor, we are painfully aware of

22   the complexities of this case.

23              THE COURT:  Yes.

24              MS. THOMAS:  So --

25              THE COURT:  So anyway.  Anyway, anyway.
```

```
 1              MS. THOMAS:  And we would try to --

 2              THE COURT:  I -- excuse me, excuse me --

 3              MS. THOMAS:  -- to negotiate a sample.

 4              THE COURT:  -- I asked you, what is it that you want

 5   from this, what feels like an attenuated discovery request, and

 6   you said, we want the opportunity to go to Caremark and see if

 7   we can get a sample.  So let's hear from Caremark; what's your

 8   view on this, Mr. Dockery?

 9              MR. DOCKERY:  Your Honor, our view is that most of

10   what counsel is just said is an inaccurate and misleading

11   portrayal of the process and how pricing works.  But taking it,

12   you know, on its face, and putting aside all of the reasons why

13   it's wrong, if what matters, and it seems to be the only thing

14   that matters to counsel, are the averages, you know, what

15   happens at the end of the year when you look at the average,

16   you know, sort of as her documents show.

17              Then if you take a look at the, you know, this

18   document she was just showing us, the third page, there's  --

19   you know, it's a Rite Aid spreadsheet, you'll see that there's

20   a line, the very first line is plain group name, there's a line

21   "commercial" there, and then there's a whole series of numbers

22   for a commercial, including, you know, how many claims there

23   were, and a lot of other numbers.

24              THE COURT:  Which chart are you looking at?

25              MR. DOCKERY:  It's -- the base number is CVS bank
```

```
 1   0004353.
 2            THE COURT:  4353, go ahead.
 3            MR. DOCKERY:  Right.  So if you look, it's -- you
 4   know, the text is a little bit hard to read, but under --
 5            THE COURT:  Yeah.
 6            MR. DOCKERY:  -- claim group name, you'll see
 7   "commercial."
 8            THE COURT:  Uh-huh.
 9            MR. DOCKERY:  Okay.  There's a whole line of data for
10   commercial.  And then if you look down there is overall
11   commercial, and there's overall Med-D, and then there's some
12   breakdowns under that.
13            THE COURT:  Uh-huh.
14            MR. DOCKERY:  Okay.  So, you know, we don't believe
15   that relators' theory makes even a modicum of sense.  But to
16   the extent, what she needs to know, is kind of what are the
17   aggregate numbers for commercial claims, or, you know, given
18   pharmacy, the reconciliation spreadsheets that she has been
19   provided show that information.
20            And what we have said is, we have no understanding
21   why she would then need to get into the transaction level
22   detail of individual commercial transactions where we are
23   talking -- I mean, billions of records have already been
24   provided, and that's just as to Medicare Part-D --
25            THE COURT:  Billions?
```

1          MR. DOCKERY:  Yes.

2          THE COURT:  Okay.

3          MR. DOCKERY:  Billions.

4          THE COURT:  Okay.

5          MR. DOCKERY:  And that's scratching the surface of

6    what's out there, in the sense that if you know, if you get

7    into commercial claims, if you get into completely different

8    clients, you know, the volume is truly immense.  So we think

9    that Medicare Part-D claim detail that, you know, concerns

10   these clients and Medicare Part-D, we understand why that might

11   be relevant at a transactional level.

12          We do not understand it, and have not heard an

13   explanation here as to why commercial data would be relevant at

14   a transactional level.  And as the documents demonstrate, if,

15   you know, the relator is going pursue a theory that's based on

16   not on what was paid for individual prescriptions, and I could

17   show you where this is an issue.

18          Now if you look at the Caremark's fraud page, the

19   very first page that she's showed you, and where she says that

20   this kind of demonstrates the nature of the fraud, you'll note

21   that what she has in the various boxes here, is that there

22   wasn't -- for the first box there's an average of $19.60 for

23   one $100 AWP fraud.

24          Now the second box it says it was an average of

25   $22.40 per $100 AWP fraud.  They actually looked the data for

```
 1   any given drugs, what you would have are numbers that are not

 2   averages, and they wouldn't be equal to each other.  All right.

 3         So if we're looking at the transaction level detail,

 4   that's just not even what her theory seems to be about.  He

 5   theory is only about the averages, and to the extent she needs

 6   that information she has it.

