# IN THE UNITED STATES DISTRICT COURT FOR
# THE EASTERN DISTRICT OF PENNSYVLANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* SARAH BEHNKE,<br><br>                                            **Plaintiff-Relator,**<br><br>        v.<br><br>CVS CAREMARK CORPORATION, *et al.*,<br><br>                                                **Defendants.** | **Civil Action No. 2:14-cv-00824 MSG** |

## DEFENDANTS' BRIEF PURSUANT TO
## COURT ORDER DATED JULY 28, 2021

I.    **Introduction**

      Caremark's production of documents and data to Relator has been extensive, as detailed in prior filings. ECF No. 170 at 1 & n.1. Since February, the Court has held three lengthy hearings on Relator's various complaints regarding Caremark's production, and has issued numerous orders in connection therewith. ECF Nos. 136, 143, 147, 143, 147, 155, 168, and 171. All case deadlines have been stayed since April 26, 2021. ECF No. 143. The parties have submitted numerous briefs and letters. Caremark produced thousands of share drive files as part of a compromise it had offered in an effort to resolve Relator's groundless complaints.

      Most recently, in accordance with the Court's Order dated July 28, 2021, Caremark prepared and delivered to Relator (1) a chart providing information regarding each of the "missing documents" identified in Relator's July 28, 2021 handout, (2) a file index for the two Terabytes of data Caremark had offered to produce if Relator wanted it, and (3) good faith proposals for custodians and search terms applicable to Request No. 57. Relator's brief dated August 27, 2021 ("Br.") doesn't contest any of this, yet continues to pile on additional complaints. None have merit.

II.   **Purportedly "Unresolved Issues from July 28 Hearing"[1]**

    A.    **Purportedly "Missing Documents from Chart Itemizing Production of Data"**

      At the July 28, 2021 hearing, the Court ordered Caremark to provide Relator "with information on how to locate in their productions each of the allegedly missing documents identified in Exhibit 1 to the July 28, 2021 hearing." Caremark did so, as reflected in Exhibit A to Relator's August 27, 2021 brief.

      1.    **"Final Versions"**

      Still unsatisfied, Relator now contends that Caremark should be required to go beyond identifying where categories of documents and data appear in the production, and demands that Caremark also specify which particular documents and data within each category qualify as "final versions." Br. at 1-2. The Court's July 28, 2021 order contained no such requirement. Nor did Relator raise this issue either in her July 19, 2021 brief or at the July 28, 2021 hearing.

      Relator is inventing a discovery obligation where none exists. Nothing in the Federal Rules of Civil Procedure requires a party responding to a request for production of documents to characterize which of the requested documents or data files qualify as "final."[2] Moreover,

---

[1] As Relator's complaints have shifted over time, so too have the headings in her letters and briefing. *Compare* ECF Nos. 144, 159, 169, and 177. To avoid further confusion, this brief follows the organization and headings of Relator's most recent brief (ECF No. 177).

[2] The only case Relator cites in support of this novel requirement did not even *consider* the question of whether a party must identify which produced documents are "final," let alone impose such an obligation. *See New Prime, Inc. v. Brandon Balchune Constr. Co.*, 2016 WL 3742872, at *4 (M.D. Pa. July 13, 2016)). That case merely noted that whether a produced contract is executed

Relator's demand that Caremark pick out which documents within various categories are "final" is not as straightforward as Relator seems to think. As just one example, Relator contends that Caremark should identify which of multiple "Annual Summary DIR reports" produced for a given year is "final." But as Relator is aware, there are multiple reports submitted to CMS for each given year; are all "final" because they are all submitted to CMS, or is only the most recent one "final"? Furthermore, if it is obvious from the face of a document whether it is "final" (e.g., an executed contract), then that is as easy for Relator to discern as for Caremark. If, on the other hand, the status of documents within a given category is not facially obvious, it is unreasonable to insist that Defendants investigate every such produced document to determine which specific ones are "final," particularly when many of the documents are as much as ten years old.

