IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* SARAH BEHNKE,<br><br>*Plaintiff*,<br><br>v.<br><br>CVS CAREMARK CORPORATION, *et al.*,<br><br>*Defendants*. | Civil Action<br><br>No. 14-824 |

**MEMORANDUM OPINION**

**GOLDBERG, J.**                                                                                                    **December 28, 2021**

      This is a qui tam suit under the False Claims Act, 31 U.S.C. § 3729 et seq. Sarah Behnke ("Relator"), as relator for the United States of America, alleges Defendants CVS Caremark Corporation, Caremark PCS Health LLC, Caremark Part D Services, LLC, Caremark Rx, LLC (collectively "Caremark") submitted, or caused others to submit, false reports to the Centers for Medicare and Medicaid Services that inflated the apparent cost of prescription drugs, enabling Caremark and its clients to obtain higher reimbursement from the government under Medicare Part D than they would otherwise be entitled to.

      Presently at issue is a discovery dispute, which follows numerous discovery disagreements that have arisen in this matter. Relator has previously sought a broad array of documents that she contends are necessary due to the complexity of the alleged fraud and the large sums of money involved. Caremark disputes the relevance of many of Relator's requests but has produced several terabytes of electronic data. I have invested significant time to resolving these disputes.

1

Presently before me are multiple requests for additional discovery by Relator. These requests are divided across two filings. First, Relator requests several items of discovery as set forth in counsel's August 27, 2021 letter to the Court. Second, Relator requests numerous additional items in a proposed "reply" in further support of her previous requests, filed September 17, 2021. I will not consider Relator's reply at this time. Relator may, after meeting and conferring with Caremark, file a separate motion to compel any items of discovery on which the parties remain at an impasse.

Briefly summarized, I find that: (1) Relator is entitled to have Caremark identify final versions of certain documents; (2) Caremark has represented, and I accept, that it does not have custody or control of Aetna "prescription drug event" reports, documents that belong solely to Aetna and Silverscript, and any "CVS reconciliation look-alikes" other than those that were produced in the "Industry Analytics Share File"; and (3) Relator may discover "CVS financial information" but only on the condition that Relator bear a portion of the cost.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

### A.     Overview of the Alleged Fraud

Medicare Part D is a federal government program that provides coverage for prescription drugs to Medicare beneficiaries. (2d Am. Compl. ¶¶ 28-29.) The program operates under a hybrid public-private model in which private insurance companies (called "plan sponsors") interface with customers and pharmacies while receiving reimbursements from the government on the backend. (Id. ¶¶ 30-31.) The exact reimbursement formula is complicated, but, in general, the more a plan sponsor spends on prescription drugs, the more it will receive in government reimbursements. (Id. ¶¶ 37-39, 57-68, 139, 143-145, 163.)

Caremark is a pharmacy benefits manager (PBM), which is a business that interfaces between an insurance company and a pharmacy. (See 2d Am. Compl. ¶¶ 12, 46-47, 62, 89.) The

insurance company could be a plan sponsor under Medicare Part D. (Id. ¶¶ 13-15.) The role of the pharmacy benefits manager is to purchase drugs from the pharmacy on the insurance company's behalf. (Id. ¶ 89.)

Relator alleges Caremark caused false reports to be submitted to the Centers for Medicare and Medicaid Services (CMS) that overstated the amount plan sponsors (through Caremark) were spending on prescription drugs. (2d Am. Compl. ¶¶ 94, 106.) These inflated prices caused the government to reimburse the plan sponsors at too high a rate. (Id. ¶¶ 4, 151.) In Relator's view, this was a fraudulent scheme that violated the False Claims Act.

The complicated part, and possibly one of the reasons discovery in this case has generated so many disputes, is the way Caremark is alleged to have caused these false reports. Relator does not claim that Caremark simply paid the pharmacy one price and reported a different one. Rather, Relator alleges Caremark would pay one price at the time of sale, report that, and then engage in unreported side transactions with the pharmacy that would have the effect of changing the actual price of the drugs without CMS noticing. (See 2d Am. Compl. ¶ 122.)

