IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* SARAH BEHNKE<br><br>           Plaintiffs,<br><br>     v.<br><br>CVS CAREMARK CORPORATION, CAREMARK Rx, LLC (f/k/a CAREMARK Rx, INC.), CAREMARKPCS HEALTH LLC, and CAREMARK PART D SERVICES, LLC,<br><br>           Defendants. | Civil Action No. 2:14-cv-00824 (MSG) |

## MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF-RELATOR'S MOTION TO COMPEL PRODUCTION OF DOCUMENTS BY AETNA

**I.   INTRODUCTION**

After extensive communications,[1] Aetna continues to stand on its objections and refuses to produce any documents responsive to two requests in Plaintiff-Relator's ("Relator's") second Rule 45 subpoena. Aetna has inappropriately refused to produce relevant policy and procedure (RFP No. 5) and merger negotiation (RFP No. 6) documents that are undeniably relevant and

---

[1] Counsel for Relator and Aetna met and conferred on September 23, 2021 and followed up those communications with the following written correspondence discussing the requested documents: Email from Relator's Counsel (Joy Clairmont) to Aetna's Counsel (Sarah O'Connor) dated September 24, 2021; Letter from Aetna's Counsel to Relator's Counsel dated October 4, 2021; letter from Relator's Counsel to Aetna's Counsel dated October 11, 2021; Letter from Aetna's Counsel to Relator's Counsel dated October 19, 2021; Email from Relator's Counsel to Aetna's Counsel dated October 28, 2021; Email from Aetna's Counsel to Relator's Counsel dated November 4, 2021; Email from Relator's Counsel to Aetna's Counsel dated December 16, 2021. After Aetna confirmed that it was "standing on its objections" to Requests 5 and 6 and the negotiations had reached an impasse, Relator's Counsel informed Aetna's Counsel that they would be filing this motion.

1

proportionate to the needs of the case. The documents bear directly on Relator proving her False Claims Act case as well as refuting Defendants' Affirmative Defenses, as they relate to industry practice (which Caremark has asserted as an Affirmative Defense); industry understanding of the government price reporting law and regulations as that relates to ambiguity (also asserted as an Affirmative Defense); Caremark's knowledge of the price reporting requirements; and Caremark's awareness of Aetna's practices (scienter). Because the requested documents are relevant, in addition to being narrowly targeted and not unduly burdensome to produce, Relator respectfully moves for an order compelling their production.

## II.  FACTUAL AND PROCEDURAL BACKGROUND

### A.  Overview of the Fraudulent Scheme

This case focuses on fraudulent price reporting to the government (*i.e.,* the Centers for Medicare and Medicaid Services, "CMS") that caused CMS to overpay—by hundreds of millions of dollars—for Medicare Part D drugs. Relator alleges that Defendant Caremark, a Pharmacy Benefits Manager ("PBM") or middleman between Medicare Part D plan sponsors (*e.g.,* Aetna and SilverScript) and pharmacies (*e.g.,* Rite Aid, Walgreens and CVS Pharmacy), caused false and inflated prices to be submitted to CMS for Medicare Part D drugs. Under the clear legal and regulatory requirements, the prices ultimately received by the pharmacies for drugs must be reported on the Prescription Drug Events (PDEs) and all price concessions not captured in the PDEs must be reported in the year-end Direct and Indirect Remuneration (DIR) reports. Instead, Caremark submitted (or caused to be submitted) inaccurate PDEs and DIR reports to CMS, causing it to overpay for Medicare Part D drugs.

This scheme allowed Caremark to pocket the spread between the higher amounts Caremark charged to the Medicare Part D plans (and caused to be reported to and paid by the government)

and the lower amounts it actually paid to the pharmacies for the drugs. As alleged by Relator, Caremark's conduct violated the False Claims Act as it knowingly submitted (or caused to be submitted) materially false PDEs and DIR Reports for Medicare Part D drugs, causing damage to the government.

>   B.   **Aetna's Changing Relationship with Caremark**

Beginning on January 1, 2011, Caremark began providing PBM services to Aetna, an independent insurance company at that time, offering a range of health insurance plans, including Medicare Part D plans. Second Amended Complaint ("SAC") ¶ 88 (Dkt. 114); Answer ¶ 88 (Dkt. 119). Among the PBM services provided by Caremark, it negotiated, on behalf of Aetna, the prices to be paid to the pharmacies for each drug dispensed to an Aetna beneficiary, SAC ¶ 89, in addition to other services such as managing drug formularies and negotiating rebates with drug companies.

