IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** *ex rel.* **SARAH BEHNKE,**<br><br>        *Plaintiff*,<br><br>        v.<br><br>**CVS CAREMARK CORPORATION** *et al.*,<br><br>        *Defendants*. | **Civil Action**<br><br>**No. 14-cv-824** |

**MEMORANDUM OPINION**

**GOLDBERG, J.**                                                                                                                                   **March 4, 2022**

In this ongoing qui tam litigation under the False Claims Act, 31 U.S.C. § 3729 et seq., Relator Sarah Behnke ("Relator") moves to compel production of attorney-client communications in the possession of Defendants CVS Caremark Corporation and related entities (collectively "Caremark"). Relator contends Caremark waived its attorney-client privilege when Aetna, Inc. ("Aetna"), which is not a defendant in this lawsuit, but is in the same corporate family as Caremark, produced some of Aetna's own attorney-client communications. Caremark opposes the Motion and argues that any waiver on Aetna's part does not implicate Caremark's privilege. For the reasons set forth below, I will deny Relator's Motion.

**I.       FACTS**

The facts supporting the alleged false claims are complicated, but a brief summary is necessary to provide context to the latest discovery dispute in this case.

Caremark is a pharmacy benefits manager (PBM), a business that purchases drugs on behalf of insurance companies. (Second Amended Complaint ¶¶ 12, 46-47, 62, 89.) Some of

1

Caremark's clients offer plans under Medicare Part D, the part of Medicare that deals with prescription drugs. (Id. ¶¶ 13-15.) Relator alleges that Caremark inflated the apparent cost of prescription drugs in reports sent to the Centers for Medicare and Medicaid Services (CMS), causing the federal government to reimburse Caremark's clients at too high a rate. (Id. ¶¶ 4, 94, 106, 151.) Specifically, Relator claims that Caremark negotiated discounts on non-Medicare drugs to offset higher payments for Medicare drugs and concealed those discounts from CMS. (Id. ¶¶ 122, 169-72.)

Relator explains that she discovered Caremark's allegedly fraudulent pricing scheme while employed by Aetna—an insurance company, a Medicare Part D sponsor, and one of Caremark's clients. (Id. ¶¶ 8, 101.) According to Relator, other Aetna employees took Relator's concerns seriously and concurred in her assessment that Caremark's pricing did not comply with CMS regulations. (Id. ¶ 103, 110, 115-16.)

Relator filed the present lawsuit against Caremark under the False Claims Act on February 6, 2014. Aetna intervened on May 8, 2018 solely to litigate the confidentiality of its documents but Aetna is not involved as a party. During the pendency of this lawsuit, Caremark and Aetna became part of the same corporate family. While the docket still reflects separate counsel for Caremark and Aetna, Caremark's lawyers have responded on behalf of Aetna to Relator's third-party discovery requests. (See, e.g., Relator's Ex. 5.)

On June 2, 2021, Aetna, through it and Caremark's joint counsel, announced a partial waiver of its attorney-client privilege. (Relator's Ex. 6.) Pursuant to that waiver, Aetna produced documents from an internal investigation it conducted in 2012 through 2015 in response to Relator's concerns. (Id.) This investigation culminated in the production of a pair of memoranda authored by the law firm Crowell & Moring LLP in 2013 and 2015. (Relator's Exs. 7 & 8.) These

memos state that the firm could not identify "credible evidence" that Caremark's pricing scheme violated Medicare Part D regulations and recommended that the matter be treated as "resolved." (2013 memorandum at 5; 2015 memorandum at 5.)

The Crowell & Moring memos were based, in part, on representations made by Caremark that Crowell & Moring was not able to verify. Some of those representations are exculpatory. For example, Caremark represented:

> [Caremark] reports that it found no evidence that it or pharmacies explicitly agreed to accept lower commercial pricing and accept higher Part D pricing with the expectation that Medicare rates will offset, or otherwise make acceptable, the lower commercial rates.

and

> [Caremark] asserts that CMS' guidance does not suggest that PBM pharmacy guarantees across multiple lines of business, without more, trigger[] [direct and indirect remuneration ("DIR")] reporting.

