## IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| **UNITED STATES OF AMERICA** *ex rel.* **SARAH BEHNKE,**<br><br>*Plaintiff,*<br><br>*v.*<br><br>**CVS CAREMARK CORPORATION** *et al.*,<br><br>*Defendants.* | **Civil Action**<br><br>**No. 14-cv-824** |

### ORDER

**AND NOW**, this 12th day of May, 2022, upon consideration of Relator's Motion to Compel (ECF No. 207) and Defendant's response in opposition thereto (ECF No. 208), I find as follows:

1.    This case involves qui tam litigation under the False Claims Act, 31 U.S.C. § 3729 et seq., in which Relator Sarah Behnke ("Relator") alleges that Defendants CVS Caremark Corporation and related entities (collectively "Caremark") caused false reports to be submitted to the Centers for Medicare and Medicaid Services (CMS). Discovery has been lengthy and contentious.

2.    Before me is Relator's Motion to Compel answers to interrogatories, which raises two disputes: First, Relator and Caremark disagree as to whether Relator's interrogatories, when properly counted, exceed the presumptive 25-question limit of Federal Rule of Civil Procedure 33(a)(1). Second, Relator contends that four of Caremark's answers do not properly respond to the interrogatories.

3.    For the reasons given below, I will grant in part and deny in part Relator's Motion.

## I.     FACTUAL BACKGROUND

4.      Briefly summarized, Relator alleges that Caremark, a pharmacy benefits manager, falsely reported the prices it paid to pharmacies for prescription drugs. One way Caremark is alleged to have done so is by reporting a "point of sale" price that did not reflect all transactions between Caremark and the pharmacy.

5.      Several of Relator's allegations involve "pass-through" contracts between Caremark and some of its insurer clients in which Caremark was contractually obligated to charge the client the same price it paid the pharmacy. (E.g., Second Amended Complaint ¶ 98.) Relator contends that Caremark's internal documents discuss Caremark extracting "value" from drug transactions for pass-through clients in violation of Caremark's obligation not to charge a markup.

6.      A second issue involves a contractual term called a "generic effective rate" ("GER"), in which Caremark would agree to pay a fixed average price for a given drug across all transactions. Relator does not contend that a generic effective rate is fraudulent but alleges that payments used to manage the generic effective rate must be accurately reported. A point of contention between Relator and Caremark has been whether Caremark had a generic effective rate with its corporate sister, CVS. (See December 28, 2021 Memorandum Opinion at 5.)

## II.    LEGAL STANDARD

7.      The scope of discovery includes any matter that is relevant to any party's claim or defense, not privileged, and proportional to the needs of the case. Fed. R. Civ. P. 26(b)(1). In evaluating this standard, a court should consider "the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit." Id. When discovery has been

sought and refused, the requesting party may seek an order compelling its production. Fed. R. Civ. P. 37(a)(3)(B).

## III.   DISCUSSION

### A.   Numerosity Objections

8.     "Unless otherwise stipulated or ordered by the court, a party may serve on any other party no more than 25 written interrogatories, including all discrete subparts. Leave to serve additional interrogatories may be granted to the extent consistent with Rule 26(b)(1) and (2)." Fed. R. Civ. P. 33(a)(1). "The aim is not to prevent needed discovery, but to provide judicial scrutiny before parties make potentially excessive use of this discovery device. In many cases it will be appropriate for the court to permit a larger number of interrogatories in the scheduling order entered under Rule 16(b)." Fed. R. Civ. P. 33, Notes of Advisory Committee on the 1993 Amendment. In other cases, even "fewer than twenty-five interrogatories" may be unduly burdensome. Hilt v. SFC Inc., 170 F.R.D. 182, 187 (D. Kan. 1997). In either case, the inquiry is one of proportionality. See Fed. R. Civ. P. 33(a)(1) (referencing Fed. R. Civ. P. 26(b)(1)).

9.     Subparts of a single interrogatory may count as separate interrogatories. In making this distinction, courts take a "'pragmatic approach' … with an eye to the competing purposes of Rule 33(a)(1): allowing reasonable latitude in formulating an inquiry to elicit as complete an answer as possible, while at the same time not allowing the multiplication of interrogatories to the point that it defeats the purposes underlying the 25-interrogatory limit." Engage Healthcare Communications, LLC v. Intellisphere, LLC, No. 12-cv-787, 2017 WL 2371834, at *4 (E.D. Pa. Feb. 10, 2017) (special master's report and recommendation) (quotation marks omitted).

