June 24, 2022

**VIA ECF**
The Honorable Mitchell S. Goldberg
United States District Court
Eastern District of Pennsylvania
601 Market Street
Philadelphia, PA 19106

    *Re:*    *U.S., ex rel. Sarah Behnke vs. CVS Caremark Corp., CA No. 14-cv-00824*

Dear Judge Goldberg:

Pursuant to ECF 221, the parties respectfully submit this joint letter. Regarding the first and third bullet points in the Order, the parties are negotiating a stipulation regarding the contracts and Aetna represents that it is producing responsive documents it can reasonably locate.

### I.     Caremark's, Aetna's, and SilverScript's Data Productions

#### a.     Relator's Position

The parties' fundamental disagreement is that Relator believes it is Caremark's obligation to produce complete data—and represent that it has done so—and Caremark's obligation to identify final, complete data files (when, for example, multiple files cover the same year). Caremark disagrees, arguing that Relator must somehow *prove* that the produced data are incomplete before Caremark, SilverScript and Aetna (who Caremark calls "non-parties" but are in fact related entities all represented by the same counsel) will even investigate. Caremark refuses to clearly *represent* that its production is complete *and* refuses to say whether additional responsive data exists. It is not "too late" for these issues to be addressed—these issues were all raised by letter dated May 6, 2022—nearly 2.5 months before the scheduled close of discovery—or earlier. Caremark failed to respond. Caremark cannot be allowed to stonewall, then claim it is "too late" to require them to do anything.

***Gaps in data production.*** On May 6, 2022, Relator identified likely gaps and inconsistencies regarding four types of data: (1) Prescription Drug Event (PDE) data submitted to the Center for Medicare Services (CMS) reflecting point-of-sale pricing for generic drugs paid for by Medicare plans, (2) Direct and Indirect Renumeration (DIR) reports submitted to CMS reflecting later adjustments to the prices paid, (3) Part D Plan (PDP) Bids submitted to CMS, and (4) Pharmacy Reconciliation Summary (PRS) Reports reflecting CMS's final reconciliation of year-end payments. The issue is that the four data sets contain different, non-identical sets of Aetna and SilverScript contract-plans, but Relator would expect that the contract-plans across data sources would be identical because *e.g.*, if an Aetna Medicare Part D contract-plan (identified by a specific number) is included in Aetna PDE data, that same contract plan number should *also* appear in the Aetna DIR Reports, since both PDE and DIR data relate to price reporting for Aetna Medicare Part D plans.[1] The partial (but not complete) overlap in the contract-plan numbers across the four data sets suggests that the data productions are likely incomplete. We say "suggests" precisely because we are not certain. Complete data reflecting all of Aetna's and SilverScript's Medicare contract-plans is relevant to damages and to showing Caremark's false statements to CMS. Caremark should (a) explain the discrepancies between the data sources, and represent in writing that the four sets of data are complete; *or* (b) produce the missing data and then represent that the data production (for all four sources) is complete, covering all Aetna and SilverScript Medicare Part D contract-plans. But Caremark refuses to do either. Relator will be prejudiced if she does not receive complete data and confirmation of same. The Court should not allow Caremark to refuse to complete its data production and then criticize Relator's experts. And Caremark cannot defend its deficient data production by claiming it made reasonable efforts to pull data. Caremark must produce complete data from its databases. This is different from a party

---

[1] For example, the SilverScript PDE data appears to relate only to contract S5601; contract numbers S5580, S5755, and S5766 are missing from the PDE data but appear in other data sources.

missing a stray email through search term collection.[2]

***Identification of final data files.*** Relator's May 6, 2022 letter explained that Caremark, Aetna, and SilverScript have not provided sufficient information to identify "final" DIR reports, PDE data, and PRS reports for each year. For example, several of the documents Aetna stated were "final versions of summary DIR reports that Aetna submitted to CMS," include *SilverScript* plans. Caremark's counsel has not explained this nor responded to any of Relator's other questions requesting identification of "final" data files. Caremark's prior correspondence is insufficient and it should be compelled to provide this information, including consistent with ECF 183.

