July 8, 2022

**<u>VIA ECF</u>**
The Honorable Mitchell S. Goldberg
United States District Court
Eastern District of Pennsylvania
601 Market Street
Philadelphia, PA 19106

> ***Re: U.S., ex rel. Sarah Behnke vs. CVS Caremark Corp., CA No. 14-cv-00824***

Dear Judge Goldberg:

On June 3 and June 9, 2022, Relator served Rule 45 subpoenas for corporate testimony on CVS Pharmacy, Inc. ("CVS Pharmacy") and SilverScript Insurance Company ("SSIC or SilverScript"). CVS pharmacy and SilverScript seek a protective order quashing certain topics as outlined below. Relator seeks to compel CVS Pharmacy and SilverScript to provide testimony as outlined below.[1]

## I.     NON-PARTIES SILVERSCRIPT AND CVS PHARMACY'S SUMMARY POSITION

Relator alleges that Caremark violated the False Claims Act by causing incorrect reporting to CMS of prices paid for generic drugs dispensed to Medicare Part D beneficiaries.  The operative complaint alleges no wrongdoing by SSIC, a Part D plan sponsor, or CVS Pharmacy, a retail pharmacy chain (collectively the "Non-Parties"), and they are not parties to the litigation.  Yet, the disputed topics in Relator's subpoenas—served just over a month before the close of fact discovery—seek to probe extensively into their relationships and interactions with Caremark solely because they and the Caremark Defendants are members of the CVS Health Corporation family.

Relator has offered no compelling justification for the burdensome discovery she now seeks, let alone any showing that could trump the Court's admonition eighteen months ago that SSIC is a non-party and thus any subpoena to SSIC would have to be "concise" and "not overburdensome."  Order at 1, Dkt. 129 (Dec. 23, 2020) (ruling on SSIC-related discovery).  With that admonition, the documents that Relator pursued from SSIC were limited.  Now, near the end of fact discovery, Relator has undermined any restraint she previously showed.  Relator's demands for broad corporate testimony would require the Non-Parties to investigate or locate and produce documents covering the full breadth of the topics now in dispute.

Worse yet, by Relator's own admission, many of the topics are intended as leverage to compel *Caremark* to produce additional information.  *See, e.g.,* June 21, 2022 Letter from W. Fedullo ("Relator is prepared to accept complete substantive written answers or responsive documents from Caremark in lieu of deposing a SilverScript representative on this Topic.").  Relator's discovery disputes with Caremark are already the subject of extensive briefing before this Court, *see, e.g.*, Joint Statement, Dkt. 225 (June 24, 2022), and the Non-Parties should be protected from Relator's transparent attempt to end-run that process.

The Non-Parties are separate corporate entities from Caremark, *see* 2d Am. Compl., ¶¶ 1–2, 17, and must be afforded the Federal Rules' heightened, mandatory protections against irrelevant or "unreasonably cumulative or duplicative" discovery and against proposed discovery for which "the burden or expense . . . outweighs its likely benefit."  *State Farm Mut. Auto. Ins. Co. v. New Horizont, Inc.*, 254 F.R.D. 227, 233 n.3 (E.D. Pa. 2008); *accord, e.g., Avago Techs. U.S.,*

---

[1] As per the Court's Policies and Procedures, CVS Pharmacy, SilverScript, and Relator originally intended to raise these issues via separate letters.  For the convenience of the Court, and consistent with the Court's June 10, 2022 Order (Dkt. 220) regarding disputes pertaining to Caremark 30(b)(6) deposition topics, CVS Pharmacy, SilverScript and Relator are providing this joint submission.

*Inc. v. IPtronics Inc.*, 309 F.R.D. 294, 297 (E.D. Pa. 2015).  It is Relator's duty to "to avoid imposing undue burden or expense" on the Non-Parties, Fed. R. Civ. P. 45(d)(1), and, accordingly, she must "make a stronger showing of relevance" here than when requesting discovery from Caremark, *In re Domestic Drywall Antitrust Lit.*, 300 F.R.D. 234, 239–40 (E.D. Pa. 2014).  Even if Relator can chin the heightened relevance bar, "the Court should be particularly sensitive to weighing the probative value of the information sought against the burden of production." *S.G. v. W. Willow Fire Co.*, No. 5:16-CV-04201, 2017 WL 11550403, at *3 (E.D. Pa. June 28, 2017).

Relator cites a string of cost-shifting cases to suggest that the Non-Parties are somehow stripped of their heightened protections under Rule 45 because they are "interested" parties.  Not so.  The Non-Parties have no "financial or reputational stake" in this litigation, *see, e.g.*, *Culliver v. Ctr. for Toxicology & Envtl. Health LLC*, 2022 WL 475185, at *4 (N.D. Fla. Feb. 16, 2022), and Relator's bare assertion that they are "connected to" the fraud she alleges because the Non-Parties contracted with Caremark and thereby dispensed generic prescriptions (CVS Pharmacy) to their members (SSIC) does not make it so.  Relator has not alleged that the Non-Parties participated in any alleged fraudulent conduct or any wrongdoing whatsoever by the Non-Parties, such that the Non-Parties "stand to benefit from certain litigation outcomes."  *Id*.  Further, those cases, which focus on allocation of discovery costs rather than third-party discovery protections, are inapposite. Indeed, one of Relator's cited cases *confirms* that litigation parties must "minimize the costs" to non-parties.  *In re Mushroom Direct Purchaser Antitrust Litig.*, 2012 WL 298480, at *7 (E.D. Pa. Jan. 31, 2012).  Even if the CVS Pharmacy and SSIC were full *parties* to this case, Relator's discovery still would have to—and plainly does not—satisfy the Federal Rules' touchstone principle of proportionality.  *New Horizont*, 254 F.R.D. at 233 n.3.  Here, the substantial burden the Non-Parties would face to prepare their witnesses, measured against the marginal relevance and duplicative nature of Relator's disputed topics (as set forth below) justify a protective order quashing Topics 2–5, and 9 of Relator's June 3 subpoena to CVS Pharmacy and Topics 3–5, 7–10, and 16 of Relator's June 9 subpoena to SSIC.

