```
                    UNITED STATES DISTRICT COURT

             FOR THE EASTERN DISTRICT OF PENNSYLVANIA

SARAH BEHNKE, et al.,               :
                                    : Case No.  2:14-cv-00824-MSG
                    Plaintiffs,     :
                                    : U.S. District Court
            vs.                     : ED of PA
                                    : 601 Market Street
CVS CAREMARK CORPORATION, et al.,   : Philadelphia, Pennsylvania
                                    :
                    Defendants.     : August 24, 2022
                                    : 2:09 p.m.
. . . . . . . . . . . . . . . . . . :
```

```
              AMENDED TRANSCRIPT OF DISCOVERY HEARING
            BEFORE THE HONORABLE MITCHELL S. GOLDBERG
                  UNITED STATES DISTRICT JUDGE
```

<u>APPEARANCES</u>:

```
For Plaintiffs:              CAITLIN G. COSLETT, ESQ.
                             DAVID F. SORENSEN, ESQ.
                             WILLIAM H. FEDULLO, ESQ.
                             BERGER MONTAGUE
                             1818 Market Street, Suite 3600
                             Philadelphia, PA  19103
                             ccoslett@bm.net
                             dsorensen@bm.net
                             wfedullo@bm.net
                             (215) 875-3000


For Defendants:              DANIEL M. DOCKERY, ESQ.
                             HOLLY M. CONLEY, ESQ.
                             SARAH O'CONNOR, ESQ.
                             WILLIAMS & CONNOLLY LLP
                             725 12th Street NW
                             Ed Bennett Williams Building
                             Washington, D.C. 20005
                             ddockery@wc.com
                             hconley@wc.com
                             soconnor@wc.com
                             (202) 434-5698
```

Court Recorder:                 Jimmy Cruz

Transcription Service:          Weber Reporting Corporation
                                (970) 405-3643


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

1

 1              THE CLERK:  All rise.  The United States District
 2  Court for the Eastern District of Pennsylvania is now in
 3  session.  The Honorable Mitchell S. Goldberg presiding.
 4              THE COURT:  All right.  Have a seat.
 5              All right.  This is Behnke vs. Caremark, 14-824.
 6  Wow, 2014.  This is an old case.  This is a really old case.
 7  One of the oldest cases on my docket.  Who is -- let's just get
 8  counsel who are here.
 9              So for the Relator?
10              MS. COSLETT:  Yes, Your Honor.  Caitlin Coslett from
11  Berger Montague.  With me today at counsel's table is David
12  Sorensen at the end of the table, also with Berger Montague,
13  and my colleague William Fedullo, also with my firm.
14              MR. FEDULLO:  Good afternoon, Your Honor.
15              THE COURT:  Hi.
16              MR. SORENSEN:  Good afternoon.
17              THE COURT:  Good afternoon.
18              And for Caremark.
19              MR. DOCKERY:  Good afternoon, Your Honor.  Dan
20  Dockery with the Williams & Connolly for the Defendants.  With
21  me at Counsel's table immediately to my right, is Holly Conley.
22  And to her right is Sarah O'Connor.  Both of -- all of them are
23  colleagues of mine at Williams & Connolly.
24              THE COURT:  Okay, good afternoon.
25              GROUP COLLECTIVELY:  Good afternoon.

1              THE COURT:  Good afternoon.

2              All right.  We're here to try to resolve some

3    discovery matters.  I want to just give you some observations

4    that I think hopefully will inform the positions that you take.

5    I think I have a good comprehensive list of what's outstanding,

6    but we're still in the fact discovery phase.

7              So I did the best I could to get caught up to speed.

8    This case reminds me of some patent cases that I handle.  When

9    you're away from it, the learning curve is enormous.  So the

10   lawyers, I don't know how much of your time you're spending on

11   the case, you know daily, but I haven't thought about this case

12   in a while.  So I did my best to catch up today.  But try to

13   have the mindset that you're going to be a lot more conversant

14   in the case, which I think it's complicated than I am.  Of

15   course at the right time, forget the dispositive motions.  I'll

16   get my fingernails dirty and really get into.  So please don't

17   use acronyms, and try to be, you know, as plainspoken as

18   possible about things.

19             I think I am into enough to know that when we have a

20   discovery order that was issued in September of 2020, and we're

21   now in August of 2021 (sic), you know, we're almost at, you

22   know, two years, of just have fact discovery.  So that's going

23   to stop.  Fact discovery is going to end.  I mean, there may be

24   some additional things that Relator can convince me that we're

25   going to -- I'll let you get into, but the case has got to

```
1    move.  I know that there was a period of time, I stayed

2    discovery.  I think that was maybe like three months.  But a

3    two-year time period for fact discovery is too long.  And my

4    impression -- again, with the acknowledgement that I'm not as

5    steep in the facts as you are, so I could be wrong -- is that

6    discovery, if I gave, you know, Relator an open-ended discovery

7    timeline, and said, you know, come back to me -- I mean, some

8    judges do this, they say, come back to when you're done with

9    discovery.  You could dig for facts for the next five years.

10          So I think, Relator, you're at the point of overdoing

11   it.  That's my impression.  And I want you to be -- the word

12   I'm looking for -- concise, and just keeping my thoughts in

13   mind when you're continuing to push for things.

14          I know some of your responses are, well, Judge, if we

15   had gotten things from them, it would different.  But I really

16   don't have the impression that Caremark is hiding the ball.  So

17   these are just my impressions initially.  I couldn't be wrong.

18          So I always start my conversation with the lawyers in

19   the case by asking the Relator to -- just to make sure I'm on

20   the same page as Relator to, in very basic terms, talk to me

21   like I am a juror.  You're fraud allegation is what?  Explain

22   it to me.  And this will help me to make better decisions on

23   outstanding discovery.

24          MS. COSLETT:  Yes, Your Honor.  Would you prefer for

25   me to approach?
```

 1              THE COURT:  Wherever you're comfortable.

 2              MS. COSLETT:  Okay, thank you, Your Honor.

 3              Our basic fraud allegations, I know you said this was

 4  a complicated case, I think from my perspective, the case is

 5  not that complicated.  Our allegations in our case is that

 6  Caremark negotiated and actually paid prices for generic drugs

 7  that were lower than the prices that Caremark falsely -- caused

 8  to be falsely reported to the Government, to the Center for

 9  Medicare and Medicaid Services.

10              THE COURT:  Take me -- take me through the steps.

11              MS. COSLETT:  Sure.  And the way this -- the way this

12  was effectuated is this, Your Honor.  Caremark -- the evidence

13  shows that Caremark negotiated overall generic effective rates

14  with each of Rite Aid, Walgreens, and CVS Pharmacies.  And the

15  generic effective rate discount is essentially if the drugs --

16  if the generic list price or the average wholesale price of a

17  drug is $100, then -- and the negotiated generic effective

18  discount rate is 80 percent, that the amount due would be $20,

19  80 percent less than $100 in that example.  Okay.

20              And the way that this applied -- and this is really

21  important to our case, Your Honor -- is this is an aggregated

22  combined, generic effective discount rate that applies both to

23  commercial drugs, drugs that are not reimbursed ultimately by

24  the Government, and drugs that are Medicare Part D drugs that

25  are ultimately paid for by the United States Government by the

1   Center for Medicare and Medicaid Services.

2          So Caremark negotiates those generic effective

3   discount rates, which each have, again, Walgreens, Rite Aid,

4   and CVS Pharmacy.

5          Then what Caremark did was it caused prices to be

6   reported to CMS to the -- sorry, to the Center for Medicare

7   Services, the Government agency, that were higher than the

8   overall generic discount rate that it had negotiated with the

9   pharmacies.  So in essence, in the example I gave, the price of

10  the drug is $20, because it was an 80 percent discount below

11  the $100 list price for the generic drug.

12         Caremark did not go to the Government and say, the

13  price of the generic drug is 20 percent.  That corresponds to

14  the 20 -- the 80 percent generic discount rate that we

15  negotiated with the pharmacies, and then actually paid to the

16  pharmacies for the generic drugs.

17         Instead, Caremark systematically, year after year,

18  for all three pharmacies, caused prices to be reported to the

19  Government that were above -- higher than $20.  They were $22,

20  $23.  These numbers are obviously not exact.  But that's the

21  idea.

22         THE COURT:  They were just examples.

23         MS. COSLETT:  Yeah.

24         THE COURT:  So the $100 number that you started with,

25  it's a negotiated price down to 20 you said --

```
 1                    MS. COSLETT:  That's right.

 2                    THE COURT:  -- because it's a generic, is that why?

 3                    MS. COSLETT:  It's a generic.

 4                    THE COURT:  Is that why it's 100, but it becomes 20

 5     because it's generic, not a brand?

 6                    MS. COSLETT:  Essentially, for generic drugs, Your

 7     Honor, the price that's actually paid is often, and in fact,

 8     usually a pretty significant discount off of the list price for

 9     brand drugs, which are not in our case.  Often the price paid

10     is pretty close to the list price, or the average wholesale

11     price.

12                    THE COURT:  For brand.

13                    MS. COSLETT:  But for generic drugs, there are

14     significant discounts.  And so --

15                    THE COURT:  So the discount is derivative of the fact

16     that it's a generic?

17                    MS. COSLETT:  Yes, exactly.

18                    THE COURT:  Got it.

19                    MS. COSLETT:  And that's -- generic drugs, again, are

20     the only type of drugs at issue in our case.

21                    THE COURT:  You did -- is it Ms. Coslett?

22                    MS. COSLETT:  Yes.

23                    THE COURT:  Well done, to simplify it and set the

24     stage.  Thank you.

25                    MS. COSLETT:  Thank you.
```

 1          THE COURT:  All right.  So unless someone has a

 2   better idea -- and I'm open to that -- I think I have a pretty

 3   good list here what remains, according to the parties,

 4   outstanding.  I think once the complaints are Relators, and

 5   I'll just tee up the issue.  You can tell me what you think is

 6   deficient.  I'll hear from Caremark.  They can tell me why it's

 7   not deficient or why it's not discoverable.  Maybe I'll rule

 8   right here.  Maybe I won't.  Maybe I'll say I want to think

 9   about it, and we'll just try to roll through these things.

10          Does that work?

11          MS. COSLETT:  Yes, thank you.

12          THE COURT:  All right.  So I have some notes here

13   that I'm going to review before each topic comes up just to

14   remind myself what the topic is.  So just give me a second

15   before I tee up the first topic.

16          So the first issue, as I understand, is that Caremark

17   has produced database -- datasets.  I'm not sure what those

18   are.  Maybe someone could explain that, but the allegation is

19   that the entries in the datasets, according to Caremark,

20   correspond to contract plans.  And Relator is saying that the

21   contract plans are inconsistent and not the same across the

22   four datasets.

23          By way of example, Relator says the first dataset

24   contained entries for contract plans A, B, C, and D, but the

25   second dataset contain entries for contract plans B, C, D and

1   E.  And Relator's worried about some inconsistency and that

2   their expert's going to be impeached.  I mean, without really

3   getting much deeper than that, you can't -- you can't -- I

4   wouldn't allow impeaching an expert for not having information

5   that wasn't produced, number one, that would be a legitimate

6   objection you can make a trial.  And -- but go ahead, explain

7   it to me.

8          MS. COSLETT:  Your Honor, the basic issue is this.

9   There's four datasets that have been produced by Caremark and

10  the Caremark entities in this case.

11         THE COURT:  What's a dataset?

12         MS. COSLETT:  What's that?

13         THE COURT:  What's a dataset?

14         MS. COSLETT:  A dataset.  So there's four different

15  types of files.  So there are the first type, if you're just

16  taking sort of sequentially, is plans -- these healthcare

17  plans, they submit bids to the Center for Medicare and Medicaid

18  Services.  So they would submit them around the middle of say,

19  2011 for 2012.

20         Those bids then are relevant to the subsidies that

21  the Government, the Center for Medicare and Medicaid Services,

22  pays to the plans during the next calendar year, during 2012.

23  That's one type of data.  So there's a set of -- we requested

24  and Caremark and the Caremark entities agreed to produce those

25  bid files that were submitted to the Center for Medicare and

```
 1  Medicaid Services.
 2              The next step in the reporting sequentially is that
 3  there is prescription drug event data that is -- essentially
 4  reflects the price that is paid at the pharmacy.  It's called
 5  point of sale prices, because it's the price that is recorded
 6  when a prescription is paid -- is purchased at Walgreens, Rite
 7  Aid, or CVS.  So that amount -- that data gets then submitted
 8  to the Center for Medicare and Medicaid Services.  And that
 9  also factors --
10              THE COURT:  You can just say the Government.  It will
11  be simple.
12              MS. COSLETT:  Thank you, the Government.  And that
13  figures into how much the Government then reimburses for the
14  generic drugs.
15              Then there is a another step, which is that there is
16  a submission of direct and indirect renumeration reports, which
17  is essentially, if there are price adjustments that are paid,
18  not right the moment at the pharmacy, but after the fact, those
19  also have to be -- those also have to be reported to the
20  Government because the Government again wants to pay the amount
21  on net, including any price adjustments that may have been made
22  after the point of sale that are associated with drugs that the
23  Government is paying for.  So that's the third step.
24              Then the final step is, the Government sends a year-
25  end payment reconciliation -- I'm forgetting the last letter --
```

1   year-end report back to the plans and says, we've looked at

2   this, we've reconciled everything you said, here's how much

3   money we're going to pay for the entire year, and then makes

4   payments in accordance with that.

5              THE COURT:  And these four things are called

6   datasets?

7              MS. COSLETT:  They're four -- we describe them as

8   datasets.  I mean, their technical names are the names I gave.

9              THE COURT:  Just use the word dataset.

10             MS. COSLETT:  Yes, datasets.  So there's four

11  datasets.

12             THE COURT:  And you acknowledge they produced the

13  datasets, right?

14             MS. COSLETT:  Well, those -- they have produced no

15  2013 Aetna bids, so that's one clear gap in our mind, but they

16  have produced at least some --

17             THE COURT:  Put that aside.

18             MS. COSLETT:  -- of each type of the four datasets,

19  yes.

20             THE COURT:  Okay.  And in each dataset, there's all

21  kinds of information in each dataset --

22             MS. COSLETT:  That's --

23             THE COURT:  -- so it's not going to be simple enough

24  to just say datasets.  It's -- there's subparts to each one.

25             MS. COSLETT:  That's right, Your Honor.

1          THE COURT:  And you've gone to Caremark and said,

2    thank you for the four set -- four categories of datasets, but

3    there's this information missing from each one, right?

4          MS. COSLETT:  Yes, Your Honor.  So we --

5          THE COURT:  And is Caremark, according to you, refused

6    to produce, or are they saying they can't find, or what?

7          MS. COSLETT:  In our mind, Your Honor, they have just

8    not responded.  We sent a detailed letter on May 6th.

9          THE COURT:  How many -- how many -- we can take it

10   one at a time, dataset one, two, three, and four, or we can do

11   it all together.  How many pieces of information total out of

12   the four datasets do you believe you have not received that

13   you've asked for?

