**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** *ex rel.* **SARAH BEHNKE,** | **Civil Action** |
| *Plaintiff*, | **No. 14-cv-824** |
| *v.* | |
| **CVS CAREMARK CORPORATION** *et al.*, | |
| *Defendants*. | |

Goldberg, J.                                        February 3, 2025

<u>**MEMORANDUM OPINION**</u>

## I.        <u>INTRODUCTION</u>

This <u>qui tam</u> case revolves around Pharmacy Benefits Manager CVS Caremark Corp.'s alleged false reporting of Medicare Part D benefits.  Presently before me is Relator's Motion to preclude two witnesses who may be called by Caremark at an upcoming bench trial.  In the alternative, Relator asks that I allow her to depose these witnesses.

Relator's requests are primarily premised on "fairness" and rely in part on a narrowly drawn partial waiver of the attorney-client privilege, effectuated by non-party Aetna, Inc.  More specifically, Relator anticipates that Caremark will call as witnesses two lawyers previously employed as Aetna's in-house counsel.  According to Relator, these lawyers may testify about Aetna's internal investigation regarding Caremark's pricing and reporting practices and the production of two memos prepared by Aetna's outside counsel, which contain representations supplied by Caremark.  Based on an evidentiary record that has yet to be developed, Relator continues to press that it would be unfair to allow these witnesses to testify because Caremark has

withheld "its own lawyers' internal documents and communications on the same subject." (ECF No. 398-1 at 4 of 12.)  For the reasons set forth below, I will deny Relator's Motion.

## II.    **BACKGROUND**[1]

This case centers around the relationship between insurers, pharmacies, Pharmacy Benefits Managers ("PBM"s), and the Centers for Medicare and Medicaid Services ("CMS").  As explained in my March 25, 2024 Summary Judgment Opinion:

> Individuals covered by an insurance plan ("members") typically purchase drugs from pharmacies, such as Walgreens or Rite Aid. Sometimes, a health insurer will delegate the task of establishing relationships with pharmacies to an intermediary entity called a "pharmacy benefits manager" ("PBM"), with the insurer being the PBM's "client." The PBM will enter into contracts with pharmacies in which the PBM promises to reimburse pharmacies for drugs purchased by members insured under the PBM's clients' health plans. Under a separate contract, the insurer reimburses the PBM for its services. (Caremark's Facts ¶¶ 10-13.) In this case, Caremark was the PBM for health insurers Aetna and Silverscript.

(S.J. Op. at 8-9.)

In 2012, Relator—who worked as an actuary for Aetna[2]—raised questions regarding Caremark's pricing contracts.  She suspected that Caremark was charging "Aetna different prices than Caremark charged its other clients for the same drugs."  (Id. at 42.)  Relator's concerns were raised internally and ultimately brought to the attention of Aetna's Chief Medicare Counsel Christine Clements and Deputy General Counsel Charles Klippel.  Aetna then hired outside counsel—Crowell & Moring ("the Crowell firm")—to assist their investigation.

Relator provided questions and comments to both Klippel and Clements as well as the Crowell firm concerning how to proceed.  On March 26, 2013, Klippel informed Relator and other

---

[1] These facts are taken from my Summary Judgment Opinion (ECF No. 339), my Order denying Relator's initial Motion to Compel on this issue (ECF No. 200), Relator's current Motion (ECF No. 398), and Caremark's Response in Opposition (ECF No. 402.)  I use ECF page numbers where a document's pagination is unclear.

[2] At that time, Aetna was a separate company with no affiliation to Caremark.  As will be explained infra, Aetna was later acquired by CVS Health and thus became part of the same corporate family as Caremark.

Aetna employees that he had provided Caremark a list of preliminary questions and that Caremark had begun the "legal review process." (ECF No. 402-6 at 2 of 3.) Klippel explained that the goal of the investigation was to "understand the specific claim and network contracting practices of [Caremark] as they apply to [Aetna's] Medicare business and to determine whether as a matter of law those are inconsistent with Medicare [] requirements." (Id.)

