**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* SARAH BEHNKE,<br><br>                           Plaintiffs,<br><br>   v.<br><br>CVS CAREMARK CORP. (n/k/a CVS HEALTH CORP.); CAREMARKPCS HEALTH LLC; CVS CAREMARK PART D SERVICES, LLC; and CAREMARK RX, LLC (f/k/a CAREMARK RX, INC.),<br><br>                        Defendants. | Civil Action No. 14-cv-824 (MSG) |

**PLAINTIFF-RELATOR'S PROPOSED CONCLUSIONS OF LAW**

## TABLE OF CONTENTS

I.     The Court Finds Relator Has Proven Falsity as to CVS Pharmacy ...................................1

II.    The Court Finds Relator Has Proven the Materiality Element ...............................................3

III.   The Court Finds Relator Has Proven Causation as to Aetna ................................................6

IV.    The Court Finds that Relator Has Proven the Scienter Element .........................................9

V.     The Court Finds that Relator Has Reliably Proven Damages............................................14

VI.    The Court Finds CVS Health Corporation Liable ...............................................................17

VII.   The Court Enters Judgment in Favor of Relator Under § 3729(a)(1)(A), (B) and (G)......18

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Berckeley Inv. Grp., Ltd. v. Colkitt,*
455 F.3d 195 (3d Cir. 2006) .......................................................................................... 18

*Bigelow v. RKO Radio Pictures, Inc.,*
327 U.S. 251 (1946) ...................................................................................................... 15

*Bouriez v. Carnegie Mellon Univ.,*
585 F.3d 765 (3d Cir. 2009) ............................................................................................ 8

*BRP Colleague Inc. v. Gillen,*
2023 WL 8507683 (N.D. Ga. Oct. 31, 2023) ............................................................... 18

*Heckler v. Cmty. Health Servs.,*
467 U.S. 51 (1984) ........................................................................................................ 10

*J.P. Jenks, Inc. v. 7 Com. & Indus. Ins. Co.,*
2017 WL 635288 (W.D. Pa. Feb. 16, 2017) ................................................................ 17

*Kisor v. Wilkie,*
588 U.S. 558 (2019) ........................................................................................................ 2

*Merck & Co., Inc. v. U.S.,*
652 F.3d 475 (3d Cir. 2011) ............................................................................................ 2

*Miller v. Holzmann,*
563 F. Supp. 2d 54 (D.D.C. 2008) ................................................................................ 15

*RSACO, LLC v. Res. Support Assocs., Inc.,*
208 F. App'x 632 (10th Cir. 2006) .................................................................................. 2

*Stop Ill. Health Care Fraud, LLC v. Sayeed,*
957 F.3d 743 (7th Cir. 2020) ........................................................................................... 2

*Story Parchment Co. v. Paterson Parchment Paper Co.,*
282 U.S. 555 (1931) ...................................................................................................... 15

*U.S. ex rel. Baker v. Cmty. Health Sys., Inc.,*
2012 WL 7220646 (D.N.M. Mar. 30, 2012) ................................................................ 15

*U.S. ex rel. Chandler v. Cook Cty., Ill.,*
277 F.3d 969 (7th Cir. 2002) ........................................................................................... 9

*U.S. ex rel. Class v. Bayada Home Health Care, Inc.*,
    2018 WL 4566157 (E.D. Pa. Sept. 24, 2018) .................................................................. 19

*U.S. ex rel. Customs Fraud Investigations, LLC v. Victaulic Co.*,
    839 F.3d 242 (3d Cir. 2016) ............................................................................................ 20

*U.S. ex rel. Ellsworth Assoc., LLP v. CVS Health Corp.*,
    660 F. Supp. 3d 381 (E.D. Pa. 2023) ................................................................. 8, 9, 17, 18

*U.S. ex rel. Garbe v. Kmart Corp.*,
    824 F.3d 632 (7th Cir. 2016) ............................................................................................. 5

*U.S. ex rel. Gray v. Mitias Orthopaedics, PLLC*,
    512 F. Supp. 3d 689 (N.D. Miss. 2021) .......................................................................... 14

*U.S. ex rel. Heath v. Wis. Bell, Inc.*,
    92 F.4th 654 (7th Cir. 2024) ............................................................................................. 9

*U.S. ex rel. Hueseman v. Pro. Compounding Centers of Am., Inc.*,
    664 F. Supp. 3d 722 (W.D. Tex. 2023) ........................................................................... 19

*U.S. ex rel. Int'l Broth. of Elec. Workers v. Farfield Co.*,
    5 F.4th 315 (3d Cir. 2021) ...................................................................................... 5, 6, 13

*U.S. ex rel. Landis v. Tailwind Sports Corp.*,
    2017 WL 5905509 (D.D.C. Nov. 28, 2017) .................................................................... 15

*U.S. ex rel. Marcus v. Hess*,
    317 U.S. 537 (1943) .......................................................................................................... 7

*U.S. ex rel. Patzer v. Sikorsky Aircraft Corp.*,
    2018 WL 3518518 (E.D. Wis. July 20, 2018) ................................................................ 20

*U.S. ex rel. Schmidt v. Zimmer, Inc.*,
    386 F.3d 235 (3d Cir. 2004) ......................................................................................... 7, 8

*U.S. ex rel. Schutte v. SuperValu Inc.*,
    598 U.S. 739 (2023) ............................................................................................ 9, 11, 12

*U.S. ex rel. Shiloh v. Phila. Vascular Inst. LLC*,
    2024 WL 1355135 (E.D. Pa. Mar. 29, 2024) .................................................................. 11

*U.S. ex rel. Spay v. CVS Caremark Corp.*,
    913 F. Supp. 2d 125 (E.D. Pa. 2012) .............................................................................. 18

*U.S. ex rel. Strauser v. Stephen L. LaFrance Holdings, Inc.*,
    2019 WL 1086363 (N.D. Okla. Mar. 7, 2019) .................................................................. 5

*U.S. ex rel. Streck v. Bristol-Myers Squibb Co.*,
    2018 WL 6300578 (E.D. Pa. Nov. 29, 2018) ............................................. 5, 9

*U.S. ex rel. Streck v. Takeda Pharms. Am., Inc.*,
    2022 WL 595308 (N.D. Ill. Feb. 28, 2022) .................................................. 19

*U.S. ex rel. Strunck v. Mallinckrodt Ard LLC*,
    2020 WL 362717 (E.D. Pa. Jan 22, 2020) ................................................... 12

*U.S. ex rel. Suarez v. Abbvie, Inc.*,
    503 F. Supp. 3d 711 (N.D. Ill. 2020) ........................................................... 12

*U.S. ex rel. Tyson v. Amerigroup Ill.*,
    488 F. Supp. 2d 719 (N.D. Ill. 2007) ........................................................... 15