 7         THE COURT:  Do you want to take Ms. Thomas up on her

 8   suggestion that you attempt to negotiate a sampling of this

 9   information, or do you object to her discovery request and want

10   me to rule on your objection?

11         MR. DOCKERY:  So we object to it, given the volume of

12   what has already been produced to-date, and the burden that is

13   associated with producing this kind of data, and given that,

14   again, you know, this is not a commercial case, and the level

15   of commercial information that she seems to be saying is at

16   issue has been provided.

17         With that said, if something was provided to us a

18   proposal that we thought was minimally burdensome to the point

19   that it's not even worth fighting over, we would actually

20   consider --

21         THE COURT:  Do you think --

22         MR. DOCKERY:  -- it, we've agreed to a lot.

23         THE COURT:  Do you think given the history of this

24   case you're going to get something that you're going to

25   consider to be minimally burdensome?
```

1          MR. DOCKERY:  I'm doubtful of it, which is why I say,

2     you know, I think we have --

3          THE COURT:  So pick. I'm --

4          MR. DOCKERY:  -- an objection, but I --

5          THE COURT:  -- I'm giving you a choice.

6          MR. DOCKERY:  Yes.

7          THE COURT:  You can't say rule, but, you know, we're

8     open.  Do you want me to rule or not?

9          MR. DOCKERY:  Your Honor, I think if the question is

10    a blank check to the Plaintiffs on this, no, we can't agree to

11    that.  We object and we think that the --

12          THE COURT:  They want --

13          MR. DOCKERY:  -- basis for it as well, this is will

14    bal --

15          THE COURT:  They're requesting, in discovery, as I

16    understand it, non-Medicare transactions, as it relates to

17    writing it, correct?

18          MR. DOCKERY:  That's correct.

19          THE COURT:  Okay.  For whatever relevant time period;

20    do you object or not?

21          MR. DOCKERY:  Object.

22          THE COURT:  Okay.  Your objection is sustained.  That

23    is not discoverable in my view, it's too attenuated.  This case

24    is about non-Medicare transactions.  I've given Plaintiffs'

25    counsel, and she deserves it, she's very thoughtful, a lot of

1   time to explain to me, I think that this is -- why it would be

2   discoverable and she hasn't convinced me.  If she wants to, you

3   know, renew this, she's free to do that, but Defendant's

4   objection is sustained.

5           The next area of inquiry is the relator is asking

6   that -- no, let me just read it to myself.  Pertains to

7   "Caremark's index of CVS' industry analytic share file."  I

8   don't know what that is, so, Ms. Thomas, could you explain that

9   to me.

10          MS. THOMAS:  Yes, sir.  So we have referred to that

11  in the past as the compromise production.  That was where

12  Caremark came to us and to the Court and said, look, there's

13  all these discovery requests out there, we're going to give

14  them the industry analytic share file, and we had I believe --

15          THE COURT:  What is an industry analytical share

16  file?

17          MS. THOMAS:  Industry analytics is a working group,

18  or department at Caremark, that manages these various price

19  constructs.

20          THE COURT:  And the analytics' team, the analytics'

21  department are the ones that put -- study the formulas and put

22  the pricing together?

23          MS. THOMAS:  That's at least my general

24  understanding.

25          THE COURT:  Okay.

```
 1                 MS. THOMAS:  We haven't taken depositions --

 2                 THE COURT:  Right.

 3                 MS. THOMAS:  -- but that is indeed my sense.

 4                 THE COURT:  Oh, good, Lord.  You guys haven't done

 5      depositions yet?

 6                 MS. THOMAS:  No, sir.

 7                 THE COURT:  Okay.  All right.

 8                 MS. THOMAS:  So Caremark said, well, how about if we

 9      produce this industry analytic share file, it should have

10      everything that the Plaintiffs want.  When Your Honor asked me

11      on a prior call, did I want to accept that as a compromise, and

12      I didn't really give you an answer, because we weren't really

13      sure what was in it, we didn't know what they were purporting

14      that it would suffice, in terms of production, Your Honor chose

15      to have them produce it, and then have us come back if we

16      thought it was inadequate.