### 2. "Aetna/SilverScript"

Relator argues that Caremark "refuse[d] to produce various documents that they deem to be Aetna or SilverScript documents." Br. at 1. Not so. Consistent with prior dealings between the parties and nonparties in this case, Caremark identified to Relator categories of documents that were ***not within Caremark's possession***, thus giving Relator notice that she should subpoena such documents from Aetna and SilverScript if she wished.[3] For reasons that were never explained, Relator waited to do so until last Friday—the same day she filed her brief.

Relator's argues that Caremark should be required to produce documents even if they are uniquely in Aetna's and SilverScript's possession because other courts in other contexts have sometimes required corporations to produce documents possessed by their subsidiaries or affiliates. Br. at 2-3. Whatever else might be appropriate in other cases involving different facts, in ***this case*** the Court and the parties have long recognized the important distinction between Caremark (as a Pharmacy Benefits Manager) and Aetna and SilverScript (as Part D Plan Sponsors). For example, the Court determined that SilverScript, which was initially named as a defendant but was subsequently dismissed, would be required to respond to appropriate document discovery "via a ***concise***, ***not overburdensome subpoena***." *See* Order, ECF No. 129 (Dec. 23, 2020) (emphasis added). Relator did in fact issue a Rule 45 subpoena to SilverScript in 2020, and has pursued discovery from Aetna based on a Rule 45 subpoena Relator issued to Aetna in 2018. All of Relator's discovery as to Aetna and SilverScript has proceeded based on those subpoenas, and has been handled separately from Relator's discovery directed to Caremark.

Simply put, Relator has not been denied discovery of documents that are uniquely within the possession of Aetna and SilverScript. Aetna and SilverScript have each responded to Relator's Rule 45 subpoenas and have produced documents in their possession. The instant dispute arises only because Relator inexplicably did not subpoena certain documents from Aetna and SilverScript until just last Friday—despite having been advised by Caremark months ago that that

---

or not can be significant. *Id.* Here, Relator has ***not*** asserted that Caremark failed to produce executed contracts, nor that Relator is unable to discern which are executed.

[3] To be clear, Caremark has produced requested documents if Caremark itself possessed them, regardless of whether copies were also in the possession of Aetna and SilverScript. This "dispute" applies only where Caremark does ***not*** actually possess the requested documents itself.

the documents at issue were only in the possession of Aetna or SilverScript. Aetna and SilverScript will respond appropriately to Relator's subpoenas issued on August 27, 2021, just as they have done with regard to her prior subpoenas. There is no cause to abruptly alter the manner in which discovery has proceeded thus far by forcing Caremark to begin producing material uniquely within Aetna's and SilverScript's possession.

### 3. "CVS Pharmacy Reconciliations"

Relator acknowledges that Caremark has produced what Relator refers to as "CVS Pharmacy Reconciliation look-alikes," and that Caremark has represented that to the extent such documents existed, they were contained within Caremark's production of documents from the Industry Analysis ("IA") share drive. Br. at 3.

It is unclear what more Relator wants. Relator contends that Caremark is obligated to "conduct a diligent search and produce all responsive documents." *Id.* That is exactly what Caremark has represented it did. Relator offers no support at all to suggest that Caremark's search was not diligent, or that its production was not complete.

### 4. "CVS Financial Information"

Relator contends that as to CVS Pharmacy, Caremark has not produced the "corporate financial documents that will allow Relator to understand what Caremark, the PBM, paid CVS Pharmacy." That is simply incorrect. Caremark has produced both (1) the contracts between Caremark and CVS Pharmacy, which set forth how reimbursement is calculated, as well as the executed network enrollment forms that provided additional financial detail applicable to the pharmacy networks through which Aetna and SilverScript Part D claims were adjudicated and (2) claims data for prescriptions dispensed to Aetna and SilverScript Medicare Part D beneficiaries, including for claims dispensed by CVS Pharmacy.