As I understand the alleged scheme, and by way of example, if Caremark were to pay Walgreens $50 for Drug X, report the $50 to CMS, but then accept a $10, unreported, side payment from Walgreens, Caremark would have effectively paid $40 for the drug while telling CMS it paid $50. In Relator's view, this would be a false report. Relator alleges these unreported side payments could take different forms, including underpayments on claims for commercial (non-Medicare) members, on the theory that an underpayment from Caremark to the pharmacy is equivalent to a payment from the pharmacy to Caremark. (See 2d Am. Compl. ¶¶ 122, 169-72.) Much of the discovery in this case has consisted of Relator searching for these unreported side payments.

Relator's discovery requests to unearth and understand those unreported side payments has led her to pursue financial arrangements between Caremark and pharmacies which she calls "aggregate price guarantees." As I understand Relator's allegations, an aggregate price guarantee is not fraudulent in itself, but creates opportunities for side payments that, if not properly reported, could be fraudulent. As Relator explains it, Caremark will agree with a pharmacy on the average price to be paid for a drug across all claims, both Medicare Part D and commercial (non-Medicare). (2d Am. Compl. ¶ 172.) Then, Caremark will skew the *individual* prices for drugs so that Caremark pays below the agreed average on commercial claims and above the agreed average on Medicare Part D claims. (Id.) The true economic cost to Caremark on all claims is the negotiated average, but, according to Relator, if the arrangement is not accurately reported to CMS, the reported Medicare Part D price will be the higher individual price, which amounts to a false report. (Id.)

An added wrinkle is that one of the pharmacies for which Caremark is alleged to have misrepresented its payments is CVS, which is in the same corporate family as Caremark. (2d Am. Compl. ¶ 16.) In Relator's view, the close relationship between Caremark and CVS created opportunities for the two companies to shift funds between each other with less of a paper trail. This has made it more difficult for Relator to uncover the alleged unreported side payments between Caremark and CVS, assuming such existed.

Caremark disputes the above allegations on multiple levels. Caremark insists it accurately reported the cost of drugs on Medicare Part D claims. As to CVS specifically, Caremark points out that its contract with CVS contained no term guaranteeing an average price, meaning Relator's theory of fraud (or, at least, the version involving an aggregate price guarantee) cannot be true for CVS.

Relator is not convinced that the fraud could not have occurred with respect to CVS. Relator points out that Caremark's internal documents discuss and track a type of aggregate price guarantee called a "generic effective rate (GER) cap." (See, e.g., ECF No. 145 at 1 (sealed document).) In these documents, numbers for CVS are tabled alongside similar numbers for Walgreens and Rite-Aid, pharmacies for which Caremark's contract did have a contractual term that Relator claims resembles an aggregate price guarantee. And Relator speculates that the close corporate relationship between Caremark and CVS allowed this generic effective rate cap to be enforced informally even in the absence of a specific contractual term.

### B. The Instant Discovery Disputes

Relator's August 27, 2021 letter describes numerous ongoing issues with the discovery process but asks for relief as to only five of them.[1] Those five disputes are as follows:

#### 1. *Final Versions of Documents*

Caremark produced multiple versions of some communications with CMS. Relator has requested to know which versions are "final," which, because these are communications with CMS, I understand to mean which version was ultimately sent to CMS. Caremark opposes providing this information because it insists Relator is equally capable of examining the document metadata and determining which versions are final.

#### 2. *Aetna Prescription Drug Event Reports*

Relator believes Caremark should produce reports of prescription drug events (PDEs) sent by Aetna to CMS. Although Caremark has responded that it does not have Aetna prescription drug event reports, Relator questions the accuracy of this representation and points to an allegation in Caremark's pleading that it considers inconsistent with Caremark's position.