In around the Fall of 2012, as alleged in the Complaint, Relator, Head Medicare Part D Actuary at Aetna, became suspicious of Caremark's conduct because the prices being charged by Caremark to Aetna were significantly higher than prices being charged by other Part D Plan sponsors for the same drugs. SAC ¶¶ 100-103. Given Caremark's huge presence in the PBM market, it did not seem plausible that Caremark actually had to pay the pharmacies the high prices it was charging Aetna. Subsequent investigation and admissions by Caremark revealed the nature of the scheme: Caremark had negotiated lower prices with pharmacies on Aetna's behalf, but had not passed them through to Aetna (as was required by their contract) *nor had Caremark reported the lower prices to the government, as is required by the price reporting law and regulations*. SAC ¶ 106.

This led to a major disagreement between Caremark and Aetna and culminated in Aetna's decision to renegotiate the contract with Caremark. Thus, beginning on January 1, 2015, Aetna

would handle pharmacy price negotiations for Medicare Part D on its own (while still using Caremark as a PBM for other services). Declaration of Sarah Behnke dated June 21, 2018 (Dkt. 43-2). At that point, presumably, Aetna became primarily responsible for its government price reporting, including PDE and DIR reporting for the Medicare Part D segment of its business. It should be noted, as it reflects the scope of Caremark's fraud, when Aetna took the Med D price negotiations with pharmacies back in-house, it lowered its drug spend (and the cost to the government) by hundreds of millions of dollars, including substantial savings from Caremark's wholly-owned CVS Pharmacy. SAC ¶ 137.

Thus, from January 2015 through November 2018, Aetna was an independent entity from Caremark and handled much of the government price reporting, including PDE and DIR reporting, on its own. Due to the ongoing relationship with Caremark as its PBM, however, there was still massive entanglement between the companies, and it is Relator's understanding that Caremark was very much aware that Aetna was handling its price reporting in a significantly different manner than what Caremark had been doing.

Sometime in around 2017, Caremark and Aetna began discussions that culminated in their merger, finalized in November 2018.[2] Thus, from November 2018 to the present, Aetna and Caremark have functioned as a combined entity (referred to herein as "Caremark-Aetna") with Caremark the parent corporation and Aetna as its wholly-owned subsidiary.

Given the substantial discord between the two companies concerning the Medicare Part D prices and price reporting up through 2014, and Caremark's knowledge that Aetna did not agree

---

[2] CVS Health, CVS Health Completes Acquisition of Aetna, Marking the Start of Transforming the Consumer health Experience, CVSHealth.com (Nov. 28, 2018), available at https://cvshealth.com/news-and-insights/press-releases/cvs-health-completes-acquisition-of-aetna-marking-the-start-of.

with its price reporting and had implemented different policies, it is highly likely that there were communications between the two companies in the course of their merger negotiations as to how business would be conducted for the combined entity.

In sum, there are multiple relevant time periods as follows:

- **January 1, 2010 – December 31, 2016**: the relevant time period for False Claims Act claims against the Caremark Defendants;

- **January 1, 2011 – December 31, 2014**: the relevant time period for False Claims Act claims against the Caremark Defendants for drug claims submitted for Medicare Part D drugs dispensed to Aetna beneficiaries;

- **January 1, 2015 – November 2018**: the period during which Aetna, then still an independent entity, handled government price reporting for Medicare Part D drugs dispensed to its beneficiaries;

- **November 2018 – present**: the period beginning following Caremark's acquisition of Aetna in November 2018, and during which Aetna became a wholly-owned subsidiary of Caremark.

C.     **The Discovery Subject to this Motion**

On August 27, 2021, Relator served a second Rule 45 subpoena for the production of documents on Aetna containing eight Requests for Production ("RFP") in total. These included RFP Nos. 5 and 6. RFP No. 5 requested the following documents:

> Process & Procedure, Policy & Procedure, or similar documents relating to Aetna's GER reconciliation and DIR reporting policies and practices within Med D from 2015 through the present.

RFP No. 6 asked for the production of:

> Documents relating to Caremark's PDE and DIR reporting to CMS, including documents reflecting discussions with Caremark during merger negotiations or after, concerning the approach that Caremark, Aetna or the combined entity would take regarding any global pharmacy discount rate (GER or similar) and PDE and DIR reporting to CMS regarding any such global pharmacy discount rate for the time period of 2017 through 2020.