(2015 Memorandum at 3-4.)

Although this case is still in the discovery phase and no trial date has been set, Relator somehow predicts that Caremark will attempt to use the Crowell & Moring memos at trial to introduce Caremark's own representations about the legality of its business. While Caremark has stated that it will not rely on an advice of counsel defense, Relator nonetheless characterizes the exculpatory representations in the memos, some of which reflect legal analysis by Caremark's attorneys, as a "backdoor advice of counsel defense." (Relator's Brief at 2.)

Relator further speculates that Aetna must have produced the memos at Caremark's direction. Relator points out that Aetna's waiver came only after Caremark and Aetna became part of the same corporate family. In addition, Aetna's waiver was announced by the same lawyers who represent Caremark and resulted in the production of documents favorable to Caremark. Caremark

3

does not deny that its litigation strategy may have played a role in Aetna's decision to waive privilege, and does not disavow that it will seek to use the Crowell & Moring memos at trial.

Based on the above facts, Relator asks that Aetna's waiver of privilege be treated as extending to Caremark's attorney-client communications as well. Specifically, Relator seeks to discover the attorney-client communications that resulted in the representations appearing in the memos. Relator intends to serve additional document requests for Caremark's attorney-client communications from 2012 through 2015 and states that she may need to depose additional witnesses. Caremark opposes Relator's request.

## II.   LEGAL STANDARD

The scope of discovery includes any matter that is relevant to any party's claim or defense, not privileged, and proportional to the needs of the case. Fed. R. Civ. P. 26(b)(1). In evaluating this standard, a court should consider "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Id. When discovery has been sought and refused, the requesting party may seek an order compelling its production. Fed. R. Civ. P. 37(a)(3)(B)(iv).

## III.   DISCUSSION

The attorney-client privilege "protects from disclosure confidential communications made between attorneys and clients for the purpose of obtaining or providing legal assistance to the client." In re Grand Jury Subpoena, 745 F.3d 681, 687 (3d Cir. 2014). Relator does not dispute that the documents she seeks fit the above definition and therefore would normally be exempt from discovery. Instead, Relator contends that Caremark waived the privilege when Aetna produced the Crowell & Moring memos.

"The attorney-client privilege is waived for any relevant communication if the client asserts as a material issue in a proceeding that … the client acted upon the advice of a lawyer or that the advice was otherwise relevant to the legal significance of the client's conduct." Livingstone v. N. Belle Vernon Borough, 91 F.3d 515, 537 (3d Cir. 1996). This can occur, for example, when a party claims that it lacked scienter based on legal advice it received before engaging in the challenged transaction. Berckeley Inv. Grp., Ltd. v. Colkitt, 455 F.3d 195, 222 n.24 (3d Cir. 2006). However, "[a]dvice is not in issue merely because it is relevant…." Rhone-Poulenc Rorer Inc. v. Home Indem. Co., 32 F.3d 851, 863 (3d Cir. 1994). "[T]hat remains the case even if one might conclude the facts to be disclosed are vital, highly probative, directly relevant or even go to the heart of an issue." Id. at 864. Rather, the client must have "taken the affirmative step in the litigation to place the advice of the attorney in issue." Id. at 863.

In addition, when a party waives the attorney-client privilege as to some but not all documents, "courts broaden the waiver as necessary" to eliminate any unfairness resulting from the partial disclosure. In re Teleglobe Commc'ns Corp., 493 F.3d 345, 361 (3d Cir. 2007). In deciding how far to extend the waiver, the "touchstone is fairness." Id.

Applying the above standard, I conclude that Caremark has not waived its attorney-client privilege. Private discussions between Caremark and its attorneys over what to tell Aetna about Caremark's pricing are "not in issue merely because [they are] relevant" to the truth of representations in the Crowell & Moring memos. Rather, to waive privilege, Caremark would have had to "attempt[] to prove … [its] defense by disclosing or describing an attorney client communication." Rhone-Poulenc Rorer, 32 F.3d at 863. But Caremark has not done so and, indeed, has sought strenuously to keep communications with its attorneys secret.