10.     In this case, two additional considerations are relevant: First, because this is a complex case, appropriately tailored interrogatories in excess of the default 25-question limit may, in some instances, meet the proportionality test. Second, however, Relator has already engaged in

extensive discovery, and care must be taken to limit additional discovery to avoid unfairly burdening Caremark.

11.     While the parties disagree on the precise count of Relator's interrogatories, it is clear that Relator has propounded more than 25 questions. The following interrogatory, which Relator seeks to count as a single question, is illustrative:

> Explain in detail how the field "Generic Variance" [as shown in e.g., CVS-BEHNKE1815602, Tab "Monthly", column "R"], is calculated. Explain a) what this field is used for; b) why this field is not reported consistently on Quarterly or Annual Reports to WAG and RAD; and c) if there was a similar calculation done for CVS (and, if so, identify where, including identifying documents showing such calculation for CVS).

(Interrogatory No. 6.)[1]

12.     Accordingly, the disputed interrogatories are analyzed below with an eye for limiting discovery to matters that are "relevant … and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1).

### (a)     Interrogatory Number 13

Confirm that CVS-BEHNKE-0331740 (Tabs: Proposed P&L - 2014 OLD 2015 OLD and Proposed P&L – 2014 NEW 2015 NEW) models the financial impact to CVS Health or any of its units of improving Aetna's GER Guarantee from 75.6% to 77.0%, as shown in the excerpted part of that document:

| | Proposed P&L-2014 OLD 2015 OLD | Proposed P&L-2014 NEW 2015 NEW |
|---|---|---|
| Aetna GER | 75.6% | 77.0% |
| Enterprise Wide Margin [cell I69] | $          218,062,533.21 | $          206,416,044.07 |
| Restated Enterprise Margin [cell V143] | $          246,187,475.03 | $          222,813,238.08 |

If not, explain what is being modeled where the document refers to "Enterprise Wide Margin" [cell I69 of Proposed P&L – 2014 OLD 2015 OLD] or "Restated Enterprise Margin" [cell V143 of Proposed P&L – 2014 NEW 2015 NEW].

---

[1] Relator also claims that Caremark waived its numerosity objections by providing insufficient detail as to how it counted each subpart. This position is a small example of why this case has been unnecessarily litigious. It is clear that Caremark specifically stated how many questions it considered each interrogatory to be. But in any event, even if Caremark provided deficient details on this topic, that would certainly not be a valid reason to grant Relator's motion in its entirety.

Confirm whether it models the PBM incurring a loss of $23.4M in "Restated Margin" if it improves Aetna's GER Guarantee and confirm that the difference between the original and restated total Enterprise margin of $28.1M is that under the "original" reporting approach, the $28.1M would have been attributed to traditional or lock-in business, and in the "restated" approach that margin is attributed to Aetna Med D. In the email attaching the referenced spreadsheet [CVSBEHNKE-0173044], what is meant by Christine Ciotinga's entry "Capped pharmacy cost: ~$23.8M"?

- Because this interrogatory asks straightforward, nonburdensome questions about the meaning of terms in a document, and because the subject matter of the document (value obtained on pass-through transactions) is relevant to Relator's claims of fraud, I will require Caremark to answer **Interrogatory Number 13**.

### (b)     <u>Interrogatory Number 14</u>

With respect to the April 14th Letter, explain how, if at all, claims that were excluded from the Quarterly or Annual Reports with WAG and RAD impacted the reporting of prices to CMS (through PDE files or DIR) for claims that were <u>not</u> excluded from the Reports.

- This interrogatory asks an open-ended question about the impact of one variable on another, and Relator has not explained how she cannot perform the analysis herself. Given the volume of discovery that has occurred thus far, I find that this interrogatory is not proportional to the needs of the case. Accordingly, I will not require Caremark to respond.

### (c)     <u>Interrogatory Number 15</u>

With respect to the statement in CVS-BEHNKE-0017215 that "[p]harmacy reimbursement rates for Medicare Part D networks may be higher than other network rates," explain every factor that was being referred to; whether Caremark determined that "higher" amount based on any quantification of those factors in any respect; and identify what documentation exists for such quantification.