### b.     Caremark's, Aetna's, and SilverScript's Positions

Caremark, Aetna, and SilverScript have performed the reasonable searches they agreed to perform and have produced the responsive DIR, PDE, bid, and reconciliations data they each agreed to produce from those searches. That is what the Rules require. *E.g.*, Fed. R. Civ. P. 26(b). Relator frames these disputes as "likely gaps," *supra* p. 1, or "apparent gaps," Ltr. Reply at 1, Dkt. 219 (June 6, 2022), because she *has no basis* to assert otherwise. Rather, Relator and her experts have questions about substantive matters within and among the produced documents, such as why certain client-plan data appears in some reports but not others and why the companies would generate multiple copies of the same reports for the same years. *See, e.g.*, May 6 Ltr. at 2 ("[T]here are contract-plans that appear in DIR reports for a given calendar year but not in the PDE data and *vice versa*."), 4 ("[E]xplain how there can be multiple 'final' DIR reports for the same year.").

The Federal Rules do not require, however, that parties accompany their productions with such explanations. (Though, notably, information already provided should obviate several of Relator's questions. *See, e.g.*, Aug. 11, 2021 Ltr. from D. Dockery, Attmt. p. 3 (identifying contract-plans "acquired by SilverScript" and explaining that certain plan data was "missing" only for "years prior to when the plans in question were consolidated into SilverScript"); Jan. 28, 2022 Ltr. from D. Dockery (identifying "final" versions of PDE and DIR reports pursuant to the Court's December 28, 2021 Order)). Nor is a producing party—much less a third party like Aetna or SilverScript—required to generate tomes ticking-and-tying fields in its produced data to *prove* the completeness of its productions. *Cf., e.g.*, *Bethea v. Comcast,* 218 F.R.D. 328, 330 (D.D.C. 2003) (mere "suspicion" or "conjecture" that an opponent's production is incomplete is "insufficient"). What Relator really seeks here is *fact evidence* of the type litigation parties must obtain (if at all) from knowledgeable fact witnesses or, where not unduly burdensome, interrogatories.[3]

Relator has had ample opportunities on both fronts. She was granted more than the 25 interrogatories provided by Rule 33, *see* Order, Dkt. No. 214 (May 12, 2022), and Caremark agreed she could take *50 percent more* depositions than the Federal Rules allot. Relator has issued interrogatories and deposition notices that fully exhaust (in fact, exceed) those generous limits. In doing so, she presumably has prioritized the discovery she believes is most important for her case (as all litigation parties must). And beyond formal discovery, Caremark has provided extensive

---

[2] Caremark or Aetna should also be compelled to produce the Aetna 2012 and 2013 PDP Bids (as requested in Relator's May 6 letter and as Caremark's counsel appears to agree to do for the first time in this letter).

[3] Caremark is not declining Relator's requests because they are "too late," *see supra* p. 1, but rather because she seeks to end-run the Federal Rules' reasonable discovery limits by instead pursuing her requests through seemingly endless informal letter-writing campaigns.

responses to numerous of Relator's questions about produced data. Relator's demand that Caremark be required to do still more is untethered to the Federal Rules and unreasonable given the extensive and burdensome discovery Caremark already has provided.[4]

## II.   Interrogatories 23 and 24 and Requests for Production ("RFPs") 82 and 83

### a.   Relator's Position

Plaintiffs served on May 6, 2022 two RFPs[5] and two interrogatories aimed at addressing data gaps/issues. Interrogatory 23 and RFP 82 both seek Aetna's and SilverScript's shares of Caremark's Part D generic drug business during the relevant time period. This should have been produced in response to prior RFPs (*e.g.*, RFP 50, served 12/31/2020) and is relevant to damages, because Relator will calculate CMS's overpayment for generic drugs associated with Aetna and SilverScript Part D plans. Relator agreed to accept *either* (a) a *complete*, verified response to Interrogatory 23 *or* (b) documents sufficient to show these shares, per RFP 82. Caremark refused to answer Interrogatory 23 and identified certain already-produced documents in response to RFP 82 but, as Relator has explained, if Caremark believes these documents can be used to calculate shares then it should explain how, as it is not apparent from the documents Caremark identified. Caremark employee Elena Kinney testified that these client shares (*e.g.*, Aetna and SilverScript) are readily available to Caremark. Kinney Tr. at 268:18-269:3. Caremark should be compelled to answer Interrogatory 23 *or* produce documents sufficient to show the shares, particularly given Caremark's refusal to provide 30(b)(6) testimony on this issue. *See* ECF 224 at 3-4.[6]

Interrogatory 24 and RFP 83 seek lists of the Aetna and SilverScript Medicare Part D contract-plans reflected in each year of Caremark's pharmacy reconciliations to assist with the calculation of damages on the relevant contract-plans. Relator agreed to accept (a) a complete, substantive, verified response to Interrogatory 24 *or* (b) documents responsive to RFP 83, either of which would allow Relator to confirm the completeness of the data productions and deal with the contract-plan discrepancies addressed above. This discovery is proportional given Caremark's refusal to represent that all of the produced data sources include all of the Medicare Part D contract-plans and refusal to provide the shares discussed above. Caremark's resurrecting its "offer" to produce its "Industry Analytics share drive" underscores the fundamental problem—Caremark is obligated to search its data and documents and produce those that are responsive, not point to some

---

[4] With respect to the separate matter of Aetna's 2012 and 2013 Medicare Part D bids, Aetna is actively confirming the location of those bids within its productions. If those bids have been omitted, Aetna will produce responsive bids that can be located through reasonable searches.