## II.   **RELATOR'S SUMMARY POSITION**

Relator cross-moves to compel CVS Pharmacy and SilverScript—entities wholly-owned by Defendant Caremark, represented by the same counsel as Defendant Caremark, and engaged in a common litigation strategy with Defendant Caremark—to produce witnesses prepared to testify on the topics below. For many of these topics, Relator has diligently sought the same discovery directly from Caremark, CVS Pharmacy, and SilverScript through a variety of devices. Caremark/CVS Pharmacy/SilverScript's refusal to provide full discovery responses has created the need for CVS Pharmacy and SilverScript to provide testimony on the below listed topics. Further, both Caremark and SilverScript, in arguing to the Court why they should not be required to explain apparent gaps in their data production, argued that Relator should be required to seek explanations via deposition (ECF 225 at 2-3)—depositions that the same lawyers now seek to block. This Court should not allow the Caremark corporate "family" to give Relator the run-around. As a matter of fundamental fairness, CVS Pharmacy and SilverScript must be compelled to produce witnesses on the topics described below.

CVS Pharmacy and SilverScript are not entitled to "heightened protections" under Rule 45. SilverScript and CVS Pharmacy are not the "classic disinterested non-part[ies]" whose protection is contemplated by Rule 45. *In re Mushroom Direct Purchaser Antitrust Litig.*, 2012 WL 298480,

at *7 (E.D. Pa. Jan. 31, 2012); *see also Culliver v. Ctr. for Toxicology & Envtl. Health LLC*, 2022 WL 475185, at *4 (N.D. Fla. Feb. 16, 2022) ("An interested non-party is an entity that does not have an actionable right at issue in the litigation, but has a significant, underlying connection to the case and, typically, some sort of financial or reputational stake in the litigation's outcome."). CVS Pharmacy and SilverScript's claim that they lack any stake in this litigation is belied by the fact that they are Caremark's subsidiaries, represented by the same counsel as Caremark, and were connected to the fraud alleged in this litigation, which involves false reporting on generic drugs dispensed to SilverScript (and Aetna) beneficiaries at CVS Pharmacy (and Walgreens and Rite Aid). Courts routinely deny interested non-parties Rule 45's heightened protections where—as here—they are related to a party in the litigation, or when they are involved in transactions relevant to a litigation. *See Sandoz Inc. v. United Therapeutics Corp.*, 2021 WL 1259667, at *3 (D.N.J. Apr. 6, 2021) (finding non-party not entitled to cost-shifting for document production under Rule 45 because it was the parent of defendant); *In re Mushroom Direct Purchaser Antitrust Litig.*, 2012 WL 298480, at *7 (deferring decision to award Rule 45 cost-shifting due in part to the fact that subpoenaed non-party shared common ownership with defendant); *Culliver,* 2022 WL 475185, at *1, *5-7 (denying defendant's contractor the heightened protections of Rule 45); *Wells Fargo Bank, N.A. v. Konover*, 259 F.R.D. 206, 206-07 (D. Conn. Aug. 20, 2009) (denying non-party cost-shifting for its response to Rule 45 subpoena where defendants had a 34% ownership interest in non-party, non-party was involved in transaction central to the case, and non-party was represented by the same law firm as defendants).

None of the cases CVS Pharmacy and SilverScript cite in support of their motion for protective order addresses the situation here, where a Defendant's subsidiary attempts to avoid discovery related to a transaction with which the subsidiary itself was involved. *See S.G. v. W. Willow Fire Co.*, No. 5:16-CV-04201, 2017 WL 11550403, at *3-4 (E.D. Pa. June 28, 2017) (holding, in action against fire company concerning claims of sexual abuse against minors, defendant was not entitled to discovery against Lancaster County Children and Youth Services Agency where defendant simply "failed to make any assertion as to the relevance of the records sought"); *Avago Techs. U.S., Inc. v. IPtronics Inc.*, 309 F.R.D. 294, 295 (E.D. Pa. 2015) (addressing, in patent case, subpoena served on disinterested non-party *customer* of defendants, not subsidiary of defendant); *In re Domestic Drywall Antitrust Litig.*, 300 F.R.D. 234, 239-40, 245-49 (E.D. Pa. 2014) (addressing subpoena served on non-party construction industry research group, ***and nonetheless requiring non-party to produce substantial discovery***); *State Farm Mut. Auto. Ins. Co. v. New Horizont, Inc.* 254 F.R.D. 227, 233-34 (E.D. Pa. 2008) (addressing deposition of an individual whom the parties acknowledged had no "personal knowledge of the facts underlying [plaintiff's] claims or defenses," not subsidiary of defendant directly involved in transactions at issue). These cases simply do not address the situation before the Court—where wholly-owned subsidiaries of the defendant, represented by the same counsel as the defendant, attempt to avoid discovery related to transactions in which they were involved—and are thus inapposite. CVS Pharmacy and SilverScript are not entitled to heightened Rule 45 protections and must be compelled to produce witnesses prepared on all the below topics.

Finally, throughout the meet and confer process, Relator narrowed the scope of the deposition subpoenas to minimize any burden on CVS Pharmacy and SilverScript.

III.    CVS PHARMACY SUBPOENA

A.    **Topic 2: "Whether, for each year during the Relevant Time Period, there existed contract(s) or other agreement(s) between Caremark and CVS Pharmacy concerning any price terms for generic drugs (including any generic effective rate(s)), including generic drugs dispensed to enrollees of Caremark's PBM clients, and, if so, the contents, terms, and date(s) of the contract(s) or agreement(s)."**

**CVS Pharmacy's Position:** In April 2021, in response to Relator's Rule 45 document subpoena, CVS Pharmacy produced its only relevant contracts with Caremark: a March 1997 Provider Agreement with PCS Health Systems, Inc. and the executed Medicare Part D Network Enrollment Forms for Aetna and SilverScript's pharmacy networks.  This Topic does not target testimony about those contracts.  Rather, Relator seeks corporate testimony regarding budget targets utilized by Caremark for CVS Pharmacy.