14         MS. COSLETT:  So, Your Honor, the way I would put it

15   is this.  We don't know what we don't have.  It's the Caremark

16   entity's data.  We -- what we have done is we have identified

17   contract plan, so that basically is --

18         THE COURT:  I mean, I've said this to -- I've said

19   this to this group before and maybe it's worth saying again.

20   Mostly, I think I've interfaced with Ms. Schneider Thomas --

21   Susan Thomas.  But when -- and you can tell me if you think

22   this is over simplifying it -- when a lawyer representing your

23   company, like these folks represent Caremark, they stand up and

24   say, Judge, we've done a reasonable search, we don't have that

25   information.  To me, that's an answer.  And that -- that closes

1  the book, unless you can show me really blatantly why they're

2  not telling the truth.  And I think some of what's going on

3  here from your end is, you're saying, well, they said they've

4  produced it, but that doesn't make sense to us.  And I sort of

5  disagree with that mindset.  They're obligated to -- I mean,

6  there's enormous repercussions if they actually have the

7  document and they've deep-sixed it.  I mean, that's criminal

8  conduct.  Could be.  So --

9          MS. COSLETT:  So, Your Honor --

10          THE COURT:  -- I mean, you've gone to them and said,

11  I don't understand this answer, like we think we should have

12  it, or they should have it, but they don't.  Like what are you

13  saying?

14          MS. COSLETT:  Here's the issue, Your Honor, and I

15  think it might help to analogize to, you know, some of the drug

16  cases that our firm also works on, including, you know,

17  Suboxone, the Provigil cases.  In these cases, we often get and

18  while --

19          THE COURT:  Coincidence you just brought that up.

20  It's like the patent case I just tried where they managed to

21  feed into the expert's qualifications that they went to Temple

22  Law School.  I mean, where I went.  So --

23          MS. COSLETT:  When good things happen, you bring

24  them.

25          THE COURT:  Yeah.  Okay.  Oh, what a surprise.  That

```
 1    was a denial of summary judgment.  I wouldn't have thought of

 2    that unless you brought that up.  Go ahead.  Analogize it.

 3            MS. COSLETT:  So, routinely, Your Honor, the

 4    pharmaceutical cases like the two I just mentioned, we get data

 5    from a drug manufacturer, and the drug manufacturer produces

 6    it, and we work with our experts.  We look at it and we say --

 7    we often come back with questions, and we say to the drug

 8    manufacturer, we don't see.  We would have expected to see

 9    suboxone in the five milligrams strength, the 10 milligram

10    strength, the 20 milligram strength, but we only see 5 to 20.

11    Where's the data for the 10 milligram?

12            And there are, as you said, you know, Your Honor, and

13    we agree, there are two acceptable answers to that.

14            One is, oh, you're right, we failed to produce the 10

15    milligram data, and here it is.  We're giving it to you.

16            THE COURT:  Or we don't have it.

17            MS. COSLETT:  Or we don't have it.  But the issue,

18    Your Honor, here with respect to the Caremark entity's

19    counsel's representations, they have not represented that the

20    data we have is complete, or that they don't have additional

21    data.  They have represented that they have --

22            THE COURT:  Okay.  Well, this is going to be

23    productive, because they're right here.

24            So, Counsel for Caremark, stand up.  Whichever --

25    whoever's going to address this.  As to the -- as to the -- do
```

```
 1    you understand what Relator's counsel says when she's talking
 2    about datasets?
 3              MS. CONLEY:  I believe I do, Your Honor.  And that
 4    there are four different --
 5              THE COURT:  Yes.
 6              MS. CONLEY:  -- we would call them sets of data or
 7    documents.  I think many of them are document-type information.
 8              THE COURT:  Okay.
 9              MS. CONLEY:  But there are four sets of information I
10    understand --
11              THE COURT:  Have you received a comprehensive list
12    from Plaintiff's counsel regarding the sub-categories in those
13    datasets that they are looking for?
14              MS. CONLEY:  We -- what we received from Relator's
15    counsel was an explanation of they had looked across and they
16    said we see some contract numbers in some sets, and we don't
17    see them in other sets.
18              And I think their question is, is exactly as you --
19    as sort of you have framed it, is their question is, why might
20    that occur?  Right.  That's a fact question.  Why might we see
21    some information in some datasets --
22              THE COURT:  Okay.
23              MS. CONLEY:  -- and not in other datasets?
24              THE COURT:  Have you answered that question?
25              MS. CONLEY:  We have -- what we have done is we have
```

```
1   said that we believe that the data is complete.  Back in August

2   of last year, they had asked us specific questions about

3   certain contract numbers and bids, which they had said were

4   missing.  We were -- I think we were here a year ago exactly.

5   We sent them a letter after a hearing with Your Honor, and

6   said, well, the reason that you don't see these contract plan

7   numbers in the bids is because those contract plans were

8   subsequently acquired by Caremark.  So they were not -- they

9   were not there.  Just because those contracts --

10              THE COURT:  So you've given them an explanation as to

11  why the information they think is not there is not there.

12              MS. CONLEY:  We've given them information as to the

13  bids that they raise.  They have other questions as to other

14  contract numbers that they raised back in May, as to, you know,

15  they said we see this, or we don't see that.  They have asked

16  for both Aetna and SilverScript to provide 30(b)(6) testimony

17  on the contract plan numbers --

18              THE COURT:  Well, they're --

19              MS. CONLEY:  -- for each year.

20              THE COURT:  Remind me.  They're not defendants in

21  this case?

22              MS. CONLEY:  They are not defendants in this case.

23              THE COURT:  Okay, so that's not your concern.  Right?

24              MS. CONLEY:  It is the means by which they -- so this

25  data that was produced, was produced by Aetna and SilverScript.
```

1            THE COURT:  Okay.

2            MS. CONLEY:  So the there's one set of data --

3            THE COURT:  Right.

4            MS. CONLEY:  -- one -- the prescription drug event

5   data --

6            THE COURT:  Right.

7            MS. CONLEY: -- that was produced by Caremark.  All

8   the other three sets of data that they're talking about were

9   all produced by Aetna or SilverScript.  So the question sort of

10  about the production of those are Aetna and SilverScript, who

11  are in fact, third parties.

12           THE COURT:  Right.

13           MS. CONLEY:  And that's -- but I'm here today to talk

14  for -- are the third parties.

15           THE COURT:  And as to sub, the datasets, have you

16  produced everything in your client's possession that's been

17  asked for?

18           MS. CONLEY:  We believe that we have produced

19  everything in our client's possession that has been asked for.

20           THE COURT:  Okay.

21           MS. CONLEY:  We acknowledge that there is -- you

22  know, there are some contract plan numbers that appear

23  someplace and not other places.  We take the documents as we

24  find them.

25           THE COURT:  Right.

1              MS. CONLEY:  Just because there are, you know, some

2    numbers that are referenced one place does not mean that they

3    are missing from --

4              THE COURT:  Numbers generated --

5              MS. CONLEY:  -- something else.

6              THE COURT:  Numbers generated by your client?

7              MS. CONLEY:  Numbers -- contract plans that are --

8    contract plans that may be -- that may be plans, but not within

9    sort of the scope of this case.

10             Like, for example, Aetna has a number of contract

11   plans, a number of legacy contract plans, some of which were

12   serviced by other PBMs.  So they may see those in documents --

13   in Aetna documents, because they're Aetna documents that exist.

14             THE COURT:  Right.  So according to you --

15             MS. CONLEY:  But not produced data produced -- no

16   data produced for those.

17             THE COURT:  So according to you, the deficiencies

18   that that Ms. Coslett is raising you're framing as, we're

19   asking questions, Relator, you've produced some documents, but

20   we're wondering why there's omissions in some subcategories

21   under the subsets.  And your position is, those omissions are

22   -- are -- they may be there, and they may not be there, but if

23   they're there, they're through documents that we don't control

24   and we didn't generate.  Is that close to what you're saying

25   or?

```
 1              MS. CONLEY:  That's very close.  So if there are

 2   omissions, it's not because there was something necessarily

 3   missing.  It may be because some other information is included

 4   in a document, and they expect to see it someplace else.  They

 5   have a fact question as to why they would -- why they don't see

 6   it someplace else.  Aetna and SilverScript have agreed to

 7   produce -- to provide information regarding the contract plans.

 8              THE COURT:  Right.

 9              MS. CONLEY:  It may be -- it may be information -- I

10   don't want to say that Aetna does not have the information, but

11   it's information that is not -- is far outside of the scope of

12   this case, because it's contract plans that were not even

13   serviced by Caremark.

14              THE COURT:  Okay.

15              Quick Response.

16              MS. COSLETT:  My quick responses is, I'm hearing this

17   for the first time today.  My question for Aetna and

18   SilverScript's counsel, is whether the produced datasets, the

19   four sets, cover all of SilverScript and Aetna's Medicare --

20              THE COURT:  Start your question.  Say it again.

21              MS. COSLETT:  Yeah.  My question for Aetna and

22   SilverScript's counsel is whether the produced data include all

23   -- the four sets.

24              THE COURT:  All right, I want to make sure --

25              MS. COSLETT:  -- each of the four sets.
```

1          THE COURT:  I need to get -- I'm sorry to interrupt

2    you again.  This -- all three of you represent --

3          MS. COSLETT:  They all represent all three entities.

4    They represent Caremark, CVS, Aetna, and SilverScript.

5          THE COURT:  All -- are there separate counsel, one

6    for Caremark, or all three of you were from the same firm and

7    represent each entity in unison?  Right?

8          MS. CONLEY:  All of us are from the same firm, and

9    all of us represent each of the entities.

10         THE COURT:  Okay.  So when she says there's -- and

11   the entities are SilverScript, Aetna --

12         MS. CONLEY:  CVS pharmacy, and those three are not

13   parties --

14         THE COURT:  And CVS and Caremark, right?

15         MS. CONLEY: -- to this lawsuit.  And then there is

16   Caremark, which is the Defendant in this lawsuit.

17         THE COURT:  Which is the Defendant.  Okay.  So the

18   deficiencies, while they're not -- the alleged deficiencies,

19   while they're not vis-à-vis documents generated from Caremark,

20   the Defendant, nonetheless, they've been requested from

21   entities that you folks represent.  Right?

22         MS. CONLEY:  That's correct, Your Honor.

23         THE COURT:  Okay, so how does this -- we can't answer

24   where the holes are because your other entities -- I don't

25   understand.  You represent these companies.  Why can't you go

```
 1     back to them and ask -- they're your clients?

 2             MS. CONLEY: That's not our position at all, Your

 3     Honor.  We as Aetna and SilverScript, who have produced the

 4     documents, believe that we have produced the responsive

 5     documents.  We've undertaken --

 6             THE COURT:  Your position is, you don't have to --

 7             MS. CONLEY:  -- a reasonable search.

 8             THE COURT:  -- because this is outside of what's

 9     allowable under discovery.  Right?

10             MS. CONLEY:  No.  It's that we have produced

11     everything that Aetna and SilverScript agreed to produce.

12             THE COURT:  But Plaintiff's counsel, Relator's

13     counsel is saying there are gaps in the subsets.  And I heard

14     you acknowledge that there are gaps in the subsets.

15             MS. CONLEY:  I -- then I think I misspoke.  There are

16     not gaps in the -- in the data and the documents produced with

17     the contract plans that are at issue in this litigation.

18             There are certain -- for example, there are certain

19     Aetna documents that lists all of the Aetna plans that are

20     relevant to this litigation, and certain other plans that use

21     an entirely different PBM, and so are not relevant to this

22     litigation.

23             They may see those contract plan numbers in one set

24     of documents, and not see them in another set of documents, but

25     that doesn't mean that that information was omitted from the
```

```
1    other dataset.  The other dataset includes everything that we

2    agreed to produce in this case.  It's just that the documents,

3    they have everything we agreed to produce.  And as the

4    documents come, they have a little bit of extra information in

5    it.

6              THE COURT:  All right.  And isn't there someone who

7    can explain the inconsistency in that?

8              MS. CONLEY:  Well, they've asked for testimony at the

9    30(b)(6) about the Aetna and SilverScript plans.  We have

10   agreed to produce that.

11             THE COURT:  And you're going to produce --

12             MS. CONLEY:  So we think that's the best way to do

13   it.

14             THE COURT:  You're going to produce someone who's

15   going to be able to explain the differences?

16             MS. CONLEY:  We will produce someone who will be able

17   to identify, yes, each of the SilverScript and Aetna contract

18   plans for each of the relevant years for this case.

19             THE COURT:  And look at the numbers, and when

20   Relator's counsel says, look at this Deposition Exhibit A, and

21   look at this Deposition Exhibit B, you see how the numbers are

22   different?  Explain that witness is not going to say, I don't

23   know, that's beyond my scope.  That witness is going to be able

24   to explain the differences?

25             MS. CONLEY:  That witness will certainly be able to
```

1    say whether the Aetna plan was an Aetna plan for that year, and

2    so you should expect to see information in that dataset for

3    that year.

4              THE COURT:  Okay.  So acknowledging my desire to make

5    this simple, is her suggestion that she will produce a witness

6    who will explain these deficiencies acceptable?

7              MS. COSLETT:  Your Honor, it's helpful, but I think

8    the disconnect that we're having -- you know, that I'm having

9    with counsel for the Caremark entities, is that I've asked for

10   confirmation that the produced -- the four different datasets

11   include all Aetna and SilverScript Medicare Part D plans.  And

12   all of the Medicare Part D plans are included in those

13   datasets.

14             THE COURT:  Okay.  Have you produced that

15   information?

16             MS. CONLEY:  We've undertaken a reasonable search,

17   and we believe that we have produced all of the Aetna and

18   SilverScript Medicare Part D plans, the pertinent information

19   for those plans for the relevant time period.

20             THE COURT:  All right, that's an answer.  Okay.

21             So then, with that answer, binding on --

22   SilverScript?  Is that who we were just talking about?

23             MS. CONLEY:  Aetna and SilverScript.

24             THE COURT:  Aetna and SilverScript, is counsel's

25   suggestion that the deficiencies -- discrepancies I think is a

```
 1    better word as you see them?

 2            MS. COSLETT:  Discrepancies, okay, Your Honor.

 3            THE COURT:  -- they will produce a witness to explain

 4    those.  Is that acceptable?

 5            MS. COSLETT:  Your Honor, I think it would be less

 6    burdensome to provide it through counsel, but we will we will

 7    take those depositions from Aetna and SilverScript and

 8    hopefully that will resolve our --

 9            THE COURT:  Okay, then that's --

10            MS. COSLETT:  -- concerns.

11            THE COURT:  -- what we're going to do.

12            Okay.  So then the next category I -- and let me just

13    read the next category, if I may, and when you're taking

14    careful notes on what we're doing here, okay.

15            The next issue, as I understand Relator has framed

16    it, is they claim that some databases Caremark produced to them

17    consist of data that was required to be reported to the

18    Government.  And they want to know, Relator, what was actually

19    reported to the Government.  Relator's concerned that some of

20    the datasets are not final or drafts.  And Relator wants

21    Caremark to identify which datasets are actually -- were

22    actually sent to the Government.

23            Is that a fair summation --

24            MS. COSLETT:  Yes, that's correct.

25            THE COURT:  -- of the next issue?
```

 1              MS. COSLETT:  We what the final what was sent to the

 2      Government or received from the Government identified.

 3              THE COURT:  Okay.  What's your response?

 4              MS. CONLEY:  And again, Your Honor, I think this is

 5      information that was sought from both Aetna and SilverScript.