Thereafter, Caremark obtained its own outside counsel—Epstein, Becker, & Green ("the Epstein firm")—to assist in providing responses to Aetna. On April 8, 2013, Caremark's in-house counsel provided initial responses to the questions posed by Relator and Aetna. (See ECF No. 402-8.) On June 11, 2013, the Crowell firm provided Aetna an initial draft memorandum which outlined its investigation thus far. (See ECF No. 402-10.) The 2013 Memo contained certain factual and legal representations made by either the Epstein firm or Caremark's in-house counsel. Some of these representations could be considered exculpatory in nature. For example, and relevant to the issues in this case, Caremark indicated:

> 5. When negotiating with pharmacies, [Caremark's] business team is not permitted to seek reductions in rates for non-Medicare Part D networks . . . Any proposed pharmacy agreement involving an aggregate rate guarantee is reviewed in advance by [Caremark] counsel, including Medicare counsel, if the guarantee involves any payments to pharmacies involving Medicare Part D claims.
> . . .
> 7. The amount paid to the pharmacy at point of sale is the price the Part D plan member pays, is recorded on the PDE and is what the Medicare Part D plan is charged.

(Id. at 4-5 of 7.) In addition, the 2013 Memo included Caremark's attestations dated May 23, 2013, certifying the "completeness and truth of the following:"

> a. That the prices for Part D covered drugs dispensed by network pharmacies to Aetna members that [Caremark] reports to Aetna for claims adjudication purposes are the negotiated prices as defined in 42 CFR § 423.100, subject to any subsequent changes Aetna makes in the adjudication system.
> . . .

3

> c. In connection with Part D covered drugs dispensed to Aetna members, [Caremark] does not receive or retain any other remuneration from any source (excluding administrative fees paid by Aetna) that constitutes DIR that is not reported to Aetna . . . .

(Id. at 5 of 7.)

Of note, the Crowell firm cautioned that it had "not made any independent confirmation of the [] representations and attestations." (Id. at 6 of 7.) The Crowell firm explained it did not identify "credible evidence that [Caremark's] activities [] resulted in overpayments to Aetna under the Medicare Part D program" and concluded that it did "not believe that Aetna has [as a result] violated applicable Medicare requirements by relying on the pricing data provided by [Caremark] or that Aetna [] acted in deliberate ignorance or reckless disregard of the actual facts." (Id.) The Crowell firm recommended that Aetna "follow-up with [Caremark] to test the basis for its assertions" and conduct an "audit . . . to further monitor and assure compliance" with the regulations (Id.)

In the months that followed, Aetna hired the Burchfield Group—an outside audit company—to complete the suggested audit. In August 2014, Burchfield issued its audit report to Aetna. (See ECF No. 402-11.) According to Aetna and the Crowell firm, the audit report did "not necessarily address [Relator's] areas of concern." (ECF No. 402-12 at 2 of 3.) In September 2014, Klippel prepared and sent follow up questions to Caremark. (ECF No. 402-13.) Caremark responded, explaining, _inter alia_, that "[p]ayments by a PBM to a pharmacy under a PBM guarantee do not constitute DIR[3]" under the regulations. (ECF No. 402-14 at 6 of 8.) Dissatisfied

---

[3] Under the regulations, a Part D sponsor was entitled to subsidies only for drug spending that was "actually paid." 42 C.F.R. § 423.308 (effective June 7, 2010). "Actually paid means that the costs must be actually incurred by the Part D sponsor and must be net of any direct or indirect remuneration." Id. Direct and indirect remuneration ("DIR") refers to "discounts, chargebacks or rebates, cash discounts, free goods" and more. Id. CMS rules required Part D sponsors like Aetna to submit: (1) prescription drug event reports ("PDE") which gave the prices for individual purchases; and (2) DIR reports, "which included all other discounts and rebates that affected what it cost the Part D sponsor (or its PBM) to purchase those drugs." (S.J. Op. at 13.)

with Caremark's response, Aetna wrote back, explaining that the response did "not address the central DIR question" and asked Caremark to "update or revise the response" to adequately address Aetna's concerns.  (ECF No. 402-15 at 2 of 3.)  On March 12, 2015, Caremark provided a supplemental response.  (ECF No. 402-16.)

On May 19, 2015, the Crowell firm issued its second and final memo to Aetna.  (See ECF No. 402-17.)  At that time, Clements had left Aetna, joined the Crowell firm, and co-authored the 2015 Memo.  Like the 2013 Memo, the 2015 Memo included several representations from Caremark, including the following:

> 5. . . . [Caremark] has insisted that any prices it pays to pharmacies for non-Part D drugs, to the extent they may be lower than the average MAC guarantee to the pharmacy or lower than the Aetna Medicare MAC price, do not "decrease" either directly or indirectly (via some artifice or camouflage) the costs. [Caremark]'s position is that any price reductions it secures from pharmacies do not "serve to decrease the costs incurred under the Part D plan" and therefore are not DIR.
>
> 6. [Caremark] reports that it found no evidence that it or pharmacies explicitly agreed to accept lower commercial pricing and accept higher Part D pricing with the expectation that Medicare rates will offset, or otherwise make acceptable, the lower commercial rates.
> . . .
> 9. [Caremark] states it did not find evidence that lower commercial rates are enabled by higher Part D rates.
> . . .
> 13. [Caremark] states that "A pharmacy guarantee is the minimum price level, overall in aggregate that a pharmacy agrees to receive. [Caremark] does not receive a price concession or discount when it negotiates a pharmacy guarantee." For DIR to exist there would need to be additional facets or activity that "reduce the price" under the Part D plan.
> . . .
> 14. . . . [Caremark] asserts that CMS' guidance does not suggest that PBM pharmacy guarantees across multiple lines of businesses, without more, triggers DIR reporting.