*U.S. ex rel. Westrick v. Second Chance Body Armor, Inc.*,
    266 F. Supp. 3d 110 (D.D.C. 2017) ............................................................ 12

*U.S. ex rel. Wilkins v. United Health Group, Inc.*,
    659 F.3d 295 (3d Cir. 2011) ........................................................................ 19

*U.S. v. Bourseau*,
    531 F.3d 1159 (9th Cir. 2008) ............................................................... 14, 20

*U.S. v. Care Alts.*,
    81 F.4th 361 (3d Cir. 2023) .................................................................. 3, 4, 6

*U.S. v. Corp. Mgmt., Inc.*,
    78 F.4th 727 (5th Cir. 2023) ......................................................................... 6

*U.S. v. Hodge*,
    933 F.3d 468 (5th Cir. 2019) ...................................................................... 15

*U.S. v. Honeywell Int'l Inc.*,
    47 F.4th 805 (D.C. Cir. 2022) ..................................................................... 18

*U.S. v. SuperValu, Inc.*,
    2024 WL 4351951 (C.D. Ill. Sept. 30, 2024) ............................................... 6

*U.S. v. Triple Canopy*,
    857 F.3d 174 (4th Cir. 2017) ........................................................................ 4

*Universal Health Servs. Inc. v. U.S. ex rel. Escobar*,
    579 U.S. 176 (2016) ....................................................................... 3, 4, 5, 12

**Statutes**

31 U.S.C. § 3729.................................................................................passim

**Regulations**

42 C.F.R. § 423.100................................................................................. 1

**Other Authorities**

S. Rep. No. 99-345................................................................................. 9, 14

## I.    The Court Finds Relator Has Proven Falsity as to CVS Pharmacy

1.    As the Court ruled, "price reports for Caremark's Part D sponsor clients did not reflect Caremark's negotiated average prices with Walgreens and Rite Aid" and were false.  ECF 339 ("SJ Op.") at 68.  The Court finds Relator also has proven falsity as to CVS Pharmacy.[1]

2.    ***First,*** Relator proved that Caremark actually paid the budgeted CVS Pharmacy Overall GERs, and therefore these GERs were required to be reported to CMS.  Under the 2010 Rule Change, the "negotiated prices" were the prices "negotiated as the amount [the pharmacy] will receive, in total."  42 C.F.R. § 423.100 (effective June 7, 2010).  The budgeted CVS Pharmacy Overall GERs were negotiated and set by CVS Health, CVS Pharmacy, and Caremark PBM executives as the total amount CVS Pharmacy would be paid.  Rel. CVS Pharm. Facts 1-2.  Caremark understood the budgeted CVS Pharmacy Overall GERs were the prices it would pay, in total, changed individual drug prices (MACs) for commercial lock-in clients to ensure those Overall GERs were achieved (just as for Rite Aid and Walgreens), and closely managed to those Overall GERs, including paying (at its own cost) $13 million more to CVS Pharmacy in December 2016 to achieve the budgeted CVS Pharmacy Overall GER.  *See id.* Facts 3-8.  CVS Pharmacy likewise understood it would be paid, in total, those Overall GERs.  *See id.* Fact 10.

3.    Prices equal in the aggregate to the budgeted CVS Pharmacy Overall GERs were required to be reported to CMS in PDEs and/or DIR Reports.  The 2010 Rule Change did not require "negotiated prices" be contractual and did not exempt prices paid to related entities like CVS Pharmacy.  "[T]he purpose of price reporting was to inform CMS how much each Part D plan paid for drugs so that CMS could calculate the appropriate subsidy, which depended only on amounts 'actually paid.'"  SJ Op. at 58; *see also id.* at 58-59 (interpreting 2010 Rule Change);

---

[1] All findings herein are by a preponderance of the evidence.  "Caremark" refers to all Defendants, collectively.  "Caremark PBM" refers to Defendants excluding CVS Health Corporation ("CVS Health").

*Kisor v. Wilkie*, 588 U.S. 558, 589-90 (2019) (structure and purpose should be considered in interpreting regulations).

4.    It is the substance, not the form, of what Caremark actually incurred and paid to CVS Pharmacy that is pertinent. *E.g.*, *Merck & Co., Inc. v. U.S.*, 652 F.3d 475, 481 (3d Cir. 2011) ("The substance of a transaction, rather than its formal characterization, has always dictated its tax treatment"; "transactions between related parties merit extra scrutiny.") (citation omitted).[2]  Substantively, the budgeted CVS Pharmacy Overall GERs were the same as the Rite Aid and Walgreens Overall Pharmacy GERs.  Caremark set generic MACs prices paid to CVS Pharmacy for Medicare Part D ("Part D") (which were reported to CMS in PDEs) to be higher in the aggregate than the budgeted CVS Pharmacy Overall GERs and commercial prices to be lower in the aggregate than those Overall GERs, and used Part D overpayments to offset commercial underpayments.  *See* Rel. CVS Pharm. Facts 12-15; Rel. Scienter Fact 10 (citing Caremark's interrogatory responses, PTX-0125 & PTX-0126, admitting Caremark did so for CVS Pharmacy, as with Rite Aid and Walgreens); SJ Op. at 24, 59 (paying Walgreens and Rite Aid more than the Overall Pharmacy GERs for Part D allowed Caremark to pay less for commercial "because of how averages work").  Caremark's conduct caused CMS to pay more in subsidies for claims at CVS Pharmacy, just like Walgreens and Rite Aid.  *See infra* (damages).

5.    As the Court previously explained for Walgreens and Rite Aid, "Caremark's overall indebtedness to the pharmacy would increase by the negotiated average price for each purchase, regardless of what price Caremark put down at the time of sale.  The present dispute is whether similar reasoning could apply to CVS[.]" SJ Op. at 69.  Similarly, with CVS Pharmacy, Caremark's overall indebtedness increased by the budgeted Overall GER on each Part D generic

---

[2] *RSACO, LLC v. Res. Support Assocs., Inc.*, 208 F. App'x 632, 640 (10th Cir. 2006) (similar); *Stop Ill. Health Care Fraud, LLC v. Sayeed*, 957 F.3d 743, 750 (7th Cir. 2020) (FCA case emphasizing substance over form in statutory interpretation).

purchase, regardless of the MAC price Caremark set (as evidenced by, *e.g.*, Caremark's $13 million December 2016 payment, continuous management of MAC prices, and success in hitting the Overall GERs).  Rel. CVS Pharm. Facts 6-8.

6.      ***Second,*** the Court finds that prices reported to CMS in Aetna and SilverScript PDEs and DIR reports were higher in the aggregate than the budgeted CVS Pharmacy Overall GERs for 2013-2016 (*see id.* Facts 12-15; Rel; Caremark's Resp. to Rel. Damages Fact 9), and, as such, were false.