17                 So the industry analytic share file is what we have

18      and calling the "compromised production."  And all we are

19      asking here, Your Honor, it's fairly simple request, obviously

20      Your Honor will rule, you know, however you decide.  In

21      addition to the enormous amount of data that was in the

22      industry analytic share file that was provided to us, there are

23      these additional two terabytes, and I don't know what a

24      terabyte is, but I thinks it a whole lot; I can't be more

25      specific.  Two terabytes of additional data that Defense
```

 1   counsel said, we don't think you're all that likely to want

 2   this, but if you do want it, we'll produce it.

 3          We took a pass on that, and then as we started

 4   getting into telling them that we thought had been produced was

 5   not sufficient in various respects, it seems like they were

 6   saying, well, maybe you should have taken those two terabytes.

 7   So what we were proposing, Your Honor, is that if there is any

 8   type of index available, particularly with respect to the part

 9   that we declined; we're not looking for attorney work product.

10          THE COURT:  Is there an index available to the

11   terabytes, Mr. Dockery?

12          MR. DOCKERY:  Your Honor, no there is not, besides

13   the metadata associated with it.

14          THE COURT:  How she's supposed to figure out what's

15   in it?

16          MR. DOCKERY:  By looking in the metadata, that's

17   exactly how we figure it out, and then you have to look at the

18   individual files, it's a lot of work.  But when one asks for

19   this kind of volume of material, that's probably what comes up

20   with it, is what we had to do.

21          But the metadata for the files identifies the file

22   path, which enables you to see what folders, something is put

23   in.  Much like if somebody worked a computer, if you had

24   folders and arranged things, you know, here's one case, here's

25   one case, here's the pleadings for this case, that over

1   structure is revealed in the metadata.

2             THE COURT:  Uh-huh.

3             MR. DOCKERY:  So if you want to see that a particular

4   file is in the CVS folder, and is in the subset of that, that

5   is the, you know, monthly reports' folder, and then you want to

6   see the title on the file --

7             THE COURT:  It's kind of like an index.

8             MR. DOCKERY:  -- that information was provided.  Now

9   I will just say one thing --

10            THE COURT:  Hold on, hold on, she's shaking her head

11   no.  So how about this, could you provide her a letter

12   explaining, get your tech person or you do it, if you're -- you

13   seem like you're techie enough, could you just send her a

14   letter or an email, giving her a roadmap on how she can better

15   organize and figure out what's in the -- there's a tera what;

16   what kind of file?

17            MS. THOMAS:  The two terabytes is what we've been

18   referring to it as.

19            THE COURT:  The two terabyte, what are they thumb

20   drives, or what are they?  How are they transmitted?

21            MR. DOCKERY:  They're -- they have to actually be

22   transmitted on drives, because they're so big, all those some

23   we'd have to --

24            THE COURT:  On drives.  So could you just --

25            MR. DOCKERY:  They have to be supplied.

1           THE COURT:  -- pen her an email or a letter, and give

2    her a roadmap on how she can figure it out?

3           MR. DOCKERY:  We will do that.  And, Your Honor, we

4    will also --

5           THE COURT:  And Sam, let's put that in the order.

6           MR. DOCKERY:  There is -- what's being asked for now

7    is a little bit different than what we were asked for during

8    the meet and confer process.  For the meet and confer process

9    we were asked to provide an index of what we produced.  What --

10          THE COURT:  Okay.  But I've just -- I'm sorry to

11   interrupt you.

12          MR. DOCKERY:  Yes.

13          THE COURT:  I think I've resolved her concern, so is

14   it productive to point out that what is now resolved was

15   different than what you tried to resolve, and resolve it?

16   You're going to write her a letter and explain it, and she's

17   going to figure it out, because your letter is going to

18   comprehensive.  So I'd rather not go back to, this is different

19   than what she asked for blah, blah, blah.

20          MR. DOCKERY:  It's only because what she's asking

21   Your Honor for, I believe, is actually for an index of material

22   that we didn't produce, that we identified as being --

23          THE COURT:  I think she's asking --

24          MR. DOCKERY:  -- more files.

25          THE COURT:  -- for direction from you.

 1          MR. DOCKERY:  Right.

 2          THE COURT:  She's saying, we got a lot of

 3   information, we're having a very hard time figuring out how to

 4   understand it and digest it.  Could you please explain to me,

 5   give me a roadmap on how to do that, and I've ordered you to do

 6   that; so that's what we're going to do.

 7          MR. DOCKERY:  And to the extent, Your Honor --

 8          THE COURT:  Uh-huh.

 9          MR. DOCKERY:  -- to the extent that what's now being

10   requested is a list of the files that we offered to produce,

11   that they declined to take production of, we are willing to do

12   that.  They don't have that because they never asked us for

13   that directly.

14          THE COURT:  Do it.

15          MR. DOCKERY:  But we can do that.

16          THE COURT:  Do it.  Thank you.  That's helpful, thank

17   you.  Okay.

18          MS. THOMAS:  So, Your Honor, if I might, with respect

19   to this industry analytics' share file that was produced, this

20   really ties into the bigger problem that we have been

21   struggling with throughout discovery.  We don't actually know

22   what Caremark believes that the IA, industry analytic share

23   file is responsive to, where they think it fully satisfies any

24   particular discovery requests.  And we don't believe that it

25   does, with respect to a number of our requests, and --