Relator's demands for yet more documents stem from Relator's unwillingness to accept that in contrast with Caremark's contracts with Walgreen Co. and Rite-Aid, Caremark's contract with CVS Pharmacy during the relevant period did *not* contain a GER guarantee. This was the subject of an earlier request for relief by Relator, which this Court heard at the status conference on February 26, 2021, and denied without prejudice on March 9, 2021. ECF No. 136. Relator subsequently called attention to a document stating that Caremark's Industry Analytics group tracked Rite-Aid and Walgreens to an overall GER "guarantee," while separately noting that same group tracked a "CVS GER and manages the overall to budget." ECF No. 145 ("Apr. 26 App'x") at 6. "Managing to a budget" is of course quite different from committing to a financial "guarantee," because the latter by definition incorporates financial consequences if not satisfied. And as there was no such guarantee as between Caremark and CVS Pharmacy regarding GER, there were no payments or financial adjustments between them in connection with it either.

None of the documents cited by Relator suggest otherwise. Relator points to documents referencing a "GER cap" applied internally within Caremark with regard to CVS Pharmacy, Apr. 26 App'x at 1-9, but nothing in those documents suggests any "payments" ever occurred or were even contemplated as between Caremark and CVS Pharmacy in connection with the internal "cap." Likewise, the documents Relator cites concerning "restated margin," *id.* at 5-7, 14-18, do not even

3

hint at, much less establish, that any revenues or profits were (as Relator speculates) "reallocated . . . as between Caremark as a PBM and CVS Pharmacy." Br. at 4. To the extent Caremark examined or analyzed "restated margin," those analyses were internal to the PBM business; they did not involve (as Relator speculates) any "reallocation" or "trade-off" of revenues or profits as between Caremark and CVS Pharmacy. *Id.*

Undeterred by the evidence, Relator posed requests for production to Caremark that on their face would have required an astoundingly burdensome fishing expedition. In Requests Nos. 49-52, Relator requested (among other things) ***every document*** "reflecting or evidencing ***any*** intra-corporate or related party agreement or transaction" as to prices paid by Caremark (currently the largest PBM in the United States) to CVS Pharmacy (currently the largest retail pharmacy chain in the United States) for all transactions between them for a six year-period. Br. at 4. Caremark rightfully objected that such an extraordinarily broad request was disproportionate to the needs of the case.

Relator subsequently "clarified" by letter that Requests Nos. 49-52 sought "inter alia, [1] certain General Ledger entries relating to reallocation of revenues or profits between Caremark and CVS Pharmacy, [2] budgets for Caremark and CVS Pharmacy with respect to claims paid by Caremark to CVS Pharmacy by line of business, and [3] detailed variance analyses with respect to claims paid by Caremark to CVS Pharmacy, by line of business." Br. at 4 (numbering added for clarity). There is no reason to believe Caremark has any documents within those three specified categories. Based on our investigation to date, Caremark's general ledger would not include any entries "relating to reallocation of revenues or profits between Caremark and CVS Pharmacy." Caremark's annual corporate budgets for 2010 through 2016 contained no line items corresponding to "claims paid by Caremark to CVS Pharmacy by line of business," and accordingly there would have been no reason to prepare variance analyses for such line items in connection with those budgets. Given that Caremark has no reason to believe such documents exist, requiring Caremark to comb through all of its general ledger entries, budgets, and variance analyses for a six-year period just to confirm that there are no "needles in the haystack" would be wildly disproportionate.

Relator's requests, as originally stated, were facially overbroad and disproportionate. And if Relator's "clarification" of those requests is interpreted as actually narrowing them (rather than simply identifying three examples, as Relator's use of "inter alia" suggested was her intention), then there is no reason to believe Caremark would have anything that falls within the specified categories, and no basis to force Caremark to conduct a massive search to confirm that.

### B.     "Search Terms"

Despite the fact that the Court's order to meet and confer regarding search terms was expressly limited to Request No. 57, ECF No. 171, Relator proceeded to propose search terms and custodians for numerous other requests—not just Request No. 57. Relator's most recent proposal would require Caremark to review an additional ***1.3 million documents.*** Not only is that disproportionate on its face, it also is completely out of line with both the actual text of the Court's July 28 Order (focusing exclusively on Request No. 57) and also the Court's more general admonishment to Plaintiff at the July 28 hearing: "So try to be a little more reasonable, Plaintiff, in what you're requesting." Tr. 56:17-18. Defendants have offered counterproposals, most

recently on August 23, 2021, and Caremark is awaiting Relator's response.  Though negotiations are ongoing, Defendants may request the Court to intervene if Relator continues to seek overbroad discovery unrelated to communications between Defendants and CMS requested via Request No. 57.  *Id.*; see also July 28 Hearing Tr. 9:24-25; 17:19-21; 19:16-19.