---

[1] Relator's September 17, 2021 reply brief requests relief on numerous other issues, but, as noted, I will not consider those requests unless and until Relator files a separate motion.

### 3.   *Aetna and Silverscript Documents*

Relator has requested that Caremark produce documents responsive to its discovery requests in the possession of Caremark's subsidiaries Aetna and Silverscript. Caremark represents it has produced all Aetna and Silverscript documents that also happen to be in Caremark's possession, but objects to producing documents held solely by the subsidiaries.

### 4.   *CVS "Reconciliation Look-Alikes"*

Relator seeks to have Caremark produce documents she calls CVS "reconciliation look-alikes." Caremark represents it *has* produced any such documents in its possession as part of a voluminous discovery package it calls the "Industry Analytics Share File." Relator considers this representation vague and seeks clarification as to whether other such documents may have previously existed but may have since been destroyed.

### 5.   *CVS Financial Information*

Relator requests a set of documents from Caremark under the heading "CVS financial information." Relator's briefing is somewhat unclear as to exactly which documents are encompassed by that term, but they include at least "certain General Ledger entries relating to reallocation of revenues or profits between Caremark and CVS Pharmacy"; "budgets for Caremark and CVS Pharmacy with respect to claims paid by Caremark to CVS Pharmacy by line of business"; and "detailed variance analyses with respect to claims paid by Caremark to CVS Pharmacy, by line of business."

In Relator's view, discovery into the financial relationship between Caremark and CVS is necessary to uncover any unreported side payments that would have skewed the effective prices paid on Medicare Part D clams. Relator posits that these payments may have happened informally and at a high level, rendering the more routine pricing documentation that sufficed for Walgreens and Rite-Aid inadequate.

Caremark objects to producing "CVS financial information" for several reasons. First, Caremark believes the documents it has already produced, which consist of its contracts with CVS and pricing data on Medicare Part D claims, should suffice. Second, while acknowledging that certain documents do refer to a "generic effective rate cap" between Caremark and CVS, Caremark insists it only kept track of the average price paid to CVS but did not adjust prices to meet a target. Third, Caremark represents it has "no reason to believe" the three enumerated categories of documents (ledger entries, budgets, and variance analyses) would contain the information Relator is looking for. I do not understand Caremark to be representing that the documents do not exist, just that the likelihood of finding them is sufficiently small that it should not be put to the expense of searching.

## II.  LEGAL STANDARD

The scope of discovery includes any matter that is relevant to any party's claim or defense, not privileged, and proportional to the needs of the case. Fed. R. Civ. P. 26(b)(1). In evaluating this standard, a court should consider "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Id.

When discovery has been sought and refused, the requesting party may seek an order compelling its production. Fed. R. Civ. P. 37(a)(3)(B)(iv). "The party seeking discovery has the burden of showing the information sought is relevant to the subject matter of the action, while the party resisting discovery has the burden of clearly explaining its objections and providing the support thereto." Supermedia LLC v. Morley, No. 13-cv-176, 2013 U.S. Dist. LEXIS 205508, at *6 (E.D. Pa. Sep. 5, 2013) (citations omitted).

### III. DISCUSSION

#### A. Final Versions of Documents

Relator's request to know which versions of communications between Caremark and CMS are "final" is reasonable. This is a case about an alleged fraud on CMS, and it is important to know which documents Caremark sent to the agency. I will therefore grant this request.

#### B. Aetna Prescription Drug Event Reports

I accept Caremark's representation that it does not have Aetna prescription drug event reports. The possible tension between this representation and a single paragraph in Caremark's Answer does not rise to a level that would suggest discovery misconduct. I have seen nothing that would lead me to believe the parties and their counsel are approaching their discovery obligations in any way other than in full compliance with ethical standards and the Rules of Civil Procedure.