On September 10, 2021, Aetna served its objections and responses. With regard to the documents requested in RFP No. 5 (post-2015 policy and procedure documents) and RFP No. 6 (discussions with, and documents about, Caremark, relating to PDE and DIR price reporting practices during and after the merger negotiations), Aetna refused to produce any responsive documents because the Requests "seek[] documents post-dating December 31, 2014, which are irrelevant to the parties' claims and defenses, not likely to lead to the discovery of admissible evidence and disproportionate to the needs of this case." Aetna also objected that the Requests were "vague," "ambiguous," "overbroad," and "unduly burdensome" among other objections.[3]

## III. ARGUMENT

### A. The Requested Documents Are Relevant to Proving Caremark's Scienter and Refuting its Affirmative Defenses

The requested documents are clearly relevant to proving Caremark's scienter and refuting its Affirmative Defenses.

By way of background, a False Claims Act claim has four elements: (1) falsity, (2) causation, (3) knowledge, and (4) materiality. *United States ex rel. Petratos v. Genentech Inc.*, 855 F.3d 481, 487 (3d Cir. 2017); *see also United States ex rel. Wilkins v. United Health Group, Inc.* 659 F.3d 295, 305 (3d Cir. 2011) ("A plaintiff, in order to establish a prima facie FCA violation under section 3729(a)(1), must prove that (1) the defendant presented or caused to be presented to

---

[3] With regard to the other Requests (other than RFPs Nos. 5 and 6), Aetna agreed to produce documents responsive to some of those Requests or to meet and confer with Relator's Counsel. While Aetna has agreed to produce documents in response to some of the RFPs, it appears that to date, **Aetna has produced documents responsive to just one RFP** (RFP No. 2, Summary DIR reports), even though 4 months have passed. Further, after meeting and conferring in the Fall of 2021, Aetna promised to get back to Relator on several RFPs (RFP No. 3, year-end reconciliations from CMS, and No. 4, actuarial certifications), yet Relator has not heard back from Aetna. Relator hopes to avoid filing an additional motion to compel by engaging in a final meet and confer as to the other Requests.

an agent of the United States a claim for payment; (2) the claim was false or fraudulent; and (3) the defendant knew the claim was false or fraudulent."). Pertinent here is the element of knowledge (or scienter), which can be shown by establishing that Caremark recklessly disregarded that it was not in compliance with the price reporting law and regulations. 31 U.S.C. § 3729(b)(1)(A) (knowledge is defined to include "act[ing] in reckless disregard of the truth or falsity of the information"). Specific intent to defraud is not required. *Id.* § 3729(b)(1)(B).

As stated in its Affirmative Defenses, Caremark will presumably try to argue that it lacked the requisite scienter[4] because, among other reasons, its alleged interpretation of the price reporting law and regulations was reasonable as it was purportedly based on "established industry practice" and the price reporting law and regulations were allegedly "ambiguous":

> SECOND AFFIRMATIVE DEFENSE
> Relator's claims fail because any and all actions taken by Defendants with respect to any of the matters alleged in the Second Amended Complaint were taken in accordance with established industry practice.
>
> ***
>
> FOURTH AFFIRMATIVE DEFENSE
> Relator's claims are barred, in whole or in part, because they rely upon ambiguous provisions of law and the rule of lenity requires such ambiguities to be resolved in Defendants' favor.

(Dkt. 119 at 31).

Aetna's policies and procedures (RFP No. 5) and discussions of, and with, Caremark of PDE and DIR price reporting practices during and after the merger negotiation (RFP No. 6) are indisputably relevant. Under Rule 26 of the Federal Rules of Civil Procedure, "[p]arties may obtain

---

[4] Defendants may also try to argue—as they did unsuccessfully in their motion to dismiss—that the claims submitted to the government were not "false" because the law regarding price reporting is supposedly ambiguous and unclear. (Dkt. 50-1 at 11-12). In this regard also, the requested discovery about Aetna's practices (which were known to Caremark) and any discussions of the price reporting conduct would be relevant to Relator's allegations.