5

My conclusion is not changed by the fact that Caremark's nonprivileged representations to Crowell & Moring later appeared in documents produced under a privilege waiver. Caremark's statements to Crowell & Moring were never attorney-client communications because Caremark was not Crowell & Moring's client. See id. at 862. That Aetna's counsel later quoted these statements in a privileged memorandum does not change their status. See id. at 864 ("A litigant cannot shield from discovery the knowledge it possessed by claiming it has been communicated to a lawyer…."). Accordingly, Caremark has not placed its communications with its attorneys in issue.

But even if Aetna's waiver did place Crowell & Moring's conclusions in issue, the source material for those memos is already discoverable without further waiver by Caremark. In particular, Caremark concedes that communications between Aetna and Caremark from 2012 through 2015 are not privileged. "[C]ourts will not imply a waiver that is broader than necessary to ensure that all parties are treated fairly." Robert Bosch LLC v. Pylon Mfg. Corp., 263 F.R.D. 142, 145 (D. Del. 2009) (quotation marks omitted). Relator has access to sufficient information to determine whether the Crowell & Moring memos reflect independent analysis or, as Relator claims, merely repeat Caremark's self-serving statements. Disclosure of Caremark's attorney-client communications is thus unnecessary to ensure that Relator is treated fairly.

Finally, although Aetna did waive its own attorney-client privilege, separate "members of [a] corporate group" are not treated as "one client" for purposes of privilege. Teleglobe, 493 F.3d at 372 (3d Cir. 2007). "[T]he client's confidential communications will not be disclosed unless the client takes an affirmative step to waive the privilege," and the client here, Caremark, has not done so. Rhone-Poulenc Rorer, 32 F.3d at 863. Relator has not cited a case in which waiver by one corporation was treated as extending to attorney-client communications of another, nor has Relator

offered a "compelling reason" to disregard the separate legal status of Aetna and Caremark. Teleglobe, 493 F.3d at 372.

Relator nevertheless asks me to find waiver based on a general principal that "[t]he privilege is waived when a litigant puts protected information in issue through some affirmative act for its own benefit, and to allow the protection would be manifestly unfair to the opposing party." In re Broadcom Corp. Sec. Litig., No. 01-cv-275, 2005 WL 1403516, at *1 (C.D. Cal. Feb. 10, 2005). Specifically, Relator contends that, when Caremark allegedly directed Aetna to disclose the Crowell & Moring memos, this was an "affirmative act" for Caremark's "own benefit." And, because the Crowell & Moring memos repeat nonprivileged legal conclusions from Caremark's counsel, Relator argues that concealing the privileged analysis leading up to those conclusions would be "manifestly unfair."

Relator's concern that Caremark will introduce a self-serving assessment of its conduct through the "backdoor" of the Crowell & Moring memos is premature and is a trial, not a discovery, issue. While I do not now decide whether the Crowell & Moring memos may be admissible and, if so, for what purpose, I note that evidentiary rules are ordinarily sufficient to prevent a party from introducing its own exculpatory statements while shielding them from examination. See United States v. Hernandez, 176 F.3d 719, 727 (3d Cir. 1999).

In addition, Aetna's reaction to learning of Caremark's pricing scheme is of at most tangential relevance to Relator's claims. The investigation Relator proposes, by contrast, would extend this already eight-year-old litigation with new document requests and additional depositions. Considering "the burden or expense of the proposed discovery" in comparison to its "likely benefit," I find that any potential unfairness stemming from Aetna's disclosure of the

Crowell & Moring memos should be resolved at trial rather than through additional discovery. See Fed. R. Civ. P. 26(b)(1).

For these reasons, I find that Caremark has not waived its attorney-client privilege. Because the discovery Relator seeks is privileged, Relator's Motion to Compel will be denied.

## IV. **CONCLUSION**

For the reasons set out above, I will deny Relator's Motion to Compel.

An appropriate order follows.