- Similarly, because this interrogatory asks for every factor that could bear on a result along with supporting documentation, I find that it is not proportional to the needs of the case. I will not require Caremark to answer this interrogatory.

    (d)    **Interrogatory Number 16**

Explain whether Caremark's MAC management process – as described in CVSBEHNKE-0004420; CVS-BEHNKE-0068247; CVS-BEHNKE-0180214 and CVSBEHNKE-1688886 – that tracked and adjusted client MAC prices to Plans in order to hit the Plan GER Guarantees, could have been used to track and adjust MAC prices to pharmacies to hit the pharmacy GER Guarantees. If so, explain whether that was done and why or why not. If you claim that a substantially similar management of MAC prices to hit pharmacy GER Guarantees would not have been possible, explain why not; who made this determination; and identify all documentation of discussion or analysis of this issue.

- This interrogatory contains several discrete subparts. I find that asking Caremark to analyze whether the given process (management of client MAC prices) could have been used in the given application (management of MAC prices to pharmacies) is not proportional to the needs of the case. Similarly, the request for all supporting documentation and discussions is unduly burdensome.

- The final subpart, which is a contention interrogatory, is premature at this time. See Fed. R. Civ. P. 33(a)(2) ("An interrogatory is not objectionable merely because it asks for an opinion or contention that relates to fact or the application of law to fact, but the court may order that the interrogatory need not be answered until designated discovery is complete, or until a pretrial conference or some other time.").

- The specific question as to whether Caremark used its process for adjusting client MAC prices to also adjust pharmacy MAC prices is a straightforward and relevant factual question. I will therefore require Caremark to answer this portion only of **Interrogatory Number 16**.

(e)   **Interrogatory Number 17**

During the relevant time period, did Caremark ever calculate, forecast or estimate, for any reason, a per-claim price paid to CVS, Rite Aid or Walgreens for generic Med D or commercial claims that reflected the anticipated or actual impact of the Rite Aid or Walgreens GER Guarantees or the CVS GER Target that was in place, whether that information was provided to the pharmacy or not? If so, identify employees involved in that process or with access to that data and identify all data files produced in this litigation (by Bates number), that you contend include or reflect any such per claim prices or, if not produced, identify the types of files or databases in which that information was maintained.

- Because this interrogatory would require Caremark to search for a calculation that could have been performed over a long period of time by a large number of employees, I find it is not proportional to the needs of the case. I will therefore not require Caremark to answer it.

(f)   **Interrogatory Number 18**

Is Caremark able to crosswalk prices paid to pharmacies for specific generic drugs between any combination of databases that allows one to compare the following: a) the price paid to a pharmacy at POS <u>with</u> b) a post-POS per-claim price that reflects the impact of the WAG and RAD GER Guarantees or the CVS GER Target that was in place? If so, identify the process by which this can be done, including identifying information about the location and current status of each database with pertinent information.

- This interrogatory asks a straightforward factual question about the nature of a database Caremark maintains. In addition, the subject matter is relevant because it involves the difference between point-of-sale prices and average per-claim prices. I will therefore require Caremark to answer **Interrogatory Number 18**.

(g)   **Interrogatory Number 19**

With regard to a meeting and/or call between Caremark and CMS as referenced in CVSBEHNKE-1830849, identify: a) all individuals who attended (whether in person or by phone or by other means) from or on behalf of Caremark including employees and attorneys; b) any notes taken by any such individuals; c) any follow up discussion within Caremark concerning CMS' comments about the

GER (or pharmacy price protection, as referenced in the meeting described in CVS-BEHNKE-1831565); d) any further meetings or communications with CMS concerning that topic; and e) any further discussions Caremark had with other industry participants, including but not limited to Pharmaceutical Care Management Association (PCMA), concerning that topic.

- Because the identity of individuals who attended a meeting with CMS is relevant and not burdensome to determine, I will require Caremark to answer that subpart of **Interrogatory Number 19**. The remaining subparts would require an extensive search for documents and I will not require Caremark to answer them.