[5] These RFPs both seek "documents sufficient to show," to *reduce* any burden to Caremark, who would need to produce a small number of documents pulled in a targeted manner, without running search terms.

[6] Even assuming that Caremark would have to extract this share information from its data, it should be compelled to do so (or answer the corresponding interrogatory). *See, e.g.*, *Mervyn v. Atlas Van Lines, Inc.*, 2015 WL 12826474, at *5 (N.D. Ill. Oct. 23, 2015) (requiring production of data from preexisting database, even though that would require spending a week writing a computer script, a week running the script on the database, and a week checking the results); *id*. at *6 ("requiring a party to query an existing database to produce reports for opposing parties is *not* the same as requiring the creation of a new document. Thus, the argument that Plaintiff's request is outside the scope of Rule 34 is unfounded.") (emphasis in original). And this share data is plainly available to Caremark: share information appears in one produced reconciliation (CVS-BEHNKE-0004380). If Caremark were to produce other reconciliations with this same information that would be sufficient.

3

database and say to Relator "maybe you will find something in there." Caremark has produced data and documents identifying *some* contract-plans, but has not provided a comprehensive list of such contract-plans, which again is necessary to confirm the completeness of the data productions.

### b. Caremark's Position

Acknowledging that RFPs 82 and 83 were duplicative of Interrogatories 23 and 24, Relator sought Caremark's responses to *either*. *See* May 6 Ltr. at 1–2. Given that Relator already had more than exhausted her 25 allotted interrogatories, Caremark responded to the RFPs.[7] Setting aside its ambiguity, RFP 82 seeks "[d]ocuments sufficient to show" what portions of four data figures within Caremark's pharmacy reconciliations would correspond to prescriptions filled under Caremark-administered Aetna and SilverScript Part D plans, respectively. Caremark fully complied with that Request. It pointed Relator (with specific Bates ranges) to the billions of lines of transaction-specific PDE and claims data already produced concerning Aetna and SilverScript. *See* Objs. & Resp. to Seventh RFPs at 9–10 (June 6, 2022). And it explained how Relator can use the "code for brand versus generic prescriptions . . . to distinguish and count generic prescriptions," and that Relator can use Caremark's produced pharmacy contracts to discern which generic prescriptions are included in GER reconciliations. *Id.* RFP 83 relatedly sought "documents sufficient to identify" the Aetna and SilverScript contract-plans represented in aggregate generic drug totals in Caremark's pharmacy reconciliations. Caremark again satisfied the request by identifying: (a) produced PDE data, including the *specific fields* that reflect the contract-plan and the filling pharmacy for each prescription; and (b) produced pharmacy contracts from which Relator can determine which prescriptions are included in GER guarantees. *Id.* at 12–13. As to both RFPs, Caremark also renewed its offer to produce to Relator "additional large reconciliation data files from its Industry Analytics share drive" that Relator previously *declined* after reviewing a sample, *id.*; Relator has not expressed any interest.

Relator's endless dissatisfaction with Caremark's provided discovery regarding pharmacy reconciliations—including its responses to RFPs 82 and 83—is straightforward: Relator wishes Caremark had done during the relevant time period the analyses and calculations that she now wants for this litigation. And since the documents and data do not present information just the way Relator would like it, she now seeks to compel Caremark to do her work for her and *generate an analysis* of the transactional data Caremark *has already produced.*

Relator relies solely on Caremark's 2013 reconciliation with Walgreen, which has separate rows pertaining to Aetna and SilverScript. But, as Relator acknowledges, no such rows appear in other years' reconciliations. *See* May 6 Ltr. at 1. The reconciliations produced to Relator were exactly what Caremark compiled in the ordinary course of its business each year. Caremark cannot merely press a button on a database and spit out versions of its historic reconciliations adjusted to Relator's liking.[8] And Caremark already has extracted and produced the *actual underlying*

---

[7] Contrary to Relator's suggestion, RFP 50 did not encompass Aetna and SilverScript "shares" of GER reconciliations but rather sought "information regarding amount paid for each prescription" processed by Caremark for Aetna and SilverScript Med D plans. *See* Objs. & Resps. to 4th RFPs at 8, 15–17 (Feb. 1, 2021). Had Relator believed otherwise, presumably she would not have issued new discovery requests.