Relator appears to seek such testimony from CVS Pharmacy because she does not like the responses she has received from Caremark.  For instance, Relator claims she is "entitled to get to the bottom of whether there were binding, negotiated budget agreements," but Caremark has made clear, time and again, that the budgeted GER for CVS Pharmacy was not a contractual guarantee.  Relator argues below, for example, that she needs this testimony because Caremark's Interrogatory Response No. 7 was incomplete.  Yet Relator already brought Caremark's interrogatory responses before this Court, and she asserted no basis to challenge No. 7.  *See* Dkt. 207-1, at 21–24.  Next, Relator resorts to baldly mischaracterizing the testimony of Dom Gugliuzza, a former Caremark employee.  He testified that Caremark and CVS Pharmacy had "budget agreement[s]," Dep. 220:18, but he made clear, at various points, that they were not *written* agreements.  In fact, when Relator explicitly asked why the "type of amendment or documentation" of GER agreements differed between CVS Pharmacy, Rite Aid, and Walgreens, Mr. Gugliuzza testified that he "was not aware" of "any document prepared for CVS" or "there actually being a contract in place."  Dep. 222:17–223:3.  John Lavin, another former Caremark employee, testified the same in May 2022.  Lavin Dep. 124:13–15 ("I don't think we had . . . [a] contracted generic effective rate with CVS.").  Despite this testimony, Relator paints Mr. Gugliuzza's testimony as some revelation that CVS Pharmacy and Caremark were "negotiat[ing] budget agreements" rather than "setting GER targets at an enterprise-wide level."  That is a distinction without a difference, and it is not clear how this purported discovery would alter the course of this case.

The budget targets have also been the subject of extensive discovery and motions practice between Relator and Caremark, dating back to April 2021.  They are again before the Court in the parties' June 24 joint submission. Dkt. 225 at 5–6.  Indeed, Relator represented that she would be prepared to accept "Caremark's production of budget agreements," if they existed, "in l[i]eu of deposition testimony from CVS Pharmacy on Topic 2."  June 21 Letter at 2.  It is clear from Relator's position here that she views Caremark (a party) and CVS Pharmacy (a non-party) as interchangeable, and she is using burdensome discovery to third-parties as attempted leverage in her discovery disputes with Caremark.  But if there is information to be provided once the parties' disputes are resolved, it should come from Caremark.

At bottom, Relator does not have free reign to seek unlimited, duplicative testimony from

4

Caremark and CVS Pharmacy.  Relator's claim that she needs discovery from CVS Pharmacy to test the veracity and completeness of Caremark's discovery responses is merely discovery *about discovery*, and such discovery is not proportional.  *See, e.g.*, *United States ex rel. Robinson v. Indiana Univ. Health Inc.*, 2016 WL 10570221, at *4 (S.D. Ind. Aug. 29, 2016) (granting a protective order for third-party 30(b)(6) deposition topics, even though they "could produce relevant impeachment evidence," because the noticing party "simply want[ed] to fish around in order to see what it might uncover" and "fail[ed] the Rule 26(b) proportionality prong").  Although Relator cites *Mushroom Direct Purchaser* for a contrary proposition, the case suggested no such thing; rather, it directed parties "to minimize the costs" of non-party discovery.  2012 WL 298480, at *7; *see also Avago Techs.*, 309 F.R.D. at 297 (noting that courts "must limit" duplicative discovery).  Relator's attempt to use demands on CVS Pharmacy to gain leverage in her dispute with Caremark or to hedge her bets on a matter she has asked the Court to resolve should be rejected, and Topic 2 should be quashed.

      **Relator's Position**: Caremark has produced only a single contract between Caremark and CVS Pharmacy, dating to 1997, and has stated that there are no contracts reflecting generic effective rates.  *See, e.g.*, Interrogatory Response No. 7 ("The budgeted generic effective rate for CVS Pharmacy was not a contractual guarantee, and therefore was not documented by contract.").  While Caremark's interrogatory references a "budgeted generic effective rate," Caremark has failed to provide information regarding "how and by whom the referenced CVS GER cap was set," as required by the Interrogatory.  *Id.* Crucially, Caremark did not reveal in this Interrogatory Response that this "budgeted generic effective rate" was set by negotiation between Caremark and CVS Pharmacy.

      However, Domenico Gugliuzza, a former Caremark VP, testified on June 10, 2022 that unnamed executives from CVS Pharmacy and Caremark actually negotiated budget agreements which contained pharmacy discount terms, including GER caps. Gugliuzza Dep. 218:19-219:5; 220:11-19;[2] *see also* ECF 225 at 5. This was the first time that any witness revealed that there were *negotiated* budget agreements between CVS Pharmacy and Caremark (as opposed to simply setting GER targets at an enterprise-wide level).[3] The pricing terms in the pharmacy contracts and

---

[2]    Q: And then at the bottom – or near the bottom, it says, Assumes new CVS and Rite Aid deals. Do you see that? A: Yes.

    Q: So what – what's that referring to?

    A: Again, I – I don't recall when the cap started with those pharmacies, so I don't know if this is referring to we got enhancements to – **well, CVS, we also negotiated annually**, so, you know, that was – that would be a new value for – a new value for – 2013. …

    Q: How did you—how did you come to be the person, or how did you know what the CVS cap was? ...

    A: It was provided to me. Depending upon the year that we're talking about, it was different people. But that was kind of negotiated, you know, above me with CVS retail to determine what our **budget agreement** would be on – you know, as they worked through the budget process.

Gugliuzza Dep. 218:19-220:11-19 (emphases added).

[3] CVS Pharmacy cites Mr. Lavin's testimony, but he testified:

    Q: But did you have internal budget meetings with members of CVS Pharmacy's team?

    A: When you say "CVS Pharmacy," CVS, Caremark's finance team and some of those finance members that I recall had responsibilities across the entire organization.

    Q: So they were wearing multiple hats, so to speak? …

    A: Yeah. I'm not sure about hats, but they had responsibilities at an enterprise level.

in these budget agreements, including generic effective rates, are highly relevant to understanding how Caremark skewed its generic drug pricing. Relator has repeatedly told CVS Pharmacy that it is willing to accept production of the budget agreements, or written descriptions of their contents, in lieu of testimony but these agreements have not been produced and so CVS Pharmacy must provide testimony regarding these highly relevant agreements. Further, if no written budget agreements exist (as CVS Pharmacy/Caremark's counsel have stated), the need for *testimony* regarding the contents of any oral budget agreements is even higher.

CVS Pharmacy claims that, because the budget targets have been the subject of previous discovery aimed at Caremark, CVS Pharmacy purportedly should not be burdened with "duplicative discovery." To the contrary, a plaintiff's attempt to find discoverable information from parties *before* seeking discovery from "non-parties" weighs *in favor* of allowing the non-party discovery. *In re Mushroom Direct Purchaser Antitrust Litig.*, 2012 WL 298480, at *4. Relator is entitled to get to the bottom of whether there were binding, negotiated budget agreements through CVS Pharmacy's testimony, particularly given that Mr. Gugliuzza's testimony casts doubt upon the completeness of Caremark's discovery responses concerning CVS Pharmacy. *See id.* at *4 (finding that plaintiff had right to test the veracity of defendant's claim that it had produced all responsive documents by serving overlapping discovery request on non-party); *Med. Tech., Inc. v. Breg, Inc.*, 2010 WL 3734719, at *4 (same). The case CVS Pharmacy cites— *United States ex rel. Robinson v. Indiana Univ. Health Inc.*, 2016 WL 10570221, at *4—is completely inapposite, as it addresses a situation in which a defendant hospital was harassing an FCA whistleblower through a subpoena on her current employer, seeking records that defendant hospital already possessed. Here, by contrast, Relator seeks testimony concerning highly relevant agreements from Defendant's subsidiary.