 6      And so I'll speak on their behalf.

 7              Again, we're talking about --

 8              THE COURT:  All three entities now, right?

 9              MS. CONLEY:  Just Aetna and SilverScript.

10              THE COURT:  Well --

11              MS. COSLETT:  And Caremark with respect to the PDE

12      data.

13              MS. CONLEY:  So right, one portion -- so -- was

14      affirmed for Aetna, the four sets of documents would be the bid

15      documents, the PDE data, the DIR reports, and the PRS reports,

16      which are the year-end reconciliation reports.

17              THE COURT:  Too many acronyms, but go ahead.

18              MS. CONLEY:  There are there are many, and I'm

19      trying.  So sort of the what comes at the beginning, the bids,

20      the two reporting things that happened during the -- during the

21      contract years that Relator claims are, you know, are at issue

22      at this case.  And then year-and reconciliation documents with

23      money exchanged.

24              THE COURT:  And these are Aetna documents?

25              MS. CONLEY:  These -- all four those are on the Aetna

1    side, or Aetna documents, all produced by Aetna in this case.

2          So for three out of those, we have already, in fact

3    represented to Relator that they are the final ones that came

4    from CMS.

5          So for the --

6          THE COURT:  Well say it.  Say it on the record, so --

7          MS. CONLEY: I will say it.

8          THE COURT:  You can complete your discovery

9    obligations as counsel for Aetna by saying that -- go ahead,

10   you have done -- say it.

11         MS. CONLEY:  So the PDE data, we have previously

12   represented to Relator, and will represent again here, are the

13   final state of those claims and the PDE return files received

14   from CMS at the time the data was extracted.  So that is the

15   final state of the claim that we have at the time --

16         THE COURT:  Done.

17         MS. CONLEY:  -- the data was produced.

18         THE COURT:  Go ahead.  What's next?

19         MS. CONLEY:  The next one is the DIR reports.  Those

20   identify the documents that were submitted to CMS, and we

21   provided them the Bates numbers of those.

22         THE COURT:  Okay.

23         MS. CONLEY:  The next one, the PRS reports, those are

24   the year-end reconciliations.  Those are documents that

25   actually come from CMS to Aetna rather than the other way

1  around.

2          THE COURT:  Right.

3          MS. CONLEY:  And we have represented that those are

4  the ones that came from CMS to Aetna.

5          THE COURT:  Okay.

6          MS. CONLEY:  The other category of documents --

7          THE COURT:  And they're final, not draft documents

8  that you've produced?

9          MS. CONLEY:  Well, they came from CMS to us --

10          THE COURT:  Okay.

11          MS. COSLETT:  -- so --

12          THE COURT:  Right.

13          MS. CONLEY:  And the final category is the bid

14  documents.  For the bid documents, those, when we collected

15  from Aetna, we went to the client, we said we need the bid

16  documents, you know, for all of these years.  And they said

17  here are the bid documents where those, you know, exist.  We

18  collected those ,and we produced those.

19          THE COURT:  Okay.

20          MS. CONLEY:  Now, may there have been a draft in

21  there --

22          THE COURT:  Don't -- don't --

23          MS. CONLEY:  -- not to the best of our knowledge.

24          THE COURT:  If you just said our client has certified

25  to us and we certified to you, Judge, that these bid documents

1   -- is that the right term?

2          MS. CONLEY:  The bid documents, yes.

3          THE COURT:  -- are final documents --

4          MS. CONLEY:  To the best of our knowledge, they are.

5          THE COURT:  Fine.  Okay.

6          They've answered that discovery.  What's deficient --

7   is there --

8          MS. COSLETT:  There's two issues, Your Honor.

9          THE COURT:  Go ahead.

10          MS. COSLETT:  One is that we've asked since May for

11   2013 Aetna bids.  We haven't located any or received them from

12   Counsel.

13          THE COURT:  Okay, hold on.  What about 2013 Aetna

14   bids?

15          MS. CONLEY:  Ms. O'Connor's reminding me that on

16   July 1st, we set the Bates numbers to them for those documents.

17          MS. COSLETT:  That's not correct.  You sent the Bates

18   number for the 2012 bids.  We looked at them.  They all related

19   to 2012.

20          THE COURT:  Yeah, see this is --

21          MS. COSLETT:  So we're missing 2013.

22          THE COURT:  -- whether they sent 2012 or '13.  This

23   is -- I would greatly appreciate that the lawyers work that

24   type of minutia out.  Okay.

25          So she's represented that she's produced 2013.  If

```
 1    it's a typo, you two work that out.  But that's the

 2    representation to the Court.  And I'm ruling that that's

 3    sufficient.

 4            What else?

 5            MS. COSLETT:  Your Honor, just -- are you ruling that

 6    we can revisit this with Counsel after this hearing because

 7    we --

 8            THE COURT:  I'm ruling -- no, I'm not ruling -- I'm

 9    suggesting --

10            MS. COSLETT:  We work it out.

11            THE COURT:  -- that if there's -- if she says 2013,

12    and you think she's wrong, that's something that sophisticated,

13    courteous lawyers could work out without dragging --

14            MS. COSLETT:  I --

15            THE COURT:  -- a judge into it.

16            MS. COSLETT:  I agree, Your Honor.

17            THE COURT:  That's what I'm suggesting.

18            MS. COSLETT:  Okay.  I appreciate that.

19            THE COURT:  Go ahead, what's next?

20            MS. COSLETT:  The second issue is that among the

21    final -- the final direct and indirect renumeration reports

22    that were identified by Counsel for the Caremark entities,

23    those are the DIR reports.

24            THE COURT:  We're talking about Caremark documents

25    now, right?
```

1          MS. COSLETT:  They are -- I believe Counsel said they

2    are SilverScript and Aetna documents.

3          THE COURT:  Okay.

4          MS. COSLETT:  Among the final documents that were

5    produced to us that they said were final, there are issues.  So

6    for a given range, they said the document range, page 1 to 12

7    are the finals, but there's multiple for a given year in that

8    range.

9          Or another example is that, there were Aetna files

10   that were represented to be final Aetna, direct and indirect

11   renumeration reports, but they include -- appear to include

12   SilverScript plans.  That doesn't make sense to us.  We've

13   raised this and we haven't received an answer.

14         THE COURT:  What's your answer?

15         MS. CONLEY:  Again, I think these are questions that

16   they have, and they've asked for 30(b)(6) testimony on it, and

17   Aetna has agreed to provide 30(b)(6)testimony on this.  We've

18   agreed to provide when the doc -- when the DIR reports were

19   submitted.  I think as Mr. Dockery actually I recall --

20         THE COURT:  So your answer is --

21         MS. CONLEY:  -- explained to the Court.

22         THE COURT:  -- you're going to -- there's going to be

23   a 30(b)(6) witness who's going to answer her question.

24         MS. CONLEY:  There will be --

25         THE COURT:  And you're --

1          MS. CONLEY:  -- a 30(b)(6) witness.

2          THE COURT:  -- you're assuring me that that 30(b)(6)

3  witness, you're assuring me, number one, you understand Relator

4  -- Relator's Counsel's concerned.  Yes?

5          MS. CONLEY:  I --

6          THE COURT:  I'm not saying you agree with it.

7          MS. CONLEY:  But then let -- so her concern, I

8  believe, is that there may be multiple DIR reports for the same

9  year --

10          THE COURT:  That's where I --

11          MS. CONLEY:  -- which is something that I think

12  Mr. Dockery addressed again a year ago, that there are initial

13  files, and then there are reopenings of files.

14          THE COURT:   Yeah, rather than regurgitate it --

15          MS. CONLEY:  -- but we didn't -- I mean, but that's a

16  fact question that's --

17          THE COURT:  -- she said it, I mostly understood it.

18  Did you understand what her deficiency concern is?

19          MS. CONLEY:  So I understand it.  So, one, whether

20  there were multiple DIR reports for the same year, and two,

21  whether one of the DIR reports submitted by Aetna may include

22  plans that were not Aetna plans.

23          THE COURT:  And you're assuring me that your witness

24  will be able to answer those questions?

25          MS. CONLEY:  That's correct, Your Honor.

1              THE COURT:  Okay.  What else?  What's next?  Does

2      that cover -- I think that covers that topic, so let me read

3      what I have is the next topic.

4              (Pause while the Court review documents.)

5              THE COURT:  I think, if I understand the next concern

6      of Relator is that they have asked about Aetna and

7      SilverScript's shares of Caremark's Part D generic drug

8      business?  What does that mean?  Could you explain that?

9              MS. COSLETT:  And I apologize.  I'm sure you don't

10     want to go backwards.  But I assume the prior discussion -- we

11     were discussing Aetna, the same path forward applies equally to

12     SilverScript as well.  Is that your understanding?

13             THE COURT:  Well, it should yeah.  Okay.  That's what

14     I assume.

15             MS. COSLETT:  Okay, thank you, Your Honor.

16             So I think the next issue, or the next two issues,

17     both relate to damages calculations.

18             The first issue is that we have -- we issued on May

19     6th a limited document request seeking documents sufficient to

20     show the contract plans for SilverScript and Aetna that appear

21     in the pharmacy reconciliation documents.

22             Just take a second to explain what the pharmacy

23     reconciliation documents are, Your Honor, because they really

24     implicate several topics here.

25             The reconciliation documents are documents that show

1    the sort of math that leads out.  If you remember back to the

2    example I gave at the outset of the hearing, which is the --

3    you know, if there's a list price, an average wholesale price

4    for a generic drug of $100, there's a negotiated generic

5    discount rate of 80 percent, then what everybody has agreed is

6    that Caremark will pay the pharmacy $20, because it's 80

7    percent lower than 100 percent list price for the generic

8    drugs.  And that's a combined average.  That's a combined

9    generic discount rate across commercial Medicare.

10           So the pharmacy reconciliation documents are

11   documents, where essentially at the end of the year, what

12   Caremark does, is it goes, and it has to go settle up with

13   Walgreens, and Rite Aid, and say, you know, we bought all these

14   generic drugs over the course of the year.  We paid prices that

15   varied at each point of sale, but we had a contract and for

16   across all of our commercial and Medicare Part D generic drugs,

17   we owe you this 80 percent discount below a number that's at

18   least this $20 figure in my example.

19           And so if we've -- you know, if Caremark has slightly

20   undershot that $20. maybe they've paid $19, then they would owe

21   Rite Aid and Walgreens a dollar at the end of the year.

22           And this reconciliation document includes the

23   commercial plans that are subject to the contract with the

24   pharmacies, and also the Medicare Part D contracts that are

25   subject again to the same contract between Caremark and the

1    pharmacy.

2          And so what we've asked for, Your Honor -- so these

3    documents are not -- these documents really show, Your Honor,

4    the fraud that we're challenging.  They show that the price

5    that was ultimately paid to the pharmacy is different and lower

6    than the price that was falsely reported for the Medicare Part

7    D drugs.

8          And what we've asked for in related discovery

9    requests, Your Honor, is either a response to an interrogatory

10   or documents sufficient to show this, just a list of the

11   contract plans for each of Aetna and SilverScript that feed

12   into those pharmacy reconciliation documents for the years at

13   issue in our case.

14         Caremark has -- you know, these are Caremark

15   documents.  Caremark creates them.

16         THE COURT:  And what's been the response?

17         MS. COSLETT:  The response has been that it's too

18   late, discovery is closed.  I mean, we sent these requests

19   May 6th, more than two months before the end of fact discovery.

20   And we have received a refusal to produce --

21         THE COURT:  Well, I'm sure --

22         MS. COSLETT:  -- either an interrogatory response --

23         THE COURT:  -- I'm sure the lawyers from this law

24   firm are not going to say, you propounded it on time, we

25   dragged our feet, and ha ha, discovery is closed, therefore,

```
 1   it's not -- I mean, that's --

 2             MS. COSLETT:  Your Honor, I don't --

 3             THE COURT:  -- it's really second -- that would be

 4   like a second grade response, right.  They're not going to say

 5   that.  So what's their -- what do you think their response is?

 6             MS. COSLETT:  I think their responses that we have

 7   propounded burdensome discovery requests.  My response to

 8   that --

 9             THE COURT:  Let's hear their response.

10             What's your response?  What's your response?

11             MS. CONLEY:  Mr. Dockery is going to handle this one.

12             THE COURT:  All right.  Mr. Dockery.

13             MR. DOCKERY:  All right.  Thank you, Your Honor.

14             THE COURT:  She's gladly passing the podium to you.

15             MR. DOCKERY:  Yeah.  So, Your Honor, this -- this

16   request, from our perspective, is -- is one on which there

17   hasn't been a proper request made to us.

18             THE COURT:  Well, she just made one.

19             MR. DOCKERY:  Right, I know.  But there's no

20   interrogatory.

21             THE COURT:  So it's amended.  I'm going to consider

22   her request, as amended, as articulated by Counsel here in the

23   courtroom.  So I mostly understood what she's asking for.

24             What's your response?

25             MR. DOCKERY:  Our response is that the
```

1   reconciliations that we produce, that she says, you know,

2   demonstrate fraud, which they don't, she has those

3   reconciliations.

4           She also has the data that we have produced that was

5   the data that is the same data that gets used to generate

6   reconciliations.  She has the Aetna and SilverScript Medicare

7   Part D data that we produced.

8           THE COURT:  Right.  But I think -- I think she's

9   going to say, dumping a whole lot of data on us doesn't help us

10  to understand what we want to understand.  And you folks know

11  an answer to a request that's legitimate, which I haven't

12  determined that it is or not, is not to dump a whole lot of

13  unintelligible data on someone and say figure it out, right.

14  So is that -- did you do that or?

15          MR. DOCKERY:  What we -- what we have done is

16  produced the contracts that were -- that govern the generation

17  of these reconciliations.  We've produced the reconciliations.

18  We've produced the Medicare Part D data for Aetna and

19  SilverScript that would feed into those reconciliations or --

20  and what they're asking here is for an identification -- to the

21  extent what they're asking for is an identification of the

22  contract plans that fed into those reconciliations.  That's not

23  a question that was actually properly put to us in an

24  interrogatory form.  To the extent it was put to us in a

25  request for production, we've produced what we have.

1          The only additional material that we've said that we

2    could produce is a set of backup materials on what Your Honor

3    may recall hearing of as the IA shared drive intellectual

4    (indiscernible) --

5          THE COURT:  Yeah, I'm sure they don't want backup

6    materials from your drives.

7          MR. DOCKERY:  But that would be even more data.

8          THE COURT:  They've got enough to digest.

9          So in two sentences.  His response is deficient

10   because -- two sentences, literally.

11         MS. COSLETT:   Okay.  First sentence is, Your Honor,

12   is that Counsel for the Caremark entities just said that some

13   of the data sources they produced are over-inclusive and

14   include contract plans that may not in fact, be relevant to our

15   case, because they were produced by Aetna, and they might

16   include plans for which -- you know, that are not properly

17   within the scope of our case.  That's first response.  So we

18   can't look at the data -- I guess my second sentence is -- so

19   we can't look at the produced data and pull out the contract

20   plans a feed into the reconciliations because we have

21   representation that the data is, you know, overly -- over

22   inclusive.