(Id. at 5-6 of 7.)

Based on these representations, the Crowell firm suggested that "unless and until CMS issue[d] further guidance on DIR . . . [it saw] no reason to alter the guidance [from the] 2013 draft memo and believe[d] it would be reasonable for Aetna to treat the [] matter as resolved."  (Id. at 7 of 7.)  The Crowell firm once again told Aetna that it had "not undertaken any independent factual

investigation as to the representations made [by Caremark] or its counsel and [could not] predict with certainty how CMS or other officials or a fact-finder might view the scenario involved here." (Id.)  At all relevant times, Klippel and Clements participated in the above-stated investigation as either counsel for Aetna or the Crowell firm.

In 2014, Relator filed this qui tam lawsuit and on April 4, 2018 the case was unsealed. Shortly thereafter, on May 8, 2018, Aetna attempted to intervene and moved to protect attorney-client privileged documents, communications, and other work product.  (See ECF No. 32.)  I denied the Motion on grounds not relevant to this Opinion.  (ECF Nos. 39, 64.)

On November 28, 2018, CVS Health acquired Aetna, thus making Caremark and Aetna part of the same corporate family.  (See ECF Nos. 189, 200.)  On June 2, 2021, Caremark's counsel—acting on behalf of Aetna—communicated a partial waiver pertaining to Aetna's "attorney-directed investigation into the issues raised by Relator beginning in 2012 and continuing through 2015."  (ECF No. 189-2 at 58 of 412.)  In effect, Caremark's lawyers waived Aetna's privilege as it relates to the documents at issue in this Motion.

On January 17, 2022, Relator moved to compel production of Caremark's attorney-client communications.  (ECF No. 189.)  Relator argued that because Caremark's lawyers waived Aetna's privilege, the Aetna waiver should be extended to Caremark's attorney-client communications as well.  Relator asserted that because the 2013 and 2015 Memos contained factual and legal representations made by Caremark counsel, she should be allowed to fully explore Caremark's internal communications relating to the investigation.  I denied that Motion, holding that: (1) Caremark's statements and representations to the Crowell firm were not attorney-client communications because Caremark was not Crowell's client; (2) it was unnecessary to extend the waiver because Caremark had already provided the underlying communications between Aetna

and Caremark from 2012 through 2015 and those communications were not privileged; and (3) Aetna's partial waiver did not extend to Caremark because the two were "separate members of [a] corporate group and are not treated as one client for purposes of privilege." (ECF No. 200 at 6 (internal quotations and citations omitted).)

On June 24, 2022, Caremark provided disclosures pursuant to Rule 26(a)(1) and explained that it may call as trial witnesses Klippel and Clements. (See ECF No. 402-19.)

## III.    LEGAL STANDARDS – THE ATTORNEY CLIENT PRIVILEGE

"The attorney-client privilege is 'so compellingly important' that the courts must, within their limits, 'guard it jealously.'" AMS Constr. Co., Inc. v. Reliance Ins. Co., No. 04-2097, 2005 WL 8177504, at *2 (E.D. Pa. May 26, 2005) (quoting Haines v. Liggett Grp., Inc., 975 F.2d 81, 90 (3d Cir. 1992)). However, a party may not use the privilege "as both a 'shield' and a 'sword.'" Berckeley Inv. Grp., Ltd. v. Colkitt, 455 F.3d 195, 221 n.24 (3d Cir. 2006). Specifically, "if a party 'agrees to disclose only favorably privileged documents while keeping for itself the unfavorable ones to gain an advantage in litigation,' this partial disclosure may constitute an implied waiver." In re Zohar III Corp., No. 23-2549, 2024 WL 1929021, at *4 (3d Cir. Apr. 23, 2024) (quoting In re Teleglobe Commc'ns Corp., 493 F.3d 345, 378 (3d Cir. 2007)). Moreover, a party may not "rely upon the legal advice it received for the purpose of negating its scienter without permitting [the other party] the opportunity to probe the surrounding circumstances and substance of that advice." Colkitt, 455 F.3d at 221 n.24.