## II.    The Court Finds Relator Has Proven the Materiality Element

1.      Materiality is a "holistic, totality-of-the-circumstances inquiry."  *U.S. v. Care Alts.*, 81 F.4th 361, 367 (3d Cir. 2023).  A representation is material "'[if] a reasonable man would attach importance to [it] in determining his choice of action in the transaction;'" or "if the defendant knew or had reason to know that the recipient of the representation attaches importance to the specific matter 'in determining his choice of action[.]'"  *Universal Health Servs. Inc. v. U.S. ex rel. Escobar*, 579 U.S. 176, 193 (2016).  Materiality turns on non-exclusive factors, none alone dispositive, including "whether the government has expressly designated the legal requirement at issue as a 'condition of payment'"; "whether the alleged violation is 'minor or insubstantial' or instead goes to the 'essence of the bargain' between the contractor and the government"; and "whether the government made continued payments, or does so in the 'mine run of cases,' despite 'actual knowledge' of the violation."  *Care Alts.*, 81 F.4th at 367 & n.1.

2.      The Court finds Relator has proven materiality.  CMS required and relied on accurate Part D drug price reporting, which was an express condition of payment by CMS, and Caremark understood this.  *See* Caremark's Resp. to Rel. Materiality Fact 4.

3.      Caremark knew CMS placed importance on compliance with the 2010 Rule Change, including pass-through price reporting and transparency requirements, further showing

materiality.  *Escobar*, 579 U.S. at 193; *Care Alts.*, 81 F.4th at 372 (defendants "clearly

understood the importance of … compliance" with regulation); Rel. Materiality Facts 1-3, 10-11.

4.    Caremark knew the 2010 Rule Change was designed to, *inter alia*, prevent PBMs

from earning profit on pass-through Part D business not specifically identified to CMS as an

administrative cost, yet Caremark knowingly and intentionally earned undisclosed profits on its

Part D business.  Rel. Materiality Facts 2-3, 15.  Caremark's Pricing Guidelines "legal refresher

training" demonstrate that it knew CMS did not want it to "increase [a Part D] plan's pass-

through drug prices…for the purpose of decreasing drug payments to pharmacies for commercial

business."  *Id.* Fact 10.  Caremark admits that it knew CMS was concerned about "whether

PBMs were 'clawing back' money from pharmacies" through pharmacy GERs.  Caremark

Materiality Fact 4.  Caremark's offsetting of Part D overpayments and commercial

underpayments was identical economically to "clawing back" money from pharmacies, enabling

Caremark to increase spread on commercial lock-in.  Rel.'s Resp. to Caremark Materiality Fact

3.  This shows Caremark's conduct was not minor or insubstantial, but pertained to the essence

of the bargain, and demonstrates that Caremark knew CMS considered the price reporting to be

important.  *See also* Rel. Materiality Fact 5 (Caremark subject to an FTC Consent Order to not

misrepresent Part D drug prices).  This is irrefutable proof of materiality.

5.    That Caremark repeatedly concealed its conduct is proof of materiality.  *U.S. v.

Triple Canopy*, 857 F.3d 174, 178 (4th Cir. 2017); Rel. Materiality Facts 7-8 (Caremark did not

provide Aetna its pharmacy contracts or reconciliations, or tell Aetna about its offsetting, and did

not want its pass-through clients to see its pharmacy contracts because the clients were not

receiving the Overall Pharmacy GERs, which would "not align with client expectations"); 10

(employees directed to "not create documents that link how increased payments to pharmacies

for Medicare Part D drugs may relate to reduced payments to pharmacies for commercial drugs"); 11-12 (Mr. Azzolina's false and grossly misleading response to CMS).

6.    A reasonable company seeking to act in compliance with its legal obligations would have known Caremark's misrepresentations to CMS were material, as demonstrated by Aetna's concerns regarding Caremark's DIR reporting failures. *Escobar*, 579 U.S. at 193; Rel. Materiality Facts 6 (Aetna required Caremark to provide additional attestations regarding the accuracy of PDE and DIR reporting); 9 (When Aetna took Part D contracting in-house in 2015, it reported to CMS Part D pharmacy reconciliation payments it received  (and Caremark knew this)); 8 (Aetna's counsel understood that if money flowed back to Caremark from the Pharmacies, it had to be reported to CMS; but Caremark concealed from Aetna the offsetting, which undeniably resulted in money flowing back to Caremark).[3]

7.    Caremark's fraud increased the price the government paid, which "go[es] to an essential element of the bargain—price," demonstrating materiality.  Rel. Materiality Facts 13-14; Rel. Damages Facts; *U.S. ex rel. Strauser v. Stephen L. LaFrance Holdings, Inc.*, 2019 WL 1086363, at *14 (N.D. Okla. Mar. 7, 2019) (misreporting Part D prices material); *U.S. ex rel. Streck v. Bristol-Myers Squibb Co.*, 2018 WL 6300578, at *18 (E.D. Pa. Nov. 29, 2018) (similar); *U.S. ex rel. Garbe v. Kmart Corp.*, 824 F.3d 632, 639 (7th Cir. 2016) (similar).

8.    Because Caremark's fraud caused the government to overpay Part D subsidies by $242-338 million, the fraud was not "minor and insubstantial," further proving materiality.  Rel. Materiality Fact 14; Damages Concl. of Law, *infra*; *Escobar*, 579 U.S. at 194.  Courts have found much smaller amounts sufficient.  *See U.S. ex rel. Int'l Broth. of Elec. Workers v. Farfield Co.*, 5 F.4th 315, 347 (3d Cir. 2021) ("not minor or insubstantial" to misclassify employment

---

[3] Relator preserves for appeal her position that Caremark should not have been permitted to offer certain evidence at trial relating to Aetna's "investigation."  *See* ECF 410 (Relator Letter Brief).

status of contractors performing "more than $150,000 in electrical work"); *U.S. v. Corp. Mgmt., Inc.*, 78 F.4th 727, 738 (5th Cir. 2023) ($10 million over 12 years material).[4]

9.      There is no evidence that, during the relevant time period, CMS gained "actual knowledge" of Caremark's violations and continued to pay the false claims.  When asked directly by CMS to explain how its Pharmacy GERs worked, Caremark gave false and grossly misleading answers; Aetna provided minimal information concerning Caremark's conduct to CMS's third-party auditor; and there is no evidence that the auditor transmitted this information to CMS.  Rel.'s Resp. to Caremark Materiality Facts 3-9, 11-14.  Rel. Materiality Facts 11-12. Relator's complaint did not give CMS "actual knowledge" of Caremark's violations.  *Care Alts.*, 81 F.4th at 375.  As the Government explained, due to the structure of the Part D program, "CMS is usually not privy to contracts among Plan Sponsors, PBMs, and/or pharmacies," and thus "it is reasonable for the Government to wait for facts to be fully developed before taking appropriate action," and "government inaction is not automatically a valid defense."  ECF 312 (U.S. SOI) at 9-12 (citing cases).  This is especially true here, given the nature of the fraudulent conduct.  There is no evidence that proves the Government conducted the analysis required to have actual knowledge of Caremark's fraud.  As in *Care Alternatives*, "we simply do not know what the government knew and when."  81 F.4th at 745; *see U.S. v. SuperValu, Inc.*, 2024 WL 4351951, at *8-9 (C.D. Ill. Sept. 30, 2024) (granting relator's motion for summary judgment as to materiality; finding that despite "12,433 audits" of defendant's pharmacies by payors, "there is no evidence [the payors] knew claims submitted were false … and continued to pay").