```
 1              THE COURT:  You said to me --

 2              MS. THOMAS:  -- that was our hesitation.

 3              THE COURT:  Excuse me.  You just said to me you don't

 4  understand what's in it.

 5              MS. THOMAS:  No, sir, I'm sorry.  There may have been

 6  a little bit of miscommunication there.  We do have a pretty

 7  decent idea at this point what is in the industry analytic

 8  share file materials that we did receive.  What we have no idea

 9  about is the two terabytes --

10              THE COURT:  The terabytes, okay.

11              MS. THOMAS:  -- that we chose --

12              THE COURT:  Okay.  I'm sorry --

13              MS. THOMAS:  -- not to receive.

14              THE COURT:  -- it's confusing the two, okay.

15              MS. THOMAS:  But even with respect to what we did

16  receive, Your Honor, and this is just a problem that we have

17  been struggling with throughout, basically we were discussing

18  with Defendants, responses to our fourth set of RFPs, which

19  focused on data, and documents explaining, for example, how the

20  various price terms would have been set, how they came to have

21  this differential payment structure, that we're addressed.

22              And in the course of those discussions Caremark

23  pivoted to, we'll give you the whole IA share file, that should

24  resolve all the disputes pertaining CVS, Rite Aid and

25  Walgreen's Pharmacies.  And the problem is, Your Honor, it
```

```
 1   doesn't.  I did provide a lot of useful information, but it

 2   doesn't respond to various of our specific requests, and we

 3   don't even know if Caremark is taking the position that it does

 4   respond to those requests.

 5          So getting back to one of the questions you asked

 6   earlier, Your Honor, is this just us saying we think there's

 7   something missing, we haven't been told that there has been a

 8   complete production of responsive, non-privileged documents.

 9          And I don't mean every single one, you know, we

10   understand it's a big company, maybe they missed something,

11   there has simply been no representation, Your Honor, that what

12   has been produced is fully and appropriately responsive --

13          THE COURT:  To what?

14          MS. THOMAS:  -- to our requests.

15          THE COURT:  Which request, be specific?

16          MS. THOMAS:  Okay.  So for example, 49, 50 and 51,

17   they are all in the fourth request, which is not what I handed

18   up.

19      (Counsel confer)

20          MS. THOMAS:  And again, Your Honor, just to save

21   paper we only are producing he Defendants' objections, because

22   they repeat our requests, so we just didn't want to

23          THE COURT:  So a request -- your question is what?

24   Request 49, 50 and --

25          MS. THOMAS:  51.  They would be the ones that we --
```

```
 1                THE COURT:  51 and you'll --

 2                MS. THOMAS:  -- would focus on.

 3                THE COURT:  -- receive -- the acronym was of -- did

 4   you say "AI" what did you say?

 5                MS. THOMAS:  The "IA".

 6                THE COURT:  What's that?

 7                MS. THOMAS:  Industry analytics' share file.

 8                THE COURT:  Share file.  And your question is, is the

 9   industry analytic share file responsive to Plaintiffs' request

10   for production of documents 49 through 51; is that your

11   question?