      **C**      **"Industry Analytics Share File Production"**

Caremark's offer to produce files from the IA share drive primarily related to Request No. 28 of Relator's Second Request for Production, which sought "reconciliations between [Caremark] and any pharmacy pursuant to *any pricing guarantee or term* (e.g., a retail price guarantee, a Contractual Reimbursement level, a CAP or a generic discount guarantee) in contracts between [Caremark] and the pharmacy." (emphasis added).  To be clear, the documents on the IA share drive relating to CVS Pharmacy are not *actually* responsive to that request, because there was no pricing guarantee or term in contracts between Caremark and CVS Pharmacy, Inc.  Indeed, at the hearing on February 26, 2021, the Court denied Relator's request to compel Caremark to produce such documents as to CVS Pharmacy because Relator had not "supplied evidence to support that Caremark *contracted with or otherwise had agreements* with retail pharmacies other than Rite Aid and Walgreens for *guarantees* applicable to Medicare Part D prescriptions during the relevant period."  Order (Mar. 9, 2021) (emphasis added).

Relator has never supplied such evidence.  But rather than continue the dispute over whether such guarantees existed, Caremark offered in April to simply produce documents from a share drive used by the Industry Analysis group to track Caremark's performance relating to specific pharmacies (including, *inter alia*, GER guarantees if such existed).  ECF No. 146 at 2.  Caremark proposed that compromise as an effort to avoid a "motion to compel" that Relator had threatened in April, in which she asserted would renew her request for CVS Pharmacy documents that had been denied by the Court in February.[4]  ECF No. 141, at 3.

**III.**    **Relator's "Requested Relief"**

The scope of Relator's "requested relief" is indiscriminate, imprecise, and bears only the faintest connection to subject matter addressed elsewhere in Relator's brief.  None of the relief Relator requests is limited in any way to *any* specific requests or issues.  Instead, the requested relief would apply broadly across *all* 78 individual document requests issued by Relator to date, *all* objections Caremark has lodged in response thereto, and *all* documents Caremark has produced in response thereto.  Relator has failed to show how she is entitled to any relief at all, let alone relief of such breathtaking scope.

Relator's complaints regarding Caremark's document discovery have already caused all deadlines in this case to be stayed for more than four months.  Relator's inability to articulate any specific, substantiated request for judicial relief simply reinforces that it is time to move on.

---

[4] The compromise was also intended to address Relator's request for information regarding commercial transactions for Walgreen and Rite Aid by including all reconciliation drafts and supporting data, even regarding commercial transactions.  Relator nonetheless demanded more information regarding commercial transactions, which this Court denied.  ECF No. 171.

Respectfully submitted,

WILLIAMS & CONNOLLY LLP

/s Daniel M. Dockery
Enu Mainigi (*pro hac vice*)
Craig D. Singer (PA 71394)
Holly M. Conley (*pro hac vice*)
Daniel M. Dockery (*pro hac vice*)
David J. Park (*pro hac vice*)
725 Twelfth Street, N.W.
Washington, DC 20005
Telephone: (202) 434-5000
Facsimile: (202) 434-5029
E-mail: emainigi@wc.com
          csinger@wc.com
          hconley@wc.com
          ddockery@wc.com
          dpark@wc.com

*Counsel for Defendants*

Dated:  September 3, 2021

## CERTIFICATE OF SERVICE

I, Daniel M. Dockery, hereby certify that on September 3, 2021, I caused a true and correct copy of the foregoing to be filed electronically with the Clerk of the Court using the ECF system, which will render this document available for viewing and downloading via the ECF system and accomplish service on all parties entitled to service by automatically sending a notice of electronic case filing to their counsel of record who are registered as ECF filing users.


Dated: September 3, 2021                                                         /s Daniel M. Dockery
                                                                                                  Daniel M. Dockery