#### C. Aetna and Silverscript Documents

I disagree with Relator that a corporate party must in all cases produce its subsidiaries' documents. See Gerling Int'l Ins. Co. v. Comm'r, 839 F.2d 131, 140 (3d Cir. 1988) (noting the various approaches). Rather, Rule 34's requirement that a party produce documents in its "control" remains the standard, and a parent corporation must produce its subsidiary's documents only to the extent "the intracorporate relationship establishes some legal right, authority or ability to obtain the requested documents on demand." Camden Iron & Metal, Inc. v. Marubeni Am. Corp., 138 F.R.D. 438, 442 (D.N.J. 1991).

Relator has not demonstrated that Caremark has refused to produce any responsive documents within its "possession, custody, or control." Fed. R. Civ. P. 34(a)(1). I will therefore deny Relator's request.

8

### D. CVS "Reconciliation Look-Alikes"

I accept Caremark's representation that any responsive documents that exist are in the Industry Analytics Share File. Contrary to Relator's argument, Caremark's representation is clear that there are no additional documents of this nature that have not been produced.

### E. CVS Financial Information

I am not persuaded that the discovery Relator seeks under the heading "CVS financial information" is proportional to the needs of the case.

Although some payments between CVS and Caremark, if they occurred, could be relevant to Relator's claims of fraud, discovery in this case has already been extensive, and Relator has not adequately explained how these additional documents would reveal payments based on or offsetting purchases for Medicare Part D claims. I am also concerned about the potential breadth of the proposed investigation given that the requested documents appear to cover broad-ranging and sensitive financial information well beyond Caremark's Medicare Part D business.

On the other hand, I appreciate that Relator faces a difficult task in uncovering payments between two large and closely related business entities. And Relator offers a plausible, albeit somewhat speculative, justification for how a "generic effective rate cap" could indicate side-payments skewing the cost of Medicare Part D claims.

I will therefore permit some discovery of "CVS financial information" on the condition that Relator bear a substantial portion of the cost. A "court may, for good cause, issue an order to protect a party or person from … undue burden or expense" by "specifying … the allocation of expenses[] for the disclosure or discovery." Fed. R. Civ. P. 26(c)(1)(B). "[W]here the cost of producing documents is very significant, the Court has the power to allocate the cost of discovery, and doing so is fair." Boeynaems v. La Fitness Int'l, 285 F.R.D. 331, 335 (E.D. Pa. 2012). If Relator's counsel "has confidence in the merits of" Relator's claims with respect to CVS, "they

9

should not object to making an investment in the cost of securing documents from [Caremark] and sharing costs with [Caremark]." Id.[2]

Accordingly, if Relator wishes to pursue future discovery regarding "CVS financial information," Relator must use the following procedure: First, Relator and Caremark shall meet and confer to define the set of documents. Relator shall narrow the scope of her request as much as reasonably possible with the understanding that Relator may renew her request if new grounds emerge to establish additional production. Then, Caremark shall, within fourteen days of the conference, respond with an estimate of the cost of production. If Relator still wishes to pursue the discovery in light of its cost, Caremark shall produce the requested documents within twenty-one days along with a certification detailing the cost of production. Relator shall bear 80% of the cost. If Relator disputes Caremark's calculation, Relator may, after meeting and conferring with Caremark, seek relief by filing a motion.

## IV.    CONCLUSION

For the reasons stated above, I will grant Relator's request for Caremark to identify final versions of certain documents, deny Relator's request for Aetna prescription drug event reports, deny Relator's request for documents held solely by Aetna and Silverscript, deny Relator's request for "CVS reconciliation look-alikes," and grant Relator's request for "CVS financial information" on the condition that Relator bear a portion of the cost as described above.

An appropriate order follows.

---

[2] I note that Boeynaems involved a discovery request by the same law firm that represents Relator here, and the court there observed that the firm "has the financial ability to make the investment in discovery" if costs were shifted. Boeynaems, 285 F.R.D. at 335; see also Fed. R. Civ. P. 26(b)(1) (directing consideration of "the parties' resources").