7

discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case . . . ." Fed. R. Civ. P. 26(b)(1). Courts in this District have generally required a somewhat higher showing of relevance when discovery is sought from a non-party. *E.g., In re Domestic Drywall Antitrust Litig.*, 300 F.R.D. 234, 240 (E.D. Pa. 2014). However, this higher standard should not be applied to Aetna, which, as Caremark's wholly-owned subsidiary, is not the "classic disinterested non-party" the standard was designed to protect. *In re Mushroom Direct Purchaser Antitrust Litig.*, 2012 WL 298490, at *7 (E.D. Pa. Jan. 31, 2012).[5]

Even if the standard were applicable to Aetna, however, the documents requested clearly meet the standard since they bear directly on at least one of the required elements of proving a False Claims Act action (scienter), as well as refuting two of Defendants' asserted Affirmative Defenses. Courts routinely require non-parties to produce documents when those documents bear directly on a party's claim or defense.[6] Although Aetna objects that the requests post-date the relevant time period, that is incorrect, as discussed below.

---

[5] *See also id.* ("non-party" shared ownership with defendant and was defendant's exclusive distributor); *Sandoz Inc. v. United Therapeutics Corp.*, 2021 WL 1259667, at *3 (D.N.J. Apr. 6, 2021) ("non-party" was the parent of plaintiff and thus clearly an interested party). As noted above, Caremark and Aetna merged in November 2018. Further, Counsel for Caremark, Williams & Connolly LLP, "wears a number of different hats" in this litigation, also representing Aetna as well as SilverScript. In fact, Aetna has partially waived attorney-client privilege to bolster Caremark's defense to the allegations. Declaration of Susan Thomas, Exhibit 1 (June 2, 2021 Aetna Letter).

[6] *See Domestic Drywall Antitrust Litig.*, 300 F.R.D. at 240-41 (finding that in antitrust case, non-party researcher group's investigation into drywall market met heightened relevancy requirements, especially given that the investigative file and factual analysis specifically touched on the existence of an antitrust conspiracy); *Mushroom Direct Purchaser Antitrust Litig.*, 2012 WL 298480, at *6-7 (holding that plaintiffs satisfied the "stronger showing of relevance" for non-party discovery because sales data from non-party mushroom distributor was "clearly relevant" to establishing or refuting plaintiffs' antitrust claims); *Mycogen Plant Sci., Inc. v. Monsanto Co.*, 164 F.R.D. 623, 626 (E.D. Pa. 1996) (finding that in patent infringement case, information that defendant gave non-party about plaintiff's patent was relevant and discoverable, because defendant could be liable for inducing others to infringe a patent).

With respect to the relevant time period, Relator is pursuing claims against the Caremark Defendants for conduct from 2010 through 2016. Although Caremark's liability for the pharmacy claims submitted through Aetna's Medicare Part D Plans begins on January 1, 2011 and concludes on December 31, 2014 (because Aetna took its Med D pharmacy negotiations and price reporting in-house at that time),[7] Relator's claims continue after that time because Caremark's alleged fraud continued, through SilverScript (and likely other Part D Plans, although Relator is not pursuing those claims). When the focus is properly shifted to *Caremark's* liability, it is apparent that the requested documents are plainly relevant.

Regarding RFP No. 5, evidence of how Aetna or the combined Caremark-Aetna entity handled its government price reporting is relevant to assessing whether Caremark acted with reckless disregard in causing false prices to be reported to the government for Medicare Part D. From 2015 until approximately November 2018, Aetna conducted direct negotiations with pharmacies and handled price reporting to CMS; Aetna's policies and procedures during that time setting forth the legal and regulatory requirements for accurately reporting prices to the government may show that the requirements are clear and unambiguous and that Caremark's price reporting practices were *not* "in accordance with established industry practice." Similarly, the relevant policies and procedures after November 2018 for the combined Caremark-Aetna entity may further rebut Caremark's defenses.