(h)     **Interrogatory Number 20**

With regard to the meeting between PCMA and CMS in or around December 2015, as referenced in CVS-BEHNKE-1831565, identify: a) all individuals who attended (whether in person or by phone or by other means) from or on behalf of Caremark including employees and attorneys; b) any notes taken by any such individuals; c) any follow up discussion within Caremark concerning reporting of the "pharmacy price protection" (or GER) noted in the summary; d) any further meetings or communications with CMS concerning that topic; and e) any further discussions Caremark had with other industry participants, including but not limited to PCMA, concerning that topic.

- Similarly, I will only require Caremark to answer the first subpart of **Interrogatory Number 20** as to which individuals attended the meeting. I will not require Caremark to answer the remaining subparts.

(i)     **Interrogatory Number 21**

Regarding your Second Affirmative Defense that You acted consistent with established industry practice, identify all PBMs, Plans or industry entities that conducted price reporting of PDE and DIR like You or SilverScript did during the relevant time period with regard to pharmacy discount rates or GERs and provide all detail you have about the entirety of those entities' price reporting structure and practices. If you are not aware of other entities reporting in a similar fashion, please so state. If you are aware of other entities that reported in a different fashion (including Aetna post-2015), please identify them and provide all detail you have about the entirety of those entities' price reporting structure and practices.

- Although this interrogatory is relevant, it is a contention interrogatory which is premature at this time. See Fed. R. Civ. P. 33(a)(2). Consequently, I will not require Caremark to respond.

### (j)      Interrogatory Number 22

Regarding your First and Fifth Affirmative Defenses that Relator's claims are barred, in whole or in part, by government knowledge, waiver or estoppel, or consent or ratification, explain in detail a) the government knowledge to which You refer in both Affirmative Defenses (including who knew what and when and how such individuals gained the knowledge that You identify), and b) specific actions taken or not taken by the government that constitute waiver, estoppel, consent or ratification.

- Although this interrogatory is relevant, it is a contention interrogatory which is premature at this time. See Fed. R. Civ. P. 33(a)(2). Consequently, I will not require Caremark to respond.

## B.      Sufficiency of Certain Answers

13.     Relator contends that certain of Caremark's answers to interrogatories are incomplete. An incomplete answer is treated as a failure to answer. See Fed. R. Civ. P. 37(a)(4).

### (a)      Interrogatory Number 4

How, if at all, was Caremark's Additional Reimbursement to [Walgreens] and [Rite-Aid] under their respective GER Guarantees impacted by the prices Caremark charged Aetna or SilverScript on Med D claims? For example, if Caremark reduced Aetna's or SilverScript's Med D generic drug prices in a given year (that is, charged them lower prices for generics, in the aggregate, for Med D), would that have changed the Additional Reimbursement Caremark would have owed [Walgreens] or [Rite-Aid] for that year, and if so, how? To the extent necessary, explain separately for each pharmacy, for each year from 2010 through and including 2016.

**Answer**:

… [A]ny compensation that Caremark was required to provide Walgreen or Rite-Aid to [the] extent that it did not meet the guarantee provisions set forth in its contracts with those pharmacies is calculated as set forth in those contracts.

Amounts paid to Walgreen or RiteAid for drugs dispensed to beneficiaries of SilverScript or Aetna may be included in those calculations according to the terms of the contracts and therefore factor in to the overall calculation. However, to the extent the phrase "Additional Reimbursement" appears as a defined term in Caremark's agreements with Walgreens or Rite-Aid between 2010 and 2016, calculation of that amount did not rely on or require Caremark to specifically isolate the impact (if any) on Additional Reimbursement of "prices Caremark charged Aetna or SilverScript on Med D claims." Based on the information provided, Caremark cannot provide any further response to the hypothetical that is incorporated as an "example."

- Relator contends that this answer is insufficient because it only points to the formula that set prices paid to Walgreens and RiteAid but did not answer how those prices would change in the hypothetical Relator posed.

- I find that Caremark's answer is sufficient. Caremark identified how prices paid to Walgreens and RiteAid were set. Relator is equally capable of determining how that process would be affected by prices charged to Aetna or SilverScript on Medicare Part D claims. Requiring Caremark to work out this analysis is not proportional to the needs of the case.

  **(b)**    <u>**Interrogatory Number 5**</u>

With regard to CVS-BEHNKE-0180214: … b) explain in detail what was meant in the statement on page 7, that "[c]hanging a Pass through clients [sic] GER will have an impact on the amount of 'Value' we get from Retail pharmacies in total," specifically including what was referred to as, or meant by "value," and whether and how the "value" received varied depending on whether the retail pharmacy was WAG or RAD versus CVS.