[8] Relator's impression that Caremark *can* readily do so misinterprets the testimony of Caremark's Elena Kinney, who said only that Caremark "can pull back *claims* at a client level" such that one could count up

*transactional data*, so the precedent Relator cites in footnote 5 is inapposite.

The Federal Rules do not require Caremark to perform non-standard calculations or *create* modified iterations of its reconciliations for Relator. Nor do they require a party to provide a detailed instruction manual—as Relator demands—explaining how its opponent can analyze documents "sufficient to show" particular facts (though Caremark's responses to RFPs 82 and 83 offered some such guidance). Caremark has produced the underlying documents and data at issue, and Relator is free to engage experts to perform whatever analyses she chooses.

### III. Documents Concerning Negotiations with Pharmacies (RFP No. 51)

#### a. Relator's Position

Caremark has not produced (a) budget agreements with CVS Pharmacy, or (b) documents reflecting Caremark's contract negotiations with Walgreens, Rite Aid, and CVS Pharmacy, specifically regarding the generic effective rate ("GER") that Caremark would owe and pay each pharmacy. These documents are relevant and responsive to RFP No. 51, which seeks documents "establishing, reporting, or implementing pharmacy discount rates[.]"

As to category (a), Caremark has represented that Caremark's budget agreements with CVS Pharmacy were not contractually set and not reflected in written documents. However, former Caremark employee Mr. Gugliuzza testified on June 10 to the existence of Caremark-CVS budget agreements. Gugliuzza Tr. at 220:11-22, 223:9-22.[9] Documents concerning these budget agreements—whether contractually set or not—are relevant evidence of how Caremark implemented an overall GER (covering both Medicare and commercial prescription claims). The overall GER was key to implementing the challenged fraudulent price reporting—it allowed Caremark to earn unlawful spread on its commercial business financed by overpayments on its Medicare business. Caremark must produce these documents.

Caremark should also be compelled to produce category (b), documents concerning and reflecting its negotiations with Walgreens, Rite Aid, and CVS Pharmacy. Relator proposed as search terms only the names Walgreens, Rite Aid, and CVS Pharmacy employees that handled the negotiations, who were identified in recent Caremark testimony. Caremark refused to negotiate any search terms and refused to produce these documents, which are sought by RFP No. 51 because the process by which a pharmacy discount rate is "established" includes negotiation of the rate.[10]

---

"how many" prescriptions each client has in order to break out its "percentage of generic prescriptions." Kinney Dep. at 242, 269 (emphasis added). Relator can perform the same exercise using the produced data and documents that Caremark has identified, including transaction-level claims data that Relator requested.

[9] Mr. Gugliuzza testified there were no *contracts*, but that there were documents "communicated to me, here's what we've agreed to on a GER brand rate[.]" *Id.* at 222:23-223:3; *id.* at 223:9-22 (there were no contracts, but there were budgets). This gap came to light at Mr. Gugliuzza's June 10 deposition, and so is not addressed in the June 10 Order. Caremark confirmed on the parties' meet and confer call that Caremark refuses to run additional searches to identify documents responsive to RFP 51 and Caremark indeed refuses as of today. This issue is ripe for the Court.

[10] Relator disputes that Caremark's payments to CVS Pharmacy were not affected by GER budgets and is entitled to discovery; Caremark's interrogatory response merely says its "*contracts* with CVS Pharmacy during the relevant time period did not contain any [GER] *guarantee* provision." ECF 207-5 at 12.

5

### b. Caremark's Position

Relator's request to compel production of documents concerning Caremark's *negotiations* with pharmacies should be denied because such documents simply do not fall within the scope of RFP 51. That request sought in relevant part "all documents *establishing, reporting, or implementing* pharmacy discount rates in connection with payments to pharmacies by Caremark for drugs reimbursed by any Aetna or SilverScript plan, including contracts, addenda, price lists, spreadsheets, data, billing statements and reconciliations." (Emphasis added). In February 2021, Caremark responded to RFP 51 by explaining that it had already agreed to produce final pharmacy reconciliations (RFP 28) and executed contracts between Caremark and pharmacies incorporating GER guarantee provisions (RFP 30), and objecting to producing anything further.