CVS Pharmacy argues that because Relator did not challenge Interrogatory Response 7 in her Motion to Compel (ECF 207), she is foreclosed from seeking CVS Pharmacy testimony on this subject. That makes no sense since Relator is entitled to relevant testimony regardless of prior (deficient) written discovery responses from Caremark and moreover, that Motion to Compel was filed on April 8, 2022, more than two months *before* Mr. Gugliuzza's June 10, 2022 deposition. Mr. Gugliuzza's testimony revealed to Relator the existence of relevant CVS Pharmacy-Caremark budget agreements, and Relator is entitled to testimony on these agreements (again, regardless of whether they are memorialized in writing or not).

**B.**   **Topic 3:[4] "Documents regarding Caremark and CVS Pharmacy in the form of CVS-BEHNKE-1813534, CVS-BEHNKE-1814124, CVS-BEHNKE-0243680, and CVS-BEHNJE-0471772, including (a) to the extent you received or were aware of the information in the pharmacy reconciliations, whether the information in the pharmacy reconciliations was reported to CMS, (b) any negotiations or discussions between CVS Pharmacy and Caremark concerning any reconciliation stemming from pharmacy discount rate(s) for generic drugs**

---

Lavin Dep Vol. 2, 137:12-23. This testimony suggests that the budgets were set by executives who had responsibility across the entire Caremark enterprise (that is, worked for the Caremark parent company). By contrast, Mr. Gugliuzza's testimony states that CVS Pharmacy and Caremark engaged in joint negotiation.

[4] This and other topics below incorporate the modifications Relator agreed to and thus is the scope of the topic that is now disputed.

reflected in these documents, and (c) the "settling-up" by CVS Pharmacy and Caremark of the dollar amounts owed or expected to be owed, as reflected in these documents, including (i) cash transfers or by (ii) journal entry to the intercompany accounts maintained between Caremark and CVS Pharmacy (including any underlying analysis performed to generate the amount of the journal entry)."

**CVS Pharmacy's Position:** Topic 3, and its multiple subparts, seeks from CVS Pharmacy information about Caremark's ***internal*** documents, which Relator surmises must have been shared with CVS Pharmacy because the information "was highly relevant to CVS Pharmacy." July 1, 2022 Letter from W. Fedullo at 4. Even if that were the case, Caremark, not CVS Pharmacy, is the appropriate entity from which to seek testimony regarding the contents of those documents and any related actions, and, indeed, Caremark has agreed to provide Rule 30(b)(6) testimony about these very documents. The burden to CVS Pharmacy to provide *duplicative* testimony cannot be justified. *Avago Techs.*, 309 F.R.D. at 297 (noting that courts "must limit" duplicative non-party discovery). In addition, all of the subparts, including the foundational question as to whether CVS Pharmacy received or was aware of the information contained in the Caremark documents (subpart (a)), would require CVS Pharmacy to conduct new and extensive document reviews and internal interviews (spanning seven years and dating back to 2010), none of which was previously required of CVS Pharmacy. With regard to subparts (b) and (c), Relator purports to justify these burdens solely on the generalized and speculative basis that this information "***may*** provide evidence of both scienter and falsity." This falls far short of Relator's duty to "make a stronger showing of relevance" for non-party discovery, *Domestic Drywall*, 300 F.R.D. at 239-40, and that Relator alleges that Caremark's conduct was fraudulent does not change that standard. Topic 3 should be quashed.

**Relator's Position**: The documents cited in Topic 3 are documents prepared by Caremark showing prices for generic drugs dispensed by CVS Pharmacy, and the overall GERs for those generic drugs. Subtopic (a) is relevant because CMS's awareness or lack thereof of the pricing conduct at issue in this case goes to falsity, and Caremark's decision to withhold the documents from CMS goes to scienter, as Relator argued previously in ECF 224, at 1-6 & ECF 225, at 4-5. Relator is also entitled to testimony regarding the extent to which CVS Pharmacy had access to these documents and its understanding of them, as they are highly relevant documents showing the prices for generic drugs dispensed by CVS Pharmacy to Medicare Part D beneficiaries, which prices Relator claims were falsely reported.

As to subtopics (b) and (c), negotiation between Caremark and CVS Pharmacy concerning pharmacy reconciliations, as well as any "settling-up" of the reconciliations themselves, may provide evidence of both scienter and falsity. Evidence regarding the extent to which a single GER was negotiated that applied to both commercial and Medicare Part D generic prescriptions dispensed at CVS Pharmacy is relevant to showing that the false reporting of generic prices dispensed by CVS Pharmacy operated in the same manner as the false reporting of generic prices dispensed by Walgreens and Rite Aid.

C.      Topic 4: "Any negotiations or discussions with Caremark concerning Caremark's guaranteeing, promising, or representing to CVS Pharmacy any generic price term (including any generic effective rate(s)) regarding generic

drugs dispensed to enrollees of Caremark's PBM clients, regardless of whether the price terms were, or were not, contractually set or memorialized in a written contract."

**CVS Pharmacy's Position:** Topic 4 is entirely duplicative of Topic 2, which, as set forth above, itself overlaps information Relator simultaneously seeks from Caremark that is the subject of a discovery dispute pending before the Court. *Avago Techs.*, 309 F.R.D. at 297. Topics 2 and 4 should be quashed for the same reasons. *See supra* p. 4-5.

**Relator's Position**: Mr. Gugliuzza testified that budget agreements, which contained pharmacy discount rates, were negotiated between CVS Pharmacy and Caremark. Gugliuzza Dep. 218:19-219:5; 220:11-22. Because CVS Pharmacy and Caremark continue to refuse to produce documents concerning these budget agreements (whether the agreements themselves are written or not), CVS Pharmacy testimony on this topic is relevant and proportional. *Avago Techs.* is inapposite—it addresses a subpoena served on a defendant's *customer*, not its owned and controlled subsidiary. 309 F.R.D. at 297.