23         The second response is this is their data.  They know

24   the answers.  It would be very easy for them to just comply

25   with their discovery obligations.  Telling us to figure it out

1   from their data is not appropriate.  It's not --

2          THE COURT:  Do you have an expert -- by the way I'm

3   just teasing you.  That was five sentences, not two.  You're

4   very crafty though.  You changed my word sentences and you

5   turned it into a response.

6          Can your expert figure this out?  Can an expert take

7   the data that they've given you and get you the answers that

8   you want?

9          MS. COSLETT:  I'll be candid, Your Honor.  This is a

10  question and a request that came from our expert.  We've worked

11  with our expert and they said --

12         THE COURT:  Right.

13         MS. COSLETT:  -- for damages, we would -- we would

14  request the list of contract plans that cater to the

15  reconciliations.

16         THE COURT:  All right.  This issue is held under

17  advisement.

18         (Discussion between the court and clerk.)

19         THE COURT:  Okay.  Let me read the next issue.

20         Right, as I understand the next issue, it's an

21  alleged deficiency raised by Relator.  They're claiming they're

22  entitled to lists of Aetna and SilverScript contract plans that

23  correspond to Caremark's pharmacy reconciliations.

24         MS. COSLETT:  Your Honor, we may have flipped the

25  order on you, but that's what we just discussed.  And we're --

```
 1    I think, next up is the Aetna and SilverScript shares.
 2             THE COURT:  That's what we just discussed and I just
 3    apparently missed that one.
 4             MS. COSLETT:  That's the second.
 5             THE COURT:  Okay.  I thought we were talking about
 6    something different.  I thought we're talking about the --
 7             (Discussion between court and clerk.)
 8             THE COURT:  Okay.  All right.  So what do you want to
 9    talk about next?
10             MS. COSLETT:  I would love to talk, Your Honor, about
11    the share issue, which is the third paragraph of our --
12             THE COURT:  Okay.  I thought that's what we were
13    talking about.
14             MS. COSLETT:  No, no problem, Your Honor.
15             THE COURT:  Fine, go ahead. MS. COSLETT:  So the
16    other issue, Your Honor, for damages -- this is another damages
17    issue -- which is that we have pharmacy reconciliations that
18    were produced by -- that were created by Caremark and then also
19    produced by Caremark to us in this case.  And Caremark -- these
20    are important documents -- Caremark has produced one of them,
21    which of it's okay with Your Honor, I'd like to hand up to you,
22    which has a breakout.  That'd be okay if I approach?
23             THE COURT:  Sure, sure.
24             MS. COSLETT:  So, Your Honor, I'm sure you didn't,
25    you know, want to look at spreadsheets.  But this is the 2013
```

```
1   Walgreens reconciliation -- Caremark/Walgreens reconciliation
2   document.  This document, as you can see, has totals in row 8,
3   13 and 16 that are really important for our case.  The breakout
4   in 8 -- in row 8 is the commercial totals.  So that shows what
5   the average -- the generic effective rate and the prices paid
6   across all the commercial drugs were.  Those are starting in
7   column J.
8            Then it's broken down by -- in row 13, there's --
9   there are totals provided for the SilverScript plans.  That's
10  SSI.  That's what SSI stands for.
11           Then row 16 includes the Aetna Medicare Part D
12  totals.  That's what that stands for.
13           And then, you know, at the bottom is the overall, and
14  that's the row that shows that. in fact, the price that was
15  actually paid for generic drugs by Caremark is the price that
16  was in the contract, which is this combined overall GER,
17  covering both commercial and Medicare Part D.
18           This document, as you can see, Your Honor, has line
19  items for SilverScript and Aetna Medicare Part D.  SilverScript
20  is entirely Med D -- Medicare Part D.  So when you see a
21  SilverScript line, you know that that's all Medicare Part D.
22           The other reconciliations that have been produced in
23  this case do not have breakdowns that we see in this one --
24           THE COURT:  Other reconciliations, meaning other
25  years or --
```

 1              MS. COSLETT:  Yes, other years --

 2              THE COURT:  -- other years?

 3              MS. COSLETT:  -- and also the 2013 Rite Aid

 4    reconciliation does not include an Aetna line item or a

 5    SilverScript line item the way this one does.

 6              And so, you know, Your Honor, we're seeking damages

 7    on the overpayment of -- the overpayment for generic drugs by

 8    the Government for Medicare Part D generic drugs through Aetna

 9    and SilverScript plans.

10              And so if we had a complete set of documents like

11    this 2013 Walgreens reconciliation, if we have other years with

12    these breakdowns, that would be very helpful.  So we requested

13    them.

14              THE COURT:  So this is -- this is 2013.

15              MS. COSLETT:  This is --

16              THE COURT:  And you just want other years for

17    Walgreens similar to what you handed out?

18              MS. COSLETT:  And Rite Aid and CVS.

19              THE COURT:  Okay.  Responses.

20              MR. DOCKERY:  The response is, they have the

21    reconciliations as they were generated.  What they don't like

22    is the fact that other general -- other reconciliations don't

23    look like this one.  They would like it to look like this one,

24    but they don't.  That's not a function of our litigation

25    choices on this case.  That's not a -- something that we

1   decided.  That's how the documents were generated many, many,

2   many years ago in the ordinary course of business.  They were

3   generated with, you know, each of them having certain analyses

4   in them.  And they have that same information that we have.

5              Now to the extent --

6              THE COURT:  They -- they who?  Who's they?

7              MR. DOCKERY:  Relator has those reconciliations as

8   well as we do.

9              THE COURT:  For other years from for the other

10  companies?  What were the other companies that you named

11  besides Walgreens?

12             MR. DOCKERY:  They're Walgreens and Rite Aid or the

13  two.

14             THE COURT:  Walgreens and Rite Aid.

15             MR. DOCKERY:  And then there -- for CVS pharmacy,

16  there aren't reconciliations like this one, because they didn't

17  have a contractual guarantee.

18             THE COURT:  Okay.  So hold on --

19             MR. DOCKERY:  But there are some budget tracking

20  documents that they also have as well.

21             THE COURT:  Ms. Coslett the document you handed up,

22  the Walgreens 2013, what's the right term for this document?

23             MS. COSLETT:  Pharmacy reconciliation document.

24             THE COURT:  Counsel has represented that in a

25  different form for Walgreens and CVS?

```
 1              MS. COSLETT:  Rite Aid.

 2              THE COURT:  -- Walgreens and CVS, they have produced

 3   a reconciliation for the years you've requested, but not in the

 4   same form.  Is that close to what you're saying, or is that

 5   what you're saying?  I'm asking you.

 6              MR. DOCKERY:  Yes, that's right.

 7              THE DEFENDANT:  Okay, okay.

 8              MR. DOCKERY:  We produced them in the form they

 9   existed for that year.

10              THE COURT:  So --

11              MS. COSLETT:  So my --

12              THE COURT:  -- why isn't that sufficient?

13              MS. COSLETT:  My response, Your Honor, is that

14   sufficient to the request for reconciliations, but we issued on

15   May 6th, 2022.  Again, to try to reduce any burden to Caremark,

16   we issued simultaneous one RFP seeking documents sufficient to

17   show Aetna and SilverScript's share of Caremark's overall

18   Medicare Part D.

19              THE COURT:  I thought I heard counsel for Caremark

20   say, he's produced those, but just in a different form than

21   this document you've handed out.

22              MS. COSLETT:  He has produced pharmacy

23   reconciliations that are in a different form than the document

24   I handed up.  He has not produced documents responsive to the

25   request for production seeking documents sufficient to show
```

```
 1    Aetna and SilverScript's share of Medicare Part D business.

 2               THE COURT:  Okay.  So I have a --

 3               MR. DOCKERY:  And we also asked an interrogatory for

 4    this.

 5               THE COURT:  -- I need some advice for both of you.

 6               So I'm thinking the only way for me to figure this

 7    one out is to get a tutorial -- first of all, understand this

 8    document, which you've tried to explain to me in a short amount

 9    of time, but you need a PhD in math from MIT to figure this out

10    in the five minutes that I have to figure it out.  So I can't

11    figure this document out.

12               I'll take the time to do that if you think it's

13    important, but, I mean, I only have so much time for this case.

14    I mean, so --

15               MS. COSLETT:  Your Honor --

16               THE COURT:  -- so how would you suggest I figure this

17    out in an efficient way that doesn't move the next two weeks of

18    the time I'm going to spend to devote judicial resources to,

19    you know, an enormously successful law firm and giant

20    companies?

21               MS. COSLETT:  Your Honor, I --

22               THE COURT:  Give me an efficient way to figure this

23    out.

24               MS. COSLETT:  So okay.  Your Honor -- and I think

25    perhaps it was a mistake to show you this document.  We -- the
```

1    information we want is to understand if Caremark has $100

2    million of Medicare Part D business in a given year, how much

3    of that is Aetna and how much of that is SilverScript?

4           The point of this document is to show that Caremark

5    could generate some similar documents for different years.

6    That would be sufficient.  We're not requiring you to

7    understand this document.  We're not requiring Caremark to

8    produce these exact documents for other years.

9           The key, I think, for this dispute is really just a

10   question of, again, damages.  We understand we're seeking

11   damages on Aetna and SilverScript overpayments.

12          THE COURT:  Acknowledging I'm kicking this can down

13   the road.

14          MS. COSLETT:  Yes.

15          THE COURT:  We're going to have -- we haven't even

16   done -- we haven't even finished fact discovery.  We have to do

17   expert discovery.  And then they're going to -- enormous

18   amounts of dispositive motions are going to land on my desk.

19   Okay.  And this is about damages.  Can we table this until we

20   see whether you even survive to get to a jury?

21          MS. COSLETT:  Well -- I mean, Your Honor, we're

22   confident we're going to survive to get to a jury.  And, you

23   know, our expert reports on damages are due with the reports

24   for merits.  And we don't think this is burdensome.  We've

25   cited a case on the briefing --

1              THE COURT:  Okay.  I'm willing -- of all the things

2      that need to be managed in this case, this is not high on the

3      priority list.  So your request for -- you say it.  I guess

4      it's -- I thought it was --

5              MS. COSLETT:  Shares.

6              THE COURT -- request three, but -- of four, but it's

7      really three.  It's the shares -- you want Aetna's and

8      SilverScript's shares of Caremark D -- part D generic drug

9      business and more information on that.  That request for

10     further information is denied without prejudice to revisit at a

11     later time.  Okay.

12             I'm moving on.

13             So the next thing that I have, and I have a hard stop

14     -- I think we have enough time to finish this, so let me just

15     keep going.

16             Did you give this back to Plaintiff's counsel?  It's

17     stressing me out that I have it up here.  Thank you.

18             MS. COSLETT:  You've hurt my feelings, Your Honor.

19     It's my favorite document in the case.

20             THE COURT:  What did you say?

21             MS. COSLETT:  It's one of my favorite documents.  You

22     hurt my feelings.

23             THE COURT:  I hurt your feelings.  That's funny.

24     Would it make you feel better or worse if I said, I actually

25     believe you?

1          All right, let me focus.  Hold on.

2          All right.  I think the next topic pertains to

3    requests for production of documents made by Relator regarding

4    reporting or implementing pharmacy discounts, which we

5    understand to be sort of synonymous with price, but I'll let

6    Plaintiff's counsel explain.  Relator has insisted that they

7    should get two categories of documents.  One, documents

8    reflecting informal agreements between Caremark and CVS

9    regarding prices, and two, documents reflecting Caremark's

10   contract negotiations with Walgreens, Rite Aid, and CVS

11   regarding prices.

12          Go ahead.  You can take it from there.

13          MS. COSLETT:  Thank you, Your Honor.

14          I think, you know, this is an area like the share we

15   just mentioned where, you know, there's testimony confirming

16   that additional discovery is necessary.  I think what we have

17   here is Caremark has made a big deal in this case about the

18   absence of a contractual signed written contract saying, here

19   is the generic discount rate that will be paid by Caremark to

20   CVS pharmacy for generic drugs.  That's been a big defense.

21   Mr. Dockery has repeated it several times today.

22          During discovery, we have received testimony,

23   including the June deposition of Mr. Gugliuzza that confirmed --

24          THE COURT:  Who's that?

25          MS. COSLETT:  A Caremark trade and --

```
 1              UNIDENTIFIED SPEAKER:  (Indiscernible).

 2              MS. COSLETT:  What's that?  Vice president at

 3    Caremark.  Thank you.  Mr. Gugliuzza confirmed that there were

 4    budget agreements that were negotiated between Caremark on the

 5    one hand and CVS on the other.

 6              Now, you know, Your Honor, it's important to remember

 7    Caremark and CVS are related corporate entities.  That's why

 8    they're -- likely why they're represented by the same counsel

 9    here.

10              And so they don't have a written contract that works

11    in the exact same way that there is -- as between Caremark when

12    it's contracting with Walgreens, which is a true non-party to

13    this case, a true third party.  They're separate.  They

14    negotiate.  They sign a contract.  Here's the price we'll pay

15    for generic drugs.

16              With respect to CVS, things worked a little bit

17    differently.  Caremark -- the testimony is that Caremark and

18    CVS negotiated the generic discount rate that would be paid for

19    generic drugs that Caremark purchased at CVS pharmacy.  Just as

20    with Rite Aid and Walgreens, that generic discount rate applied

21    as a combined manner across Medicare and commercial

22    prescriptions.

23              The testimony is that then what happens is Caremark

24    sets its prices to really hit that budgeted GER.  It's not

25    written in a signed contract.  That's what the testimony is.
```

1   But the -- Caremark sets prices to hit the combined generic

2   effective discount rate that's budgeted.

3           What we'd like in light of the testimony that's been

4   obtained is discovery concerning those budgeted generic

5   discount rates that apply to CVS.  You know, it's something

6   that, frankly, we needed deposition testimony before we would

7   even --

8           THE COURT:  Just as it relates to CVS?

9           MS. COSLETT:  They're a separate issue, Your Honor,

10  which is that there are also not communications -- email

11  communications as between --

12          THE COURT:  Let's deal with that first issue.

13          Response.

14          MR. DOCKERY:  Thank, Your Honor.

15          So, yeah, it's a little bit of a moving target here.

16  But taking the CVS part of this issue all by itself, there's a

17  couple of pieces to it.

18          First of all, just as a baseline matter, it's false

19  that there was no contract between CVS and Caremark.  There was

20  and Relator has that contract.  There were enrollment forms

21  that were connected with that contract which Relator has.  So

22  there is a contract.  It just doesn't contain any kind of GER

23  guarantee in it.

24          So what Relator is trying to do here is create the

25  impression that there was a GER guarantee.  No one has

1  testified.  Mr. Glusto -- nobody has testified that there was a

2  GER guarantee.  What the --

3           THE COURT:  What's GER?

4           MR. DOCKERY:  Huh?

5           THE COURT:  What is GER?

6           MR. DOCKERY:  GER is what she has been referring to

7  is the generic effective rate.  So it is the -- with respect to

8  Walgreens and Rite Aid, there was a guarantee that the -- at

9  the end of the year, all of the individual payments -- which by

10  the way, Relator hasn't been clear about this with you today --

11  there's a way that those individual drug payments are supposed

12  to be calculated.  And you haven't heard anything about that.