## IV.    DISCUSSION

This is not the first time Relator has taken issue with the Crowell evidence. As noted above, Relator has previously attempted to expand the scope of Aetna's partial waiver to include Caremark's attorney-client communications. I denied that request in my March 4, 2022 Opinion.

Presently, Relator seems to recast this issue, seeking to preclude Klippel and Clements from testifying about the Crowell evidence, or in the alternative, to depose these potential witnesses before trial. I will address the deposition question first.

## A. Depositions

In seeking to take the depositions of Klippel and Clements, Relator is essentially asking me to reopen discovery. I note that Relator's Motion comes on the eve of trial (March 10, 2025), that fact discovery has been closed since October 21, 2022, and that I have already allowed Relator to take fifteen depositions—more than the presumptive limit set by Federal Rule of Civil Procedure 30(a)(2)(A)(i). (See ECF Nos. 190, 239 at 87.)

Once a scheduling order is issued, it "may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). To establish good cause, a Plaintiff must "show why the discovery sought could not have been obtained during the discovery period." Yarmey v. Univ. of Pa., No. 20-5535, 2024 WL 1556387, at *3 (E.D. Pa. Apr. 10, 2024) (internal quotations and citations omitted).

Klippel and Clements were listed as potential witnesses in Caremark's June 24, 2022 Supplemental Rule 26(a)(1) disclosures. (See ECF No. 402-19.) At that time, Relator knew who these witnesses were and the role they played in Aetna's internal investigation. Even after I allowed Relator to take more depositions than envisioned by the Rules of Civil Procedure, Relator chose not to depose these witnesses. (See ECF No. 239 at 87.) Under these circumstances, and for other reasons explained infra, Relator has not made out "good cause." See Yarmey, 2024 WL 1556387, at *3 (internal quotations and citations omitted) ("A determination of good cause depends on the diligence of the moving party where [t]he moving party has the burden of demonstrating that despite its diligence, it could not reasonably have met the scheduling order

8

deadline."). Accordingly, I will not permit Relator to take belated depositions of Klippel and Clements.

### B. Preclusion of Testimony

The gravamen of Relator's preclusion argument is that it would be "unfair" to allow Klippel and Clements to testify. This is so, Relator contends, because Caremark and its attorneys provided representations to Aetna's counsel and those representations were incorporated into the Crowell Memos. Relator is concerned that Caremark will attempt to introduce, through Klippel and Clements, the Crowell Memos and the representations therein. Relator asserts that allowing Caremark to do so without giving Relator the opportunity to probe and review Caremark's internal communications regarding the representations would be unfair. I disagree for several reasons.

#### 1. Aetna's Waiver Cannot be Extended to Caremark

As I have previously ruled, "Caremark's statements to [the Crowell firm] were never attorney-client communications because Caremark was not [the Crowell firm's] client." (See ECF No. 200 at 6 (citing Rhone-Poulenc Rorer Inc. v. Home Indem. Co., 32 F.3d 851, 862 (3d Cir. 1994)).) The Crowell Memos, Caremark's responses to the investigation, and all other attorney-client communications between Aetna and Crowell were thus Aetna's to waive.

Relator continues to assert that "[a]s a matter of law, Caremark controlled waiver of Aetna's privilege" and thus, Caremark's independent attorney-client privilege is somehow implicated. (ECF No. 398-1 at 5.) That Aetna's waiver was communicated through Caremark's counsel of record is of no moment. Even if Caremark and Aetna are now part of the same corporate family—Aetna's partial waiver was an act completely separate and legally unattributable to Caremark. As the Court held in Teleglobe, "absent some compelling reason to disregard entity separateness, in the typical case courts should treat the various members of the corporate group as

the separate corporations they are and not as one client." 493 F.3d at 372; see also Margulis v. Hertz Corp., No. 14-1209, 2017 WL 772336, at *6 (D.N.J. Feb. 28, 2017) (internal citations omitted) ("[A]ll the members of a corporate family are not a single client for purposes of addressing privilege questions."). Relator has not identified, and I have not found case law stating otherwise.