## III.    The Court Finds Relator Has Proven Causation as to Aetna

1.      The FCA "reaches any person who 'causes to be presented[] a false or fraudulent

---

[4] Alternatively, if the Court were to find damages only for Rite Aid and Walgreens, damages would be $80-96 million, which would still be material.  Damages Concl. of Law 5, *infra*; *Farfield*, 5 F.4th at 347.

claim for payment.'"  SJ Op. at 81 (citing 31 U.S.C. § 3729(a)(1)(A)).  The FCA imposes

liability for claims rendered false by one entity (here, Caremark), but submitted by another (here,

Aetna).  31 U.S.C. § 3729(a)(l)(A), (B) and (G); *U.S. ex rel. Marcus v. Hess*, 317 U.S. 537, 543-

45 (1943) (contractors liable even though others submitted the claims).

2.      When assessing causation under the FCA, courts look to "ordinary [proximate]

causation principles from negligence law"—whether the defendant's conduct was a substantial

factor in the submission of a false claim and the submission of the false claim was the normal

consequence of the conduct or reasonably foreseeable.  *U.S. ex rel. Schmidt v. Zimmer, Inc.*, 386

F.3d 235, 244-45 (3d Cir. 2004); *accord* ECF 312 (U.S. SOI) at 7.

3.      The Court finds the causation element satisfied as to Aetna.  First, Caremark was

a "substantial factor" in the submission of false Aetna PDEs and DIR Reports to CMS, as the

MAC prices in the PDEs and the relevant DIR amounts came from and were set by Caremark.

Rel. Aetna Causation Facts 1-2 (Caremark set MAC prices reported in PDEs that were not based

on Overall Pharmacy GERs); 3-4 (Caremark was responsible for and sent Aetna the relevant DIR

amounts, which Aetna did not change); Caremark's Resp. to Rel. Aetna Causation Fact 5.

(admitting Caremark knew the DIR Reports did not report amounts derived from Overall GERs).

4.      Second, the submission of false PDEs and DIRs to CMS by Aetna was

"reasonably foreseeable" and the "normal consequence" of Caremark's conduct, as Caremark

knew and intended that the MAC prices it set would be reported in PDEs, that the DIR amounts

it sent to Aetna would be reported to CMS, and that these pricing reports would be used by CMS

to calculate federal reimbursement.  Rel. Aetna Causation Facts 6-7 (Caremark provided

attestations to Aetna that the prices reported to CMS were true, accurate and complete and would

be used for purposes of determining federal reimbursement).

5.      In assessing causation, the focus is on defendants' conduct, "and the [causation] outcome [does] not turn on whether the actual presenters [of the false claims to the government] were 'duped' or participated in the fraudulent scheme." *Zimmer*, 386 F.3d at 244.  Although whether Aetna was "duped" is not determinative, Aetna was kept in the dark by Caremark, particularly regarding the offsetting of Part D and commercial, was fully dependent on the provision of information and attestations from Caremark, and had no way of knowing the accurate prices to report on the PDEs and DIR Reports.  Rel. Aetna Causation Facts 8-13.

6.      It is Defendants' burden to establish that a "superseding cause" broke the causal chain: "[a] 'superseding cause' is an intervening force that is 'so extraordinary as not to have been reasonably foreseeable.'" *Bouriez v. Carnegie Mellon Univ.*, 585 F.3d 765, 773 n.4 (3d Cir. 2009); *see also* ECF 312 (U.S. SOI) at 9 (similar; citing cases); SJ Op. at 82; Rest. (2d) of Torts § 443, cmt. b (1965) (superseding cause must be "so extraordinary as to fall outside of the class of normal events.").  Caremark has not carried this burden because Caremark knew and intended for Aetna to submit the false price reports to CMS.  *Supra*; *U.S. ex rel. Ellsworth Assoc., LLP v. CVS Health Corp.*, 660 F. Supp. 3d 381, 404-05 (E.D. Pa. 2023) (rejecting defendant CVS Pharmacy's causation defense that Part D plan sponsors decided which drugs to put on their formularies and made "certification[s] to the Government" about the formularies).

7.      Caremark is liable even if Aetna were, as Caremark has claimed, "ultimately responsible" or "accountable" for ensuring accurate price reporting (regardless of whether Aetna also could have been found liable).  *See Zimmer*, 386 F.3d at 243-45 (defendant manufacturer liable for causing a hospital system to submit false claims, even though the hospital system had a duty to submit true claims and "allegedly made its own decision" to file false claims); *see also* ECF 312 (U.S. SOI) at 7-8; Rel.'s Resp. to Caremark Aetna Causation Facts 1-2.

**IV.    The Court Finds that Relator Has Proven the Scienter Element**

1.    When Congress amended the "knowledge element" of the FCA, it did so in order

to "set[] a fairly low standard, making it easier for the United States [or relator] to prevail in

FCA actions." *U.S. ex rel. Chandler v. Cook Cty., Ill.*, 277 F.3d 969, 976 (7th Cir. 2002), *aff'd*,

538 U.S. 119 (2003).  Consistent with the amendment, the FCA provides for three distinct states

of mind, each independently sufficient to support a finding of scienter.  The FCA broadly defines

"knowingly" to include when a defendant (i) has actual knowledge of the information; (ii) acts in

deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of

the truth or falsity of the information.  31 U.S.C. § 3729(b)(1); *U.S. ex rel. Schutte v. SuperValu

Inc.*, 598 U.S. 739, 751 (2023).  "[N]o proof of specific intent to defraud" is required.  *Id.* at 750

n.3.  The "deliberate ignorance" and "reckless disregard" standards reach "the 'ostrich' type

situation where an individual has 'buried his head in the sand' and failed to make simple

inquiries which would alert him that false claims are being submitted."  S. Rep. No. 99-345, at

21.  Scienter can be shown circumstantially.  SJ Op. at 88; *U.S. ex rel. Heath v. Wis. Bell, Inc.*,

92 F.4th 654, 663 (7th Cir. 2024), *aff'd sub nom. Wis. Bell v. U.S.,* 145 S. Ct. 498 (2025).  The

Court finds that Caremark actually knew, deliberately ignored and/or recklessly disregarded that,

under the 2010 Rule Change, the Overall Pharmacy GERs were the drug prices "actually paid" to

the pharmacies, and had to be reported to CMS through PDEs or DIR Reports.