12                MS. THOMAS:  Essentially.  Although, for Defendant to

13   say it's responsive without us having any idea where there --

14                THE COURT:  I didn't -- I'm asking what your question

15   is?  Is your --

16                MS. THOMAS:  Our concern is that it is not fully

17   responsive.  There is nothing, for example --

18                THE COURT:  I thought your concern is we don't what

19   it's responsive to.  So is -- do you want me to ask -- I'll ask

20   Mr. Dockery, is the production of the IA share file, responsive

21   to 49 through 51?

22                MS. THOMAS:  Fully responsive, yes, Your Honor; that

23   would be our question.

24                THE COURT:  Mr. Dockery?

25                MR. DOCKERY:  Your Honor, we've never taken the
```

1    position of wholly responsibly object to these requests, so we

2    objected to them in our --

3          THE COURT:  So why did you produce the IA file, then?

4          MR. DOCKERY:  Because we believe that it captures, to

5    the extent that they're asking for appropriate material, and

6    these requests themselves copy in large part, prior requests

7    that we -- to some of them we did agree to produce material to.

8    To the extent we believe there is material that is appropriate

9    to ask for, we believe that was the location.

10          And just to give you an idea --

11          THE COURT:  Hold on, hold on.  I feel like we're

12    talking in circles.  So you're saying, to the extent that

13    there's information in the IA share files, I'm just not

14    following you.  She's asked you for information in 49 through

15    51; you've produced the IA file.  Is the IA file in response to

16    49 through 51?

17          MR. DOCKERY:  It is not specifically in response to

18    those.  We object to those, those str incomprehensible --

19          THE COURT:  Then way -- what is it --

20          MR. DOCKERY:  -- requests.

21          THE COURT:  Then what -- the IA file is in response

22    to what?

23          MR. DOCKERY:  The document she attached to her hand

24    up to you, it's this stuff; that's what's on the IA share

25    driver.  So, I mean, when I say that I think it's what they're

 1   asking for, I'm not just making that up.  This is the material

 2   that is on the IA share drive.

 3          The IA group was the group that developed these kinds

 4   of documents, and we produced to the Plaintiff/relator, all of

 5   the documents on that share drive, that you know, there were

 6   Excel spreadsheets like this.  You know, some of the -- some of

 7   the underlying data is such, that's the two terabytes we talk

 8   about, but all of the reports that reflect the work product

 9   that shows the analysis, that look like these --

10          THE COURT:  Uh-huh.

11          MR. DOCKERY:  -- for every single pharmacy that is at

12   issue her, Walgreen's, Rite Aid and CVS, which we disagreed

13   with, but we said we'll give you all that material from the

14   share drive, because we think this should answer our

15   disagreement over the inclusion of CVS as a pharmacy; that's

16   what we've provided.

17          THE COURT:  I'm lost.  I'm lost because, Ms. Thomas,

18   I don't know -- here's what I'm hearing.  I'm hearing a lot of

19   requests, some of which I've ruled are not discoverable.  I'm

20   seeing an huge amount of documents produced to Plaintiff with

21   may a little bit of deficient care as to what's being produced,

22   and I think that's where we are with this, and the IA share

23   file.  So where are we on this, Ms. Thomas?  You want to know

24   why they're producing the IA file?

25          MS. THOMAS:  It's not so much a question of why

```
 1   they're producing the IA share file, Your Honor.  In a letter,

 2   either to us, or to this Court, I don't remember, the Defendant

 3   said that they believe the production of the IA share file

 4   would resolve outstanding disputes about CVS, Walgreens and

 5   Rite Aid Pharmacies, and documents that we --

 6              THE COURT:  Right.  So they're producing it --

 7   they're producing the IA file in response to your request for

 8   documents regarding those pharmacies, right?  So you have their

 9   production.

10              MS. THOMAS:  But their production, Your Honor, does

11   not actually address what we asked for, in full.  It addresses

12   some of the data parts, but for example in request 49, we were

13   asking for documents concerning how the prices were determined.

14   How did the divergence between payments on Med-D and

15   commercial, the payments to the pharmacies, how did that come

16   into existence?  Was the negotiated with the pharmacies, was it

17   set by Caremark, is there a discussion of the purpose?