Further, with regard to RFP No. 6, documents discussing price reporting during the merger negotiations and operational integration of Caremark-Aetna (2017-2020) are highly relevant to

---

[7] While with respect to discovery on Aetna, the parties have generally agreed to the time period of 2011 through 2014 (*i.e.,* the time frame when Caremark handled negotiations with pharmacies on Aetna's behalf). However, Relator reserved her rights to seek discovery related to different time periods. *See, e.g.,* Dkt. 134 at 11. Indeed, for certain requests the parties have agreed to tailor the time period to the specific request and have in fact agreed to different dates.

proving Caremark's scienter. As discussed above, in and around 2013 there was a significant dispute between Aetna and Caremark as to how to account for pharmacy GER, which led Aetna to upend part of its contract with Caremark and return to direct negotiating and contracting with pharmacies for its Medicare Part D plans. A few years later, the entities decided to merge and the topic of government price reporting was undoubtedly a subject of negotiation and discussion, both between Aetna and Caremark and internally within Aetna, in light of their previous history and the fact that they would be operating together. Accordingly, Aetna likely has documents reflecting, *inter alia*, discussions with or about Caremark, relating to Caremark's earlier position as to price reporting and any changes made to it, differences between Caremark's and Aetna's approaches to price reporting, the combined entity's approach to price reporting, and other subjects relevant to Caremark's scienter.

Documents concerning Aetna's, Caremark's, or the combined entity's approach to government price reporting, including PDE and DIR reporting, (sought in RFP No. 6), for example, may provide a compelling view of Caremark's knowledge and awareness of other industry participants' understandings and practices. Notably, in support of its position that CMS did not require the type of price reporting that Relator believes was necessary, Caremark has argued that it would not have been feasible to report prices in that manner. (Dkt 50-1 at 9). Documents showing that Aetna found such reporting feasible, or documents reflecting Caremark's knowledge of Aetna's approach to price reporting, would also bear on Caremark's scienter and its defenses.

### B.     Relator has a Substantial Need for the Requested Documents

Relator has a substantial need to obtain the requested documents from Aetna, because (1) it is unable to obtain them from Caremark pursuant to the Court's December 28, 2021 Memorandum Opinion (Dkt. 183); and (2) as outlined above, the requested documents are relevant

to proving Relator's claims as well as in refuting Caremark's Affirmative Defenses. *See, e.g., In re Mushroom Direct Purchaser Antitrust Litig.*, 2012 WL 298480, at *4 (enforcing subpoena on non-party sharing common ownership with defendant, where plaintiff had already unsuccessfully requested same documents from defendant).

      **C.**    **Production of the Requested Documents Would not be Unduly Burdensome**

Production of documents responsive to RFP Nos. 5 and 6 will not be unduly burdensome as the Requests are targeted, narrowly tailored and reasonable. Request No. 5 is sufficiently narrow in that it requests Aetna's policies and procedure documents on the limited topics of "GER reconciliation and DIR reporting policies and practices" for the post-2015 time period. Request No. 6 is limited in that it seeks documents during the merger negotiations of Caremark and Aetna and for a short time thereafter discussing their approach to Medicare Part D government price reporting specifically as to "any global pharmacy discount rate (GER or similar) and PDE and DIR reporting." These are not overly broad Requests requiring a disproportionate effort to produce responsive documents. In fact, Aetna has not made any real showing of burden in responding other than stating throughout the extensive back-and-forth during the meet and confer that the Requests would require new custodians and search terms. Relator's offer to discuss possible custodians and search terms was rebuffed. Because the requested documents are sufficiently limited and directly relevant to the issues in this case, Aetna should be compelled to produce all responsive, non-privileged documents, and to do so promptly.

**IV.**    **CONCLUSION**

For the reasons set forth above, Relator respectfully requests that this Court enter an Order requiring Aetna to produce documents responsive to Requests 5 and 6.

Dated: January 14, 2022

Respectfully submitted:

*/s/ Susan Schneider Thomas*
BERGER MONTAGUE PC
Susan Schneider Thomas
David F. Sorensen
Joy P. Clairmont
Caitlin G. Coslett
William H. Fedullo
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 875-3000
Facsimile: (215) 875-4604
E-mail:  sthomas@bm.net
          dsorensen@bm.net
          jclairmont@bm.net
          ccoslett@bm.net
          wfedullo@bm.net

Natalie Finkelman Bennett
MILLER SHAH LLP
1845 Walnut Street, Suite 806
Philadelphia, PA 19103
Telephone: (610) 891-9880
Facsimile: (866) 300-7367
E-mail: nfinkelman@millershah.com

Jayne A. Goldstein
MILLER SHAH LLP
1625 N. Commerce Parkway, #320
Fort Lauderdale, FL 33326
Telephone: (866) 849-7545
Facsimile: (866) 300-7367
Email: jagoldstein@millershah.com

*Attorneys for Plaintiff-Relator*