<u>**Answer**</u>:

… (b) Caremark understands that statement on slide 7 that "[c]hanging a Pass through client['s] GER will have an impact on the amount of 'Value' we get from Retail pharmacies in total," to reflect the fact that the total amount a pass-through client pays for generic drug impacts the total amount paid to all pharmacies for such drugs. Caremark further responds that it does not understand the statement to refer or apply specifically to any one pharmacy or chain.

- Relator contends that Caremark's answer is incomplete because it does not state what is meant by "value." Caremark, in response, does not claim that its answer does say what is meant by value. I therefore find that Relator is correct that Caremark's answer is incomplete.

- In addition, this question is relevant and proportional to the needs of the case because it pertains to Relator's allegation that Caremark earned value on pass-through transactions.

- I will therefore require Caremark to supplement its answer to **Interrogatory Number 5** by answering what is meant by "value" in the referenced document.

    (c)    **Interrogatory Number 8**

In CVS-BEHNKE-0359761, Mr. Gugliuzza states: "IA tracks and reports a CVS GER and manages the overall to budget" and "YTD 2014 we calculated and implemented 50 Pharmacy side adjustments that had an annual impact of $450m to help client achieve targets and Caremark to achieve company goals." Provide a detailed explanation of how the CVS pharmacy budget is set and managed with respect to anything impacted by the CVS GER, including an accounting of the $450 million impact referenced by Mr. Gugliuzza and identify the documents that reflect that $450 million impact.

**Answer**:

… Caremark understands the statement that "IA tracks and reports a CVS GER and manages the overall to budget" to refer to the fact that during the relevant time period Caremark tracked the generic effective rate with respect to CVS Pharmacy to a budgeted rate by way of documents such as those identified in response to Interrogatory 7.

- Relator argues that Caremark's answer is incomplete because it does not state how Caremark's "IA" department "manages" a generic effective rate for CVS. Caremark's opposition does not claim that the answer responds to this portion of the interrogatory. Managing a generic effective rate, if it occurred, would be

11

relevant to Relator's claims because it could involve payments between Caremark and CVS that were in addition to point-of-sale payments.

- I will therefore require Caremark to supplement its answer to **Interrogatory Number 8** by answering how, if at all, IA managed a generic effective rate for CVS.

- However, I will not require Caremark to provide a "detailed explanation of how the CVS pharmacy budget is set and managed with respect to anything impacted by the CVS GER," because this broad question is not proportional to the needs of the case.

### (d)    <u>Interrogatory Number 9</u>

Identify (by Bates number if produced) any internal Caremark or CVS documents that provide definitions or descriptions of any or all of the following terms or concepts with respect to Med D claims dispensed by CVS Pharmacy to beneficiaries of Aetna or SilverScript Med D Plans: GER; GER target; excluded claims; generic AWP performance; provider reimbursement; POS reimbursement; additional reimbursement; adjusted, net or final reimbursement; or reimbursement category, specifically including, but not limited to, definitions that exist regarding CVSBEHNKE-1813534.

**<u>Answer</u>**:

Subject to and without waiving the foregoing general and Specific objections, Caremark states that based on its investigation to date, Caremark is not aware of any documents that expressly define the listed terms with respect to Med D claims dispensed by CVS Pharmacy to beneficiaries of Aetna or SilverScript Med D Plans, or specifically regarding such terms to the extent they appear in CVS-BEHNKE-1813534.

- Relator argues that Caremark's answer is insufficient because Caremark did not identify documents that "describe"—rather than "define"—the listed terms. Relator additionally asserts that Caremark must have had working definitions for terms such as GER (generic effective rate) because Caremark tracked a generic effective rate for some pharmacies.

- I find that Caremark's answer is sufficient. To the extent that "describe" is broader than "define," the question would require an extensive search for documents and is therefore not proportional to the needs of the case. Relator's contention that Caremark must have had a working definition of GER goes to the truth of the answer, not its completeness.

**WHEREFORE**, it is hereby **ORDERED** that, within thirty (30) days of the date of this Order, Caremark shall serve amended answers consistent with my findings set forth above.

**BY THE COURT:**


*/s/ Mitchell S. Goldberg*
**MITCHELL S. GOLDBERG, J.**