Nearly 18 months later, Relator for the first time complained that Caremark's response to RFP 51 was deficient because it did not produce "documents concerning and reflecting Caremark's *negotiations* with each of Walgreens, Rite Aid, and CVS Pharmacy regarding its contracts [and] . . . the generic effective rate ("GER") that Caremark would owe and pay each pharmacy under these contracts." May 20, 2022 Ltr. from C. Coslett at 1 (emphasis added). But in contrast to the enumerated examples in RFP 51 (*e.g.*, contracts, addenda, and other such *formal and operative* documents), negotiations do not "establish, report, or implement" pharmacy discount rates. At most, negotiation emails or draft contracts would reference *potential* discount rates arrangements. Relator tries to avoid this obvious fact by recharacterizing RFP 51 as seeking documents relating to the "process" for establishing pharmacy discount rates—but nothing in the text of RFP 51 supports that tortured characterization. This dispute can be readily resolved in Caremark's favor.[11]

Even if negotiations were within RFP 51's scope, their minimal relevance would be far outweighed by the burdens to Caremark of yet further searches for materials that are not easily sifted out. Indeed, Relator's proposed search terms (names of those she believes negotiated on behalf of the pharmacies) hit on over 84,000 unproduced documents (154,000 with families) in Caremark's custodians' files, which likely would require over 2,000 more hours of attorney review. That would be precisely the type of "unfair[] burden[]" to Caremark this Court cautioned against last month, particularly at the tail end of already "extensive discovery" by Relator. *See* Order at 3–4, Dkt. No. 214 (May 12, 2022).

---

[11] Relator in this submission now claims that "documents concerning budget agreements" should have been produced under RFP 51. This argument was not part of Relator's early June letters to the Court or the June 10 Order, and Relator did not raise it in the Court-ordered meet-and-confer for this joint letter, which occurred a full week after Mr. Gugliuzza's deposition. It is not properly before the Court. In any event, Caremark has explained (including in its substantive interrogatory responses) that its GER targets for CVS Pharmacy were not contractual and did not entail any payments by Caremark to CVS Pharmacy. *See* Mot. to Compel, Ex. 1 at 12, Dkt. No. 207-5 (Apr. 8, 2022). Mr. Gugliuzza *confirmed* the "lack of a CVS contractual document" and explained that any CVS Pharmacy "cap" was a "budgetary exercise." Gugliuzza Dep. 222:17–223:22 ("not aware of there actually being a contract in place" and "*not aware of any document*") (emphasis added); *accord, e.g.*, Lavin Dep. 124 ("I don't think we had . . . [a] contracted generic effective rate with CVS."). Non-contractual, internal communications about GER budgets—the only documents Mr. Gugliuzza arguably identified—do not establish or implement "discount rates in connection with payments to pharmacies," especially where Caremark's GER budgets with CVS *did not involve any "payments to pharmacies."*

6

Dated: June 24, 2022

/s/ *Sarah L. O'Connor*
Enu A. Mainigi (*Pro Hac Vice*)
emainigi@wc.com
Craig D. Singer
csinger@wc.com
Holly M. Conley (*Pro Hac Vice*)
hconley@wc.com
Daniel M. Dockery (*Pro Hac Vice*)
ddockery@wc.com
Sarah L. O'Connor (*Pro Hac Vice*)
soconnor@wc.com
WILLIAMS & CONNOLLY LLP
680 Maine Avenue SW
Washington, DC 20024
Tel:  202-434-5000
Fax:  202-434-5029

*Counsel for Defendants*

/s/ *Caitlin G. Coslett*
David F. Sorensen
Susan Schneider Thomas
Joy P. Clairmont
Caitlin G. Coslett
William H. Fedullo
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 875-3000
Facsimile: (215) 875-4604
E-mail: sthomas@bm.net
dsorensen@bm.net
jclairmont@bm.net
ccoslett@bm.net
wfedullo@bm.net

Natalie Finkelman Bennett
MILLER SHAH LLP
1845 Walnut Street, Suite 806
Philadelphia, PA 19103
Telephone: (610) 891-9880
Facsimile: (866) 300-7367
E-mail: nfinkelman@millershah.com

Jayne A. Goldstein
MILLER SHAH LLP
1625 N. Commerce Parkway, #320
Fort Lauderdale, FL 33326
Telephone: (866) 849-7545
Facsimile: (866) 300-7367
Email: jagoldstein@millershah.com

*Attorneys for Plaintiff-Relator*