    D.    **Topic 5: "Any negotiations or discussions with Caremark concerning, at a high level, Caremark's setting and management of MAC prices for generic drugs for Caremark to pay CVS Pharmacy at the point of sale on behalf of Caremark's PBM clients, including any explanation offered by Caremark to CVS Pharmacy concerning the same."**

**CVS Pharmacy's Position:** CVS Pharmacy's discussions with Caremark about how MAC prices were set or managed have no apparent relevance to Relator's claims. The "prices Caremark agreed to pay pharmacies at point of sale," as Relator puts it, are set forth in Caremark's *contracts*, which were produced long ago. And, as with Topic 3, identifying and preparing a corporate witness on "any negotiations or discussions" on MAC pricing, even at a high level, would be insurmountable on any reasonable timetable, particularly where CVS Pharmacy dispensed *billions* of prescriptions adjudicated at MAC prices, any one of which could be the source of a responsive discussion with Caremark. The Federal Rules do not require CVS Pharmacy to conduct new and extensive document reviews and internal interviews (spanning seven years and dating back to 2010) to satisfy Relator's curiosity and speculation as to whether Caremark at some time, in some conversation, may have said something to someone at CVS Pharmacy that Relator could use to support scienter. Topic 5 should be quashed.

**Relator's Position:** The prices Caremark agreed to pay pharmacies at point of sale are highly relevant to this case, which relates to Caremark's false price reporting, because Caremark caused prices to be reported that were *not* the prices Caremark actually paid the pharmacies for generic drugs. Representations made by Caremark in the course of negotiating with CVS Pharmacy are also relevant to Caremark's scienter.

To be clear, Relator does *not* seek testimony about negotiations regarding specific MAC prices or changes to individual MAC prices. Rather, Relator seeks high level testimony regarding representations Caremark made to CVS Pharmacy regarding Caremark's use of the MAC pricing system to pay CVS Pharmacy for generic drugs at point of sale.

    E.    **Topic 9: "The shares of CVS Pharmacy's (a) generic prescriptions that were**

**attributable to each of Aetna Med D plans and to SilverScript plans for each year during the relevant time period, and (b) generic Med D prescriptions that were attributable to each of Aetna Med D plans and to SilverScript plans for each year during the relevant time period. This includes the extent to which documents or data exist with or may be readily generated to include separate breakdowns of SilverScript and Aetna Med D plans' generic prescriptions, including documents in the form of CVS-BEHNKE-1813534, CVS-BEHNKE-1814124, CVS-BEHNKE-0243680, and CVS-BEHNKE-0471772."**

**CVS Pharmacy's Position:** Topic 9 seeks from CVS Pharmacy detailed, made-for-litigation calculations and information Relator is simultaneously (equally improperly) pursuing from Caremark and SSIC. June 24 Joint Statement at 3. It is not apparent from the operative complaint, and Relator does not explain here, why Aetna and SSIC shares of CVS Pharmacy's *total prescriptions* would be relevant to Relator's claims or damages at all. Any such investigation for Relator's use (which CVS Pharmacy plainly has no obligation to undertake) would require analysis of data pertaining to each of the billions of prescriptions dispensed by CVS Pharmacy over a seven-year period. The sheer volume alone would impose a staggering burden. Relator's assertion that this analysis is something that CVS Pharmacy can readily do, based upon a document that *Caremark* purportedly supplied to *another pharmacy*, is simply incorrect: whatever analysis Caremark may have conducted on data it maintained pertaining to an entirely different set of prescriptions has no bearing on the burden required of CVS Pharmacy to analyze its data pertaining to all of the prescriptions it dispensed. Further, Relator's final sentence of Topic 9 seeks testimony about *Caremark*'s documents (denoted by the CVS-BEHNKE Bates prefix), about which CVS Pharmacy lacks knowledge and information to testify. Topic 9 should be quashed.

**Relator's Position:** This testimony is relevant to damages, because Relator will calculate CMS's overpayment for generic drugs associated with SilverScript and Aetna Part D plans. Relator has told CVS Pharmacy she would accept complete substantive written answers or responsive documents in lieu of deposing a 30(b)(6) witness on this Topic, and has also sought this information through a variety of discovery devices from Caremark, which has refused to produce it (ECFs 224, 225).

CVS Pharmacy's position that it is somehow improper for Relator to offer to accept a written response from Caremark in lieu of testimony from CVS Pharmacy is without basis. Caremark undisputedly has this information but has refused to produce it. *See* ECFs 224, 225. Given Caremark's improper refusal to provide this information, Relator seeks similar share information from Caremark subsidiary CVS Pharmacy. Caremark/CVS Pharmacy can decide how to produce this to minimize any burden (though again, there is no undue burden (*see id.*), but given Caremark's refusal to provide this relevant, proportional discovery, CVS Pharmacy must do so. And it can, readily, based on its records, given that this information was provided in a pharmacy reconciliation relevant to a different pharmacy. ECF 224 at 3-4 (describing this document).

**IV.     SILVERSCRIPT SUBPOENA**

**A.     Topic 3: "Whether SilverScript was sent, received, or otherwise obtained Caremark's contracts and/or GER pharmacy reconciliations with Rite Aid Corporation, Walgreen Co., and/or CVS Pharmacy, and, if so, who at**

**SilverScript received them and when they were received.”**

**SSIC's Position:** SSIC has agreed to provide testimony regarding whether it received copies of Caremark's contracts and/or GER reconciliations Caremark provided to pharmacies between 2010 and 2016, thus completely satisfying the justification Relator gives for Topic 3 (SSIC's "awareness or lack thereof of the pricing terms Caremark agreed to with pharmacies (reflected in contracts and pharmacy reconciliations)").  Somehow still unsatisfied, Relator demands the identities of specific individuals *who* received reconciliations and *when*, arguing that SSIC should conduct "targeted searching of its email system, using keywords from the pharmacy contracts and pharmacy reconciliations in its searching."  Relator's July 1, 2022 Letter at 2-3. Relator's claim that "there is no burden" to identify custodians and collect and search millions of emails, especially at this stage of discovery, is baseless and counterfactual, and her attempt to back-door document discovery that she did not pursue years ago is improper.  It is also false that, as Relator contends, SSIC could not know whether it received the reconciliations without also knowing who received the reconciliations.  Relator's purported justification that she needs the identity of individuals to "test the veracity" of SSIC's forthcoming testimony not only implicates the truthfulness of SSIC witnesses but falls far short of justifying the burden that would be required for SSIC to identify *every individual* that received documents and *every instance* of such occurrence.  SSIC agreed in good faith to provide limited testimony that it believed was proportional to the case's needs.  But the further granularity that Relator now demands is disproportionately burdensome and, at this stage, nearly an "impossible task."  *Reed v. Bennett*, 193 F.R.D. 689, 692 (D. Kan. 2000).  SSIC's limited formulation of Topic 3 should be adopted and the remaining subjects of Topic 3 quashed.