13           The contracts with two pharmacies said that in

14  addition to the calculation of those individual drug prices,

15  according to an agreed methodology, that at the end of the

16  year, if the total aggregate compensation did not reach a

17  certain level, that Caremark would make a payment to the

18  pharmacy to make up the difference.  It was not a pricing

19  agreement.  It was a minimum guarantee in aggregate at the end

20  of the year, there were other methods by which the prices for

21  the individual drugs were calculated.

22           So the -- to get back to the question here.

23           First of all, the notion that there's something that

24  is like Walgreens or Rite Aid or CVS, is missing a key

25  component, which is that it's very clear there wasn't such a

 1    thing.  To the extent, there was a GER that was budgeted to,

 2    that's different.  Each of this Caremark and the pharmacy would

 3    have expectations and budgets internally as to a lot of

 4    different metrics.

 5            And the point with respect to this metric was that it

 6    would make sense for them to have the same expectation as to

 7    where it would end up.  But there was --

 8            THE COURT:  All right, you're losing me.  What was it

 9    you want to -- what is it that you want that you don't have?

10            MS. COSLETT:  I think it's important, Your Honor,

11    this is not summary judgment.  It's a discovery dispute.  We

12    obviously disagree that CVS is different than Rite Aid and

13    Walgreens.

14            THE COURT:  Please answer my questions.

15            MS. COSLETT:  I want discovery as to the setting of

16    what Mr. Dockery refers to as the budgeted generic effective

17    rate that was in place as between Caremark and CVS.

18    Mr. Dockery says they're both budgeting to the same generic

19    effectively.

20            THE COURT:  The setting?

21            MS. COSLETT:  What's that?

22            THE COURT:  What do you mean by setting?  You want

23    the setting.

24            MS. COSLETT:  They agreed on a number.  They agreed

25    and negotiated, Caremark and CVS, and said the number that

```
 1   we're going to use, according to Mr. Dockery just now -- which

 2   I'm not sure I agree with his characterization -- is they agree

 3   on a budgeted generic effective rate, and then they both budget

 4   towards that number.

 5            My question is --

 6            THE COURT:  What is that you want that you don't

 7   have?

 8            MS. COSLETT:  Documents concerning the setting of

 9   that generic effective rate as between --

10            THE COURT:  Between?

11            MS. COSLETT:  Caremark and CVS.

12            THE COURT:  And CVS.  Okay.  Say it again.

13            MS. COSLETT:  The documents concerning the setting of

14   the negotiation of the generic effective rate that's in -- that

15   was agreed to between Caremark and CVS, whether it's written --

16            THE COURT:  Okay, I understand your request.

17            What's your response to that specific request?

18            MR. DOCKERY:  That request was never made as an RFP

19   to us.

20            THE COURT:  Okay, she just made it.

21            MR. DOCKERY:  Okay.  So after they did not -- they

22   pointed to a request for production that does --

23            THE COURT:  I don't want to --

24            MR. DOCKERY:  -- not say that.

25            THE COURT:  I don't want to hear what they didn't do.
```

1    I'm telling you, that is a request that's being made here.

2    Will you produce that information?

3              MR. DOCKERY:  So we worked with them.  They proposed

4    custodians and search terms that would require review of

5    150,000 documents.  So if Your Honor doesn't want fact

6    discovery to continue much longer, and we certainly share that

7    sentiment, requiring the review of 150,000 additional documents

8    probably is going to make that a more difficult objective to

9    achieve.

10             THE COURT:  Okay.  And you're telling me the only way

11   to get that information is to review that amount of documents.

12             MR. DOCKERY:  We're not aware of any way to just get

13   at this information automatically.  What she is talking about

14   is not a contract.  It's something that would require you to

15   look at emails and other informal communications just to see

16   what communications were happening over a long period of time.

17             THE COURT:  Okay.  Excuse me one second.

18             (Discussion between the court and clerk.)

19             THE COURT:  If I told you, Ms. Coslett, that based on

20   Mr. Dockery -- did I say that right?

21             MR. DOCKERY:  That's correct, Your Honor.

22             THE COURT:  -- has convinced me that your request is

23   overly burdensome, and I was inclined to sustain his objection,

24   could you suggest a more narrow request?

25             MS. COSLETT:  Absolutely, Your Honor.  We have since

1   -- we received Hit reports from Counsel that they said were too

2   burdensome.  We tried to narrow them.  We haven't heard back.

3   We are amenable to negotiating.

4           THE COURT:  Well, no, I'm asking you here and now.  I

5   mean, he complained that you didn't make this request, and I

6   backed you up and said we just made it, let's talk about it.

7           MS. COSLETT:  No, no, Your Honor, we would --

8           THE COURT:  I'm sustaining --

9           MS. COSLETT:  We will narrow the --

10          THE COURT:  I'm sustaining his objection.  It's

11  overburdensome.  But I'm open to hear a more narrow suggestion

12  that's not as burdensome.  Do you have one?

13          MS. COSLETT:  My suggestion, Your Honor, is twofold.

14  One, that we be allowed to negotiate to search terms that are

15  as narrow as need be.  And second --

16          THE COURT:  Well, you two can agree on whatever you

17  want.  But I'm saying, do you want to talk about it now, while

18  I'm here --

19          MS. COSLETT:  Sure.

20          THE COURT:  -- while we're together?

21          MS. COSLETT:  Well, you know what, we had proposed

22  search terms, I don't have hit reports.  I don't have the

23  availability to tell if my proposals are narrow enough.  But I

24  think that --

25          THE COURT:  Okay, fair.

```
 1              MS. COSLETT:  -- adding search terms that are really
 2    modifying the key individuals that we think were engaged in
 3    this negotiation.  Eva Boratto, who is one of our proposed
 4    opponents, fits the bill for that.
 5              THE COURT:  Yeah, try narrowing the search terms and
 6    getting it from the depositions.  The Defendants on the issue
 7    -- I'm not going to try to rephrase it -- but on the last issue
 8    we're talking about, the Defendant has convinced me that your
 9    request is overly burdensome.
10              Next topic.  Let me read this.
11              MS. COSLETT:  Your Honor, is that based on just the
12    number of hits, and if we narrowed it, that there might be --
13    you know, we could re-raise it with you?
14              THE COURT:  Yeah.  Well, see if you can either get
15    the information from a deposition, which you probably can't, or
16    narrow the search terms.  And --
17              MS. COSLETT:  I mean -- I'll just say, Your Honor --
18    and it's in our letter -- we are seeking this testimony on this
19    issue from CVS, which is a Caremark-related entity --
20              THE COURT:  Okay.
21              MS. COSLETT:  -- but CVS has refused to provide
22    testimony on this issue.  And that's briefed before Your Honor
23    in ECF 230.  So -- you know, I'm -- my point is we are --
24              THE COURT:  It's impressive that you knew exactly
25    where that was in ECF.
```

```
1              MS. COSLETT:  We're seeking it through deposition
2    testimony as well is my point here, Your Honor.
3              THE COURT:  Okay.  I think your request is too
4    burdensome.  Okay.
5              Next topic.  Let me read it, please.
6              I understand Relator claims that is not -- it has
7    requested and not received documents reflecting Caremark
8    contract negotiations, negotiations with Walgreens, Rite Aid,
9    and CVS regarding prices.
10             So do you want to elaborate on that?
11             MS. COSLETT:  Yeah.
12             THE COURT:  Yeah, go ahead.
13             MS. COSLETT:  I won't retread what I said about CVS
14   because I think Your Honor -- the response from Mr. Dockery
15   would be the same.
16             But as to Rite Aid and Walgreens, it's undisputed
17   that there are contracts that provide, again, this overall
18   generic discount rate that covers both commercial --
19             THE COURT:  I thought we were talking about -- I'm
20   reading the next topic.
21             MS. COSLETT:  Oh, I'm sorry.
22             THE COURT:  Documents reflecting contract
23   negotiations.
24             MS. COSLETT:  Right.  And so what we're seeking
25   there, Your Honor, is --
```

```
 1                 THE COURT:  And that could be a --

 2                 MS. COSLETT:  No, so I --

 3                 THE COURT:  -- truckload of emails, right?

 4                 MS. COSLETT:  It's not -- we would like -- and these

 5   -- this, again, I think comes down to search permission.  We're

 6   looking for negotiations, not over the contract writ large.

 7   There are many provisions in these contracts that we don't care

 8   about at all.  We care about the negotiations of the overall

 9   generic effective rate that governs both commercial and

10   Medicare Part D combined, because again, that's the mechanism

11   through which the --

12                 THE COURT:  As it relates to which companies?

13                 MS. COSLETT:  What's that?

14                 THE COURT:  Which companies?

15                 MR. DOCKERY:  With respect -- the communications they

16   would be -- email communications between Caremark on the one

17   hand, and Rite Aid and Walgreens on the other.  And we have

18   identified the individuals through deposition testimony that

19   would have been the negotiators for Rite Aid and Walgreens.

20                 THE COURT:  Okay.

21                 MS. COSLETT:  And so we think that our targets

22   searches.

23                 THE COURT:  So you've narrowed -- in your view,

24   you've really narrowed the term search that has to occur?

25                 MS. COSLETT:  We've identified name searches, and
```

1  also we think further refining of the -- of the search terms to

2  focus on this -- this term that we care about, the generic

3  effective rate would be proportional, Your Honor.

4            THE COURT:  Okay.  So articulate for me before I talk

5  to Caremark counsel, a precise search -- precise search term

6  suggestion.

7            MS. COSLETT:  It would be emails sent to or from the

8  named individuals at Rite Aid and Walgreens who were identified

9  as having negotiated these contracts.

10           THE COURT:  How many individuals?

11           MS. COSLETT:  So only email correspondence between

12 them.

13           THE COURT:  Do you know how many individuals?  Do you

14 have them?

15           MS. COSLETT:  It looks like there are seven because

16 there are some turnover during the relevant time periods, Your

17 Honor.

18           THE COURT:  All right.  So emails, seven.  Between

19 Walgreen, Rite Aid that went to Caremark, right?

20           MS. COSLETT:  Emails between Rite Aid and Walgreens

21 and went to Caremark, or -- or vice versa?

22           THE COURT:  Yeah, of course.  Pertaining to?

23           MS. COSLETT:  The generic effective rate

24 negotiations.

25           THE COURT:  Generic effective rate.

```
 1                 MS. COSLETT:  Yes.

 2                 THE COURT:  As it relates to -- now, is this in the

 3     context of negotiation for contract that you already have,

 4     right?

 5                 MS. COSLETT:  We have the contracts, Your Honor.

 6                 THE COURT:  Okay.

 7                 Response.

 8                 MR. DOCKERY:  So thank you, Your Honor.

 9                 We dealt with this -- Plaintiffs dealt with this as a

10     single topic in their letter to you.  And in a sense, it is a

11     single topic, because there's a set of requests that they gave

12     us for search terms and custodians that isn't broken out

13     exactly, you know, as Walgreens versus Rite Aid versus CVS.

14                 So the same numbers that I told you before, which are

15     very burdensome --

16                 THE COURT:  Well, forget about her letter.

17                 MR. DOCKERY:  -- really apply here.

18                 THE COURT:  We're not talking about her letter

19     anymore.  What I want you to answer is -- and I'm trying to

20     work things out here, and I think that this Ms. Coslett is

21     trying to show some flexibility.  I'm sure what she just

22     articulated is different than what's in her letter.  So I want

23     you to respond to what you just said.

24                 MR. DOCKERY:  Sure.

25                 THE COURT:  What's your position regarding that?
```

```
 1              MR. DOCKERY:  Our position remains that, one, it's
 2    not what was originally asked for it.  And I know that's not
 3    so. Important.
 4              THE COURT:  I just asked you to comment on that.
 5              MR. DOCKERY:  But number two, and this is true --
 6              THE COURT:  Hold on.
 7              MR. DOCKERY:  -- no matter --
 8              THE COURT:  Hold on.  Hold on.  Hold on.  Hold on.
 9         I just asked you not to comment on what she
10    previously asked for.  I respectfully asked you only to respond
11    to what she just said.  Let me finish my question.  Why did you
12    ignore what I asked you to do?
13              MR. DOCKERY:  Only because it's difficult to make any
14    kind of assessment of burden or to otherwise evaluate something
15    we're hearing for the first time right now.  So --
16              THE COURT:  Okay, that's fine.
17              MR. DOCKERY:  So that that makes it --
18              THE COURT:  Right, you want to think --
19              MR. DOCKERY:  -- that's why I was saying --
20              THE COURT:  -- you want to think about it.
21              MR. DOCKERY:  -- it makes it difficult to do that.
22              THE COURT:  You want to think about it.  That's fine.
23              MR. DOCKERY:  But here's what I wanted to say, Your
24    Honor, because this won't change.  Regardless of what the
25    burden is, it's not relevant.  The negotiation of these rates
```

1    is not relevant.  What they say is that these rates established

2    some sort of --

3                THE COURT:  That was my reaction.

4                THE COURT:  -- requirement that had to be reported.

5                THE COURT:  So excuse me for a second.  You should

6    have started with that argument.  Why is this relevant if you

7    have the final contracts?

8                MS. COSLETT:  Your Honor, we haven't seen the

9    negotiations, but evidence for example, that Caremark pushed

10   for a single generic effective rate that covered Medicare and

11   commercial in order to effectuate the scheme at issue here

12   would be relevant to us.

13               THE COURT:  Okay, I disagree.  I don't think it's

14   proper discovery.  You have the final contracts.  The

15   negotiations open a can of worms and -- that I don't think are

16   relevant or discoverable.

17               The Defendant's objection as to that set of documents

18   is sustained.

19               All right.  So I think we're at the 30(b)(6)

20   questions.  I understand Relator wants a designee to testify

21   regarding the completeness of SilverScript and CVS's data

22   productions.

23               So, can't SilverScript and CVS produce an affidavit?

24   Do we really need a witness to be sworn in to do this?  I'm

25   asking that question of Ms. Coslett.

1              MS. COSLETT:  We've -- we primarily asked -- we

2     initially asked counsel for Caremark and all the Caremark

3     entities for exactly that for representations from counsel.

4     They have refused to provide it, and so we've --

5              THE COURT:  All right.

6              MS. COSLETT:  -- also sought deposition testimony.

7              THE COURT:  Response.

8              MS. CONLEY:  Your Honor, I think this is respectfully

9     what we covered at the very beginning of the hearing as to the

10    why there may be certain contract plans and certain of these

11    four datasets and not others.  And I think that the resolution

12    was that that we would provide a 30(b)(6) witness to answer

13    their facts questions about those things.

14             THE COURT:  Okay.  Okay, so just ask their 30(b)

15    witness, who will be prepared to answer that question, to just

16    sort of put the lid on this -- put the eye on the -- dot the I

17    and cross the T, is what I'm trying to say.