## 2. The Sword and Shield Doctrine

The "sword and shield" doctrine, which Relator so heavily relies upon, does not apply for two reasons. First, and as previously noted, because Aetna waived the privilege, the doctrine would apply only if Aetna then used attorney-client privilege to protect other related documents. See Murray v. Gemplus Intern., S.A., 217 F.R.D. 363, 367 (E.D. Pa. 2003) ("Where *one party* attempts to utilize the privilege as an offensive weapon, selectively disclosing communications in order to help its case, *that party* should be deemed to have waived the protection otherwise afforded it by the privilege it misused." (emphasis added)). Because Aetna—not Caremark— waived, Aetna was required to turn over all other communications on the same subject, which it has. See IQVIA, Inc. v. Veeva Sys., Inc. No. 17-177, 2024 WL 4914486, at *12 (D.N.J. Mar. 30, 2024) (internal citations omitted) (discussing the expansion of a partial waiver). As has been stated several times, if Relator wanted to explore Aetna's investigation, it could have done so by deposing Klippel and Clements within the allotted discovery period.

Second, the "sword and shield" doctrine does not apply because Caremark is not relying on legal advice it received from its own counsel. This doctrine's protections prevent one party from "rely[ing] upon the legal advice *it* received" while using the privilege rules to shield the bases for such advice. Merisant Co. v. McNeil Nutritionals, LLC, 242 F.R.D. 303, 311 (E.D. Pa. 2007) (citing Colkitt, 455 F.3d at 222) (emphasis added); see also Doe v. Schuylkill Cnty. Courthouse,

343 F.R.D. 289, 294 (M.D. Pa. 2023) ("If the defense intends to rely upon counsel's advice in any way to bolster their good faith defense to these retaliation claims, we conclude that the privilege does not apply.").

But this dynamic is not at play here because Caremark has repeatedly represented that it will not rely on advice of its counsel.  As I understand it, Caremark may use evidence from Aetna's internal investigation for a different purpose—to rebut two elements essential to Relator's claims: scienter and causation.

As to scienter, Caremark might point to Aetna's response—or lack thereof—to the Crowell Memos as evidence that sophisticated industry participants investigated Caremark's conduct and concluded no action was required to further comply with CMS regulations.  See, e.g. U.S. *ex rel.* Patzer v. Sikorsky Aircraft Corp., 722 F. Supp. 3d 839, 854 (E.D. Wisc. 2024) ("[E]vidence that industry participants would not regard an arrangement [as violative of a federal contracting rule] is relevant to whether defendants acted with deliberate ignorance or reckless disregard."); Stenson v. Radiology Ltd., LLC, No. 19-306, 2025 WL 89751, at *3 (D. Ariz. Jan. 14, 2025) (internal quotations and citations omitted) ("Plaintiff does not need to allege that Defendant *knew* it was using monitors that fell below . . . standards," but instead can point to the fact that such monitors "were not generally recognized by the medical community" at large. (emphasis in original)).  As the Patzer Court explained, if "defendants acted consistently with industry practice, then it is less likely that they acted with the[] culpable mental state[]."  722 F. Supp. 3d at 854.  Evidence offered for this limited purpose does not implicate advice Caremark received from counsel.

As to causation, Caremark may argue that because Aetna was aware of Caremark's practices, Aetna's subsequent transmittal of PDE and DIR reports prepared in large part by

Caremark broke the causal chain.  Again, this approach focuses on Aetna's actions, not the advice Caremark received from its lawyers.

Accordingly, because Caremark has "explicitly assert[ed] that [it is] not relying on the advice of counsel" and its use of the Crowell Memos "does not necessarily require placing advice of [Caremark's] counsel at issue," I also deny Relator's Motion as it relates to the "sword and shield" doctrine.  In re Processed Egg Prods. Antitrust Litig., No. 08-2002, 2014 WL 6388436, at *9 (E.D. Pa. Nov. 17, 2014).

### 3.  Fairness Concerns

Finally, Relator argues that because she has been "denied a full and fair opportunity to evaluate and rebut the [Crowell] Memoranda,"  Klippel and Clements' testimony on the subject will result in "prejudice . . . and patent unfairness." (ECF No. 398 at 8.)  While I disagree that the privilege rules call for exclusion or allow Relator to probe Caremark's protected communications, any "prejudice" may be balanced by Relator in other ways.  At trial, Relator will have the opportunity to fully cross-examine Klippel and Clements on what independent investigation or analysis—if any—Aetna did to test Caremark's representations.  I note that the Crowell Memos are full of qualifiers.  As the factfinder, I must take that into account and weigh this evidence accordingly.

### V.    CONCLUSION

Whether Aetna's partial waiver can be extended to Caremark's attorney-client communications depends on how Caremark presents the Crowell evidence at trial and argues its relevance.  If Caremark crosses into territory that implicates an advice of counsel defense or introduces previously undisclosed attorney-client communications, I will reconsider my ruling.

An appropriate order follows.