2.    This Court finds that the regulations were unambiguous and Caremark violated

them, thus showing Caremark acted with scienter.  *See U.S. ex rel. Streck v. Bristol-Myers

Squibb Co.*, 2018 WL 6300578, at *12 (E.D. Pa. Nov. 29, 2018) ("If the statute or regulation was

unambiguous, scienter is established and the inquiry ends."); *see also Ellsworth*, 660 F. Supp. 3d

at 402-03 (denying motion to dismiss as to scienter because the "plain text of the

relevant…federal regulations [did] not support Defendants' interpretation, nor [were] they

ambiguous").  The CMS regulations here are clear: they required the submission of "PDE records and DIR Reports that, collectively, reflected the prices Caremark 'actually paid'—i.e., Caremark's [Overall Pharmacy GERs]."  SJ Op. at 63, 68 ("the text of CMS's regulation was clear").

3.    Caremark knowingly reported (or caused to be reported) to CMS prices based on the Plan GERs, not the Overall Pharmacy GERs, thus ignoring the fundamental and well-publicized shift under the 2010 Rule Change to require that prices actually paid to the pharmacy be reported.  *See Heckler v. Cmty. Health Servs.*, 467 U.S. 51, 63-64 (1984) (Medicare participant's duty to "familiarize itself with…legal requirements").  Despite Caremark's implementation of a first (and only[5]) of its kind Overall Pharmacy GER soon after the effective date of the 2010 Rule Change, Caremark ***never*** changed its price reporting practices and continued its pre-2010 method for reporting Part D drug prices for submission to CMS, which was based on Plan GERs, not the Overall Pharmacy GERs that were actually paid to the Pharmacies for Part D drugs.[6]  Rel. Scienter Facts 3, 4.

4.    Caremark understood that under the 2010 Rule Change, it was permitted to earn profits on its Part D business only through per-prescription administrative fees it charged Aetna and SilverScript.  Rel. Scienter Facts 1, 8.  But Caremark knew that it was earning profits on its Part D business that it was not reporting on PDEs or DIR Reports (or otherwise) to the Plans or to CMS.  *Id.* Facts 5 (Caremark executives knowingly and deliberately planned to overpay Rite Aid relative to the Overall Pharmacy GER for Part D and underpay for commercial, knowing that the resultant offset would earn Caremark profit); 9 (Caremark used "Restated Margin"

---

[5] There are no examples in the record of any other Overall Pharmacy GER encompassing both Medicare Part D and commercial claims utilized by *any PBM other than Caremark*.  Rel. Scienter Fact 2.

[6] Caremark admits it would be obligated to report a payment received from a pharmacy in a two-way true up, but points to the purported difference of a one-way true up, even though Caremark, its own expert, and others acknowledged there was no economic distinction between the two.  Rel. Scienter Facts 6-7.

concept to track these profits), 10 (Caremark knew that there was a direct relationship between its setting of MAC prices for generic Part D drugs and its ability to earn higher (or lower) spread on commercial lock-in claims.  Through a careful and deliberate process, Caremark intended to and did manage and increase Part D prices to hit the Plan GERs so that it could concomitantly lower commercial prices, increasing its profit (in facial violation of its own Pricing Guidelines governing commercial and Med D contracting).  *Id.* Facts 4-5, 9-12; Rel. Materiality Fact 15; CVS Pharmacy Falsity Facts 12-13; 3/17/25 (Day 5) Tr. 54:17-23 (Kinney) and DX172 (Caremark increasing Part D prices to Aetna to hit Plan GER).

5.      Another sophisticated industry participant, Rite Aid, understood the reconciliation documents and that Caremark's overpayment on Part D allowed it to offset its underpayments on commercial.  Rel. Scienter Facts 4, 6.  Caremark and Aetna recognized that money flowing back from pharmacies to Caremark in connection with an overpayment on Part D relative to the Overall Pharmacy GER was required to be reported as DIR under the 2010 Rule Change.  *Id.* Facts 7, 14 (Klippel acknowledgement).[7]

6.      Scienter is measured against contemporaneous knowledge and Caremark, during the relevant time period, admitted to Aetna that it was not charging the Plans, and reporting to CMS, the prices actually paid to the Pharmacies.  *Schutte*, 598 U.S. at 752 (scienter "point[s] to what the defendant thought when submitting the false claim—not what the defendant may have thought *after* submitting it.") (emphasis in original); *U.S. ex rel. Shiloh v. Phila. Vascular Inst. LLC*, 2024 WL 1355135, at *8 (E.D. Pa. Mar. 29, 2024) (defendant's admissions sufficient to establish scienter).  During a February 11, 2013 telephonic meeting, Allison Brown admitted to Aetna that Caremark had negotiated lower Part D prices with Pharmacies but was not required to

---

[7] *See* 3/14/25 (Day 4) Tr. 114:20-22 (Caremark counsel acknowledging that: "no one disputes that a two-way guarantee would need to be reported on DIR."); 3/10/25 (Day 1) Tr. 56:20-22 (similar).

pass those prices on to Aetna and that improving (lowering) Aetna's Part D prices would come out of Caremark's profits.  Rel. Scienter Facts 11-12.

7.    Caremark's Pricing Guidelines show that it knew its conduct was improper and that it instructed employees not to document that conduct.  Rel. Scienter Fact 17 (Part D Pricing Guidelines dated May 2014 stating, *inter alia*, "to the extent CVS Caremark's reimbursement to a pharmacy does not meet the terms of a pharmacy's generic effective rate (GER) contractual commitment, Part D pricing to a Part D plan is not adjusted in any way to meet the pharmacy GER"; "the Medicare Part D pharmacy network is contracted separately from commercial business"; and "Do not create documents that link how increased payments to pharmacies for Medicare Part D drugs may relate to reduced payments to pharmacies for commercial drugs."). *See U.S. ex rel. Suarez v. AbbVie, Inc.*, 503 F. Supp. 3d 711, 721, 735 (N.D. Ill. 2020) (instructions not to create records evidence of scienter); *U.S. ex rel. Strunck v. Mallinckrodt Ard LLC*, 2020 WL 362717, at *4 (E.D. Pa. Jan 22, 2020) (internal policies demonstrating that defendants knew the challenged conduct violated Anti-Kickback Statute is evidence of scienter).