18              And they have an objection, for example that they

19   object to anything about post point-of-sale discounts or

20   adjustments, and they say they will produce documents

21   pertaining to the price paid to the pharmacy for each

22   prescription drug, that actually harkens back to an argument

23   they made back in the motion to dismiss, that the only thing

24   that's important is the price paid at the point of sale.  And

25   yet our case --
```

```
 1              THE COURT:  Did you brief this issue?

 2              MS. THOMAS:  We have not --

 3              THE COURT:  This last issue?

 4              MS. THOMAS:  -- had an opportunity to fully brief it.

 5   And, Your Honor, I would also say, I don't believe we have

 6   really negotiated search terms for this.

 7              THE COURT:  Okay.  I'm finding, maybe it's probably

 8   me, and I'm not understanding it.  I'm finding this -- I'm not

 9   finding this discussion helpful anymore, all right.  It's

10   getting me more lost and not clarifying.  So on this last

11   point, and I think we're at our last point on issues that you

12   wanted me to resolve.  Just submit a letter brief, no more than

13   three pages, within a week, on this last point.

14              And I think the issue is, the Plaintiff wants to know

15   what the AI share file is responsive -- which request it's

16   responsive to, and then Plaintiff also want wants to tell me,

17   you can tell me in that page limitation, what is deficient

18   about it, then they'll have a week to respond and I'll just

19   digest your letters and rule from there, because I'm -- this

20   isn't helpful anymore, okay?

21              MS. THOMAS:  Understood, Your Honor.

22              THE COURT:  So we're bypassing that issue, that's

23   held under advisement.

24              MS. THOMAS:  Three pages is going to be very

25   difficult, because unless we set out --
```

1           THE COURT:  Five pages, okay?  Five pages each.

2           All right.  So we're all here together, is there any

3  other issue?  I think I've resolved two out of the three

4  things, which is, given this case, not bad.  Is there any other

5  issues while we're here?

6           Mr. Dockery, are you satisfied that you've received

7  everything that you've requested; anything you want to chat

8  about?

9           MR. DOCKERY:  There's no discovery from Plaintiff

10  that we're raising any issues about right now.

11           THE COURT:  Okay.  Ms. Thomas, anything else, while

12  we're here?

13           MS. THOMAS:  The only points that we had raised Your

14  Honor, pertains to the embedded files where spreadsheets that

15  were produced have linked or embedded files that have the

16  backup data for those spreadsheets; sometimes the formula,

17  sometimes the actual data.

18           We have just sent a very comprehensive, what we

19  referred to as a "technical letter" to Defendants, asking a

20  number of questions about the nature of what was produced, so

21  perhaps we will resolve that there, but that's still a concern

22  of ours.

23           THE COURT:  To be considered maybe later.

24           MS. THOMAS:  That seems appropriate.

25           THE COURT:  All right.  Sam, on the last issue on

1    what they're going to submit letter briefs on, do you feel like

2    we -- well, can I talk to you in private?

3         (Court and Clerk confer)

4              THE COURT:  All right.  And I'll look for those

5    letters and we'll resolve the last -- I'll try to resolve the

6    last dispute.  I apologize for the expression of any

7    frustration, I don't think I've been too bad on that.  I think

8    my overall impression is that, I'll use the beach analogy, I

9    think Plaintiff is being -- both of you are being fair and

10   professional, but I think Plaintiff is being a little bit

11   unreasonable in that you expect, you know, every grain of sand

12   on the beach to be produced, and I think Defendant's being a

13   little bit unreasonable, in that -- in response to your

14   productions, they're literally dumping, sometimes, an entire

15   beach on you, and saying "figure it out."

16             So we're going to work through this one way or the

17   other.  So try to be a little more reasonable Plaintiff, in

18   what you're requesting, and Defense try to be a little more

19   instructive in what you're producing, and I think, you know,

20   we'll keep working through this.  So I look forward to your

21   letters and we'll go from there.

22             Thank you.

23             THE CLERK:  All rise.

24        (Proceedings adjourned at 11:28 p.m.)

25

## <u>C E R T I F I C A T I O N</u>

I, John Buckley, court approved proofreader, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of my ability.


*John Buckley*

John Buckley, CET-623

Date: August 2, 2021