**Relator's Position:** SilverScript's awareness or lack thereof of the pricing terms Caremark had agreed to with pharmacies (reflected in contracts and pharmacy reconciliations) is relevant to rebutting any claim by Caremark that it was anything other than responsible for the submission of false claims to the government.

SilverScript states that it is willing to provide testimony as to whether SilverScript *ever* received copies of GER reconciliations during the period 2010-2016, but claims it is unduly burdensome to state which individuals received these copies and when. This is not so.  Relator is entitled to more than conclusory testimony on this issue, including to test the veracity and to understand *when* any such documents were received and *by whom*.  For example, if a low-level SilverScript employee saw one of these documents in late 2016, that would be very different than a high level SilverScript employee receiving these documents early in the relevant time period. Moreover, there is no burden to providing this testimony because, in order to truthfully testify if it received these documents, SilverScript must investigate the issue and, during the course of the investigation, would learn and be able to provide testimony regarding when and who received these documents (if anyone at SilverScript did). Further, SilverScript's silence on the portion of Topic 3 dealing with contracts demonstrates its lack of any legitimate argument for this arbitrary limitation.

B.    **Topic 4: "For each year in the Relevant Time Period, submission of SilverScript's PDEs to CMS, including but not limited to (i) the entity (SilverScript, Caremark, or otherwise) which submitted the PDEs (the "Submitter"); (ii) the entity (SilverScript, Caremark, or otherwise)**

responsible for preparing and supply any of the data relied upon by the Submitter (the "Supplier"), the groups or departments at the Supplier who prepared or supplied the PDE data, and precisely what data was prepared and supplied; and (iii) a high-level description of the review and submission process during the relevant time period."

**SSIC's Position:** This Topic is entirely duplicative of testimony that Relator has already obtained directly from the Rule 30(b)(6) deposition of Caremark designee Rebecca Justice. Relator claims, however, that she is "also entitled to testimony from SilverScript on the issue." But duplicative testimony, particularly when sought from non-parties, must be curbed, *Avago Techs.*, 309 F.R.D. at 297—even more so here, where preparing a witness to testify "precisely" about the inputs to every PDE field would impose the type of "impossible task" the Federal Rules preclude, *Reed*, 193 F.R.D. at 692. Topic 4 should be quashed.

**Relator's Position:** Preparation of PDEs (Prescription Drug Event—data related to the point of sale prices of dispensed drugs) is relevant to rebut any claim that Caremark was not responsible for the submission of false PDEs because an entity other than Caremark was allegedly responsible. Regardless of whether Caremark's Rule 30(b)(6) witness testified regarding *Caremark's* submission of PDE data, Relator is also entitled to testimony from SilverScript on the issue. *See, e.g.*, *In re Mushroom Direct Purchaser Antitrust Litig.*, 2012 WL 298480, at *4 (finding that plaintiff had right to test the completeness of defendant's document production by serving overlapping discovery request on non-party); *Med. Tech., Inc. v. Breg, Inc.*, 2010 WL 3734719, at *4 (E.D. Pa. Sept. 21, 2010) (same). Further, Relator seeks only a high-level description of the data provided, and does not seek information regarding "every field" in the PDE.

C.      **Topic 5: "For each year of the Relevant Time Period, submission of SilverScript's DIR Summary and Final Reports to CMS, including but not limited (i) the entity which submitted the DIRs ("the submitter"); (ii) the entity (SilverScript, Caremark, or otherwise) responsible for preparing and supplying any of the data relied upon by the submitter (the "Supplier"), the groups or departments at the Supplier who prepared supplied the data, and precisely what data what was prepared supplied; (iii) what information concerning generic drugs was included in or used to prepare the DIR, including the extent to which any pharmacy reconciliations were relied upon; and (iv) a high-level description of the review and submission process during the relevant time period."**

**SSIC's Position:** Like Topic 4, Topic 5 again wholly overlaps the topics of Ms. Justice's Rule 30(b)(6) testimony on behalf of Caremark. This Topic further suffers from the same overbreadth and implicates the same onerous burdens as Topic 4 because DIR reports, like PDE reports, comprise complex, multi-faceted data and explanations drawn from numerous sources and calculations. Topic 5 should be quashed.

**Relator's Position:** Preparation of DIR (Direct and Indirect Remuneration) data related to post-point-of-sale adjustments to drug pricing, submitted to the government) is relevant to rebutting any claim that Caremark was not responsible for the submission of false DIR. Regardless

of whether Caremark's Rule 30(b)(6) witness testified regarding *Caremark's* submission of DIR data, Relator is also entitled to testimony from SilverScript on the issue.  *See, e.g.*, *In re Mushroom Direct Purchaser Antitrust Litig.*, 2012 WL 298480, at *7 (finding that plaintiff had right to test the completeness of defendant's document production by serving overlapping discovery request on non-party). Further, Relator seeks only a high-level description of the data provided, and does not seek information regarding "every field" in the DIR data.