18             Next.  Relator wants to designee to testify as to the

19    division of responsibilities among the insurer -- among

20    SilverScript, and the benefits manager Caremark, and CVS

21    regarding reports to the Government.

22             You want to elaborate on that one, please,

23    Ms. Coslett?

24             MS. COSLETT:  Your Honor, I just --- just -- I really

25    apologize, but just backing up.  You know, I think the witness

1    will be -- I hope I heard this correct -- prepared to testify

2    as to the discrepancies among the datasets and also the

3    dataset's completeness.  Is that --

4              THE COURT:  That's what I heard her say.

5              MS. COSLETT:  Thank you, Your Honor.

6              As to the second category of topics, Your Honor.

7              So we have sought testimony from SilverScript and

8    Aetna regarding the extent to which those entities were aware

9    of the contracts and the pricing terms that Caremark entered

10   into with -- with Rite Aid, Walgreens, and CVS, the pharmacies

11   at issue.

12             Your Honor, this is relevant to the extent that

13   Caremark may argue that it was not responsible for the falsely

14   reported prices at issue in this case, point the finger at

15   other entities.

16             So we think this is relevant --

17             THE COURT:  So --

18             MS. COSLETT:  -- to their defenses.

19             THE COURT:  So say again, you you've requested, but

20   have not received information pertaining to --

21             MS. COSLETT:  Yes.  We've requested testimony from

22   Caremark and SilverScript related to the extent to which it was

23   aware of the prices that Caremark actually paid the pharmacies,

24   in essence.

25             THE COURT:  Okay.  So --

```
 1              MS. COSLETT:  Aetna and SilverScript.  I apologize.
 2              THE COURT:  Is there going to be -- how many were
 3    depositions are teed up, by the way?
 4              MS. COSLETT:  Your Honor, there are three 30(b)(6)
 5    depositions that have been noticed, but they're all the three
 6    Caremark entities that --
 7              THE COURT:  And you're going to produce 30(b)(6)
 8    witnesses and they -- is one of them going to be able to answer
 9    her question?
10              MS. CONLEY:  I'm sorry, Your Honor.  I think that's
11    the first formulation of that question that I have heard.  I
12    think -- if the question is whether SilverScript had
13    information regarding the contracts and the GER guarantees that
14    Caremark had with pharmacies, is what I -- that's what I think
15    I just heard her say -- SilverScript has already agreed to put
16    up a witness on that topic.
17              THE COURT:  Okay.  You good?
18              MS. COSLETT:  Your Honor, they -- Counsel has
19    attempted to limit the scope of the testimony to just a yes or
20    no answer --
21              THE COURT:  All right.  Well, what else do --
22              MS. COSLETT:  -- and we want follow up.
23              THE COURT:  -- what else do you want the witness
24    prepared to ask?
25              MS. COSLETT:  If the answer is yes, we were aware in
```

```
 1    some sense, or, you know, did you receive the pharmacy

 2    reconciliation documents?  We want to cover this topic, not

 3    just a yes or no.

 4              THE COURT:  Of course.  Of course.

 5              MS. COSLETT:  It's a not a yes or no question.

 6              THE COURT:  Yes is not enough.

 7              MS. COSLETT:  Okay.  Thank you, Your Honor.,

 8              THE COURT:  Explain.  I mean --

 9              MS. COSLETT:  Well, that's --

10              THE COURT:  I mean, there has to --

11              MS. COSLETT:  Be an explanation.

12              THE COURT:  You're being too literal.  Okay.

13              MS. COSLETT:  I appreciate that, Your Honor.

14              THE COURT:  Yeah, she can -- she can -- you're

15    allowed to ask the basis of the yes answer.

16              MS. COSLETT:  Okay.

17              MS. CONLEY:  And, Your Honor --

18              THE COURT:  Yes.  What's the basis for that answer,

19    Mr. or Mrs. Deponent, explain.  Yeah, go ahead.

20              MS. CONLEY:  Yes, Your Honor.  And that formulation

21    makes good sense to me.  I think the concern is that as in the

22    motion or the letter, they -- what Relator sought was an

23    identification of every single individual at SilverScript who

24    ever received a copy of any reconciliation --

25              THE COURT:  Yeah, we're not -- see, what we're
```

```
 1   doing --

 2            MS. CONLEY:  -- or contract.

 3            THE COURT:  -- what we're doing, I'm trying --

 4            MS. CONLEY: -- when they did --

 5            THE COURT:  -- trying to move the ball here.  So what

 6   I want the lawyers to do is to get the transcript.  I'm trying

 7   to narrow what she's doing and what she wants from the letters.

 8   Okay.  So the letters are not the Bible.  Her representation

 9   here in court to me as to what she wants your witness to ask.

10   that is, the fence around the deposition.  So you're going to

11   be within -- you have this transcript, and you'll -- you'll

12   certainly be ready, and you'll say, regarding this topic, here

13   it is.  You represented to the Judge that you wanted a witness

14   to say this, or be prepared to answer this.  And that's the

15   scope, not what's in the letter, what we decide here today.

16   Okay.

17            MS. CONLEY:  Appreciate that.

18            THE COURT:  All right.  So lost my place.  Where were

19   we?

20            MS. COSLETT:  No, I think, Your Honor, and the last

21   category of dispute is the identities of individuals who

22   prepared the -- again, the sort of datasets that we've

23   discussed earlier, the --

24            THE COURT:  Division of responsibilities?

25            MS. COSLETT:  Yes.  And, you know --
```

```
1          THE COURT:  Okay. Are you going to have a witness to

2    explain it?  And now before I ask Defense counsel to answer,

3    say clearly and concisely what you want a 30(b) witness to be

4    prepared to answer.

5          MS. COSLETT:  We want a 30(b)(6) witness to be

6    prepared to answer -- to identify the individuals that created

7    the materials, the price reports that were then sent to the

8    Government, how they were created, from what data the reports

9    were created from -- who supplied the data that was created,

10   you know, was used to generate the reports sent to the

11   Government.

12         THE COURT:  Okay.

13         MS. COSLETT:  Essentially, the whole generation of

14   the process of the reports that were then sent to the

15   Government.

16         THE COURT:  She's expanded it a little bit.

17         MS. CONLEY:  And that, Your Honor, is where the devil

18   is in the details.

19         THE COURT:  Yes.

20         MS. CONLEY:  Right.  And that's what we've always

21   said it would be really an insurmountable burden for

22   SilverScript to identify --

23         THE COURT:  Yeah.  Well, you just -- excuse me.  What

24   you just said, it's too broad.  Narrow it.  Say it again.

25         MS. COSLETT:  Okay.  I would like to know who created
```

 1  the data sources that were submitted to the Government.

 2          THE COURT:  Okay, take them one at a time.  That

 3  sounds fair.  Your witness is to be prepared to answer that

 4  question.

 5          Next.

 6          MS. COSLETT:  From what data the reports that were

 7  submitted to the Government, were created.

 8          THE COURT:  Agreed.  Granted.  Go ahead.

 9          MS. COSLETT:  What entity Caremark, Aetna, or

10  SilverScript, or someone else supplied that data that was then

11  used to generate the reports.

12          THE COURT:  That's fine, right.  You're -- what

13  entity supplied the information?

14          MS. CONLEY:  Actually, Your Honor, that's much easier

15  than the first one, which was the identity of the individual.

16          THE COURT:  Granted.  Agreed.  Go ahead.

17          MS. COSLETT:  Your Honor, I'm going to take yes for

18  an answer and stop there.

19          THE COURT:  Okay, fine.  Thank you.

20          All right.  So what's left?

21          MS. COSLETT:  So, Your Honor, before the Court is --

22  it's not before the Court, but the parties, Relator on the one

23  hand, and Aetna on the other, had got -- are very close to

24  being prepared to submit a joint dispute.  We have disputes as

25  to the Aetna 30(b)(6) topics as well.  I don't know if Your

1   Honor would like to address these.

2           THE COURT:  I have -- I have about 20 more minutes.

3           MS. COSLETT:  Okay.

4           THE COURT:  So whatever I can resolve.  And I'll --

5   if we don't get to talk about it, I know what's been submitted.

6   I'll try to resolve everything.  We're going to try to issue a

7   comprehensive order on all this.

8           MS. COSLETT:  Okay, Your Honor.

9           THE COURT:  God bless my law clerk here, Owen.

10          But -- so let's keeping working if there's more.  I'm

11  here.

12          MS. COSLETT:  Okay.  I think the categories of topics

13  and the 30(b)(6) notice to Aetna are the authenticity and

14  status business records of the documents produced by Aetna.

15          THE COURT:  Okay.  And you'll have -- Aetna's going

16  to have a 30(b) witness, and you can do that in the deposition?

17          MS. CONLEY:  For that, Your Honor, we have said that

18  we would stipulate the authenticity.  They want the business

19  record.  Aetna has produced hundreds of thousands of documents.

20  And so to go through every single one of those --

21          THE COURT:  No, we're not going to do --

22          MS. CONLEY: -- to determine the status of a business

23  record is --

24          THE COURT:  So, Ms. Coslett, do you want a

25  representation from Aetna that all of the business records

1   they've produced are a fact.  Is that what you're asking for?

2              MS. COSLETT:  Yes, I would like that, Your Honor.

3              THE COURT:  Are they?

4              MS. CONLEY:  Are all of the documents authentic?

5   They are all authentic.

6              THE COURT:  Okay.

7              MS. CONLEY:  Are they all business records pursuant

8   to the rule?  That's something that we'd have to look at.

9              THE COURT:  That's an answer.  She said it here in

10  court.

11             MS. COSLETT:  Right.  And so, Your Honor, we would --

12             THE COURT:  Okay, done.

13             MS. COSLETT:  -- we would seek testimony as to the

14  business records then given --

15             THE COURT:  What do you mean?

16             MS. COSLETT:  -- given Counsel's representation.

17             THE COURT:  She's -- she's saying, I'm not sure

18  they're business records is what is constituted as business

19  records under the Rules of Evidence.

20             Is that what you're saying?

21             MS. CONLEY:  Correct.

22             THE COURT:  All the documents you have are authentic.

23  Counsel has confirmed that here.  She just did it.

24             MS. COSLETT:  Okay.

25             THE COURT:  Okay.  And now you want her to say the

1   business records?  Why?

2              MS. COSLETT:  No, I'm asking, can I depose a witness

3   as to the business records --

4              THE COURT:  I don't understand.

5              MS. COSLETT:  -- as to whether documents are business

6   records.

7              THE COURT:  I'm not following.

8              MS. COSLETT:  Under the Rules of Evidence, you know,

9   we often lay foundation at depositions that documents are

10  business records, that there were created and maintained in the

11  usual course of business, made contemporaneous to the time of

12  the event being recorded, and use that to then establish --

13             THE COURT:  No, you can't --

14             MS. COSLETT:  -- at trial that the documents are

15  admissible.

16             THE COURT:  There's hundreds of thousands of

17  documents.  You want to go through each one?  How are you going

18  to do that?

19             MS. COSLETT:  I don't intend to go through each one,

20  Your Honor.  I mean, frankly, we've proposed and would accept a

21  declaration establishing that specific documents we identified

22  in advance were --

23             THE COURT:  This is -- this is -- I just think this

24  is sort of a fool's errand.  I mean, pick out the documents you

25  want?  No, I'm not going to let you depose a witness and go

1    through the hundreds of thousands of documents that have been

2    produced and go through the requirements for admissibility at

3    trial under that business record exception.  We can work that

4    out later.  Denied.

5              What else?

6              MS. COSLETT:  Okay, Your Honor.  I think we've

7    covered the completeness of Aetna's data productions

8    previously.

9              THE COURT:  Yes.  She said all the documents are

10   authentic.

11             MS. COSLETT:  I think, Your Honor, we also -- Your

12   Honor's rulings with respect to the entity or otherwise which

13   supplied the data used to generate --

14             THE COURT:  Why -- just I'm curious.  I'll probably

15   regret asking this.  Why are you so concerned that Aetna has

16   produced perhaps inauthentic documents?  I don't understand why

17   you're making a fuss over this.

18             MS. COSLETT:  Your Honor, we just try to button up

19   trial admissibility issues during discovery.

20             THE COURT:  Yeah, this is -- this is, I think

21   respectfully, an example of over litigating a matter.  When a

22   company produces documents in discovery in a major piece of

23   litigation, for you to take ten minutes of everyone's time to

24   say I want them to say they're authentic.  I mean, you're

25   overthinking it, respectfully.

```
 1              MS. COSLETT:  Understood, Your Honor.

 2              Okay.  So we would like testimony from Aetna

 3    regarding the entity that actually submitted the Aetna

 4    prescription drug events.  That's the records recording the

 5    price at the point of sale, right when it's purchased at the

 6    pharmacy.  We would like to know which entity, whether it's

 7    Aetna, Caremark, or some other entity that submitted the

 8    prescription drug event data.

 9              THE COURT:  Response?

10              MS. CONLEY:  Done and already agreed.  We already

11    agreed to --

12              THE COURT:  You've already done it or --

13              MS. CONLEY:  No, we already agreed to provide the

14    entity that submitted the PDE data to CMS.

15              THE COURT: When is it going to be provided, at the --

16              MS. CONLEY:  At the deposition.  That's one of the

17    topics we agreed to.

18              THE COURT:  Okay.  Go ahead.

19              MS. COSLETT:  Okay.  The -- which entity supplied the

20    data that was used to generate the data sources?  Is that

21    something --

22              THE COURT:  Yeah, the same thing we just went

23    through?

24              MS. COSLETT:  Yes.

25              THE COURT:  Yes.
```

1          MS. COSLETT:  We can add that.  Okay, thank you, Your

2   Honor.

3          THE COURT:  And I really encourage you to have this

4   transcript with you.  Not the letters that went back and forth.

5   This transcript.

6          MS. COSLETT:   I will, Your Honor.

7          THE COURT:  Okay.

8          MS. COSLETT:  And we also seek testimony describing

9   the submission process, how it was done, how prices were

10  reported to the Government.  Who did it?  Who did the price

11  reporting to the Government?  Who submitted it?

12         THE COURT:  Who -- what entity or what person?

13         MS. COSLETT:  What entities, Your Honor.

14         MS. CONLEY:  So I'm having trouble right now

15  differentiating between that Ms. Coslett is articulating now

16  and what we've already discussed.  We've already agreed to

17  identify the entity --

18         THE COURT:  Well, let's stop so I'm -- so pause.

19         MS. CONLEY:  Okay.

20         THE COURT:  Say again.  You want the 30(b)(6) witness

21  from that Aetna, right --

22         MS. COSLETT:  Yes.

23         THE COURT:  -- to be prepared to testify as to?

24         MS. COSLETT:  Which entity submitted the various

25  types of price reporting -- you know, there were four steps

1  that we discussed -- which entity was responsible for and

2  did --

3              THE COURT:  For submitting that to?

4              MS. COSLETT:  The Government.

5              MS. CONLEY:  So you -- so she would like to know the

6  entity that was responsible for submitting the bids, the DIR

7  reports, the PDE data, and the PRS comes from CMS, so --

8              THE COURT:  The subsets.  Right?

9              MS. CONLEY:  Those four --

10             THE COURT:  Is that right, Ms. Coslett?

11             MS. CONLEY:  Is that correct?

12             THE COURT:  Is that right?

13             MS. COSLETT:  Yes.

14             THE COURT:  Okay.

15             MS. COSLETT:  Who was responsible for submitting it

16  and --

17             THE COURT:  I agree.  I think it's clear.

18             MS. COSLETT:  -- and who did submit it.

19             THE COURT:  I agree.  Your witness should be prepared

20  to do that.