8.    Caremark's efforts to conceal from Aetna and CMS how its Overall Pharmacy GERs operated and how it was earning unreported spread demonstrate scienter.  *Schutte*, 598 U.S. at 754 (attempt to conceal prices required to be reported to the government from "regulators and contractors" may show scienter); *Escobar*, 579 U.S. at 188-90 ("half-truths—representations that state the truth only so far as it goes, while omitting critical qualifying information—can be actionable misrepresentations"); *U.S. ex rel. Westrick v. Second Chance Body Armor, Inc.*, 266 F. Supp. 3d 110, 126-29 (D.D.C. 2017) (company making disclosures to government "must not suppress or conceal any facts within [its] knowledge which materially qualify those stated," and "must make a full and fair disclosure") (collecting cases).

**Aetna:**  During Aetna's attempt to "investigate" whether Caremark was reporting prices consistent with the 2010 Rule Change, Caremark knowingly failed to provide Aetna with relevant pharmacy contracts or reconciliations or otherwise inform Aetna of the Part D offsetting that was occurring.  This concealment demonstrates Caremark's knowledge that failing to report the Overall Pharmacy GERs was improper.  Rel. Scienter Facts 13-14; Rel. Materiality Facts 8-9.

**CMS:**  In response to a specific inquiry from CMS as to how its pharmacy GERs operated, Caremark, through David Azzolina, provided Caremark's only written and verbal responses to CMS, which were false and grossly misleading.  Rel. Scienter Facts 18-21, 24 (Caremark, *inter alia*, did not identify the pharmacies, did not specify that there were Overall Pharmacy GERs inclusive of both commercial and Part D lines of business, and did not disclose it was using Part D overpayments to offset commercial underpayments).  The false and grossly misleading information that Mr. Azzolina provided to CMS was forwarded to top Caremark executives, including Jon Roberts, who was actively involved in structuring Caremark's GER goals for Rite Aid.  Thus, Mr. Roberts and the other executives were aware that the information provided to CMS was false and grossly misleading.  *Id.* Fact 23.  *See also id.* Facts 18-21. Caremark admits that Mr. Azzolina's written response to CMS was "never 'withdrawn, corrected or amended.'"  Caremark's Resp. to Rel. Scienter Fact 24.

9.    If the Court credits Mr. Azzolina's testimony regarding his lack of understanding of pharmacy contract terms and reconciliation processes, then Caremark deliberately or recklessly put an uninformed individual in charge of CMS reporting related to DIR and PDE reporting, and signing the 2014 attestation (falsely) affirming the accuracy of Caremark's CMS reporting to Aetna.  Rel. Scienter Fact 25; Rel.'s Resp. to Caremark CVS Health Liab. Fact No. 1; *see Farfield*, 5 F.4th at 348 (affirming scienter finding where defendant "recklessly delegated

to unknowledgeable individuals the responsibility for ensuring that employees were properly classified"). Regardless, Mr. Azzolina acted on behalf of Caremark, with the knowledge of top Caremark executives, to mislead CMS, further evidencing Caremark's scienter.

10. Despite myriad opportunities, Caremark knowingly and intentionally, or recklessly, failed to make any inquiries of CMS about price reporting related to its novel Overall Pharmacy GERs. Caremark deliberately failed to make any such inquiries even though the Overall Pharmacy GERs, covering both Part D and commercial claims, were the first of their kind, and its knowledge that its largest client, Aetna, was raising specific concerns that Caremark's conduct violated the 2010 Rule Change. Rel. Scienter Facts 2, 22. *See* S. Rep. No. 99-345, at 21 ("[T]he definition of knowledge under the [FCA] … attempts to reach … 'ostrich' type situation where an individual has 'buried his head in the sand' and failed to make simple inquiries which would alert him that false claims are being submitted"); *U.S. v. Bourseau*, 531 F.3d 1159, 1168 (9th Cir. 2008) (those "receiving public funds have some duty to make a limited inquiry so as to be reasonably certain they are entitled to the money they seek") (citation omitted); *U.S. ex rel. Gray v. Mitias Orthopaedics, PLLC*, 512 F. Supp. 3d 689, 698 (N.D. Miss. 2021) (jury could find defendants' argument that they had no way of knowing that Medicare would not knowingly pay for drug disingenuous, where defendant sought no clarification from Medicare).

## V. The Court Finds that Relator Has Reliably Proven Damages

1. Relator proffered reliable damages calculations measuring the difference between the aggregate subsidies CMS paid for the Aetna and SilverScript Part D generic drugs and the lower aggregate subsidies CMS would have paid had prices equal in the aggregate to the Overall Pharmacy GERs been reported in PDEs or DIR Reports. *See* Rel. Damages Facts; Rel.'s Resp. to Caremark Damages Facts; SJ Op. at 76 ("damages are measured 'by the amount of money the

government paid by reason of the false statement above what it would have paid absent the false statement'") (citation omitted); ECF 449 (Caremark Ltr.) at 3 (similar); SJ Op. at 75-76 (rejecting argument that damages cannot be reliably calculated in the aggregate). *See also, e.g.*, *U.S. v. Hodge*, 933 F.3d 468, 474-75, 477-79 (5th Cir. 2019) (affirming aggregate FCA damages calculations); *U.S. ex rel. Baker v. Cmty. Health Sys., Inc.*, 2012 WL 7220646, at *3-7 (D.N.M. Mar. 30, 2012) (rejecting defendants' challenge to expert's aggregate damages calculations). The Court finds there is no requirement to calculate damages for individual PDE records or DIR reports, particularly given the evidence that the relevant prices (the Overall Pharmacy GERs and Plan GERs) were aggregate prices and that CMS made subsidy payments on an aggregate basis. *E.g.*, SJ Op. at 19; *id.* at 38 (addressing Caremark's argument); ECF 452 (Stipulations) ¶¶ 39-47, 93 (describing subsidies and GERs); Rel.'s Resps. to Caremark Damages Facts 10, 12.

2.    Damages calculations in FCA cases need not be exact. *E.g.*, *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264 (1946) ("jury may make a just and reasonable estimate of the damage based on relevant data, and render its verdict accordingly"); *Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 563 (1931) ("it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate"); *U.S. ex rel. Landis v. Tailwind Sports Corp.*, 2017 WL 5905509, at *5 (D.D.C. Nov. 28, 2017) (FCA case adopting *Story Parchment*); *U.S. ex rel. Tyson v. Amerigroup Ill.*, 488 F. Supp. 2d 719, 732 (N.D. Ill. 2007) (same); *Miller v. Holzmann*, 563 F. Supp. 2d 54, 108-10 & n.69 (D.D.C. 2008) (vacated in part on other grounds) (FCA case applying *Bigelow*).