> **D.**   **Topic 7: "A high-level description of the processes SilverScript used to ascertain the truth of the statements made in the 2010-2016 PDE and DIR attestations, including: (1) how the individuals who signed those attestations ascertained the truth of the statements contained in the attestations, (2) why those particular individuals were chosen to sign the attestations; and (3) whether a SilverScript attestation exists for 2011, and, if so, its contents and the reasons it was not produced in this case."**

**SSIC's Position:** Relator purports to seek a "high-level description of the processes SilverScript used," but then identifies three specific categories of testimony sought that are neither high-level nor concern processes. She appears to want free reign to probe any matters related to attestations submitted by SSIC to CMS, purportedly on the basis that information regarding *SSIC's* attestations might somehow support *Caremark's* scienter.  Relator's desired fishing expedition is based on a series of leaps and inferences she makes, ranging from the identity of the signatories to the assertion that "Caremark provided the information underlying the attestations." Topic 7 would require SSIC to undertake new and extensive document reviews, research, and internal interviews necessary to prepare a witness regarding strategy decisions made, specific individuals, and steps taken regarding the attestations over the course of six years.  Preparing a witness on Topic 7 would be unduly burdensome on third-party SSIC; it amounts to "a fishing expedition, causing needless expense and burden to all concerned." *N. River Ins. Co. v. Greater New York Mut. Ins. Co.*, 872 F. Supp. 1411, 1412 (E.D. Pa. 1995).  In *Symetra Life Insurance Co. v. Rapid Settlements, Ltd.*, No. 07-133, 2008 WL 597711, at *2 (E.D. Pa. Mar. 4, 2008), the Court denied in part and granted in part requests for production served on a third party, recognizing that "courts have imposed broader restrictions on the scope of discovery when a non-party is targeted."  That principle should hold even more firmly when a party seeks third-party *testimony*, not documents.  *See Lady Liberty Transp. Co. v. Philadelphia Parking Auth.*, No. CIV.05-1322, 2007 WL 707372, at *9 (E.D. Pa. Mar. 1, 2007) (considering witness status as a "non-party" a "relevant factor" in decision to quash a subpoena for deposition testimony of representative and his staff member as unduly burdensome).

**Relator's Position:** The SilverScript attestations are annual statements made to CMS under penalty of perjury asserting that the information in the PDE and DIR reports is true and accurate, among other things.  Several signatories of these attestations appear to have been *Caremark* employees and officers, rather than SilverScript employees. Relator is entitled to question why (apparently) Caremark employees were making these attestations, rather than SilverScript employees. Further, Relator is entitled to question whether the source of the attestation signatories' information was Caremark. This topic is relevant to showing that Caremark provided the information underlying the attestations, which is relevant to Caremark's liability and scienter.

SilverScript's characterization of this topic as a "fishing expedition" is baseless. The attestations relate to price reporting for SilverScript's Medicare Part D plans, which are at issue in

this case. The cases SilverScript cites are, once again, inapposite. *See N. River Ins. Co. v. Greater New York Mut. Ins. Co.*, 872 F. Supp. 1411, 1412 (E.D. Pa. 1995) (involving whether defendant had been a party to *any* insurance bad faith litigation in the past seven years, with no connection to the dispute before the court); *Symetra Life Ins. Co. v. Rapid Settlements, Ltd.*, No. 07-133, 2008 WL 597711, at *2-7 (E.D. Pa. Mar. 4, 2008)  (involving discovery request on third-parties who were merely members of an intervenor trade association, and ***nonetheless requiring the members to produce significant discovery***); *Lady Liberty Transp. Co. v. Philadelphia Parking Auth.*, No. CIV.05-1322, 2007 WL 707372, at *9 (E.D. Pa. Mar. 1, 2007) (quashing a subpoena served on the non-party ***Speaker of the Pennsylvania House of Representatives*** in litigation regarding the Philadelphia Parking Authority).  Neither CVS Pharmacy nor SilverScript has cited a single case involving the situation before the Court—a Rule 45 subpoena directed at subsidiaries of a defendant, where the subsidiaries were connected to the transactions at issue in the litigation.

**E.**     **Topic 8: The PRS reports for the years 2010 to 2016, including (i) the extent to which the PRS report reflects the amount of money CMS paid SilverScript; and (ii) to the extent you are aware, whether Caremark's pharmacy reconciliation documents were provided to CMS by SilverScript.**

**SSIC's Position:** SSIC has agreed to provide testimony regarding whether it actually received from CMS the amounts shown in the PRS reports.  Beyond that, Relator now demands SSIC must further explain, to the extent there is any variance in the amount received, why that exists.  This additional information would require the same unduly burdensome investigation and document searches demanded by Topic 3.  With respect to Topic 8(ii), unless the phrase "to the extent you are aware" suggests SSIC need not undertake any investigation on that subpart and can simply rely on the individual witness's existing knowledge, that subpart (ii) would also require the same unduly burdensome investigation and document searches.  Topic 8(i) should be limited and subtopic (ii) should be quashed.

**Relator's Position:**  With respect to Topic 8(i), Relator is entitled to testimony regarding whether the PRS reports show and reflect the amounts CMS paid to SilverScript and, if not, the amount that SilverScript says it was paid, and the reason for any differences. Topic 8(ii) is highly relevant and not unduly burdensome. Relator is entitled to testimony regarding SilverScript's knowledge of the whether Caremark's pharmacy reconciliation documents were provided to CMS by SilverScript. If SilverScript did not send these documents to CMS (which it should be able to discover easily by searching its correspondence with CMS) then it should simply say so.

**F.**     **Topic 9: "The Bid Pricing Tools ('BPTs') submitted during the relevant time period, including (a) what information is included in the BPT Schedule I cell g13 (base year rebates), (b) what information is included in the BPT Schedule III cell g7 (rate year projected rebates), (c) SilverScript's comparison of projected with actual rebates as shown in the BPTs, and the results of those comparisons, (d) what is included in reported DIR and projected DIR, and (e) SilverScript's comparison of reported DIR and projected DIR as shown in the BPTs, and the results of those comparisons."**

**SSIC's Position**: The mere fact that "CMS uses BPTs to determine the amount it pays," as Relator claims, cannot justify the disproportionate burden of requiring a non-party to recreate

the analyses and back-up for detailed financial documents created six-to-twelve years ago. *See Fed. Trade Comm'n v. Am. Future Sys.*, No. 2:20-CV-02266, 2022 WL 1437562, at *2 (E.D. Pa. Apr. 8, 2022) (demand for a witness "to master detailed data-based subject matter" is unduly burdensome). Relator likewise lacks any basis to demand that SSIC perform additional analyses pertaining to the information in its bids, especially where Relator believes the analysis to be "straightforward" and thus could conduct that analysis herself. Topic 9 should be quashed.

**Relator's Position:** The Bid Pricing Tools ("BPTs") are relevant to this litigation because CMS uses BPTs to determine the amounts it pays. Contrary to SilverScript's assertions, the testimony sought is not already contained in the bids already produced by SilverScript. Subtopics (a) and (b) ask straightforward questions about specific information contained in the BPTs. Likewise, subtopic (d) asks a straightforward question about the projected DIR in the BPTs and the ultimately reported DIR. Subtopics (c) and (e) asks straightforward questions about comparisons between specified terms, and does not ask SilverScript to conduct a burdensome "analysis" as claimed. This is quintessential 30(b)(6) testimony an entity's own spreadsheets.