21             MS. COSLETT:  And I think Your Honor covered this,

22  but -- and who supplied that data that was then --

23             THE COURT:  Mr. Sorenson's saying that you have to --

24             MS. COSLETT:  Mr. Sorenson's would like it clarified.

25             THE COURT:  -- hurry up anyway, so I'm going to --

 1                    MS. CONLEY:  So I --

 2                    MS. COSLETT:  We would like testimony as to who

 3      supplied the data that was ultimately then submitted to the

 4      Government.

 5                    THE COURT:  Yeah.

 6                    MS. COSLETT:  Yes.

 7                    THE COURT:  I could have sworn we just --

 8                    MS. CONLEY: I think --

 9                    THE COURT:  I just said that, their witness should be

10      prepared to cover that.

11                    MS. COSLETT:  Okay.

12                    MS. CONLEY:  And just to clarify, in the terms of

13      who's supplied.  Now, we understood your prior order as to what

14      they should be prepared to testify about.

15                    My concern is, is that the topics as originally

16      articulated had said, identification of every source of data

17      for every single field that could have been relied upon, which

18      again, is an insurmountable --

19                    THE COURT:  God, I think I'm really not being clear.

20      What they requested previously in their 40-page letter is not

21      what they're going to be allowed to ask.  It's this transcript.

22      They started with a letter.  We've had a discussion.  I've

23      forced her to narrow her request.  She's now, in my view, made

24      a reasonable request, to which you have reasonably agreed to.

25      Please stop referring to something that's not at play.  It's

```
 1   too much to --

 2              MS. CONLEY:  I apologize, Your Honor.

 3              THE COURT:  Now I'm going to have to get the letter

 4   in front of you, and then -- we're making progress.

 5              MS. CONLEY:  Appreciate it.  I apologize.

 6              THE COURT:  Okay.  All right.

 7              Go ahead, Ms. Coslett.  What else?

 8              MS. COSLETT:  I think we covered the topics, Your

 9   Honor.

10              THE COURT:  For Aetna?  Okay.

11              MS. COSLETT:  Yes, we've covered the Aetna topics.

12              THE COURT:  I still have ten minutes.

13              MS. COSLETT:  Can I -- and just --

14              THE COURT:  Is there anything else I can help you

15   with?

16              MS. COSLETT:  Your rulings with respect to

17   SilverScript apply equally to Aetna.  They're similarly

18   situated, is that --

19              THE COURT:  I think the logic, as you've narrowed

20   your request reasonably --

21              MS. COSLETT:  Understood.

22              THE COURT:  -- should apply to SilverScript.

23              Do you agree?

24              MS. CONLEY:  Yes, Your Honor --

25              THE COURT:  Okay.
```

1          MS. CONLEY:  -- as to the narrowing as for here

2     today.

3          THE COURT:  Narrowing this as articulated by

4     Plaintiff's counsel in the transcript that you're all going to

5     have.  In fact -- god, I'm going to regret this -- tell me the

6     dates of these 30(b)(6)'s, let me know so we can also pull the

7     transcript.  And in the event, after significant discussions,

8     you have an impasse at the deposition, and you feel a dire need

9     to call me to resolve this, I will have the date and the

10    transcript handy.  And you can say, Judge, I narrowed my --

11    this is a for instance -- I narrowed my request at our hearing,

12    and it's on page 46 of this transcript, the date that we're

13    here today, line 6.  Please read line 6 through 15.  This is

14    how I narrowed my request.

15         And then I'll now be able to see -- you know, break

16    an impasse in your deposition.  Okay.  So I'll try to abide by

17    the transcript too.

18         What else?

19         MS. COSLETT:  Okay.  Yes, Your Honor. I think we have

20    raised two categories of requests for admission responses that

21    we believe are unacceptable, insufficient, in our view.

22         THE COURT:  Okay, go ahead.

23         MS. COSLETT:  The first category is, we provided

24    names of specific individuals that provided attestations to the

25    Government basically saying the information we're providing to

```
 1    you, Government, is true and accurate.  We said they're
 2    SilverScript employees, were they also employed by Caremark?
 3    Caremark refused to answer those requests for admission.
 4              THE COURT:  Well, that's a question.  How is that --
 5              MS. COSLETT:  We said admit that this this person was
 6    an employee of Caremark.
 7              THE COURT:  So you've listed persons and basically --
 8    I know I'm dumbing it down, but --
 9              MS. COSLETT:  By year, yeah.
10              THE COURT:  -- is this person -- was this person an
11    employee of Caremark, admit or deny.
12              MS. COSLETT:  Yes.
13              THE COURT:  Response?
14              MS. O'CONNOR:  Good morning, Your Honor.
15              THE COURT:  Hi.  Good afternoon.
16              MS. O'CONNOR:  Yes.
17              THE COURT:  It's well into the afternoon.
18              MS. O'CONNOR:  Feels like we've gone a whole night.
19              THE COURT:  Yeah, it's not -- instead of it being
20    like ten after twelve and they have a mistake, it feels like
21    we've been working --
22              MS. O'CONNOR: All through.
23              THE COURT:  -- till one in the morning.
24              MS. O'CONNOR:  Exactly.
25              THE COURT:  That's why you said that.
```

1          MS. O'CONNOR:  Exactly.

2          THE COURT:  All right, go ahead.

3          MS. O'CONNOR:  Your Honor, we've actually answered 10

4    questions that were similar to this.  So explain, admit, or

5    deny whether this particular person is an employee of Caremark.

6    We provided admissions and denials with respect to those.

7          The three on which we have stood on our objections,

8    we have stood on a relevance objection.  The reason being that

9    the three that Ms. Coslett is referring to ask about someone's

10   employment status in 2017, 2019, or 2020 based on documents

11   submitted in those dates.  The whole RFA refers to documents

12   from those dates.

13         As Your Honor may remember, this case, the discovery

14   timeline goes from 2020 to the end of 2016.  So at a very basic

15   level, we simply postdate the discovery time period entirely.

16         We have a number of other objections to the --

17         THE COURT:  Well, hold -- let's deal with that one.

18   So three names.  They want to know, were they employees of

19   Caremark.  And you've objected because it's outside of the time

20   period of this case, which is 2016 to 2020?

21         MS. O'CONNOR:  I'm sorry, I misspoke on that.  2010

22   to 2016 --

23         THE COURT:  2010.

24         MS. O'CONNOR:  -- is the time period.

25         THE DEFENDANT:  Okay.  So assuming that they were

 1   employees before 2010, right -- not asking you to acknowledge

 2   it, but let's say that they were -- what's the harm in going

 3   outside 2010, like before that?  Why --

 4            MS. O'CONNOR:  The questions relate to their phrase

 5   literally, admit or deny that at the time so and so submitted

 6   this attestation in 2017, or 2019, or 2020, what was their

 7   employment status?

 8            THE COURT:  All right.  So can you just -- that's not

 9   the way she framed it.

10            Ms. Coslett, I thought you just wanted to know

11   whether they work for Caremark or not.

12            MS. COSLETT:  That's correct, Your Honor.

13            THE COURT:  All right.  As to the three, read me the

14   request.

15            MS. COSLETT:  Sure.  Excuse me, Your Honor.

16            Yes, Your Honor.  I would be happy to hand up copies

17   if you'd like.

18            THE COURT:  No, just read me one so I can --

19            MS. COSLETT:  Okay.

20            THE COURT:  -- so I can -- because you're both -- you

21   both have represented it differently.

22            MS. COSLETT:  Okay, request number -- request for

23   admission number 110.  Admit that John Conroy was an employee

24   of Caremark at the time he signed the document produced at, and

25   then it is a Bates number, a SilverScript Bates number.

1              THE DEFENDANT:  And you're objecting because why?

2              MS. O'CONNOR:  That document is from 2017.  So his

3    employment status in 2017 has no bearing on the 2010 to 2016

4    timeframe for claims in this case.

5              MS. COSLETT:  And, Your Honor, that document relates

6    to a 2016 --

7              THE COURT:  I'm sorry, 2010 to 20?

8              MS. COSLETT:  '16.

9              MS. O'CONNOR:  '16.

10             THE COURT:  And he signed the document in 2017?

11             MS. O'CONNOR:  Correct.

12             MS. COSLETT:  But it relates to prices submitted for

13   the 2016 --

14             THE COURT:  And all you want to know is when he

15   signed the document in 2017, was he an employee?

16             MS. COSLETT:  Of Caremark, yes.

17             THE COURT:  Okay.  What's the answer?  Yes or no, was

18   he?

19             MS. O'CONNOR:  Well, we have a number of objections

20   because of the way --

21             THE COURT:  I'm overruling your objections.  I'm

22   instructing you to answer.  Was he an employee in 2016 -- 2017?

23             MS. O'CONNOR:  We'd have to go back and look at

24   exactly which entity was the employee entity.

25             THE COURT:  Okay, I'm ordering you to do that.

```
 1                  Who's the other two?

 2                  MS. COSLETT:  Request number 111, admit that Kevin

 3     Grazio was an employee of Caremark at the time he signed a

 4     document produced at SilverScript Bank, 000.

 5                  THE COURT:  What was the date?

 6                  MS. COSLETT:  Excuse me?

 7                  THE COURT:  What was the date?

 8                  MS. COSLETT:  The date does -- is after 2016.

 9                  THE COURT:  Okay.

10                  MS. COSLETT:  But again, it relates to prices that

11     are during the relevant time period.

12                  THE COURT:  The Defendant's objection is overruled.

13     I'm ordering Caremark to answer whether he was an employee when

14     he signed the documents.

15                  And who's the last one?

16                  MS. COSLETT:  The last one is Todd Meek.  And it's --

17     that's the last one this category, which is Todd Meek, and the

18     question is, was he an employee of Caremark?

19                  THE COURT:  What's the date?

20                  MS. COSLETT:  Admit that he was employed with

21     Caremark.  It's September 2017.

22                  THE COURT:  Defendant's objection is overruled.

23     Caremark's ordered to answer the question.

24                  MS. COSLETT:  Okay.

25                  THE COURT:  Okay?
```

1          MS. COSLETT:  And then, Your Honor, there are three

2    other requests for admission in dispute.  The category here is

3    -- I'll read you one, the others are similar.  The first one

4    is, admit that during the relevant time period -- 2010 to 2016

5    -- Caremark never shared pharmacy reconciliations for Rite Aid,

6    Walgreens, and CVS Pharmacy with SilverScript.

7          THE COURT:  Response?

8          MS. O'CONNOR:  Your Honor, we have a number of

9    objections.  There are -- as Ms. Coslett mentioned, there are a

10   few that are cast in this manner.  The primary one being the

11   burden involved in attempting to admit or deny a negative,

12   which is never shared pharmacy reconciliations with three

13   separate pharmacies with SilverScript over a six-year time

14   period.

15         THE COURT:  I'm sorry to interrupt you.  Hold on.

16         Could you read it to me again, please?

17         MS. COSLETT:  Admit that during the relevant time

18   period, Caremark never shared pharmacy reconciliations for Rite

19   Aid, Walgreens, or CVS Pharmacy with SilverScript.

20         THE COURT:  Go ahead.

21         MS. O'CONNOR:  And, Your Honor, the pharmacy

22   reconciliation is just to remind you, are the big paper that

23   Ms. Coslett handed up to you.  So there are X number of

24   different categories of information within it.  We think the

25   request is unclear, including because of the way pharmacy

1    reconciliations is defined at the beginning of the RFAs as to

2    whether it's asking -- sharing pieces of it, sharing orally,

3    handing them an actual copy, sharing part of the process, which

4    is a word that's used to the definition.

5              THE COURT:  Yeah, yeah.  And it's a negative, so how

6    do you -- how do you figure out the right answer on a negative?

7              MS. O'CONNOR:  With all of the significant

8    implications of an RFA response.

9              THE COURT:  Okay.  You're Ms. O'Connor?

10             MS. O'CONNOR:  Yes.

11             THE COURT:  I agree with Ms. O'Connor's objection.

12   Do you want to reframe your question, Ms. Coslett?

13             MS. COSLETT:  Well, Your Honor, I -- I think the

14   request is narrow enough, frankly, Your Honor.  I guess I would

15   say my concern is, we think that if Caremark is going to refuse

16   to answer this, they should be barred from later coming in and

17   making any argument or suggestion that they did share these

18   pharmacy reconciliations to SilverScript.

19             THE COURT:  That's a fair point.  I agree.  They

20   can't -- they can't say one thing and discovery and another in

21   -- they can't refuse to answer a question, raising an

22   objection, which I am sustaining, but later trying to get in

23   evidence for which they didn't answer the question based on an

24   objection.  Caremark objection is sustained.  I think it's a

25   burdensome, confusing question.

1          MS. COSLETT:  So the last issue before the Court

2    that's in our letter from last Friday, is the additional

3    depositions to be conducted.  As Your Honor is aware, we've

4    discussed today there are the three Caremark entity

5    depositions:  CVS, SilverScript, and Aetna.

6          THE COURT:  Yeah, we're all set on those, right.

7          MS. COSLETT:  Okay.  So we have taken 11 depositions

8    so far.  We'd agreed to 15 with --

9          THE COURT:  Right.  So that will be --

10          MS. COSLETT:  -- us having leave to take more.

11          THE COURT:  -- three more, right?

12          MS. COSLETT:  What's that?

13          THE COURT:  30(b)(6)'s will take you up to 14, right?

14          MS. COSLETT:  That will take us the 14.  We have a

15    notice that we have sent to Walgreens, which is a true non-

16    party pharmacy.  We believe that we will be able to reach

17    agreement with Walgreens to accept --

18          THE COURT:  Is this -- you want to depose their CFO?

19          MS. COSLETT:  We do want to -- we want to depose Eva

20    Boratto, who was the former -- during the relevant time period,

21    she was the Chief Accounting Officer at Caremark, and then she

22    became the CFO.  And she is, Your Honor, very important, in our

23    view, particularly given Your Honor's ruling that a request for

24    documents related to the CVS budgeted generic effective

25    discount rates were too burdensome.  We believe that the

```
 1    evidence to date shows that Ms. Berardo would have been

 2    involved -- was involved in --

 3               THE COURT:  She's a former employee?

 4               MS. COSLETT:  She's a former employee, and she would

 5    have been involved in negotiating and setting the budgeted

 6    generic effective rates that govern the prices between CVS and

 7    Caremark and, you know, have --

 8               THE COURT:  What's your response?

 9               MS. COSLETT:  -- prevented us from document

10    discovery, but we seek it.  Respectfully, Boratto's deposition

11    -- Ms. Boratto's deposition and also CVS's 30(b)(6) deposition

12    on the same subject, this --

13               THE COURT:  But that's --

14               MS. COSLETT:  -- budgeted generic effective rate.

15               THE COURT:  -- that will take you over, right?  That

16    will take you to 16, right?

17               MS. COSLETT:  No, Your Honor, not if we -- well, two

18    responses, Your Honor.  Not if we --

19               THE COURT:  You can't have subpart depositions.

20               MS. COSLETT:  Your Honor, not if we are able to reach

21    agreement with Walgreens not to take a deposition.

22               THE COURT:  All right.  Well, let's deal with Boratto

23    first.

24               MS. COSLETT:  Okay, so --

25               MR. DOCKERY:  Thank you, Your Honor.
```

1            So putting aside the question of whether or not

2    they're past their limit, and we believe they are --

3            THE COURT:  Put that aside.

4            MR. DOCKERY:  -- putting that aside for the moment.

5    Ms. Boratto is someone that they have been aware of throughout

6    this discovery process.  They've asked multiple questions at

7    depositions about her specifically and about documents that

8    she's on.