3.    The Court finds that CMS incurred damages in the amount of $338 million based on Caremark's obligation to report the DIR amounts. Rel. Damages Fact 18.[8]  Accordingly, the

---

[8] The lower totals, the $249 million (DIR calculations) and $242 million (PDEs), reflect calculations utilizing the average discount calculated from the PDEs to measure reported prices; the higher totals, the $338 million and $323 million, reflect calculations utilizing the Plan GERs to measure reported prices. *See* Rel. Damages Facts 10-12, 18.

Court hereby awards Relator and the United States $338 million in damages because the Overall Pharmacy GERs were required to be reported in the DIR Reports (if not PDEs) and the Plan GER is a reasonable measure of reported prices, and Relator has reliably proven CMS would have paid $338 million less in subsidies if prices equal in the aggregate to the Overall Pharmacy GERs (rather than prices set to the Plan GERs) had been reported in DIR Reports.

4.      Caremark has not shown Relator's CVS Pharmacy damages calculations to be unreliable or overstated. *See* Rel.'s Resps. to Caremark Damages Facts. The CVS Pharmacy Overall GERs were reliably identified, and Caremark cannot show Relator's calculations are unreliable for purportedly not using the correct Overall GERs where Caremark admitted such Overall GERs existed and failed to identify alternative CVS Pharmacy Overall GERs. *See* Rel. Damages Facts 7-8, 19-20; Caremark's Resp. to Rel. Damages Fact 8; Rel.'s Resp. to Caremark CVS Pharm. Fact 7; Rel.'s Resps. to Caremark Damages Facts 14-17.

5.      Relator proffered alternative damages calculations for Walgreens and Rite Aid (excluding CVS Pharmacy). *See* Rel. Damages Fact 18.[9] The Court also finds these calculations reliable, for the reasons set forth above, and would award damages based on these calculations if the Court were to find liability as to Rite Aid and Walgreens but not CVS Pharmacy.

6.      The Court awards damages in the amounts calculated by Relator's expert Dr. Loren K. Smith, including because Caremark did not proffer its own damages calculations or disagree with any of the math in Dr. Smith's damages calculation, including Dr. Smith's calculation of the Pricing Discrepancies (the amounts by which Aetna and SilverScript reported prices exceeded in the aggregate the Overall Pharmacy GERs), and Dr. Smith's calculation of

---

I find that both are reasonable measures of reported prices.

[9] Relator calculated damages of: (1) $80 or $95 million if the Overall Pharmacy GERs were reported in DIR Reports or (2) $81 or $96 million if in PDEs. The $80 and $81 million totals reflect calculations utilizing Plan GERs to measure reported prices; the $95 and $96 million totals utilize the average discount calculated from the PDEs. *Id.*

CVS Pharmacy damages (though Caremark disagrees with the identification of the CVS Pharmacy Overall GERs).  Rel. Damages Fact 19.  *See J.P. Jenks, Inc. v. 7 Com. & Indus. Ins. Co.*, 2017 WL 635288, at *1 (W.D. Pa. Feb. 16, 2017) ("Because Defendant has not introduced any evidence to dispute Plaintiffs' calculation, the Court accepts Plaintiffs' figure.").

## VI.    The Court Finds CVS Health Corporation Liable

1.      The Court finds CVS Health liable because its employees and officers were directly involved in conduct relevant to each FCA claim element.  *See Ellsworth,* 660 F. Supp. 3d at 404-05 (direct liability alleged as to CVS Health); Rel. CVS Health Liab. Facts 1-9.

2.      **Falsity:**  The Court granted judgment against all Defendants as to falsity as to Walgreens and Rite Aid.  ECF 338 at ¶ 2(a).  CVS Health also was involved in the submission of false claims as to CVS Pharmacy, including direct involvement in setting the budgeted CVS Pharmacy Overall GERs.  *Supra*; Rel. CVS Health Liab. Facts 3-4; Rel. CVS Pharm. Fact 2.

3.      **Materiality:**  The false claims were material as to all Defendants for the reasons set forth above.  Further, Mr. Azzolina, CVS Health Vice President of Finance, Medicare Part D, made a false and grossly misleading communication to CMS concealing Defendants' conduct.  Rel. CVS Health Liab. Facts 6-8; Rel. Materiality Facts 11-12.

4.      **Causation:**  The Court granted judgment against all Defendants, including CVS Health, as to SilverScript causation.  ECF 338 (Order) at ¶ 2(a).  CVS Health signed and submitted false attestations directly to CMS on SilverScript's behalf.  Rel. CVS Health Liab. Fact 1.  As to Aetna, CVS Health directly caused the submission of the false claims.  Mr. Azzolina oversaw "CMS reporting on behalf of Medicare clients related to DIR," and signed the 2014 attestation to Aetna.  Rel. CVS Health Liab. Fact 6; Rel. Aetna Causation Fact 7.

5.      **Scienter:**  CVS Health officers and employees, including Jon Roberts, Eva Boratto, Mr. Azzolina, and Allison Brown, were knowingly involved in the conception,

implementation, and concealment of Defendants' fraud. Rel. CVS Health Liab. Facts 2-8; Rel. Scienter Facts 5-6, 9, 11-12, 18-25. *See also* ECF 484 (Jt. Sub. re Trial Witnesses) at 3-10. Mr. Azzolina informed top CVS Health executives, including CEO Larry Merlo, CFO David Denton, and Executive Vice President Jon Roberts, of the false and grossly misleading communication he made to CMS on behalf of Caremark, including CVS Health. Rel. CVS Health Liab. Fact 8.

6. **Damages:** CVS Health is jointly and severally liable for damages. *See U.S. v. Honeywell Int'l Inc.*, 47 F.4th 805, 810, 813 (D.C. Cir. 2022) (FCA liability is joint and several).

7. Defendants made binding judicial admissions at summary judgment, relevant to each FCA element, that applied to all Defendants, including CVS Health. Rel. CVS Health Liab. Fact 9; *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 211 n.20 (3d Cir. 2006) (judicial admissions are binding); *BRP Colleague Inc. v. Gillen*, 2023 WL 8507683, at *1-2 (N.D. Ga. Oct. 31, 2023) (summary judgment fact statements are binding judicial admissions).