### G.    Topic 10: "Identification of what entity or entities employed the signatory of SilverScript's July 15, 2008 comment on the proposed CMS Rule Change at issue in this litigation, Russell ("Rusty") Ring as of July 15, 2008, and his job title and responsibilities."

**SSIC's Position:** Relator asserts that this Topic is relevant to *Caremark's* conduct, knowledge, and state of mind. But, first, SSIC, which is a separate entity from Caremark, lacks any foundation to do anything other than speculate about any of that. And second, comments submitted by SSIC in 2008—*years* before the relevant and agreed time period in this case—cannot bear sufficient relevance to the parties' claims or defenses to justify third-party discovery. Relator's *ipse dixit* that public comments from 2008 are "highly relevant" falls far short of the "stronger showing of relevance" she must make. *Domestic Drywall*, 300 F.R.D. at 239-40. And Topic 10 does not even seek the information about "Caremark's involvement in this comment" that Relator asserts would be relevant; it seeks the employment status and job duties of a single individual. Topic 10 should be quashed.

**Relator's Position:** The July 15, 2008 comment was a formal public comment by SilverScript concerning its opinion on the CMS Rule Change that is at the center of this case—the requirement that Medicare Part D Plan sponsors report to the government the prices "actually paid" to pharmacies for drugs. Mr. Ring signed this highly relevant comment to CMS on behalf of *SilverScript*, while employed as ***Caremark's*** Senior Vice President for Government Affairs. Testimony on Caremark's involvement in this comment is relevant to showing Caremark's knowledge and state of mind.

SilverScript's statement that it can only "speculate" about Caremark's conduct, knowledge, and state of mind is both inaccurate and entirely beside the point. First, SilverScript emphasized, in the first line of the public comment, that it was an "affiliate[] of Caremark Rx, Inc., a leading PBM company." SilverScript clearly meant to imply that its affiliation with Caremark, a PBM, was relevant to its comment. But, more importantly, Relator does not seek to ask SilverScript questions about Caremark's state of mind. Rather, Relator seeks to ask about the employment status of a particular individual. Relator believes, with good reason, that the answer to this question

14

has bearing on Caremark's scienter. The comment is replete with arguments concerning why PBMs should be allowed to continue lock-in pricing for Medicare Part D claims. Further, the comment includes numerous statements regarding the definition of pricing terms, as well as how price reporting would operate under CMS's proposed rule change. If these statements are attributable to Caremark rather than SilverScript, they give direct insight into what Caremark understood its reporting obligations would be under the CMS rule change.

SilverScript's position that this question should be directed towards Caremark and not SilverScript is unreasonable. SilverScript, a Caremark entity, is at least as well suited to provide testimony on Topic 10 as Caremark is—the SilverScript logo printed on the comment's letterhead reads "SilverScript Inc., a Caremark Rx Company." Mr. Ring made a public comment on an important issue to SilverScript's primary regulator. SilverScript could not have possibly entrusted this role to him without having knowledge regarding such essential and simple details as what entity he worked for and what his job title was.

### H.     Topic 16: "The shares of SilverScript's generic drug prescriptions that were dispensed by each of Rite Aid Corporation, Walgreen Co., and CVS Pharmacy for each year from 2010-2016."

**SSIC's Position:** As with CVS Pharmacy Topic 9, this Topic seeks from SSIC detailed, made-for-litigation calculations and information that Relator is simultaneously (equally improperly) pursuing from Caremark and that is a subject of the parties' June 24 joint submission to the Court. Joint Statement at 3, Dkt. 225 (June 24, 2022). It is not apparent, and Relator does not explain, how or why the shares of SSIC prescriptions dispensed by certain pharmacies are relevant to Relator's alleged damages. And any such analysis for Relator's use (which SSIC plainly has no obligation to undertake) would require SSIC to retrieve and analyze claims data that Relator has already obtained in this litigation from Caremark. There is no basis for asking SSIC to take on that burden. Topic 16 should be quashed.

**Relator's Position:** This testimony is relevant to damages, because Relator will calculate CMS's overpayment for generic drugs associated with SilverScript (and Aetna) Part D plans. Relator has repeatedly told SilverScript she would accept complete substantive written answers or responsive documents in lieu of deposing a SilverScript 30(b)(6) witness on this Topic, and has also sought this information from Caremark, who has refused to produce it (ECFs 224, 225).

SilverScript's position that it is somehow improper for Relator to offer to accept a written response from Caremark in lieu of testimony from SilverScript makes no sense. SilverScript is wholly owned by Caremark and represented by the same counsel, and one of these entities must provide this information. Relator believes Caremark is best suited to do so (*see* ECFs 224, 225) but if Caremark will not, then SilverScript must.

Dated: July 8, 2022

/s/ *Holly M. Conley*
Enu A. Mainigi (*Pro Hac Vice*)
emainigi@wc.com
Craig D. Singer
csinger@wc.com
Holly M. Conley (*Pro Hac Vice*)
hconley@wc.com
Daniel M. Dockery (*Pro Hac Vice*)
ddockery@wc.com
Sarah L. O'Connor (*Pro Hac Vice*)
soconnor@wc.com
WILLIAMS & CONNOLLY LLP
680 Maine Avenue SW
Washington, DC 20024
Tel:  202-434-5000
Fax:  202-434-5029

*Counsel for Non-Parties CVS Pharmacy
and SilverScript*

/s/ *Caitlin G. Coslett*
BERGER MONTAGUE PC

Susan Schneider Thomas
David F. Sorensen
Joy P. Clairmont
Caitlin G. Coslett
William H. Fedullo
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Telephone: (215) 875-3000
Facsimile: (215) 875-4604 E-
mail: sthomas@bm.net
dsorensen@bm.net
jclairmont@bm.net
ccoslett@bm.net
wfedullo@bm.net

Natalie Finkelman Bennett
MILLER SHAH LLP
1845 Walnut Street, Suite 806
Philadelphia, PA 19103
Telephone: (610) 891-9880
Facsimile: (866) 300-7367
E-mail: nfinkelman@millershah.com

Jayne A. Goldstein
MILLER SHAH LLP
1625 N. Commerce Parkway, #320
Fort Lauderdale, FL 33326
Telephone: (866) 849-7545
Facsimile: (866) 300-7367
Email: jagoldstein@millershah.com

*Attorneys for Plaintiff-Relator*