9            THE COURT:  I'm sure they were aware of her.

10           MR. DOCKERY:  This has been going back for months.

11           THE COURT:  No question they'd be aware of her.

12           MR. DOCKERY:  So -- and so it's important to

13   understand that they made a choice, an election as to who they

14   would prioritize for their depositions.

15           THE COURT:  Would they have to subpoena her, or can

16   you produce her?  How's this working?  She's a former employee.

17   No longer works --

18           MR. DOCKERY:  Your Honor --

19           THE COURT:  -- for any of these companies, right, so

20   how is this going to work?

21           MR. DOCKERY:  So the way that it has worked for

22   former employees is that they have they have issued subpoenas

23   to those former employees.  In some cases, those former

24   employees have permitted us to represent them at the

25   deposition.  But in other cases, they have not.

1          THE COURT:  What's Boratto going to do?  Do you know?

2          MR. DOCKERY:  I don't know, Your Honor.

3          THE COURT:  Okay.  So if there's a possibility that

4    she's going to hire counsel -- that's a possibility, then --

5          MR. DOCKERY:  We can't rule it out.

6          THE COURT:  -- should we wait and see whether that

7    happens before you make argument on her behalf as the --

8    whether she should appear, or --

9          MR. DOCKERY:  I'm not making any --

10          THE COURT:  -- is this premature?

11          MR. DOCKERY:  -- argument on her behalf.

12          THE COURT:  Right.

13          MR. DOCKERY:  She may have arguments to make on her

14    behalf.

15          THE COURT:  Right.

16          MR. DOCKERY:  We're arguing on Caremark's behalf --

17          THE COURT:  Or you're saying timing.

18          MR. DOCKERY:  -- that having yet another deposition

19    here.  There's nothing that makes her so special.  There's

20    nothing about her that's particularly new.  There's no reason

21    why we should be --

22          THE COURT:  When did you -- I'm sorry to interrupt.

23    When did you notice the deposition?

24          MS. COSLETT:  So we have not noticed the deposition,

25    Your Honor.

```
 1              THE COURT:  Well, you're out of time.

 2              MS. COSLETT:  Your Honor, we had reached agreement to

 3   take 15 depositions.  Counsel for Caremark advised us that it

 4   wouldn't accept any notice for depositions given the

 5   outstanding Walgreens deposition.  We always sought leave to

 6   come back for good cause.  And I'll tell you, Your Honor, that

 7   Ms. Boratto, you know, was identified we believed when we took

 8   Mr. Gugliuzza's deposition.

 9              THE COURT:  I don't know who that is.

10              MS. COSLETT:  We referenced him earlier.

11              THE COURT:  Who was that?

12              MS. COSLETT:  He was a vice president.

13              THE COURT:  Vice president of who?

14              MS. COSLETT:  He was a vice president.  We believed

15   that he --

16              THE COURT:  Of who?

17              MS. COSLETT:  -- was the individual -- --

18              THE COURT:  Vice president --

19              MS. COSLETT:  -- of Caremark, I apologize.

20              THE COURT:  Caremark, go ahead.

21              MS. COSLETT:  Caremark vice president, who we believe

22   from the document review leading up to his deposition that he

23   would be able to give testimony as to how the budgeted generic

24   effective rate, as between Caremark and CVS, was set.  He said

25   that he was not involved in that and pointed to senior
```

1   management above him, the executives, aka Ms. Boratto.

2           And so based on that deposition, which was June 10th,

3   that's when we identified and have really honed in on

4   Ms. Boratto as a deponent.

5           THE COURT:  Okay, hold that thought.

6           MS. COSLETT:  You know, Caremark's --

7           THE COURT:  Hold that thought.

8           MS. COSLETT:  -- we're not allowed to identify

9   deponents --

10          THE COURT:  Hold that thought for --

11          MS. COSLETT:  -- as discovery continues, it's just --

12          THE COURT:  Hold that thought for a second.  I want

13  to hear -- that's a good point.  I want to hear his response

14  before you go on to your next one.

15          What's your response to her point, which is, she

16  would -- she expected she would have gotten the information she

17  could have gotten from -- she wants -- she expected she could

18  have gotten that information from another witness.  She

19  couldn't.  And the witness said Boratto has the information?

20          MR. DOCKERY:  Well, I'm not sure that's exactly what

21  -- what he said, but what I would say is --

22          THE COURT:  Okay, but --

23          MR. DOCKERY:  -- there are depositions well earlier

24  than that, including the deposition of Laura Church, where they

25  asked questions specifically about who Eva Boratto was and put

1   documents in front of witnesses and asked about her role.  So

2   in --

3           THE COURT:  Hold that thought please.

4           What's your response?

5           MS. COSLETT:  You know, deposition discovery is an

6   iterative process.  We learn through the course of deposition

7   testimony.  We had honed it on Mr. Gugliuzza.  I'm making the

8   representation, Your Honor.  We thought that this was the

9   person --

10          THE COURT:  All right.  State for the record

11  concisely the very defined, concise area, if you can get

12  Boratto in -- because you may have to subpoena her and or maybe

13  another issue with her counsel --

14          MS. COSLETT:  The issue that --

15          THE COURT:  -- what discreet area do you want to ask

16  her questions about?  And before you answer, understand that

17  this is going to count in your 15.

18          MS. COSLETT:  Understood, Your Honor.

19          THE COURT:  Okay?

20          MS. COSLETT:  I'll come back to that.  The discreet

21  area -- the focus of her deposition will be the negotiation of

22  the generic effective rate that again covers commercial and

23  Medicare Part D, as between Caremark on the one hand and then

24  the CVS pharmacy on the other.  The negotiation about how it

25  was set.  And then how it was performed to, the fact that

```
 1   Caremark then did, in fact, set prices to hit that negotiated

 2   generic effective rate that was in place as between Caremark

 3   and CVS Pharmacy.

 4            THE COURT:  Excuse me one second.

 5            Ella.

 6            All right.  Well, understanding, as I said, that's

 7   going to count as a deposition.  If you can effectuate that

 8   deposition --

 9            MR. DOCKERY:  Your Honor, may I --

10            THE COURT:  I haven't finished and Counsel's now

11   reading a note handed to her by co-counsel.

12            So let me know when you're finished.

13            MS. COSLETT:  I'm finished, Your Honor.

14            THE COURT:  Okay.  If you can get Boratto in, you're

15   going to be cabined by what you've just said.  And I'll take

16   your word for it because I don't have the time to go through

17   all the prior depositions to see if you were put on fair

18   notice.  So I'm taking your word for it, that nothing in the

19   prior discovery alerted -- nothing in the prior discovery would

20   give you reason to -- strike that.  I'm not really being clear.

21            I'm finding that I'm taking your word that only until

22   recently did you learn the necessity of having to depose

23   Boratto in the small area that you articulated.  And so I'll

24   allow it, but it counts.  Okay?

25            MS. COSLETT:  I appreciate that, Your Honor.  And I
```

```
 1  just want to slightly amend --

 2          THE COURT:  Hold on.  Hold on.

 3          MS. COSLETT:  -- based on the note I received, which

 4  is --

 5          THE COURT:  Hold on for one second.

 6          Yes.

 7          MR. DOCKERY:  Your Honor, we think it's important now

 8  to get to the issue of the deposition count, because we think

 9  they've already got 15 depositions.  And so there isn't another

10  deposition slot for them to take.

11          THE COURT:  You can't count to 15.  I mean, do you

12  really need me to --

13          MR. DOCKERY:  So here's your -- Your Honor, I'm sure

14  understands the facts here, and perhaps you'll see it

15  differently than we do --

16          THE COURT:  Okay.

17          MR. DOCKERY:  -- but we see this gamesmanship.

18          THE COURT:  Okay.

19          MR. DOCKERY:  They had a subpoena outstanding to

20  Walgreens for a deposition.  And they had a similar subpoena

21  that was out to Rite Aid.  They took that deposition.  They

22  have the 30(b)(6) subpoenas out to CVS pharmacy and

23  SilverScript that we talked about.

24          On July 14th, the day before discovery -- fact

25  discovery concluded, they told us that they were no longer
```

```
 1   intending to take the deposition of Walgreens, thus freeing up

 2   a space, and then said they're going to use that to actually

 3   depose somebody else.

 4           Now, what we learned from Walgreens counsel is that

 5   what Walgreens counsel has been hearing from them, is that they

 6   -- Walgreens will get deposed unless they submit a declaration.

 7           And so they, as we understand it again, have been

 8   working on a declaration under the threat of a subpoena

 9   deposition.  So --

10           THE COURT:  Declaration of who?

11           MR. DOCKERY:  I don't even know the details.

12           MS. COSLETT:  Walgreens, Your Honor.

13           THE COURT:  Walgreens.

14           MR. DOCKERY:  It's a Walgreens person, but on behalf

15   of Walgreens as a company.

16           THE COURT:  I'm really sorry to interrupt you because

17   I'm over time now.

18           But does it solve your concern, Mr. Dockery -- I

19   mean, if I say they can issue 500 subpoenas, does it matter?

20   Does that matter, as long as they -- when they swear the

21   witness for a deposition, that counts as one, and I hold them

22   to 15?

23           MR. DOCKERY:  It matters if a third party is being

24   told they're going to get deposed when they aren't, when they

25   can't --
```

1          THE COURT:  Well, the third -- but who -- but I'm not

2    throwing my title around here, but the third party doesn't get

3    to decide the number of depositions.  I do.

4          MR. DOCKERY:  True.

5          THE COURT:  You folks agreed to 15 and it's 15.

6    That's it.  So does that alleviate your angst?

7          MR. DOCKERY:  It does not in the sense that I would

8    never tell a third party that I'm going to take their

9    deposition if I'm not allowed to because I'm over some count.

10          THE COURT:  Right.

11          MR. DOCKERY:   And so to --

12          THE COURT:  I wish I had the time to get into that.

13    I'm already late and I --

14          MS. COSLETT:  Your Honor, I could just --

15          THE COURT:  -- and I don't -- I don't want to get

16    into what was --

17          MS. COSLETT:  We are not misrepresenting --

18          THE COURT:  -- said previously.  It's 15.  You make a

19    strategic decision.  And it's 15.  I can't be any clearer.

20    Okay?  You want to do Boratto on that, which should take a half

21    hour to depose her on that topic, I'm not limiting you to that,

22    then that's your choice.  But don't come back to me and say 16.

23    Okay?

24          MS. COSLETT:  Okay.  And I under -- okay, so I

25    understand Your Honor's rulings.  I just -- two very brief

1  comments.

2          One, we have not misrepresented anything to

3  Walgreens.  And I resent that implication to --

4          THE COURT:  I said I don't want to get into that.

5          MS. COSLETT:  Okay.  And two is that, you know, with

6  respect to Ms. Boratto, I just -- I do want to note, we are

7  going to ask her why there was a generic effective rate.

8          THE COURT:  No, no, no, no.  No.  I gave you two

9  chances to frame the precise topics that you wanted to ask her,

10 and your -- you will be bound to those topics.

11         MS. COSLETT:  Okay.

12         THE COURT:  You're not adding more.

13         MS. COSLETT:  Okay.  It's -- okay, the generic

14 effective rate in the contract.  Okay.

15         THE COURT:  So don't say anything more because I'm

16 not going to let you do that more.

17         MS. COSLETT:  Okay.  Okay.  Understood, Your Honor.

18         So the last comment, Your Honor, is that we have

19 sought more time with Caremark's 30(b)(6) deponent, Mr. Blake.

20 The 30(b)(6) deposition was stopped unilaterally by counsel for

21 Caremark by Mr. Dockery at seven hours.  We think it was

22 improper.  We didn't have time to cover one of the topics

23 satisfactorily.  And we think -- and it was, frankly, rushed,

24 Your Honor, because we were going through these pharmacy

25 reconciliation documents.  We had a lot of speaking objections

1   and the deposition took a long time.  They're complicated.

2   Request two additional hours on Zoom with a 30(b)(6) witness

3   for Caremark.

4           MR. DOCKERY:  This goes to exactly the issue that

5   Your Honor just raised.  They were entitled, based on our

6   agreement, to seven hours of deposition testimony with Caremark

7   designated 30(b)(6) witnesses --

8           THE COURT:  Who was -- what was his title?

9           MR. DOCKERY:  This individual was Kevin Blake.  But

10  there had been another 30(b)(6) witness that had been

11  designated on other topics --

12          THE COURT:  I'm going to end up where I started,

13  which is my very distinct impression, is that Relator is

14  pushing beyond the bounds of reasonable discovery.  Your

15  request to conduct an additional 30(b)(6) deposition of a

16  Caremark designee is denied.

17          Okay.  I'm really -- at this point I'm late.  So I'll

18  try to put all of that into an order.  I think we -- I don't

19  know, call me an optimist --- I think --

20          MS. COSLETT:  I'm sorry, Your Honor.  Just --

21          THE COURT:  I really don't think it's good form when

22  a judge is talking to a lawyer for other lawyers to be talking

23  to that lawyer.  Not that I'm so special, but it's one

24  conversation, please.

25          MR. SORENSEN:  I apologize, Your Honor.

1                    THE COURT:  That's okay.  I think we accomplished a

2      lot.  And I think this was very productive.  So let's keep

3      cooperating with each other and we'll get this done.

4                    And we'll try to put some sense of this into an

5      order.  We'll rely on Alan for that, so it probably makes

6      sense.  Okay.  I really have to go.  What?

7                    GROUP COLLECTIVELY:  Thank you, Your Honor.

8                    MR. SORENSON:  Your Honor, I just -- once all of us

9      assemble, it may be that we believe in good faith that we'd

10     like to submit one page on Boratto in terms of her scope.  It's

11     -- I mean, a 15 -- if --

12                   THE COURT:  No, no, no, no.  No, no.  You're a very

13     capable lawyer.  I gave her a chance to outline.  She did a

14     great job all throughout the day.  And she -- I gave her two

15     times to outline it, and you're not going to expand it.  No.

16     No, thank you.  If it's contained within the transcript, then

17     you're stuck to that.

18         (Proceedings adjourned at 4:08 p.m.)

19

20

21

22

23

24

25

# **C E R T I F I C A T I O N**

        I, Valori Weber, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, and to the best of my ability.

_____

Valori Weber

Date: August 25, 2022