## VII. The Court Finds in Favor of Relator Under 31 U.S.C. §§ 3729(a)(1)(A), (B) and (G)

1. The Court finds Caremark violated §§ 3729(a)(1)(A) and (B), which require a "false or fraudulent claim." The Aetna and SilverScript DIR Reports and PDEs are "false claims," because prices equal in the aggregate to the Overall Pharmacy GERs were required to be reported in the PDEs or DIR Reports but were not reported in either. SJ Op. at, *inter alia*, 63, 65-68; *see also supra* (CVS Pharmacy). A "claim" is "any request or demand … for money or property … presented" to the U.S. 31 U.S.C. § 3729(b)(2)(A). PDEs and DIR Reports are "claims" because they were the basis for CMS's payments.[10] Caremark knowingly "cause[d]" these false claims "to be presented" to CMS (*see* § 3729(a)(1)(A)) for the reasons set forth above as to Aetna and in the Court's summary judgment ruling as to SilverScript. SJ Op. at 81-84.

---

[10] *U.S. ex rel. Spay v. CVS Caremark Corp.*, 913 F. Supp. 2d 125, 154 (E.D. Pa. 2012) (PDEs are "claims" under the FCA); *Ellsworth*, 660 F. Supp. 3d at 405 (similar); Rel. Damages Facts (reporting prices higher in the aggregate than Overall Pharmacy GERs in PDEs and DIR Reports caused CMS to pay more).

2.      "[A] claim is legally false when the claimant knowingly falsely certifies that it has complied with a statute or regulation the compliance with which is a condition for Government payment."  *U.S. ex rel. Wilkins v. United Health Group, Inc.*, 659 F.3d 295, 305 (3d Cir. 2011) (citation omitted); *see U.S. ex rel. Class v. Bayada Home Health Care, Inc.*, 2018 WL 4566157, at *12 (E.D. Pa. Sept. 24, 2018) (similar).  The Court finds the DIR Reports and PDEs are "legally false claims" because Caremark provided attestations to CMS falsely certifying that the DIR Reports and PDEs complied with the 2010 Rule Change and caused Aetna and SilverScript to do so.  Rel. Materiality Facts 4, 6; Rel. Aetna Causation Facts 6-7, 9; Rel. CVS Health Liab. Fact 1.[11]  All of the Aetna and SilverScript DIR Reports and PDEs are false because they collectively reported prices higher in the aggregate than the Overall Pharmacy GERs.  Rel. Scienter Fact 4; Rel. CVS Pharmacy Facts 13, 15; Rel. Damages Facts 9-12; SJ Op. at 33-35, 68.

3.      Section 3729(a)(1)(B) also requires a "false record or statement material to a false or fraudulent claim," and Relator proved Caremark made such material "false statements," including in the false SilverScript PDEs it submitted to CMS, its false and grossly misleading communications to CMS, the false draft DIR Reports it sent the Plans, and its false attestations that the PDEs and DIR Reports included the prices actually paid to the Pharmacies.  *See* SJ Op. at 83; Rel. Scienter Facts 18-25; Rel. Aetna Facts 6-7, 9; ECF 452 ¶¶ 162, 167; *U.S. ex rel. Hueseman v. Pro. Compounding Ctrs. of Am., Inc.*, 664 F. Supp. 3d 722, 742 (W.D. Tex. 2023) ("false statement need not be made to the Government" if material to government payment).

4.      The Court finds Caremark violated § 3729(a)(1)(G), the "reverse false claims" provision, which imposes liability for one who "knowingly makes, uses, or causes to be made or

---

[11] *See Wilkins*, 659 F.3d at 305-06 (legally false claims may be proven through express or implied false certifications of compliance with the law, including causing false certifications of compliance to be submitted to the government). The price reports also are factually false because the prices reported to CMS do not reflect the Overall Pharmacy GERs.  *See U.S. ex rel. Streck v. Takeda Pharms. Am., Inc.*, 2022 WL 595308, at *13-14 (N.D. Ill. Feb. 28, 2022).

used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government[.]"  "Reverse false claims" refer to an entity's attempt to "retain[] money it should have paid the government."  *U.S. ex rel. Customs Fraud Investigations, LLC v. Victaulic Co.*, 839 F.3d 242, 247 (3d Cir. 2016). Caremark knowingly caused the submission of false DIR Reports and PDEs that were material to an obligation to pay money to the Government in that CMS received less money back through the year-end reconciliation process in risk corridor payments (subsidies returned to CMS) than CMS would have, had prices equal in the aggregate to the Overall Pharmacy GERs been reported in DIR Reports or PDEs.  *See* Rel. Damages Fact 18; SJ Op. at 17-18.  These "reverse false claims" are cognizable.  *E.g.*, *Bourseau*, 531 F.3d at 1164, 1169-70 (CMS cost reports "constituted false claims under the FCA, actionable as both affirmative false claims and reverse false claims" where defendants "concealed and decreased amounts" they owed to CMS).

     5.     The Court finds in favor of the United States and Relator under §§ 3729(a)(1)(A), (B), and (G) and awards $338 million in single damages, the net amount CMS overpaid due to Caremark's unlawful conduct.  Rel. Damages Facts 6, 18; Rel.'s Resp. to Caremark Damages Fact 1.  All $338 million of the awarded damages would be awarded based on a finding in Relator's favor on *either* §§ 3729(a)(1)(A) *or* (B), because prices reported in the PDEs and DIR Reports were higher in the aggregate than the Overall Pharmacy GERs.  *Id.*  Some of these damages, the risk corridor damages, are concurrently "reverse false claims" damages under § 3729(a)(1)(G); the total amount of damages would not change even if the false claims were not also found to be "reverse false claims."  Rel. Damages Fact 18 & n.14.[12]

---

[12] The risk corridor damages, the portion of damages that are also reverse false claims damages, are in Rel. Damages Fact 18 (citing PD-011, PD-014).  There will be no double-counting of damages for false claims and reverse false claims.  *Cf. U.S. ex rel. Patzer v. Sikorsky Aircraft Corp.*, 2018 WL 3518518, at *9 (E.D. Wis. July 20, 2018).

Dated: April 30, 2025

Respectfully submitted,

*/s/ David F. Sorensen*
David F. Sorensen
Caitlin G. Coslett
Susan Schneider Thomas
Joy P. Clairmont
William H. Fedullo
Laurel Boman
BERGER MONTAGUE PC
1818 Market Street, Suite 3600
Philadelphia, PA 19103
Tele: (215) 875-3000/Fax: (215) 875-4604
E-mail: dsorensen@bm.net
ccoslett@bm.net
sthomas@bm.net
jclairmont@bm.net
wfedullo@bm.net
lboman@bm.net

James C. Shah
Natalie Finkelman Bennett
MILLER SHAH LLP
1845 Walnut Street, Suite 806
Philadelphia, PA 19103
Telephone: (610) 891-9880
Facsimile: (866) 300-7367
E-mail: jshah@millershah.com
nfinkelman@millershah.com

*Attorneys for Plaintiff-Relator*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I caused a true and correct copy of the foregoing to be served by ECF on Counsel of Record.

Dated:  April 30, 2025

_/s/ David F. Sorensen_
David F. Sorensen