**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** *ex rel.* **SARAH BEHNKE,**<br><br>    *Plaintiff,*<br><br>    *v.*<br><br>**CVS CAREMARK CORPORATION** *et al.,*<br><br>    *Defendants.* | **Civil Action**<br><br>**No. 14-cv-824** |

Goldberg, J.                                                      June 25, 2025

<u>**MEMORANDUM OPINION**</u>

<u>**CONTENTS**</u>

I.   INTRODUCTION..............................................................................................................3

II.  FACTUAL BACKGROUND ...........................................................................................3

  A.  General Background and Medicare Part D.....................................................................4

  B.  Overview of Caremark's Contracts During the Relevant Time Period...........................7

  C.  Caremark's Relationship with the Part D Sponsors ......................................................8

  D.  Caremark's Pharmacy Contracts with Walgreens and Rite Aid....................................8

  E.  Caremark's Budgeted GER with CVS Pharmacy .........................................................9

  F.  Caremark's Reporting ..................................................................................................9

  G.  Relator's Role............................................................................................................10

III. PROCEDURAL HISTORY ...........................................................................................11

  A.  Summary Judgment Ruling on Falsity ........................................................................12

  B.  Summary Judgment Ruling on Causation ...................................................................13

  C.  The Bench Trial..........................................................................................................14

IV.  LEGAL STANDARDS ..................................................................................................14

V.   FINDINGS OF FACT ....................................................................................................16

  A.  Falsity as to CVS Pharmacy .......................................................................................16

    i.   *Similarities Between Budgeted GERs and GER Guarantees* ........................................18

    ii.  *Differences Between Budgeted GERs and GER Guarantees* ........................................18

  B.  Materiality and Scienter ..............................................................................................21

      *i.*    *DIR Reporting Requirements* ............................................................................... 22

      *ii.*   *What was Reportable under DIR Guidance # 9* .................................................. 23

      *iii.*  *Caremark's Contracts with Walgreens and Rite Aid* ........................................ 23

      *iv.*  *Caremark's Discussions with Others in the Industry* ..................................... 28

  C.    Causation as to Aetna ............................................................................................... 34

      *i.*    *PDE Records* ..................................................................................................... 34

      *ii.*   *DIR Reports* ...................................................................................................... 35

      *iii.*  *Aetna's Reliance on Caremark's PDE and DIR Data* .................................... 35

  D.    CVS Health Corporation's Liability ....................................................................... 37

  E.    Damages .................................................................................................................. 39

      *i.*    *Dr. Loren Smith* ............................................................................................... 39

      *ii.*   *Mr. Brett Barlag* .............................................................................................. 44

VI. CONCLUSIONS OF LAW .......................................................................................... 46

  A.    Falsity as to CVS Pharmacy ................................................................................... 46

      *i.*    *Actually Paid* .................................................................................................... 47

      *ii.*   *Identifying the Budgeted GERs* ....................................................................... 52

  B.    Materiality ............................................................................................................... 53

      *i.*    *Condition of Payment* ...................................................................................... 54

      *ii.*   *Whether the Representation was "Minor" or "Insubstantial" or Goes to the "Essence of the Bargain"* .................................................................................................................. 55

      *iii.*  *The Government's Reaction to the Representation if Discovered* .................... 57

  C.    Causation ................................................................................................................. 61

      *i.*    *Normal Consequence* ....................................................................................... 63

      *ii.*   *Superseding Cause* ........................................................................................... 65

  D.    Scienter ................................................................................................................... 66

      *i.*    *Caremark's Knowledge of CMS's Regulations and Guidance* ........................ 68

      *ii.*   *Concealment* .................................................................................................... 76

      *iii.*  *Turning a Blind Eye* ......................................................................................... 79

      *iv.*  *Employee Belief and Caremark's Motive* ....................................................... 82

      *v.*   *Others in the Industry* ...................................................................................... 91

      *vi.*  *Government Knowledge* .................................................................................... 95

  E.    CVS Health Corporation's Liability ....................................................................... 96

  F.    FCA CLAIMS PROVEN ........................................................................................ 99

  G.    DAMAGES ........................................................................................................... 102

VII. CONCLUSION ......................................................................................................... 105

## I.    INTRODUCTION

Relator Sarah Behnke ("Relator") brings this qui tam action under the False Claims Act, 31 U.S.C. § 3729, asserting the interests of the United States of America, against Defendants CVS Caremark Corporation and related entities (collectively "Caremark").  Relator alleges that Caremark caused certain health insurers to misrepresent to the government the amount they paid for prescription drugs on behalf of Medicare beneficiaries.  The gravamen of Relator's claims is that Caremark, a pharmacy benefits manager ("PBM") contracted with pharmacies to pay a fixed average price for prescription drugs but caused higher prices to be reported.

On March 25, 2024, I granted in part and denied in part the Parties' Cross-Motions for Summary Judgment (ECF No. 339.)  Thereafter, on March 10, 2025, I presided over an eight-day bench trial to adjudicate the remaining issues.  Having considered the trial record and the Parties' proposed findings of fact and conclusions of law, I will enter partial judgment in favor of the United States in the amount of $95 million.[1]  I set out below my findings of fact and conclusions of law.

## II.    FACTUAL BACKGROUND

To put what follows in perspective, I first provide an overview of the facts and procedural history.

This case concerns the complex interplay between the Centers for Medicare and Medicaid Services ("CMS"), health insurers, pharmacy benefits managers ("PBMs"), and pharmacies from 2010 through 2016 ("the relevant time period").  This case involves health insurers Aetna and SilverScript, PBM Caremark, and pharmacies Walgreens, Rite Aid, and CVS Pharmacy.  These

---

[1] The Parties have not yet briefed the issue of trebling or statutory penalties.  As a result, I make no findings as to those issues.

entities each played a role in the process whereby Medicare beneficiaries obtained prescription drugs under Medicare Part D.

## A. General Background and Medicare Part D

Medicare Part D is a CMS-administered program designed to "partially cover the cost of providing prescription drug coverage to the public." (ECF No. 452 (Joint Stipulations) ¶ 32.) CMS does not purchase or negotiate prescription drug prices for beneficiaries. (Id. ¶ 31.) Instead, it contracts health insurers—referred to as "Part D sponsors"—to sell insurance plans which partially cover the cost of prescription drugs for beneficiaries. (Id.) Part D sponsors can then delegate to PBMs the responsibility to negotiate drug costs with retail pharmacies. (Id. ¶ 34.) Under that scenario, PBMs are responsible for negotiating the prices that a Part D sponsor's customers will pay the pharmacy for their prescription drugs.

This process involved two types of contracts: (1) those between the PBM and the pharmacies; and (2) those between the PBM and the Part D sponsors. In the first contract, the PBM promises to reimburse pharmacies for drugs purchased by the Part D sponsor's customers ("members"). (Id. ¶ 35.) In the second, the Part D sponsor reimburses the PBM for the drug costs and the PBM's services. (Id.)

During the relevant time period, CMS subsidized a portion of the prescription drug cost paid by a Part D sponsor for Part D prescriptions. (Id. ¶ 36.) To calculate these subsidies, CMS needed to know how much the Part D sponsor spent on drugs. (S.J. Op. at 4.) To ensure accurate reporting, CMS promulgated regulations which required Part D sponsors to file certain reports. (Id.) First, Part D sponsors were required to complete prescription drug event ("PDE") records, "which gave the prices for individual purchases (i.e., one filled prescription for one plan member)." (Id. at 13.) Second, Part D sponsors submitted year-end direct and indirect remuneration ("DIR")

reports, "which included all other discounts and rebates that affected what it cost the Part D sponsor (or its PBM) to purchase those drugs." (Id.)

This case primarily involves what Caremark caused Part D sponsors to report to CMS. Prior to 2010, Part D sponsors were permitted to report to CMS the price that they paid to the PBM, even if that price was different from the amount the PBM paid to the pharmacy. This scenario—whereby the amount the Part D sponsor paid to the PBM differed from that the PBM paid to the pharmacy—was known as "lock-in" pricing. The difference between the amounts the PBM paid to the pharmacy and received from the Part D sponsor was known as "spread" or margin. Where, however, the price negotiated by a PBM and paid to a pharmacy equaled the price paid by the Part D sponsor back to the PBM, the contracts between the PBM and the Part D sponsor were called "pass-through" agreements. A simple example of lock-in pricing is helpful to understand how these entities interacted:

Caremark negotiates with Walgreens to reimburse a certain prescription for $8. Separately, Aetna agrees to reimburse Caremark for that same prescription at $10. Prior to 2010, Aetna could report to CMS a claim for $10, even though the price paid at the point of sale (the pharmacy) was $8. In this scenario, Caremark would generate a "spread" of $2.

In 2010, CMS decided that lock-in contracts could result in "undesirable results," including "higher beneficiary out-of-pocket costs" and "Government risk sharing on amounts that reflect administrative costs, contrary to Congressional intent to exclude risk-sharing on administrative expenses." 74 Fed. Reg. 1494, 1505 (Jan. 12, 2009). As a result, CMS promulgated new rules for the drug costs that could be reported for reimbursement. Specifically, the 2010 rule change altered the definitions of several key reporting terms, including "gross covered prescription drug costs,"

"actually paid," and "negotiated prices," and added a definition for "administrative costs." (Joint Stips. ¶ 141.)

The Parties agree that consistent with those definitions, Part D sponsors were thereafter required to report to CMS the "price ultimately received by the pharmacy or other dispensing provider." (Id. ¶ 143.) The Parties also agree that under the 2010 rule change, any difference between the price the PBM paid to the pharmacy, and the price the Part D sponsor paid to the PBM (the spread), "would have to be reported as an 'administrative cost' paid to the PBM." (Id. ¶ 142 (citing 74 Fed. Reg. at 1506).)

It is undisputed that "[o]nce the 2010 rule change took effect, the majority of Part D sponsors and PBMs adopted pass-through pricing arrangements." (Id. ¶ 146.) This makes sense because, after the rule change, if the PBM earned "margin or 'spread' by charging its Part D sponsor client more than what it paid the pharmacy, the government would only subsidize what the PBM paid the pharmacy and would not subsidize the 'spread.'" (S.J. Op. at 9.)

Relevant to this case, and more thoroughly discussed in my Summary Judgment Opinion, CMS explained that only those costs which were "actually paid" would be used to calculate reimbursements to the Part D sponsors. (S.J. Op. at 10.) This term is crucial because the "purpose of price reporting was to inform CMS how much each Part D plan paid for drugs so that CMS could calculate the appropriate subsidy, which depended only on amounts 'actually paid.'" (Id. at 58 (internal citations omitted).) As I found at summary judgment, "[a]ctually paid" costs are those that were: "(1) 'actually incurred,' (2) adjusted for price concessions and other 'direct and indirect remuneration' (DIR), and (3) the 'negotiated prices' between the PBM and the pharmacy." (Id.)

**B.  Overview of Caremark's Contracts During the Relevant Time Period**

Two contractual provisions contained in both Caremark's contracts with the pharmacies and the Part D sponsors are relevant to this case.  First, Caremark negotiated Generic Effective Rate guarantees ("GERs"), which were essentially promises to pay or receive an "agreed upon average price for drugs over the course of a year." (Id. at 22.)  The GERs operated as a "price floor but not a price ceiling: Caremark promised to pay at least the agreed-upon average, but could pay more." (Id.)  The Parties stipulated to the following explanation of a GER:

> A "generic effective rate" is a metric that captures the average price of an aggregate group of drugs. A GER is usually expressed as a set percentage off the "average wholesale price," such as "AWP-78%." So if there were three drugs that each had an AWP of $100, and the first was priced at $20 (i.e., AWP-80%), the second was priced at $30 (i.e., AWP-70%), and the third was priced at $40 (i.e., AWP-60%), then the average price would be $30, and the GER would be AWP-70%.

(Joint Stips. ¶ 93.)[2]

Second, the contracts contained provisions regarding the price of individual drug purchases.  A more detailed description of how those rates were chosen is set out in my Summary Judgment Opinion.  (S.J. Op. at 20-22.)  Importantly, the individual drug price was often set according to the "maximum allowable cost" or "MAC" price.  (Id.)  Caremark controlled the MAC price and could set different MAC rates for "Medicare beneficiaries [and] non-Medicare beneficiaries." (Id. at 22.)

Caremark maintained MAC lists and negotiated GERs for both the Part D sponsors and for the pharmacies.

---

[2] The "-" referred to in these figures denotes subtraction.  "AWP" stands for "average wholesale price."

### C.  Caremark's Relationship with the Part D Sponsors

During the relevant time period, Caremark provided PBM services to Part D sponsors such as Aetna and SilverScript.  (Joint Stips. ¶ 56.)  Under those contracts, Caremark would negotiate and pay for "drugs purchased at pharmacies by members of Aetna's and SilverScript's health plans, and Aetna and SilverScript would pay Caremark for those services."  (Id.)

Caremark's contract with Aetna, signed in 2010, covered both Part D and commercial drug plans.  (Id. ¶ 58.)  Caremark's contract with SilverScript covered only Part D plans.  (Id. ¶ 61.)  Both contracts contained a GER provision, or a promise to pay at least an agreed upon average price for certain drugs over the course of the year.  (Id. ¶¶ 60, 62.)

These contracts also contained "pass-through" pricing provisions for Part D purchases, meaning "Aetna would pay Caremark the same price Caremark paid the pharmacy, plus an administrative fee."  (S.J. Op. at 42; Joint Stips. ¶ 108 ("The amount billed to SilverScript will be equal to the amount paid to the Participating Pharmacies.").)  Caremark could, however, earn "spread" on commercial drugs under its Aetna contracts.   For example, if Caremark paid $8 to the pharmacy for a commercial drug, it could charge $10 to Aetna and retain the $2 difference.  (See S.J. Op. at 43.)

### D.  Caremark's Pharmacy Contracts with Walgreens and Rite Aid

During the relevant time period, Caremark also had GER guarantees with Walgreens and Rite Aid.  Unlike the Plan GERs, the Pharmacy GERs were "overall" guarantees, meaning that the GER covered both Part D and commercial drug purchases.  (Joint Stips. ¶¶ 114, 121; S.J. Op. at 23.)  Under these contracts, and as explained in my Summary Judgment Opinion:

> [I]f the promised average was $10 and Caremark paid $12, Walgreens would have no obligation to return the extra $2. But, if Caremark paid less than the agreed-upon average, Caremark would have to make an end-of-year payment (called a "reconciliation" payment) to make up the difference.

(Id. at 22-23.)  Relator's claims "pertain to pharmacies and years in which Caremark ended up having to make a reconciliation payment because its individual sale payments fell short of the promised average."  (Id. at 23.)

One of Caremark's goals was to hit, or get as close as possible, to the Pharmacy GER guarantee.  (Id. at 29.)  It did so by "managing" the MAC prices to meet the guarantee.  The following illustration explains how this worked:

> Suppose Caremark and the pharmacy agreed that Caremark would pay an average of $10 across all purchases. If Caremark made individual payments of $6 and $10, this would be an average of $8, and Caremark would have to make up the $4 shortfall (i.e., $2 × 2) in an end-of-year payment. On the other hand, if Caremark made individual payments of $6 and $12, Caremark would be closer to the promised average and only a $2 end-of-year payment (i.e., $1 × 2) would be required.

(Id. at 29-30.)

### E.  Caremark's Budgeted GER with CVS Pharmacy

Unlike Walgreens and Rite Aid, Caremark's contracts with CVS pharmacy did not set an average price that Caremark was "required to pay," but instead set a "target" for the average price from 2013 to 2016.  (Id. at 68; Joint Stips. ¶ 124.)  If Caremark missed the "target," it was not required to make reconciliation payments to CVS pharmacy at the end of the year.  (S.J. Op. at 70.)  However, like its contracts with Walgreens and Rite Aid, Caremark "managed" the "target" by adjusting individual MAC prices as discussed above.  (Id. at 27.)

### F.  Caremark's Reporting

For the relevant time period, Caremark "provided information to Aetna and SilverScript that those entities then used to submit drug price reports."  (Id. at 81.)  It is undisputed that the information provided to the Part D sponsors included the individual sale prices Caremark paid to the pharmacies, not the guaranteed average prices that Caremark needed to hit at the end of the

year.  Accordingly, the Part D sponsors  "reported Caremark's individual sale prices and not Caremark's guaranteed average prices."  (Id. at 33.)  "Similarly, Aetna's and SilverScript's DIR reports did not account for Caremark's guaranteed average prices with pharmacies."  (Id.)  For example, if the Pharmacy GER was set at $10, but Caremark paid Walgreens $12 for a specific Part D medication, Caremark reported to the Part D sponsor—and the Part D sponsor to CMS—a PDE record indicating a $12 purchase.

### G.  Relator's Role

Relator Sarah Behnke was an actuary in Aetna's Medicare department during the relevant time period.  Sometime in late 2012 or early 2013, Relator used publicly available drug pricing information to analyze how Aetna's Part D drug prices compared to the prices available through other Part D sponsors.  (Joint Stips. ¶ 152.)  As a result, Relator realized that "Aetna did not pay the same prices for Medicare Part D drugs as Caremark's other clients."  (Id. ¶ 153.)  At that time, Relator viewed Caremark's actions as a financial problem and told "Caremark that its MAC prices for Part D drugs were too high and that, as a result, Aetna's Part D plans would not be competitive in the marketplace."  (Id. ¶ 154.)

Caremark initially informed Aetna that its higher Part D prices were caused by "marketplace conditions," but by early 2013, Caremark acknowledged that "Aetna's competitors paid less, and Aetna's higher rates were set to maximize what Caremark was allowed to charge under their contract."  (S.J. Op. at 42.)  When Aetna requested better Part D rates, Caremark's Senior Vice President of Underwriting and Actuarial, Allison Brown, responded that Caremark "already ha[d] better deals at the pharmacies" that were not being "pass[ed] . . . along to" Aetna. (Id. at 42-43.)  Brown elaborated that the situation was "like a see-saw where . . . if [Aetna] pa[id] less, then [Caremark] [would] have to pay more somewhere else."  (Id. at 43 (internal quotations

and citations omitted); <u>see also</u> ECF No. 480 (Rel. Proposed Findings of Fact) Scienter Fact ¶ 11.)

Brown's "see-saw" comment shifted Relator's focus from a financial concern to a compliance

concern.  In her view, the "see-saw" comment referred to Caremark's GERs with the pharmacies

and meant that "if Part D prices were pushed down, commercial prices would have to go up," and

if commercial prices went up, Caremark would earn less spread on commercial drugs.  (S.J. Op.

at 43.)  According to Relator, Caremark was thus "admitting that it was, in effect, profiting on Part

D purchases because inflated Part D prices increased Caremark's spread on commercial

purchases."  (<u>Id.</u>)

Relator raised her concerns internally, prompting Aetna to conduct a "market check" and

hire outside counsel to conduct an internal investigation.  (Joint Stips. ¶ 157; S.J. Op. at 48.)  The

internal investigation—which was conducted by Crowell & Moring LLP—resulted in two memos

in 2013 and 2015, respectively.  Therein, the Crowell firm essentially opined that Caremark's

conduct was accepted practice.  Caremark relies heavily on these memos to negate the scienter

element of Relator's case.  The memos, however, were filled with qualifiers.

In 2014, while the Aetna investigation was ongoing, Relator filed the instant False Claims

Act case.  (ECF No. 1.)

### III.    PROCEDURAL HISTORY

This case remained sealed until 2018, at which time the Government filed a Notice titled

"The United States . . . is Not Intervening at This Time."  (ECF Nos. 24, 25.)  Relator originally

brought suit against CVS Caremark Corporation, CVS Caremark Rx, LLC, CaremarkPCS Health

LLC, and SilverScript Insurance Company.  (ECF No. 1.)  After I granted in part and denied in

part Defendants' first Motion to Dismiss, Relator amended her Complaint.  (ECF Nos. 78, 79, 86.)

On September 8, 2020, the Parties agreed to dismiss all claims against SilverScript.  (ECF Nos.

98, 109.) On November 16, 2020, Relator filed her Second Amended Complaint. (ECF No. 114.) There, Relator alleged three separate provisions of the False Claims Act, 31 U.S.C. § 3729, asserting the interests of the United States of America against Defendants CVS Health Corp., Caremark Rx, LLC, CaremarkPCS Health LLC, and CVS Caremark Part D Services, LLC.

After extensive discovery, the Parties filed cross-motions for summary judgment. Below, and to place the remainder of this Opinion in context, I provide some background on my rulings at the summary judgment stage.

### A. Summary Judgment Ruling on Falsity

In analyzing falsity under the False Claims Act, I interpreted several key terms from the 2010 rule change discussed above. (See S.J. Op. at 58-62.) Most important to my falsity ruling, I determined what the regulations meant in requiring Part D sponsors to report to CMS the costs "actually paid" for Part D drugs. I found, as a "matter of law, that when Caremark had a guaranteed average price with a pharmacy, and Caremark's individual sale prices in the aggregate fell below that guaranteed average, the amount Caremark 'actually paid' was the guaranteed average price and not the individual sale prices." (Id. at 62.) Thus, the amount of subsidies that Aetna and SilverScript were entitled to depended on "Caremark's negotiated average prices, not individual sale prices." (Id. (citing 42 C.F.R. § 423.308 (effective June 7, 2010)).)

Because CMS relied on the PDE or DIR reports submitted by Part D sponsors, I found that:

> as a matter of law, Aetna and SilverScript's price reports were required to reflect the prices Caremark "actually paid" for Part D drugs, which was Caremark's negotiated average price with the pharmacy. To the extent Aetna and SilverScript's PDE records reflected only individual sale prices, Aetna and SilverScript were required to account for the difference in their DIR reports.

(Id. at 68.)

I concluded that because it was undisputed that "price reports for Caremark's Part D sponsor clients did not reflect Caremark's negotiated average prices with Walgreens and Rite Aid . . . [a]s a matter of law, those reports were therefore false." (Id.) Accordingly, I granted partial summary judgment on the issue of falsity for the relevant time period as to Caremark's dealings with Walgreens and Rite Aid.

I reached a different result as it relates to Caremark's relationship with CVS Pharmacy, a materially different arrangement that that between Caremark, Walgreens, and Rite Aid. Specifically, Caremark and CVS Pharmacy (both subsidiaries of CVS Health Corp.) maintained a Budgeted GER, which unlike Caremark's contracts with Walgreens and Rite Aid, was not contractual in nature. Because the summary judgment record was not "conclusive on the question of whether the [Budgeted GER's] 'targeted' average price between Caremark and CVS was what Caremark 'actually paid,'" I denied the Parties' cross-motions on this issue for 2013-2016 time period when Caremark had a "targeted" average price with CVS Pharmacy. (Id. at 70-71.)[3]

I thus left for trial the issue of whether the Budgeted GER target set between Caremark and CVS Pharmacy was the price that Caremark "actually paid." I concluded that Relator must show that this target was "negotiated" and that "the outcome of the[] negotiation [w]as obligatory." (Id. at 70.)

**B.  Summary Judgment Ruling on Causation**

I found that although there was a genuine dispute as to whether Caremark caused Aetna to submit false reports, the same was not true for Caremark's interactions with SilverScript. For SilverScript, I concluded that it was undisputed that Caremark: "(1) submitted PDE records on

---

[3] I did, however, grant Caremark's Motion for Summary Judgment relating to similar agreements between Caremark and CVS Pharmacy for 2011-2012. (S.J. Op. at 72.)

SilverScript's behalf, (2) provided SilverScript draft DIR reports in a 'CMS-ready format,' and (3) certified to SilverScript that these reports included all reportable price concessions."  (Id. at 83.) Accordingly, I found there was no genuine dispute that the normal consequence, "or at least <u>a</u> normal consequence [of Caremark's actions], was that SilverScript would allow Caremark to submit the reports that Caremark had certified were accurate."  (Id. (emphasis in original).) Accordingly, at trial, Relator did not need to prove Caremark caused SilverScript to submit false reports, but was required to prove causation as to Aetna.

After denying the Parties' other various grounds for summary judgment, the following elements were left to be determined by a fact finder: (1) falsity specific to Caremark's relationship with CVS Pharmacy; (2) materiality; (3) causation specific to Aetna's submissions to CMS; (4) scienter; and (5) damages.

### C. The Bench Trial

I presided over a two-week bench trial from March 10, 2025 to March 20, 2025.  At the close of Relator's case in chief, Defendants moved for judgment under Federal Rule of Civil Procedure 52(c).  (ECF No. 459.)  I deferred ruling on the Motion and declined rendering any judgment until the close of evidence.  See Fed. R. Civ. P. 52(c); (N.T. Mar. 19, 2025 at 5:5-10.) Following the close of trial, each party submitted proposed findings of fact and conclusions of law. (See ECF Nos. 479, 480, 482, 483, 487, 488, 489, 490.)  On June 11, 2025, the Parties presented closing argument.  (See ECF No. 492.)

### IV.    LEGAL STANDARDS

"In an action tried on the facts without a jury or with an advisory jury, the court must find the facts specially and state its conclusions of law separately."  Fed. R. Civ. P. 52(a)(1).  My findings must be "'sufficient to indicate the factual basis for the ultimate conclusion.'"  <u>United</u>

States *ex rel.* Morsell v. NortonLifeLock, Inc., 651 F. Supp. 3d 95, 113 (D.D.C. 2023) (quoting Kelley v. Everglades Drainage Dist., 319 U.S. 415, 422 (1943)).  I need not, however, address "every factual contention and argumentative detail raised by the parties, or discuss all evidence presented at trial." Id. (internal quotations and citations omitted).  Accordingly, while I have cited trial testimony, exhibits, and designated deposition testimony to support my findings of fact, I do not identify every portion of the record upon which I have relied to make such findings.  I note that the "omission of a citation to a particular portion of the record does not necessarily mean that [I] did not rely on that portion to make [my] findings of fact." Id.

The false claims act imposes liability for anyone who, *inter alia*: (1) "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" ("presentment"); (2) "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim" ("false statement"); and (3) "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government" ("reverse false claim").  31 U.S.C. § 3729(a)(1)(A),(B),(G).  Relator has alleged causes of actions under each of these sections.

Relator's presentment and false statement causes of action are "complementary" and are "designed to prevent those who make false records or statements to get claims paid or approved from escaping liability solely on the ground that they did not *themselves* present a claim for payment or approval."  United States *ex rel.* Int'l Brotherhood of Electrical Workers Local Union No. 98 v. The Farfield Co., 438 F. Supp. 3d 348, 388 (E.D. Pa. 2020) (emphasis in original) (internal quotations and citations omitted).

To make out each of her claims, Relator must prove four elements: (1) falsity; (2) materiality; (3) causation; and (4) scienter.  If liability attaches, Relator must then prove damages.  Relator bears the burden of proof and is required to "prove all essential elements of the cause of action, including damages, by a preponderance of the evidence."  31 U.S.C. § 3731(d).

## V.    FINDINGS OF FACT[4]

### A.  Falsity as to CVS Pharmacy

As previously noted, Part D sponsors were required to report to CMS the prices "actually paid" at the point of sale to the pharmacies.  As it relates to Walgreens and Rite Aid,  "when Caremark had a contractual obligation to Walgreens and Rite Aid to pay at least a certain average price for drugs, and in fact paid no more than that average price, the negotiated average was what Caremark 'actually paid.'"  (S.J. Op. at 69.)  That is so, because "Caremark's overall indebtedness to the pharmacy would increase by the negotiated average price for each purchase, regardless of what price Caremark put down at the time of sale."  (Id.)

The question, as it pertains to CVS Pharmacy—which did not maintain a formal contract with Caremark—was whether similar reasoning applies.  Specifically, whether Caremark's "Budgeted GER" with CVS Pharmacy could be considered "negotiated" and "obligatory" in a manner consistent with my finding as to Walgreens and Rite Aid.  If answered affirmatively, Caremark's Budgeted GER with CVS Pharmacy would be considered the price "actually paid" under CMS regulations.  If not, Relator has not carried her burden on this issue.

---

[4] These facts are taken from the Parties' Proposed Findings of Fact, their respective Responses thereto, the trial transcripts, trial exhibits, and the Joint Stipulations. (ECF Nos. 452, 466-73, 475, 479, 480, 482, 483.)  I also incorporate the background section of this Opinion as well any rulings made in my Summary Judgment Opinion.

Caremark and CVS Pharmacy were both subsidiaries of CVS Health Corp. during the relevant period. (Joint Stips. ¶¶ 2-4, 86.) During that time, a provider agreement covered various pricing arrangements between CVS Pharmacy and Caremark. (Id. ¶¶ 87-89; see also ECF No. 479 (Caremark Proposed Findings of Fact) Falsity Fact ¶ 1.) Unlike its contracts with Walgreens and Rite Aid, Caremark's contracts with CVS Pharmacy did not contain any GER guarantee. (Caremark Falsity Fact ¶ 3.) Instead, from 2013 to 2016, Caremark and CVS Pharmacy maintained a Budgeted GER. (Relator Falsity Fact ¶ 1; Joint Stips. ¶ 124.)

The Budgeted GERs were created by "senior executives from Caremark and CVS Pharmacy." (Caremark Falsity Fact ¶ 5.) The question of how these GERs were formed was a key issue at trial. The only witness with insight into how both Caremark and CVS Pharmacy generated the Budgeted GER was Eva Boratto. From 2013 to 2016, Ms. Boratto was the Controller and Chief Accounting Officer for CVS Health Corp.—the parent company which owned both Caremark and CVS Pharmacy. (ECF No. 484 at 4-5.) In that role, she endeavored to learn what Caremark's "desires" and "needs were" relating to the Budgeted GER and would "also do the same separately" for CVS Pharmacy. (N.T. Mar. 14, 2025 at 136:20-137:1.) Boratto would then "bring that data" to Dave Denton—then Chief Financial Officer of CVS Health Corp., who would discuss the Budgeted GER with other "senior executives . . . and ultimately decide" the rate at which the Budgeted GER would be set. ((N.T. Mar. 14, 2025 at 137:2-6; PTX-0319 at 28 of 252 (listing Denton as "Chief Financial Officer of CVS Health Corporation since January 2010").) Both Parties agree that the purpose of this process—and the resulting Budgeted GER—was "in part to ensure that the planning assumptions for both businesses would align." (ECF No. 482 (Rel.'s Resp. to Caremark Proposed Facts) Falsity Fact ¶ 5.).)

i.      *Similarities Between Budgeted GERs and GER Guarantees*

Once the Budgeted GERs were decided, Caremark tracked performance, relative to the Budgeted GER, in a similar manner as it tracked performance relative to the Walgreens and Rite Aid GER guarantees.  (See ECF No. 483 (Caremark Resp. to Rel.'s Proposed Facts) Falsity Fact ¶ 5; Rel.'s Resp. to Caremark Falsity Fact ¶ 9.)  Similarly, as it did with Walgreens and Rite Aid, Caremark managed MAC prices to achieve or come close to achieving the Budgeted GER.  (N.T. Mar. 13, 2025 at 230:2-13 (Domenico Gugliuzza agreeing that with respect to MAC price management, what Caremark did "for CVS Pharmacy was the same as what [Caremark did] for Rite Aid and Walgreens.").)  Perhaps the best example of this was Caremark's actions in December of 2016.  Then, Caremark changed MAC prices for commercial drugs by a factor of 1.6674 to ensure that Caremark achieved the Budgeted GER for 2016.  (Rel. Falsity Fact ¶ 7 (citing PTX-0099).)  Caremark acknowledged this resulted in increased payments to CVS Pharmacy totaling $13 million.  (PTX-0099; N.T. Mar. 17, 2025 at 27:22-28:9 (Caremark Corporate Witness Elena Kinney testifying about the 2016 end-of-year MAC price adjustment).)    Caremark was "very effective" at managing individual drug prices to achieve, in the aggregate, the Budgeted GER.  (Rel. Falsity Fact ¶ 8; id. ¶ 6 ("Caremark changed the MAC prices (individual drug prices) for commercial lock-in clients (also known as spread clients) to ensure that the budgeted CVS Pharmacy overall GER was hit.").)

ii.     *Differences Between Budgeted GERs and GER Guarantees*

Unlike the contractual GER guarantees, the Budgeted GERs with CVS Pharmacy could and did change throughout the year.  (Caremark Falsity Fact ¶ 7.)  Although Relator disputes this, I credit the testimony of three separate Caremark employees who explained that the Budgeted GER was a "forecast" or "budget assumption" which was subject to change.  (See N.T. Mar. 14, 2025

at 73:4-16 (Domenico Gugliuzza examining the CVS Pharmacy budget file for 2015); id. at 140:2-5 (Eva Boratto explaining that the Budgeted GER "can change . . . [j]ust like any other budget assumption"); N.T. Mar. 10, 2025 at 120:8-12 (John Lavin explaining that the Budgeted GER was conveyed to him more than once per year).)

The key difference between the Budgeted GERs and the GER guarantees concerns what happened if Caremark missed the Budgeted GER target. Unlike the contractual GER guarantees, the Budgeted GERs between Caremark and CVS Pharmacy did not provide for a reconciliation or "claw back" if Caremark underpaid relative to the Budgeted GER. (Caremark Falsity Fact ¶ 6; N.T. Mar. 10, 2025 at 196:6-16 (former Caremark employee John Lavin explaining that the Budgeted GER did not impose any financial obligation on Caremark and that, to his knowledge, Caremark never made a reconciliation payment to CVS Pharmacy); N.T. Mar. 14, 2025 at 150:6-151:24 (Eva Boratto explaining that Caremark did not make end-of-year reconciliation payments to CVS Pharmacy); id. at 72:13-17 (Domenico Gugliuzza explaining that the "biggest difference [between the contractual GERs and the Budgeted GER] is at the end of the year there's no payment that was made between [Caremark and CVS Pharmacy].").) Indeed, in 2015, where Caremark did not meet the Budgeted GER, it was not required to make any true-up payment to CVS Pharmacy. (See N.T. Mar. 14, 2025 at 73:4-75:2; PTX-0116A.)

Another difference between the Budgeted GERs and the GER guarantees was the form or dissemination of the GERs. Whereas the GER guarantees were set at the beginning of each year, and the percentage off AWP was included in Caremark's contracts with Walgreens and Rite Aid, the same cannot be said for the Budgeted GERs.

In an effort to establish what the Budgeted GERs were and that they were both obligatory and negotiated, Relator presented evidence from various documents and spreadsheets.[5]  For 2013, Relator pointed to an internal slideshow from August 20, 2013, stating that "CVS [Pharmacy] was set to committed rate of 79.8%" and that the "Current Cap" for CVS Pharmacy was set at 79.8%. (Relator Falsity Fact ¶ 12 (citing PTX-0190, PTX-0639).)  That slideshow, however, also explains that Caremark "ha[s] an agreement with CVS [Pharmacy] to reimburse [the pharmacy] at *79* for 2013."  (PTX-0190 at 1 (emphasis added).)  She also cites a 2013 CVS pharmacy reconciliation look-a-like document showing that at the end of 2013, Caremark had managed the MAC prices of both commercial and Part D drugs to achieve a realized Budgeted GER of 79.82%.  (See Rel. Falsity Fact ¶ 12 (citing PTX-0106A).)

For 2014, Relator offered into evidence a 2014 pharmacy reconciliation look-a-like document showing that at the end of 2014, Caremark had managed the MAC prices of both commercial and Part D drugs to achieve a realized Budgeted GER of 81.16%.  (See id. (citing PTX-0115A).)

For 2015, Relator provided a pharmacy reconciliation look-a-like document which contains a cell titled "2015 Target All Other" with a value of 83.81%.  (See id. (citing PTX-0116A at 10).)  Underneath that cell, a cell titled "Actual to date" has a value of 83.08%.  (PTX-0116A.)

Finally, for 2016,  Relator cites a 2016 pharmacy reconciliation look-a-like document which shows an "Overall" "Generic" "Discount" rate of 84.30%.  (See Rel. Falsity Fact ¶ 12 (citing PTX-0117A at 36.).)  For all years at issue, and as it relates to CVS Pharmacy, Caremark paid less

---

[5] I discuss the Budgeted GER only to illustrate the Budgeted GER amounts Relator attempted to prove at trial.  As explained later, I do not find that Relator proved by a preponderance of the evidence that the amounts discussed in this section represent a "negotiated" and "obligatory" GER.

(deeper discount) for commercial drugs and more (shallower discount) for Part D drugs relative to the Budgeted GER.

Relator describes the 2013, 2015, and 2016 numbers as "explicit targets." (See PD-016 (citing PTX-190, PTX-115A, PTX-116A, PTX-117A).) However, Relator's proposed Budgeted GER numbers are taken from different cells located in different tabs of different reconciliation look-a-like excel spreadsheets.[6] Moreover, the 2013 internal slideshow listed two different target numbers and no witness at trial confirmed which number was the target for 2013.

### B. Materiality and Scienter[7]

The 2010 rule change and the impact thereof was well known throughout the industry. (Rel. Materiality Fact ¶ 1.) Under the rule change, Part D sponsors were required to "report to CMS the price actually paid to the pharmacy." (PTX-0192 (June 6, 2009 CMS Press Release) at 1.) Moreover, any "difference between the price paid by the plan to the PBM and the price paid by the PBM to the pharmacy [was required to] be reported as administrative cost." (Id. at 1-2.) The purpose of the rule change was to "ensure that sponsors' administrative costs [were] not included in the drug costs used to determine how much the beneficiary [paid]" and that the amounts subsidized by CMS did not include such costs. (Id.) In making this change, CMS sought to "bring greater transparency to drug price reporting," and explained that "[m]aking prices more transparent will help plans negotiate lower prices and administrative fees." (Id.) Caremark was aware of the 2010 rule change's requirements and purpose. (See N.T. Mar. 13, 2025 at 173:22-174:13 (Caremark Corporate Witness Rebecca Justice).)

---

[6] Caremark informed Relator that "[t]he budgeted generic effective rate for CVS Pharmacy can be identified in documents such as CVS-Behnke-1813534," which is a reconciliation look-a-like document in evidence as PTX-0106. (PTX-125 at 19 of 36.) This fact, without more, does not establish that the various numbers Relator located in these documents actually were the Budgeted GERs for the years in question.
[7] Many of the facts relevant to materiality are also relevant to scienter.

Caremark also understood that "CMS required and relied on accurate and complete Medicare Part D drug price reporting" and that such reports were an "express condition of payment by CMS." (Caremark Resp. to Rel. Materiality Fact ¶ 4.)  In addition, CMS required Part D sponsors and their PBMs to attest to the truthfulness of the pricing data submitted. (See Joint Stips. ¶ 49 (quoting 42 C.F.R. § 423.505(k)(3)).)  Caremark submitted pricing data to Part D sponsors, who in turn, incorporated such data into PDE and DIR reports which were sent to CMS.  CMS relied on truthful and accurate price reporting, including "post point-of-sale adjustments" to accurately calculate subsidies and reimbursements.  (See N.T. Mar. 13, 2025 at 173:11-18 (Caremark corporate witness Rebecca Justice).)  As a result, CMS's payments were conditioned on accurate PDE and DIR reports.

### i.    DIR Reporting Requirements

Each year, CMS issued guidance which laid out different categories of reportable DIR.  In 2011, CMS made clear that "PBM penalty payments and repayments that impact Part D drug costs" were "[c]onsidered [reportable] DIR."  (DX220.0008; see also DX 219.0026 (Final Medicare Part D DIR Reporting Requirements for 2010 stating the same).)  Indeed, Part D sponsors were required to report, in DIR Column # 9, "[a]pplicable pharmacy adjustments that reduce the total payments made to the pharmacy . . . as a positive adjustment that will serve to reduce the sponsor's drug costs." (DX220.0016.)  Both Caremark and Aetna employees were aware of this guidance.  (N.T. Mar. 10, 2025 at 84:6-10 (Caremark employee John Lavin); (N.T. Mar. 19, 2025 at 67:1-6 (Aetna in-house counsel Charles Klippel testifying about DIR guidance # 9).)  This requirement was understood to include, as reportable, "monies that were taken back from the pharmacies or withheld from the pharmacies that were not covered under other parts of DIR." (N.T. Mar. 19, 2025 at 66:5-25 (Aetna Deputy General Counsel Charles Klippel discussing DIR # 9).)

22

    *ii.  What was Reportable under DIR Guidance # 9*

   At trial, a key issue was whether Caremark's contracts with the pharmacies, which were one-way guarantees, functioned as two-way guarantees.  In a one-way guarantee, a PBM was required to make a year-end reconciliation payment to a pharmacy if it underpaid relative to the GER, but the pharmacy was not required to do the same if the PBM overpaid relative to the GER. (N.T. Mar. 18, 2025 at 156:7-158:17 (Former Acting Director of CMS Leslie Norwalk explaining the difference between one-way and two-way guarantees).)  In a two-way guarantee, the pharmacy was required to pay back the PBM if the PBM overpaid relative to the GER, and, the PBM was required to pay the pharmacy if the PBM underpaid relative to the GER.

   Industry participants agreed that a two-way GER guarantee created reportable DIR.  (See N.T. Mar. 12, 2025 at 112:14-16 (Aetna actuary Jean Walker testifying that "in [a] two-way guarantee, if we overpaid the pharmacies, they would pay us money back. So that would appear as a positive DIR."); N.T. Mar. 18, 2025 at 155:10-13, 156:7-23 (Leslie Norwalk agreeing that a "two-way guarantee . . . must be reported on DIR but [a] one-way guarantee does not need to be reported on DIR" and that "industry participants" would have understood this difference).)  Indeed, in 2015 while Aetna's investigation into Caremark's pricing scheme was wrapping up, Aetna "took pharmacy contracting in-house [and] utilized two-way pharmacy guarantees that could result in money paid from pharmacies to Aetna, [and] reported the money pharmacies paid Aetna back as DIR, and continued to report point-of-sale prices on PDEs."  (Caremark Scienter Fact ¶ 25.)

    *iii.  Caremark's Contracts with Walgreens and Rite Aid*

   In 2010, Caremark entered into its first overall GER with Walgreens which covered both Medicare Part D and commercial claims.  (Rel. Scienter Fact ¶ 2.)  Although pharmacies like Walgreens had been requesting GER guarantees for years, there is no evidence that before 2010,

any industry participant had entered into an overall GER agreement. (See N.T. Mar. 10, 2025 at 97:23-98:17 (Caremark employee John Lavin explaining that the 2010 Walgreens contract, which he negotiated, was "one of the first [overall Pharmacy GERs] for any pharmacy anywhere that" Caremark entered into and that he could not recall an example of any overall GER predating the 2010 agreement).)

In form, Caremark's contracts with Walgreens and Rite Aid were one-way GER guarantees. (N.T. Mar. 10, 2025 at 166:13-169:22 (John Lavin explaining Caremark's GER guarantees).) In function, however, these contracts acted as a two-way guarantee. This is because Caremark's contracts contained an "offsetting" provision. Under this provision, Caremark could subtract from any monies owed due to underpayments on commercial drug purchases relative to the overall GER, the amount it overpaid on Part D purchases relative to the overall GER. (See DX046.001, 004 (Caremark's 2013 and 2014 contracts with Rite Aid) ("[A]ny amounts owing pursuant to this subsection [] may be offset against any amounts received by [Rite Aid] that exceeded the Contractual Reimbursement.").)

The economic effect of Caremark's one-way guarantee was the same as if it had a two-way guarantee with the pharmacies. (N.T. Mar. 14, 2025 at 125:6-128:11 (Rite Aid 30(b)(6) witness Richard Stoneking agreeing that the net effect of a two-way guarantee and a one-way guarantee with an offsetting provision would be the same).) This impact is most readily apparent when looking at end-of-year reconciliation spreadsheets kept by Caremark for both Walgreens and Rite Aid. A series of demonstratives filed by Relator illustrate the economic impact of Caremark's one-way guarantees and offsetting provisions. (See PD-001, PD-002, PD-003, PD-004.) The demonstratives, which take data from Caremark's reconciliation spreadsheets, demonstrate two key facts: (1) from 2013-2014, Caremark underpaid on commercial drugs and overpaid on Part D

drugs relative to the overall GER guarantees; and (2) the offsetting provisions in the Walgreens and Rite Aid contracts allowed Caremark to pay less in end-of-year reconciliation payments to the pharmacies. For example:



**Caremark-Rite Aid Reconciliation (2013)**                                    PD-001

| | | A | K | L | N | P |
|---|---|---|---|---|---|---|
| 3 | | Claim Group Name | Gen Ing Cost [POS/PDE Reported] | Gen AWP [Same Drugs at 100% of AWP] | Gen Eff Rate | Gen AWP - Performance |
| 5 | | Overall Commercial | $545,584,956 | $2,789,770,192 | 80.44% | ($51,425,865) |
| 15 | | Overall MEDD | $179,183,530 | $748,032,092 | 76.05% | $19,104,663 |
| 18 | | Overall MEDD Network 20 | $227,112,400 | $945,449,354 | 75.98% | $24,786,238 |
| 21 | | OVERALL | $951,880,887 | $4,483,251,638 | 78.77% | ($7,534,964) |

**What Caremark Owed in Total** = **Overall Pharmacy GER 78.60%**

PTX-0068 (CVS-BEHNKE-0004349), at tab "2013" at cells A3:R21;  PTX-0096 (CVS-BEHNKE-0462138) at 1 of 7

(PD-001 (citing PTX-0068; PTX-0096).)[8]

As shown in PD-001, for Rite Aid in 2013, the overall GER guarantee was 78.60%. (See PTX-0096 at 1.) At the end of the year, however, Caremark had managed MAC prices so that commercial drug purchasers received a deeper discount (AWP-80.44%) and Part D purchasers received a shallower discount (AWP-76.05% and 75.98%). (See PTX-0068.) Relative to the overall GER, this meant that Caremark underpaid on commercial drugs by over $51 million dollars. Because, however, Caremark overpaid, relative to the GER, on Part D purchases to the

---

[8] All data except for the yellow cells are taken directly from end-of-year reconciliation documents that Caremark kept in the course of its business with Rite Aid. Gen Eff Rate is the end-of-year realized GER. "Gen AWP – Performance" is the difference between the amount paid to the pharmacy for individual drug sales in the aggregate and what was contractually owed for those same drugs under the overall pharmacy GERs. (Rel. Scienter Fact ¶ 4 n.5.) Put simply, the yellow cells are calculated using the following formula: (Gen AWP * overall Pharmacy GER guarantee) – (Gen AWP * Gen Eff Rate).

Caremark does not dispute that the calculation used to achieve the yellow cells is correct.

tune of some $44 million, Caremark only owed Rite Aid approximately $7.5 million in end-of-year reconciliation payments.

The same process—including overpayments on Part D and underpayments on commercial relative to the overall GER—repeated for 2013 and 2014 at both Walgreens and Rite Aid.  (See PD-002 (citing PTX-0069; PTX-0096); PD-003 (citing PTX-0073; PTX-0062); PD-004 (citing PTX-0074; PTX-0061); PD-004 (citing PTX-0074; PTX-0061).)  An illustration is helpful in understanding this phenomenon:

| | | Average Wholesale Price | Pharmacy GER | Average Discount | Over- or Under-Payment |
|---|---|---|---|---|---|
| | *(in Millions of Dollars)* | | | | |
| Scenario | | [A] | [B] | [C] | [D] |
| | **Rite Aid - 2013** | | | | |
| [1] | Medicare Part D | $1,693 | 78.6% | 76.0% | $44 |
| [2] | Commercial | $2,790 | 78.6% | 80.4% | -$51 |
| [3] | **Overall** | **$6,177** | **78.6%** | **78.8%** | **-$8** |
| | **Rite Aid - 2014** | | | | |
| [4] | Medicare Part D | $1,622 | 80.4% | 77.6% | $46 |
| [5] | Commercial | $3,426 | 80.4% | 82.0% | -$54 |
| [6] | **Overall** | **$6,669** | **80.4%** | **80.5%** | **-$7** |
| | **Walgreens - 2013** | | | | |
| [7] | Medicare Part D | $1,987 | 77.0% | 76.0% | $21 |
| [8] | Commercial | $5,959 | 77.0% | 77.6% | -$37 |
| [9] | **Overall** | **$9,932** | **77.0%** | **77.2%** | **-$17** |
| | **Walgreens - 2014** | | | | |
| [10] | Medicare Part D | $2,614 | 79.85% | 78.0% | $48 |
| [11] | Commercial | $5,592 | 79.85% | 81.5% | -$93 |
| [12] | **Overall** | **$8,206** | **79.85%** | **80.4%** | **-$44** |

(See PD-009 (citing PTX-0068, PTX-0069, PTX-0073, PTX-0074, PTX-0096, PTX-0455, PTX-0456).)[9]  As made clear by this table, from 2013 to 2014 at Rite Aid and Walgreens, the average discount Caremark paid for Part D drugs at the pharmacies and reported to Aetna and SilverScript was consistently shallower than the overall GER it maintained with the pharmacy.  Put another

---

[9] Average discount refers to the average discount off AWP calculated from PDE and DIR reports submitted by Caremark to CMS.  (See N.T. Mar. 17, 2025 at 139:20-140:2.)

way, during this time period, Caremark consistently paid more for Part D drugs and less for commercial drugs relative to the overall GER it maintained with the pharmacies.

Although nearly every Caremark-affiliated witness testified that there was no strategy to increase prices on Part D so that it could decrease prices on commercial drugs, internal Caremark documents belie that position.   Indeed, one slideshow—which incorporated input from Jon Roberts, Executive Vice President of CVS Health Corp.—showed that to hit the 2013 and 2014 Rite Aid GER, Caremark planned to manage the GER by paying shallower discounts for Part D drugs and deeper discounts for commercial drugs.  (See PTX-0312A at 8; N.T. Mar. 10, 2025 at 139:22-141:5 (Discussing PTX-0312A, John Lavin agreeing that the document showed "an intent to manage on Medicare Part D . . . paying more than the overall GER and managing the commercial line to pay less than the overall GER").)



CONFIDENTIAL AND PROPRIETARY

**Jon Roberts' Target:**
**Rates that are needed with Rite Aid for 2013 and 2014**

|  | GER | Generic Dispensing Fee | AWP Discount/ BER | Brand Dispensing Fee |
|---|---|---|---|---|
| **2013** Overall Med D Commercial | 80.50% 76.50% 83.70% | $1.00 | 15.50% By network 15.50% | $1.00 |
| **2014** Overall Med D Commercial | 80.50% 76.50% 83.70% | $1.00 | 15.75% By network 15.75% | $1.00 |

PTX 0312A - Page 8 of 9

6   CVS CAREMARK

(PTX-0312A at 8 of 9.)

Moreover, of the five fact witnesses who previously worked for Caremark and testified that they did not believe Caremark's one-way Pharmacy GER guarantees triggered PDE or DIR reporting requirements, four of them testified that their knowledge respecting Caremark's pharmacy contracts was incredibly limited. (See N.T. Mar. 13, 2025 at 199:18-200:18 (Caremark 30(b)(6) witness Rebeca Justice explaining that she has never seen a Caremark/pharmacy reconciliation report and that she was unfamiliar with the pharmacy reconciliation process); N.T. Mar. 13, 2025 at 105:15-19 (Caremark employee James Margiotta explaining that during the relevant time period, he did not "have access to detailed network pharmacy contracts"); N.T. Mar. 17, 2025 at 73:2-74:14 (Caremark employee David Azzolina explaining that during the relevant period, he: (1) had not reviewed Caremark's pharmacy contracts; (2) did not remember what Caremark's subject matter experts reviewed before instructing him to sign certain attestations; (3) was not even aware that Caremark's contracts contained an "overall GER inclusive of both commercial and Medicare D lines of business"; and (4) had no understanding of how these overall GER guarantees were reconciled post-point-of-sale); N.T. Mar. 17, 2025 at 56:16-22 (Caremark employee Elena Kinney explaining that she never saw Caremark's end-of-year reconciliation documents).) Accordingly, because these witnesses either had not seen the pertinent documents, or were otherwise unaware of how Caremark's pharmacy contracts worked, I assign little weight to their testimony.

### iv. *Caremark's Discussions with Others in the Industry*

At trial, it was hotly contested whether Caremark sufficiently informed both CMS and Aetna about its overall GER guarantees with Rite Aid and Walgreens. This point is important because, if faced with *full* disclosure, Aetna and CMS's actions—or lack thereof—could rebut both scienter and materiality.

1.  The Aetna Investigation[10]

Three individuals intimately involved in Aetna's internal investigation of Caremark's pricing scheme testified at trial: Jean Walker, Sarah Behnke, and Charles Klippel. Aetna's investigation yielded two conclusions: (1) Caremark provided pass-through pricing and did not retain spread; and (2) Caremark's overall GER guarantees with the pharmacies did not create reportable DIR not already provided to Aetna. (See Caremark Scienter Fact ¶¶ 23, 24.)

The first conclusion was based on an investigation and report conducted by a third-party auditing company, the Burchfield Group. (See PTX-0670A.) The Burchfield Audit focused in pertinent part on whether the pass-through pricing reported by Caremark to Aetna was accurate. (Id. at 5 of 65.) Although Burchfield had access to Caremark's contracts with the pharmacies, the scope of the audit "did not encompass Direct and Indirect Remuneration ("DIR") reporting provided by Caremark to Aetna." (Id.; see also id. at 14 of 65 ("While Burchfield cannot relay details found in the pharmacy contracts due to their proprietary nature, Burchfield can confirm that the prices charged to Aetna for Medicare enrollees were the rates paid by Caremark for the point of sale prescriptions.").) Moreover, "Burchfield did not address whether Caremark's arrangements with pharmacies . . . could involve amounts reportable as DIR or price concessions to be reported and passed back to Aetna" because DIR reporting "was outside the scope of the audit." (Id. at 14 of 65.) Accordingly, and despite its access to Caremark's contracts with the pharmacies, the Burchfield audit is not relevant to the question of whether Caremark's overall GER guarantees and the offsetting provisions therein created reportable DIR.

---

[10] For the sake of brevity, and because the facts and circumstances surrounding the Aetna investigation are not truly disputed, I incorporate the Background Section of my February 3, 2025 Memorandum Opinion and reference only findings of fact which the Parties disputed at trial. (ECF No. 412 at 2-7.)

The second conclusion—that Caremark's pricing practices did not trigger additional DIR reporting obligations—was based on analysis provided by attorney Art Lerner from the Crowell & Moring law firm.  (See N.T. Mar. 19, 2025 at 78:14-79:1.)  Lerner relied on representations made by Caremark and Caremark's outside counsel, Epstein Becker and Green, and thereafter submitted two memos to Charles Klippel and Aetna.  (Id.; see also N.T. Mar. 19, 2025 at 60:8-17 (Klippel explaining that, other than Caremark's representations, there was no other source for Lerner's investigation); id. at 128:4-17 (Klippel explaining he was privy to neither Caremark's pharmacy contracts nor its post-point-of-sale reconciliation spreadsheets)  Lerner did not independently corroborate Caremark's representations.  (See DX003.0005 ("We have not made any independent confirmation of [Caremark's] representations and attestations."); see also id. (Lerner explaining that he did not have "visibility into all the facts [Caremark] considered or into how [Caremark] reached its judgment or the legal analysis it performed in doing so").)

This investigation lasted years and by March of 2013, the scope of the investigation was focused on how Caremark "reconciled post point-of-sale, [its] pass-through contract with Aetna and their pharmacy contracts."  (N.T. Mar. 19, 2025 at 120:10-14 (Charles Klippel discussing DX156).)

Caremark understood Aetna's concern to be "whether 'true-up' payments from or to a pharmacy to [Caremark] under a pharmacy guarantee [counts as] DIR." (DX005.0004.)  Caremark explained that pharmacies "**have not, and do not**, make true up payments to [Caremark] under a guarantee." (DX005.0005 (emphasis in original).)  What Caremark failed to explain, however, was that its contracts with the pharmacies contained offsetting provisions that were economically identical to two-way GER guarantees, which both Parties agree would create reportable DIR.  (See DX162; DX005; DX006.)  Indeed, at trial, Charles Klippel testified that he was never informed of

any offsetting provision or the effect thereof.  (N.T. Mar. 19, 2025 at 137:17-22; id. at 140:17-22

(Klippel responding to a question about Caremark's offsetting provisions and explaining that the

offsetting provisions were "not something [he] knew about at the time" and that he was "not even

aware of what [counsel was] talking about here").)

To summarize, Caremark did not inform Lerner or Aetna about the offsetting provisions,

did not share its contracts or reconciliation spreadsheets with Lerner or Aetna, and Lerner and

Aetna did not independently verify the representations made by Caremark.  Consequently, I place

little weight on Aetna's investigation and absolution of Caremark's conduct.  Aetna simply did not

know enough to make an adequate determination as to whether Caremark's pricing practices with

the pharmacies created reportable DIR.

## 2.   Caremark's Interactions with CMS

"CMS frequently interacts with industry participants in a wide range of formal and informal

settings, ranging from formal comments on proposed regulations and guidance to informal

telephone and email conversations."  (Caremark Materiality Fact ¶ 2.)  Indeed, when CMS "has

questions or concerns about a price-reporting practice, CMS does not hesitate to express them."

(Id. ¶ 10.)

Caremark's Vice President of Finance for Medicare Part D, David Azzolina, was the

"individual at Caremark that had responsibility for CMS reporting on behalf of Medicare clients

related to DIR" during the relevant time period.  (N.T. Mar. 17, 2025 at 74:20-24.)  In 2015,

Azzolina provided attestations on behalf of Caremark to Aetna regarding pricing data for contract

year 2014.  (See PTX-0094A.)  At that time, Azzolina had not reviewed Caremark's pharmacy

reconciliation spreadsheets or its contracts with the pharmacies.  (See N.T. Mar. 17, 2025 at 73:2-

6.)  Indeed, he did not even know that Caremark's contracts with the pharmacies contained "an overall GER inclusive of both commercial and Medicare D lines of business."  (Id. at 73:25-74:8.)

In addition to overseeing CMS reporting compliance, Azzolina was also Caremark's point person for CMS communications.  In March of 2016, CMS contacted Azzolina to learn more about Caremark's GER guarantees with the pharmacies.  (Joint Stips. ¶ 184.)  On a March 8, 2016 phone call, the CMS official responsible for guidance on DIR reporting requirements explained that CMS was concerned with whether Pharmacy GER guarantees allowed PBMs to "claw back" money from pharmacies.  (Caremark Materiality Fact ¶ 4; N.T. Mar. 17, 2025 at 79:5-8 (Azzolina agreeing that "CMS's main focus on the March 8[] call was on GERs and how they were reconciled if Caremark paid more to a pharmacy than the GER").)

On May 26, 2016, Azzolina sent a follow up email to CMS.  (See PTX-0026.)  Azzolina acknowledged that, before sending that email, he had not "personally" reviewed any of Caremark's pharmacy contracts or reconciliation spreadsheets.  (See N.T. Mar. 17, 2025 at 85:8-14.)  Instead, he relied on "subject matter experts," the names of whom he could not recall.[11]  (Id. at 85:14-24.)  Azzolina acknowledged that he was answering questions from CMS which "fell outside [his] area of responsibility."  (Id. at 86:14-15.)  Still, without understanding the nature of these contracts,

---

[11] James Margiotta—who interfaced with Aetna on behalf of Caremark during the relevant time period—testified that the subject matter experts he relied on in signing similar attestations were "primarily [Caremark's] legal counsel." (N.T. Mar. 13, 2025 at 156:1-17.)  Caremark has repeatedly explained that it is not furthering an "advice of counsel defense."  (See ECF No. 412 (Opinion denying Relator's Motion to Preclude testimony and evidence relating to the Aetna investigation based on the "sword and shield doctrine" in part because Caremark asserted that it was not relying on advice of counsel).)  Margiotta's testimony was stricken because his reliance on Caremark's counsel in signing these attestations could be construed as an attempt to back-door an "advice of counsel" defense.

Because Azzolina himself was unqualified and unprepared to answer CMS's questions or sign attestations, I need not concern myself with whether Azzolina's subject matter experts were also Caremark's counsel.  To the extent that these subject matter experts were Caremark's counsel, I would have similarly stricken such testimony.  Moreover, because these subject matter experts were unnamed and the materials they relied on unknown, I do not place any weight on these so-called experts.

Azzolina informed CMS that "the example discussed where the pharmacy is required to pay back to the plan a portion of the point of sale price as an adjustment is not applicable to our GER arrangements with network pharmacies."  (PTX-0026.)  This email did not disclose the existence of any offsetting provision, and in fact, at that time, Azzolina was "not familiar with" Caremark's offsetting provisions.  (N.T. Mar. 17, 2025 at 96:15-22.)

Despite knowing that CMS was "very concerned . . . [that] PBMs [were] over performing on [Pharmacy GER] contracts [and] clawing back those dollars," Caremark did not provide to CMS its pharmacy contracts, reconciliation spreadsheets, or any other documents which would have informed CMS about the offsetting provisions.  (Id. at 114:5-9; Rel. Scienter Fact ¶ 21.) Despite knowing that it could ask CMS for clarification, Caremark never asked CMS whether its one-way GER pharmacy guarantees and the offsetting provisions contained therein triggered DIR reporting obligations.  (Rel. Scienter Fact ¶ 22.)

CMS also discussed Caremark's reporting practices with Aetna in February 2015. (Caremark Materiality Fact ¶ 12.)  CMS auditors  issued a final report which "did not note any issue concerning Caremark's Pharmacy GER guarantees" and stated that Aetna's PDE and DIR reports were "fairly stated, in all material respects."  (Id. ¶ 14 (citing DX210).)  Again, however, I place very little weight on these facts because as discussed supra, Aetna did not have enough information about the form and function of Caremark's pharmacy contracts to adequately explain Caremark's pricing scheme to CMS.

In sum, I find that Caremark's argument—that it fully disclosed to CMS and Aetna its pricing arrangements with the pharmacies—deserves little consideration.

### C.  Causation as to Aetna

Part D sponsors such as Aetna were required to submit both PDE records and DIR reports to CMS.  (Joint Stips. ¶¶ 126-129.)  PDE records were submitted each time a covered Part D drug was dispensed to a Part D beneficiary.  (Id. ¶ 127.)  DIR reports, which covered direct and indirect remuneration after a prescription is adjudicated at the point of sale, were submitted by the Part D sponsor at the end of each year.  (Id. ¶ 130.)  DIR reports captured "11 different categories" of DIR and CMS issued detailed guidance each year instructing Part D sponsors and PBMs on what was reportable DIR.  (Id. ¶¶ 131, 135-36.)

Aetna maintained its own claims adjudication system which it called the "Aetna Pharmacy Management Claim Adjudication System."  (Caremark Causation Fact ¶ 5.)  Claims adjudication is "the process that determines what a pharmacy will be reimbursed for a prescription drug at the point of sale."  (Joint Stips. ¶ 20.)  Nevertheless, Part D sponsors like Aetna "often rely on PBMs to perform claims adjudication services."  (Id. ¶ 21.)  Aetna relied on Caremark to submit certain information with respect to both its PDE records and DIR reports.

### i.    PDE Records

Caremark had the ability to set MAC prices—or price of an individual drug at the point of sale—for multi-source generic drugs.  (Id. ¶¶ 27, 29, 74, 85, 90, 150.)  Once a drug was purchased by an Aetna Part D beneficiary, Aetna received two pieces of information which it would input into its claims adjudication system.  First, Aetna would learn from the pharmacy that a prescription was filled and second, Caremark would provide "pricing assumptions to determine the point of sale paid amount."  (N.T. Mar. 18, 2025 at 39:4-8; id. at 42:4-13 (Aetna 30(b)(6) witness Clifford Passuello explaining Aetna's claims adjudication system).)  Once those pricing "assumptions" or "instructions" were provided by Caremark, the Aetna system implemented the instructions "in an

automated fashion." (Id. at 57:4-7.)  In turn, Aetna's system used those instructions "to calculate the exact dollar amount that [was] reported to CMS in the PDE data." (Id. at 57:8-12.)  In short, the PDE data Aetna supplied CMS was generated from information Caremark provided.

### ii.    DIR Reports

Both Aetna and Caremark contributed to the DIR reports submitted to CMS.  Caremark provided Aetna "draft reports with all the information [it] had in [its] systems."  (N.T. Mar. 13, 2025 at 186:14-17 (Caremark employee Rebecca Justice explaining Caremark's involvement in client DIR reporting).)  From 2011 to 2014, Caremark provided "DIR amounts to Aetna in the form of . . . an Excel spreadsheet based on the CMS template for DIR reports in which . . . Caremark added DIR amounts to [] categories" 5, 9, 10, and 11.  (N.T. Mar. 18, 2025 at 55:14-20.)  "Aetna did not change any of the values Caremark provided in the prepopulated DIR template."  (Joint Stips. ¶ 163.)  Caremark knew that the DIR templates it provided to Aetna did not report "any amounts derived from Caremark's overall Pharmacy GER calculations."  (Rel. Causation Fact ¶ 5.)

### iii.    Aetna's Reliance on Caremark's PDE and DIR Data

From 2012 through 2014, Caremark provided Aetna with attestations which certified, in pertinent part, that Caremark knew the pricing information it provided affected the calculation of CMS payments and that the data would be used to obtain Federal reimbursement.  (PTX-0078 (2012 Caremark attestation to Aetna); PTX-0079 (2013 Caremark attestation to Aetna); PTX-0094 (2014 Caremark attestation to Aetna).)  Aetna "required that Caremark provide attestations that the prices reported to CMS were true, accurate and complete, and Caremark did so."  (Rel. Causation Fact ¶ 7.)  These attestations were meant to "verify that [Caremark was] reporting to Aetna in accordance with the identified rules and regulations . . . regarding negotiated prices and

35

direct and indirect remuneration." (N.T. Mar. 13, 2025 at 148:3-9 (Caremark employee James Margiotta, who signed some of the attestations, explaining their purpose).) Aetna relied on the accuracy of Caremark's submissions because "the attestations [Caremark provided] were [meant] to tell [Aetna] things that [Caremark] would know [and] that [Aetna] wouldn't." (N.T. Mar. 19, 2025 at 42:15-21 (Aetna Deputy General Counsel Charles Klippel explaining why Caremark's attestations were necessary); N.T. Mar. 18, 2025 at 38:19-23 (Passuello testifying that Aetna relied on Caremark's attestations that "the assumptions [Caremark] gave [Aetna] is what [Aetna] should be paying and what's paid to the pharmacy"); Id. at 59:10-23 (Passuello agreeing that "Aetna required these attestations because Aetna relied on Caremark to provide the PDE and DIR amounts that were then, in fact, reported to CMS").)

As discussed previously, after Relator raised her concerns about Caremark's pricing practices, Aetna hired Art Lerner to "investigate whether Caremark's overall Pharmacy GER guarantees . . . triggered any price-reporting obligations under CMS regulations." (Caremark Causation Fact ¶ 10.) Throughout Aetna's investigation, Aetna did not reopen any of its previous PDE or DIR reports submitted to CMS, relied on "all the information" Caremark provided, and made an "independent decision to continue reporting in the same manner." (N.T. Mar. 19, 2025 at 106:19-23.)

It is worth repeating that the "information available to" Aetna, however, was provided entirely by Caremark. And, as discussed supra, Caremark failed to inform Aetna or its outside counsel of the offsetting provisions contained in its pharmacy contracts and the reportable DIR created as a result.

The Aetna investigation described above was the only action Aetna took to verify the pricing instructions, DIR templates, and Caremark attestations.  As a result, Aetna did not know the true nature of Caremark's pricing arrangements with the pharmacies.

### D.  CVS Health Corporation's Liability

Relator proceeds against Defendants CVS Health Corp., Caremark Rx, L.L.C., CaremarkPCS Health, L.L.C., and Caremark Part D Services, L.L.C.   (Joint Stips. ¶¶ 1-4.) Defendants provided an organizational chart setting out the relationship between these organizations:



(Caremark Trial Demonstratives (ECF No. 463) at 123 of 123.)  Defendants dispute liability as to CVS Health Corp., the parent company.

CVS Health Corp. was not a party to Caremark's PBM agreement with Aetna.  (See DX011.0010 (this contract, which covered the years in question, was between Aetna and CaremarkPCS Health, L.L.C. (on behalf of Caremark RX, L.L.C.)).)  Similarly, CVS Health Corp. was not a party to Caremark's PBM contracts with SilverScript.  (See DX026.0001.)  In addition,

CVS Health Corp. was not a party to Caremark's contracts with either Rite Aid or Walgreens. (See DX042.0001 (Addendum to Network Reimbursement Agreement as between PCS Health Systems, Inc. and Rite Aid Corp.); DX033.0001 (Addendum to Walgreens Provider Agreement showing contract between PCS Health Systems, Inc. and Walgreen Co.).)  Nonetheless, at trial, it became clear that current and former Caremark or CVS Health Corp. employees referred to their employer—whether the parent company or Caremark—as "CVS Health."  (Caremark CVS Health Corp. Liability Fact ¶ 9.)  This confusion is best resolved by examining the documentary evidence.

During the relevant time period, CMS "required Part D plan sponsors and PBMs they retained to generate claims data to execute attestations certifying, based on 'best knowledge, information and belief,' the 'accuracy, completeness, and truthfulness of the data' and acknowledging that it would be used 'for the purpose of obtaining Federal reimbursement.'"  (Joint Stips. ¶ 49 (quoting 42 C.F.R. § 423.505(k)(3)).)  SilverScript, which was a Part D sponsor and subsidiary of CVS Health Corp., submitted such attestations.   From 2013 to 2016, those attestations were signed by individuals whose listed organization was "CVS Health Corp."  (See PTX-0210 (2013 SilverScript attestation signed by CVS Health Corp. CFO & Treasurer); PTX-0211 (2014 SilverScript attestation signed by CVS Health Corp. CFO for SilverScript); PTX-0212 (2015 SilverScript attestation signed by CVS Health Corp. VP and CFO for Medicare); PTX-0213 (2016 SilverScript attestation signed by CVS Health Corp. representative Todd Meek).)

CVS Health Corp.'s Executive Vice President, Jon Roberts, assisted Caremark (the PBM) in determining how the overall GER guarantee should be managed for Rite Aid in 2013 and 2014. (See N.T. Mar. 10, 2025 at 141:18-21.)  An internal Caremark slideshow shows that Roberts suggested GER "[r]ates . . . needed with Rite Aid" for those years.  (PTX-0312A at 8 of 9.)  That same document shows that while the 2013 and 2014 overall Rite Aid GER guarantee would be set

at 80.50%, Part D would be set at a lower discount (higher price) of 76.50% and commercial would be set at a higher discount (lower price) of 83.70%. (Id.; see also N.T. Mar. 10, 2025 at 142:2-4 (Caremark employee John Lavin explaining that the targets were "83.7 for 2013 [commercial] versus overall and Med D was 76.5"); see also id. at 143:16-24 (Lavin agreeing that "Mr. Roberts' targets, all had Medicare D -- having the pharmacy be paid more on Med D than the overall GER and less on commercial").)

David Azzolina, who was responsible for providing verbal and written responses to CMS during the relevant time period, was the Vice President for finance at CVS Health Corp. (See N.T. Mar. 17, 2025 at 62:3-10.) He worked in the "Caremark business unit" from 2010 to 2018. (See id. at 105:12-24.) In February of 2017, Azzolina emailed a "Recap of [his] Meetings with CMS" to CVS Health Corp. President and CEO Larry Merlo, CVS Health Corp. Executive Vice President Jon Roberts, and CVS Health Corp. Chief Financial Officer David Denton. (PTX-0286.) Still, a number of former or current employees explained that CVS Health Corp. operated separately from Caremark when it came to PBM and Part D services. Allison Brown, who signed a declaration stating she was an employee of CVS Health Corp. and whose comments to Aetna in 2013 led to Aetna's internal investigation, testified that CVS Health Corp. was not involved in any of Caremark's PBM activities. (N.T. Mar. 19, 2025 at 186:14-16.)

### E. Damages[12]

#### i. Dr. Loren Smith

Relator's damages expert Dr. Loren Smith is an economic consultant who, from 2005 to 2013, served as a staff economist at the United States Federal Trade Commission. He has a Ph.D

---

[12] Because, as will be explained later, Relator has not met her burden regarding Falsity as to CVS Pharmacy, I include only those facts relevant to the damages calculation for Walgreens and Rite Aid.

in economics and while at the FTC, he led investigations into high-profile competition and consumer protection matters, including matters involving allegations of anticompetitive and other consumer-harming conduct by pharmacy benefit managers.  At trial, his qualifications went unchallenged.  (See N.T. Mar. 17, 2025 at 128:9-18.)

Dr. Smith calculated damages as the difference between what CMS *actually* paid in subsidies versus what CMS *would have* paid had Caremark submitted PDE or DIR reports which accurately reflected the aggregate average price point negotiated and paid to the pharmacies.  Smith's methodology thus required two steps: (1) calculate the pricing discrepancy; and (2) determine the difference in subsidies.

### 1.  Pricing Discrepancy

Dr. Smith first calculated the "discrepanc[y] between what was actually reported to CMS and what would have been reported had [Caremark] instead priced [] drugs in the aggregate at a price equal to the Pharmacy GER."  (N.T. Mar. 17, 2025 at 158:11-15.)  Smith used PDEs, DIR Reports, Payment Reconciliation System (PRS) data, and documents showing Pharmacy GERs to calculate the discrepancies.  (See N.T. Mar. 17, 2025 at 159:20-160:16 (Smith explaining that PRS reports: (1) are created by CMS; (2) show "the reconciliations for the subsidies that the government pays"; and (3) include "the total amount of drug costs . . . reported in PDE and DIR reports."); see also PTX-0562 (a 1006 summary of data files produced by Defendants inclusive of PRS reports used by Smith to calculate damages).)

Smith determined pricing discrepancies in two ways.  First, he calculated the difference between the overall Pharmacy GER and the realized, or average discount, reported by Aetna or SilverScript to CMS.  (See Rel. Damages Fact ¶ 10.)  To calculate the  average discount, Smith relied on PDE and DIR data taken from payment reconciliation system reports produced by CMS.

(N.T. Mar. 17, 2025 at 159:20-160:16; see also id. at 163:3-7.)  Second, Dr. Smith calculated the difference between the overall Pharmacy GER and the amount reported to CMS when set to equal the Part D sponsor's GER.  (See Rel. Damages Fact ¶¶ 10-11.)  Caremark does not dispute that Smith calculated—from a computational perspective—the pricing discrepancies correctly.  (N.T. Mar. 20, 2025 at 20:6-11 (Caremark expert Brett Barlag).)

I find Relator's first method (average discount) reliable because Relator used actual PDE and DIR data taken from PRS reports provided by CMS.  This data thus represented the actual prices and price concessions reported to CMS.  Relator's second method (price reported as plan GER), however, is not compelling.  Although it is true that Caremark got "as close as [it] could" to hitting the Plan GERs, the testimony was clear that Caremark "never hit a [Plan GER] exactly," and that Caremark was "always off."  (N.T. Mar. 13, 2025 at 222:17-19.)  Caremark expert Brett Barlag explained this concept succinctly: "The comparison of the plan GER guarantee with the pharmacy GER guarantee [in this context] also holds Caremark responsible for theoretical reimbursement amounts, rather than the prices actually reported to CMS."  (Barlag Written Testimony ¶ 42.)  I agree and find the average discount price discrepancy method to be a more reliable calculation of damages.

Once the pricing discrepancies were calculated for Aetna and SilverScript generally, Dr. Smith then allocated those amounts among the individual Aetna and SilverScript Part D plans "by year based on ingredient cost."  (Rel. Damages Fact ¶ 13; see also Caremark Damages Fact ¶ 11; N.T. Mar. 17, 2025 at 169:15-22.)  For example, for SilverScript in 2013, the total pricing discrepancy based on the average discount calculation was $43 million.  (See PTX-0564 (demonstrative citing Smith Suppl. Rpt. Table 1).)  Dr. Smith then divided that amount amongst the individual SilverScript plans for that year based on the percentage of ingredient cost each plan

41

was responsible for.  (N.T. Mar. 17, 2025 at 171:4-13.)  Such an allocation was consistent with CMS guidance.  (See id.)[13]  Although Caremark expert Brett Barlag disagreed with Smith's allocation, he did not offer any alternative method to allocate DIR across Aetna or SilverScript plans.  (Rel. Damages Fact ¶ 14.)  Instead, Mr. Barlag opined that allocation was unnecessary and that, instead, Dr. Smith should have performed his calculations "at the individual plan level."  (See N.T. Mar. 20, 2025 at 29:24-30:14.)

Smith calculated a total pricing discrepancy for 2013 and 2014 at Walgreens and Rite Aid of $123 million when using the average discount method:



**Amounts By Which Prices Reported to CMS in the Prescription Drug Events (PDEs) Exceeded Prices Equal In the Aggregate to the Overall Pharmacy Generic Effective Rates (GERs) (Covering Medicare Part D and Commercial)**
*(in Millions of Dollars)*

| | Year | Walgreens | Rite Aid |
|---|---|---|---|
| | | [A] | [B] |
| | **SilverScript** | | |
| [1] | 2013 | $17 | $26 |
| [2] | 2014 | $35 | $30 |
| [3] | 2015 | - | - |
| [4] | 2016 | - | - |
| | **Aetna** | | |
| [5] | 2013 | $4 | $5 |
| [6] | 2014 | - | $7 |
| [7] | **SilverScript:** | **$53** | **$55** |
| [8] | **Aetna:** | **$4** | **$12** |
| [9] | **Total:** | **$56** | **$67** |

---

[13] Caremark contends that "Dr. Smith . . . did not identify the CMS Guidance he relies on."  (ECF No. 483 at 138.)  In his written rebuttal testimony, however, Smith cites to his reply report, which in turn cites to CMS guidance from 2016, which is in evidence as PTX-0166.  That Guidance explains:

> We are aware, however, that some sponsors may receive and/or record DIR at the sponsor or contract level, instead. To satisfy the reporting requirements, such Part D sponsors must allocate DIR to the PBP and 11-digit NDC level by applying reasonable allocation methodologies. A description of all allocation methodologies used to report DIR at the PBP and/or 11-digit NDC level must be submitted by the sponsor in HPMS as part of the 2016 DIR Submission Information Report.

(PTX-0166 at 12.)  One such methodology includes "Allocation to the PBP level based on Plan's Total Drug Spend."  (Id. at 13.)

(PTX-0564); see also N.T. Mar. 17, 2025 at 163 (discussing Plaintiff's demonstrative PTX-0564).)

The analysis does not stop there, however. Instead, because CMS subsidizes only part of the reported drug prices, Smith calculated damages to be "[a]pproximately 60 to 70 percent of this number." (N.T. Mar. 17, 2025 at 164:1-5; see also id. at 164:6-9 (Smith explaining that the non-subsidized 30 to 40 percent is "paid by the plan sponsors and their members").)

### 2. Subsidy Allocation

During the relevant period, CMS "subsidized a portion of the cost of providing prescription drugs to Medicare beneficiaries insured under Medicare Part D plans. Generally, a subsidy can be understood as a reimbursement from CMS to cover a portion of the Part D sponsor's spending on prescription drugs." (Joint Stips. ¶ 36.) Relevant to this case, CMS paid Part D sponsors three different types of subsidies: (1) Low-Income Cost Subsidy (LICS); (2) Federal Reinsurance; and (3) Risk-Sharing. (Rel. Damages Fact ¶ 2.) To calculate the subsidy discrepancy, and thus damages, Smith used two methods: (1) the DIR method and (2) the PDE method. Both Parties agree that subsidies are impacted differently depending on which method is used. (Rel. Damages Fact ¶¶ 4, 5.)[14] Smith explained that only two of those subsidy types are relevant to the DIR method but all three are applicable where the PDE method is used.

Dr. Smith used "CMS subsidy formulas and calculations to calculate the subsidies that CMS would have paid had the Pharmacy GERs been reported in either PDEs or DIR Reports." (Rel. Damages Fact ¶ 15.)

I explained Dr. Smith's DIR-based method in my Summary Judgment Opinion:

---

[14] I more thoroughly explained each subsidy type in my Summary Judgment Opinion. (See S.J. Op. at 15-18.) The Parties have also stipulated to how each subsidy worked. (See Joint Stips. ¶¶ 36-49.)

> In that method, Dr. Smith assumed that Caremark's clients would have continued to include individual sale prices in PDE records but would have reported Caremark's negotiated average prices as price concessions. For example, if an Aetna Part D plan paid $12 on an individual sale for drug X, but the cost of drug X would have been $10 if measured using the negotiated average, Caremark would have reported $2 as a price concession, effectively telling CMS that the $12 payment should be reduced to $10.

(S.J. Op. at 36.)  Dr. Smith took the amount CMS actually paid Aetna and SilverScript in subsidies and subtracted therefrom the amount it would have paid had the appropriate price concession been reported as DIR.  Smith allocated DIR adjustments across individual Aetna and SilverScript plans, meaning that even if an individual Aetna or SilverScript plan "achieved larger discounts than the Pharmacy GER," thus decreasing the price discrepancy, that amount would be "equally offset by an increase in pricing discrepancy at other Aetna (or SilverScript) Part D Plans."  (Smith Written Rebuttal Testimony ¶ 2.)  As a result, and by using the average discount pricing discrepancy model, Dr. Smith calculated damages at $95 million under the DIR-Based methodology.  (See N.T. Mar. 17, 2025 at 174:8-15; PD-012 (citing Smith Suppl. Rpt. Table 2).)

For his PDE damages calculation, Dr. Smith used "an aggregate methodology that calculated the lower subsidies CMS would have paid had prices *in the aggregate* equal to the overall Pharmacy GERs been reported in PDEs."  (Rel. Damages Fact ¶ 16 (emphasis in original).)  To be clear, Dr. Smith did not individually recalculate millions of PDE records to match the overall Pharmacy GER.  (Id.)  For reasons explained later, and because I do not rely on Dr. Smith's PDE-based damages calculation, I decline to describe the method further.

    ii.  *Mr. Brett Barlag*

Mr. Barlag holds a bachelor's degree from Notre Dame and a master's degree in business administration from Columbia Business School.  (Barlag Written Testimony ¶ 2.)  He is a Senior

Managing Director of the Health Risk Management and Advisory Practice at FTI Consulting, Inc. (Id. ¶ 3.)  Before that, he served as the Chief Financial Officer and Chief Strategy Officer at Maxim Healthcare.  (Id.)  His qualifications went unchallenged at trial.  (N.T. Mar. 20, 2025 at 10:3.)

Mr. Barlag challenged Dr. Smith's damages analysis both generally and specifically.[15]

### 1.  Years Not Considered

First, Mr. Barlag opined that Dr. Smith's entire damages calculation should be disregarded because it is "inherently unreliable." (Barlag Written Testimony at 6.)  Barlag explained that Smith only calculated damages for 13 of 30 possible pharmacy, sponsor, and year combinations.  (Barlag Written Testimony ¶¶ 22-37.)  While it is true that Smith did not provide calculations for some 17 pharmacy, sponsor, and year combinations, he had good reason not to do so.

First, Smith did not calculate damages for 2011-2012 at Rite Aid and 2015-2016 at Walgreens because Caremark maintained separate Part D and commercial GERs with Rite Aid and Walgreens, respectively.  (N.T. Mar. 20, 2025 at 35:11-25 (Barlag agreeing those years were excluded because "they[ were] not part of [Relator's] case").)  As explained at summary judgment, "Relator's claims only relate to pharmacies and years for which the average pricing guarantees encompassed both commercial and Part D purchases." (S.J. Op. at 23.)  It is thus unsurprising that years where the Pharmacy GERs were not "overall" are excluded from Dr. Smith's calculations.

Second, Dr. Smith excluded from his calculations Aetna claims at Walgreens in 2014 and SilverScript claims at Rite Aid in 2015 and 2016 because the pharmacy GERs in those years did

---

[15] Because I find that Relator has not made out her claims relating to the CVS Pharmacy Budgeted GERs, I will not address Mr. Barlag's first opinion.  I also will not address Mr. Barlag's third opinion because I do not rely on the Plan GER method for calculating pricing discrepancy.  Finally, I do not address Mr. Barlag's fourth opinion concerning the number of allegedly false claims.  The issue of how many false claims were submitted to CMS is best decided after this opinion is issued and during briefing regarding treble damages and statutory penalties.

not cover claims from those Part D sponsors' members.  (Barlag Written Testimony ¶ 29.)  The exclusion of those combinations is not surprising for the same reasons stated above.

Finally, Dr. Smith excluded from his calculations combinations where there was either "no" or "little" evidence of fraud."  (Id. ¶¶ 30-35.)  Barlag explained that when analyzing damages, his view "is that an expert should analyze all relevant years."  (Id. ¶ 34.)  Dr. Smith's work papers showed "that Caremark paid Walgreens over $12.2 million *less* than the overall discount rate in the overall pharmacy GER guarantee for Aetna and SilverScript's Part D claims in 2011 and 2012." (Id. ¶ 32 (emphasis in original).)

## VI.    CONCLUSIONS OF LAW

### A.  Falsity as to CVS Pharmacy

To recap, at summary judgment, I found that:

> when Caremark had a contractual obligation to Walgreens and Rite Aid to pay at least a certain average price for drugs, and in fact paid no more than that average price, the negotiated average was what Caremark "actually paid."  The reason is that Caremark's overall indebtedness to the pharmacy would increase by the negotiated average price for each purchase, regardless of what price Caremark put down at the time of sale.

(S.J. Op. at 69.)  I left open for trial the question of "whether similar reasoning could apply to CVS [Pharmacy], where there was not a formal written contract but rather some other type of arrangement on what the average price would be."  (Id.)  At trial, Relator was required to prove, by a preponderance of the evidence, that: (1) the Budgeted GER's between Caremark and CVS Pharmacy represented what Caremark "actually paid"; and (2) what those average price targets were.  (Id. at 70.)  For the following reasons, I conclude that Relator has not met that burden.

i.    *Actually Paid*

The applicable regulations define "actually paid" as "costs that were: (1) 'actually incurred,' (2) adjusted for price concessions and other 'direct and indirect remuneration' (DIR), and (3) the 'negotiated prices' between the PBM and the pharmacy." (Id. at 58.)  The question left for trial was whether Caremark's Budgeted GERs with CVS Pharmacy were "negotiated" and whether "both sides viewed the outcome of their negotiation as obligatory."  (Id. at 70.)

The regulation defining "negotiated price" does not itself define the term "negotiated."  See 42 C.F.R. § 423.100 (effective June 7, 2010) (defining "negotiated prices" as "prices … that[] … [t]he [PBM] and the network dispensing pharmacy . . . have negotiated as the amount [the pharmacy] will receive, in total, for a particular drug.").  In addition, and as explained in my Summary Judgment Opinion, neither party offered "authority on the meaning of these terms beyond their regulatory definitions." (S.J. Op. at 70.)  "When words are not defined within the statute, we construe them 'in accordance with [their] ordinary or natural meaning.'"  Bonkowski v. Oberg Indus., Inc., No. 14-1239, 2015 WL 2444503, at *8 (3d Cir. May 22, 2015) (quoting FDIC v. Meyer, 510 U.S. 471, 476 (1994)).  "In such cases, resorting to dictionary definitions may be helpful."  Id. (citing MCI Telecomm. Corp. v. Am. Tel. & Tel. Co., 512 U.S. 218, 225 (1994)).

"Negotiate" is defined as:

> 1. To communicate with another party for the purpose of reaching an understanding <they negotiated with their counterparts for weeks on end>;
>
> 2. To bring about by discussion or bargaining <she negotiated a software license agreement>
>
> . . . .

*Negotiate*, BLACK'S LAW DICTIONARY (12th ed. 2024).

The Walgreens and Rite Aid contracts were negotiated instruments resulting from the bargaining of sophisticated parties. The contractual GERs contained therein were obligatory because "Caremark's overall indebtedness to the pharmacy would only increase by the guaranteed average price, and any amount by which the individual sale price exceeded the guaranteed average would be recouped by year's end." (S.J. Op. at 61.) An illustration from my Summary Judgment Opinion warrants review:

> To better understand this term as used in the CMS regulations, suppose an Aetna Part D member purchased drug X from Walgreens, and that Caremark's negotiated average price [for] that drug was $10 but Caremark paid $15 to Walgreens for that individual sale. Even though Caremark initially put down $15, the total amount of money that would actually leave Caremark's pocket by the end of the year would be $10, not $15. This result was driven by Caremark's obligation to reimburse based on end-of-year averages. Every extra dollar above $10 that Caremark gave Walgreens for this purchase would be one dollar less that Caremark would have to pay Walgreens by the end of the year to make the average $10. Conceptually, Caremark would get $5 back. Various additions and subtractions might occur over the course of the year before Caremark ultimately paid $10, but moving these sums back and forth would not change the fact that Caremark was ultimately obligated to pay $10 for every purchase of drug X.

(Id. at 58-59.)

But, as explained below, the Budgeted GERs with CVS Pharmacy did not create the same result.

### 1. Negotiated

I start with what agreements, if any, existed between Caremark and CVS Pharmacy. Caremark and CVS Pharmacy entered into "Provider Agreements," which established each entity's legal obligations to one another. (See DX058, DX059.) Although these agreements contained provisions on how to determine the point-of-sale price, they did not contain GER

guarantees.  (See id.; N.T. Mar. 10, 2025 at 195:3-9 (John Lavin explaining that from 2011 to 2016 Caremark's contracts with CVS pharmacy did not include a pharmacy GER guarantee).)

It is true that some Caremark employees considered the Budgeted GER as a "negotiation." (See N.T. Mar. 10, 2025 at 195:17-25 (John Lavin explained that "senior leadership" from CVS Pharmacy and Caremark would ultimately decide what the budgeted GER would be); (N.T. Mar. 18, 2025 at 15:4-8 (CVS Pharmacy 30(b)(6) witness Stacey Bernstein testified that she recalled "negotiations between CVS Pharmacy and Caremark," but explained there was not "necessarily any alignment on what the targeted budget numbers would be.").)  But, the subjective view of Caremark's employees does not prove Relator's claim.  Instead, it is important to look at the form of the "negotiations."

Eva Boratto, the Controller and Chief Accounting Officer for CVS Health Corporation from 2013 to 2016, explained the nature of the negotiations:

> I would understand and learn from CVS Caremark what their desires were as it pertained to winning in the market place, growth goals, new clients up for bid, mix of business, et cetera, what their desires were.  Separately and distinct, I would meet with the CVS retail pharmacy organization to have the same conversion [sic] through their lens. And I would share that, again, with my boss, Dave Denton, around the desires of both sides. And, you know, share that with him for ultimate decision.

(N.T. Mar. 14, 2025 at 148:18-149:5.)  From there, Dave Denton—Chief Financial Officer for CVS Health Corp.—met "with other senior leaders [and they would] ultimately [] decide what was the budgeting or planning assumption."  (Id. at 149:8-10.)  The purpose of these discussions was to align the interests of CVS Pharmacy and Caremark, which were both under the umbrella of CVS Health Corp.  (See id. at 149:14-21 (Eva Boratto explaining that the Budgeted GERs were a "critical assumption for the company" and that the decision was made "with the full company's

49

best interest in mind").)  The Budgeted GER was "set during the CVS Health . . . annual budget process."  (<u>Id.</u> at 135:23-136:3.)  Moreover, the Budgeted GERs changed throughout the year based on internal forecasts.

The evidence does not show that CVS Pharmacy and Caremark engaged in some arms-length negotiation or bargaining.  Rather, it is more consistent with a parent company—CVS Health—listening to each subsidiary's position and then implementing a Budgeted GER aimed at benefiting the company as a whole.  Accordingly, I find that the Budgeted GERs were not "negotiated."

## 2.  Obligatory

Even if the Budgeted GERs were "negotiated," they did not place some "obligation" upon Caremark and CVS Pharmacy.  The most compelling evidence to support this conclusion is that, unlike the contractual GER guarantees, the Budgeted GERs did not provide for a reconciliation or "true-up" payment if Caremark underpaid relative to the Budgeted GER.  (Caremark Falsity Fact ¶ 6; N.T. Mar. 10, 2025 at 196:6-16 (former Caremark employee John Lavin explaining that the Budgeted GER did not impose any financial obligation on Caremark and that, to his knowledge, Caremark never made a reconciliation payment to CVS Pharmacy); N.T. Mar. 14, 2025 at 150:6-151:24 (Eva Boratto explaining that Caremark did not make end-of-year reconciliation payments to CVS Pharmacy); <u>id.</u> at 72:13-17 (Domenico Gugliuzza explaining that the "biggest difference [between the contractual GERs and the Budgeted GER] is at the end of the year there's no payment that was made between [Caremark and CVS Pharmacy]").

Relator contends that the absence of a contractual offsetting provision is not dispositive and urges me to look to the manner in which Caremark managed MAC prices to hit the Budgeted GER.  The best and only example of Caremark making a payment that could theoretically resemble

an end-of-year reconciliation payment came in 2016. Then, Caremark increased commercial MAC prices by $13 million to make up for a shortfall as it relates to the Budgeted GER. (See PTX-0099.) This change in MAC pricing was made "to meet the *target*," or the Budgeted GER for that year. (N.T. Mar. 17, 2025 at 58:3-6 (emphasis added).) There is no evidence that Caremark made any other such changes to account for shortfalls relative to the Budgeted GER in other years.

The record indicates that Caremark was incredibly effective at managing MAC prices to hit the Budgeted GER. (See N.T. Mar. 10, 2025 at 126:15-18 (John Lavin agreeing that Caremark's MAC management team "had the ability to manage MAC very closely to the . . . budgeted [] GERs"); N.T. Mar. 14, 2025 at 31:20-23 (Domenico Gugliuzza explaining that his team was "good" at hitting the Budgeted GER); N.T. Mar. 17, 2025 at 28:20-23 (Ms. Kinney was impeached with her deposition testimony in which she explained she could not remember any year where Caremark missed the Budgeted GER target). Still, in the absence of a true-up or reconciliation payment requirement, Caremark's ability to manage to a budget does not sufficiently prove that the Budgeted GER was obligatory. Rather, I conclude that the arrangement between Caremark and CVS Pharmacy existed because that was what CVS Health Corp. determined was best for the health of the company.

In these circumstances, I cannot find that the Budgeted GERs created a binding agreement. Although Caremark *tried* to hit the target, they were not *obligated* to do so. If Caremark missed the target, they were not required to send monies to CVS Pharmacy to make up for the shortfall. Thus, unlike the contractual GERs with Rite Aid and Walgreens, where Caremark's "overall indebtedness" was increased only by the negotiated average price, the same cannot be said of the Budgeted GERs.

ii.    *Identifying the Budgeted GERs*

Finally, even if the Budgeted GERs were negotiated and obligatory, I am not convinced that Relator has presented competent evidence showing *what* those Budgeted GERs actually were. Relator relies on documents that Caremark produced in determining the Budgeted GERs for the years in question. Nevertheless, questions remain regarding the precise nature of the Budgeted GERs.

To establish the Budgeted GER for 2013-2016, Relator relies on different cells, in different tabs, with different names, in various Caremark reconciliation look-a-like spreadsheets to show the existence of a Budgeted GER. (Compare PTX-0115 (Relator relies on a cell showing the realized overall GER) with PTX-0116 (Relator relies on a cell titled "2015 Target") with PTX-0117 (Relator relies on a cell titled "Discount" for "All Other").) For 2013, Relator points to an internal slideshow which contains two separate Budgeted GER amounts. (See PTX-0190 (on one page the Budgeted GER appears to be "79," but on the next, it appears to be "79.8").) No witness could confirm which amount was correct for 2013. (See N.T. Mar. 14, 2025 at 25:10-15 (Domenico Gugliuzza explaining that he could not recall whether the 2013 Budgeted GER was 79.8 percent); id. at 28:13-20 (same); id. at 145:13-147:15 (Eva Boratto explaining that she could not remember which rate was the Budgeted GER but "looking at [PTX-0190], the CVS rate . . . was [] 79 percent.").) Although in a vacuum, the difference between "79" and "79.8%" may seem *de minimis*, the difference could equate to millions of dollars.

In 2014, Relator's own expert explained that he "wasn't comfortable" with Caremark documents and thus used "the realized value in the last document that [he] could find for that year as an *approximation* of the . . . target." (N.T. Mar. 17, 2025 at 182:10-18.) Moreover, witnesses

made clear that the Budgeted GERs—unlike the contractual GER guarantees—changed throughout the year.  (Caremark Falsity Fact ¶ 7.)

In sum, Relator has not made out falsity as to CVS Pharmacy.  Relator has failed to show the Budgeted GERs were "negotiated," rather than decided unilaterally by the parent company for budgeting purposes.  Relator has also failed to show that the Budgeted GERs were obligatory because there was no consequence if Caremark missed the mark and the budget assumptions could be changed throughout the year.  And finally, Relator has not sufficiently proven what the Budgeted GERs actually were.

## B.  Materiality[16]

Relator was required to prove that the "violation be, among other things, 'material' to the government's decision to pay."  United States *ex rel.* Druding v. Care Alternatives, 81 F. 4th 361, 365 (3d Cir. 2023) (quoting Universal Health Servs., Inc. v. United States *ex rel.* Escobar, 579 U.S. 176, 192-93 (2016)).  A violation is "material" to that decision if it has a "natural tendency to influence, or be capable of influencing, the payment or receipt of money or property."  31 U.S.C. § 3729(b)(4).

At summary judgment, "I accept[ed] Caremark's standard for materiality, and conclude[d] that Relator must establish that had CMS known of Caremark's guaranteed average pricing terms and the corresponding mismatch with reported prices, such knowledge would have had a 'likely' 'effect' on CMS's payment decisions."  (S.J. Op. at 78 (citing Escobar, 579 U.S. at 193).)

My inquiry is a "holistic" one and I consider the following non-exhaustive factors:

---

[16] After closing arguments, the Parties submitted supplemental briefing on the question of Materiality.  (ECF Nos. 495, 497.)  In addition, the Government filed a Statement of Interest, urging that its non-intervention decision should "not be used as a basis to defeat materiality."  (ECF No. 498 at 3.)  Many of the arguments presented by Relator, Caremark, and the Government are already addressed in this Opinion.

(1) whether the representation went to a condition of payment (i.e., an express condition or an implied condition for which the Government would have the option to decline payment, though neither is dispositive); (2) whether the representation was "minor or insubstantial"; and (3) if the Government knew the facts surrounding the representation, the Government's reaction to it (i.e., whether it continued to pay the claim in full).

United States *ex rel.* Krahling v. Merck & Co., Inc., No. 23-2553, 2024 WL 3664648, at *6 (3d Cir. Aug. 6, 2024) (citing Escobar, 579 U.S. at 194-95.).

### i.    Condition of Payment

"[T]he Government's designation of compliance with a particular regulatory requirement as a condition of payment is relevant to, but not dispositive of, materiality." United States *ex rel.* Int'l Brotherhood of Electrical Workers Local Union No. 98 v. The Farfield Co., 5 F.4th 315, 343 (3d Cir. 2021) (internal citations omitted).

It is undisputed that CMS payments were "conditioned upon" price reports made by Part D sponsors in the manner specified by the Secretary of Health and Human Services and CMS. (Joint Stips. ¶ 48.); see also (Caremark Resp. to Rel. Materiality Fact ¶ 4); 42 U.S.C. § 1395w-115(d)(2)(A).  CMS required Part D sponsors and their PBMs to "execute attestations certifying, based on 'best knowledge, information and belief,' the 'accuracy, completeness, and truthfulness of the data' and acknowledging that it would be used 'for the purpose of obtaining Federal reimbursement.'"   (Joint Stips. ¶ 49 (quoting 42 C.F.R. § 423.505(k)(3)).)   In turn, those attestations focused on specific price reports, including DIR, and certified that such reports affected the way CMS calculated payments to Aetna or SilverScript.[17]  (See N.T. Mar. 13, 2025 at

---

[17] See PTX-0104 (2011 Attestation from Caremark to Aetna acknowledging that the information provided "directly affects the calculation of CMS payments to Aetna . . . under the Medicare Part D program and that the DIR data will be used for the purpose of obtaining Federal reimbursement"); PTX-0078 (2012 Attestation from Caremark to Aetna acknowledging the same); PTX-0079 (2013 Attestation from Caremark to Aetna acknowledging the same); PTX-0094 (2014 Attestation from Caremark to Aetna acknowledging the same); PTX-0210 (2013 Attestation from Caremark to

173:11-18  (Caremark corporate witness Rebecca Justice agreeing that "Medicare relies on truthful and accurate price reporting" including "any post point-of-sale adjustments").)

Taken together, this evidence establishes that CMS's payment decisions were conditioned on accurate reporting—through either PDE or DIR reports—as to what Caremark actually paid to the pharmacies.  It follows that, if CMS knew that Caremark had not provided accurate reports to the Part D sponsors, and the sponsors in turn submitted inaccurate reports—thus violating a condition of payment—CMS would not have paid the subsidies based on such faulty reporting.

> ii.    *Whether the Representation was "Minor" or "Insubstantial" or Goes to the "Essence of the Bargain"*

"The next non-exclusive factor identified by the Supreme Court in <u>Escobar</u> is whether the 'non-compliance is minor or insubstantial' or 'the extent to which the requirement that was violated is central to, or goes to the very essence of, the bargain.'"  <u>United States *ex rel.* Krahling v. Merck & Co., Inc.</u>, No. 10-4374, 2023 WL 8367939, at *12 (E.D. Pa. July 27, 2023) (quoting <u>Escobar</u>, 579 U.S. at 194)).

The purpose of the 2010 rule change was to ensure that the Part D "sponsors' administrative costs [were] not included in the drug costs used to determine how much the beneficiary [would] pay, as well as [the subsidy] payments made by CMS."  (PTX-0192 at 2 of 3.)  Moreover, the change was designed to ensure "transparency[, providing] Part D sponsors with the information needed to more effectively negotiate with PBMs to reduce their risk premiums as well as other administrative fees."  74 Fed. Reg. at 1508.  The Government's Statement of Interest at summary judgment further explained that the rule change was designed to "discourage mark-ups associated

---

SilverScript acknowledging the same); PTX-0211 (2014 Attestation from Caremark to SilverScript acknowledging the same); PTX-0212 (2015 Attestation from Caremark to SilverScript acknowledging the same); PTX-0213 (2016 Attestation from Caremark to SilverScript acknowledging the same).

with 'lock-in' pricing, and to increase Part D drug price reporting accuracy." (ECF No. 312 at 3 (citing 74 Fed. Reg. at 1505).)

The essence of the bargain here was simple: Part D sponsors and PBMs would follow CMS guidance and report accurate prices to CMS, and in return, CMS would subsidize those costs accordingly. One particular CMS price reporting requirement deserves significant consideration. As discussed infra, CMS required Part D sponsors to report as DIR:

> Applicable pharmacy adjustments that reduce the total payments made to the pharmacy . . . as a positive adjustment that will serve to reduce the [Part D sponsor's] drug costs.

(DX219.0026.) This Guidance, "DIR #9," was well known in the industry. It was this Guidance that concerned CMS when it reached out to Caremark in 2016. Specifically, CMS asked Caremark whether its GER guarantees with the pharmacies called for "claw back" or "true-up" payments that flowed from the pharmacy to the PBM, thus reducing the post-point-of-sale price of Part D drugs. (See Caremark Materiality Fact ¶ 4; PTX-0026; PTX-0286 (Azzolina explaining that CMS's main focus on the March 8, 2016 call was "whether pharmacies were required to make true up payments to [] Caremark under a GER should their reimbursement be more than the minimum guaranteed amount").)

Because I have found that Caremark's GER guarantees with the pharmacies and the offsetting provisions contained therein were economically identical to two-way GER guarantees, and because Caremark failed to report to Aetna or SilverScript (and thus CMS) DIR generated as a result thereof, the prices of Part D drugs reported to CMS were grossly inflated.

The relevant question, however, is whether Caremark's reporting failures were minor or insubstantial. For the following reasons, I find they were neither. The regulations and guidance

demanded, and CMS relied on, accurate price reporting. Caremark's failure to comply resulted in the overpayment of tens of millions of dollars. See United States. v. Supervalu, Inc., No. 11-3290, 2024 WL 4351951, at *9 (C.D. Ill. Sept. 30, 2024) (finding Relator was entitled to summary judgment as to materiality and explaining that "a misstatement regarding the collection of more money than actually owed was sufficient to establish materiality"). This amount is neither minor nor insubstantial and it is "highly implausible" that CMS would "willingly [subsidize] inflated" Part D prescription prices had it known about Caremark's offsetting provisions. United States *ex rel.* Grubea v. Rosicki, Rosicki & Assocs., P.C., 318 F. Supp. 3d 680, 702 (S.D.N.Y. 2018). Indeed, although the Government did not intervene in this action, it filed a Statement of Interest at summary judgment, explaining in part that "the United States has a strong interest in ensuring that the Part D program does not pay inflated drug prices and that the information that Plan Sponsors and their PBMs report to CMS reflects the true costs of the program." (ECF No. 312 at 2.)

This factor weighs in Relator's favor on the issue of materiality.

### iii.    The Government's Reaction to the Representation if Discovered

Caremark's entire argument against materiality focuses on what CMS knew and how it reacted. Specifically, Caremark urges that Relator has not made out materiality because: (1) CMS was informed of Caremark's pricing scheme; (2) CMS continued to reimburse Aetna and SilverScript; and (3) CMS never sanctioned or otherwise brought an enforcement action against Caremark.

CMS's understanding of Caremark's pricing scheme may be evidence against materiality if: (1) "the Government pays a particular claim in full despite its actual knowledge that certain requirements were violated"; and (2) "the Government regularly pays a particular type of claim in

full despite actual knowledge that certain requirements were violated, and has signaled no change in position." Escobar, 579 U.S. at 195 (emphasis added).

Caremark argues that "[t]ime and again, [CMS] . . . was told the facts the Court later found made the price-reporting false. And time and again, CMS declined to take action in response." (Caremark Conclusions of Law (ECF No. 488 at 4).) In support, Caremark cites three instances where CMS was purportedly made aware of Caremark's pricing scheme and refused to change its subsidization practices: (1) the 2016 conversations between Azzolina and CMS; (2) CMS's 2015 audit of Aetna; and (3) the filing of Relator's lawsuit. (Id. at 4-6.) I address each in turn.

First, Caremark Vice President of Finance for Medicare Part D David Azzolina testified about his 2016 conversations with CMS. At that time, and as discussed above, CMS made clear that its main concern was whether PBMs such as Caremark were "clawing back" money from pharmacies as part of their GER guarantees. (N.T. Mar. 17, 2025 at 114:5-9.) Although Azzolina explained that Caremark did not receive any payments back from the pharmacies, he failed to inform CMS about Caremark's offsetting practices. When Azzolina emailed CMS on May 26, 2016, he once again failed to include any mention of the offsetting provisions. Caremark urges that the following portions from that email—the only written correspondence between Caremark and CMS—put CMS on notice of exactly what Caremark's contracts with the pharmacies allowed:

> Caremark has agreed to a Generic Effective Rate (GER) with a few pharmacies.
> . . .
> The commitment is to pay at least the guaranteed amount in order to provide certainty to the pharmacy for their financial and other considerations.
> . . .
> [Caremark's] GER's [sic] establish a pricing commitment to pay a minimum guaranteed amount, generally across the pharmacy book of business with the PBM.
> . . .

> The GER is also not associated with additional arrangements that reduce the price, such as DIR arrangements with the pharmacies . . . . Thus, the example discussed where the pharmacy is required to pay back to the plan a portion of the point of sale price as an adjustment is not applicable to our GER arrangements with network pharmacies.
>
> . . .
>
> Pharmacies do not make true up payments to CVS Caremark under a GER should their reimbursement be more than the minimum guaranteed amount . . . . In the event the pharmacy receives less than the minimum guaranteed amount, the cost of any true up payment to the pharmacy (typically following the end of the year) are completely the responsibility of Caremark.

(PTX-0026.)

Caremark argues that this was enough to put CMS on notice of its pricing scheme. (See N.T. June 12, 2025 at 83:23-84:20.) I disagree.

While it is true that some details from Caremark's contracts were disclosed, others were not. Importantly, Caremark did not explain its offsetting provision and the impact it had on the price Caremark actually paid for Part D prescriptions. Moreover, Relator has established that what Caremark did explain misled CMS as to the actual nature of the contracts. For example, in stating that pharmacies were not "required to pay back to the plan a portion of the point of sale price as an adjustment," Caremark failed to explain that any overpayment on Part D purchases could be used as a credit to offset amounts owed from underpayments on commercial purchases.

It is entirely unclear how Azzolina's interactions with CMS could have provided the government with actual knowledge of the offsetting provisions and the effect thereof. This is especially so in light of the dearth of evidence that any other PBM or Part D sponsor maintained an overall GER guarantee, much less one with an accompanying offsetting provision. (See N.T. Mar. 18, 2025 at 202:6-11 (Leslie Norwalk agreeing that as of her deposition, she could not identify "a single example, outside this case, of a pharmacy GER that covered both Med D and

commercial"); N.T. Mar. 20, 2025 at 73:2-17 (Joseph Zavalishin testifying that although such contracts exist, he could not identify "any other contract between a PBM and a pharmacy . . . that contained an overall GER encompassing both Medicare Part D and commercial lines of business").)  Under these circumstances, I cannot find that—based on the Azzolina emails—CMS had actual knowledge of the guaranteed average pricing terms or the corresponding mismatch in reported prices.

For essentially the same reasons, Caremark's reliance on CMS's audit of Aetna does not provide a basis for CMS's actual knowledge.  As will be explained in the Scienter Section of this Opinion, Aetna did not know—and thus could not have told CMS—about the specific contractual provisions which underlie Caremark's fraudulent representations.

Lastly, I do not find that CMS gained actual knowledge from the filing of Relator's Complaint.  It is well settled that I may not "equate the government's awareness of allegations of fraud with 'actual knowledge' that fraud occurred."  Druding, 81 F. 4th at 375; see also id. (quoting United States ex rel. USN4U, LLC v. Wolf Creek Fed. Servs., Inc., 34 F.4th 507, 517 (6th Cir. 2022) ("And we recognize that 'the Government may not want to prematurely end a relationship with a contractor over unproven allegations.'")); United States ex rel. Brown v. Pfizer, Inc., No. 05-6795, 2017 WL 1344365, at *11 (E.D. Pa. Apr. 12, 2017) (holding, albeit at the motion to dismiss stage, that "[t]he mere fact that the government has continued to pay and approve claims . . . after Relators' allegations [were filed] is insufficient to establish that Relators' claims lack materiality").

Because CMS did not have actual knowledge that Caremark's pricing terms and subsequent reporting violated the relevant requirements, CMS's subsequent inaction has little probative value.  See United States ex rel. Prather v. Brookdale Senior Living Communities, Inc.,

892 F.3d 822, 834 (6th Cir. 2018) ("Without actual knowledge of the alleged non-compliance, the government's response to the claims submitted by the defendants . . . has no bearing on the materiality analysis."); see also Supervalu, Inc., 2024 WL 4351951, at *9 ("Although some payors may have known about the Defendants pri[cing practice], there is no evidence they knew claims submitted were false.").

Based on the foregoing, I find that Relator has proven materiality by a preponderance of the evidence.

### C. Causation

As set out in my Summary Judgment Opinion, "[d]uring the time period relevant to this case, the federal government subsidized a portion of the cost of providing prescription drugs to Medicare beneficiaries insured under Medicare Part D plans." (S.J. Op. at 9.) These subsidies can "be understood as a reimbursement from CMS to cover a portion of the Part D sponsor's spending on prescription drugs." (Id.) CMS thus had to "determine how much Part D sponsors were spending on prescription drugs in order to calculate an appropriate subsidy for the sponsor's spending." (Id.)

In turn, Part D sponsors like Aetna were obligated to submit pricing information as a condition of receiving subsidy payments. 42 U.S.C. § 1395w-115(d)(2)(A) (effective March 23, 2010). CMS regulations required contracts between Part D sponsors and their PBMs to "comply with all applicable Federal laws, regulations, and CMS instructions." 42 C.F.R. § 423.505(i)(3)(v), (i)(4)(iv) (effective June 1, 2012). Thus, a Part D sponsor who submitted "claims data" to CMS that was "generated by" a PBM was "required to [ensure] the PBM [also] certif[ied] the accuracy of the data and to acknowledge that the data would be used for federal reimbursement." (S.J. Op. at 38-39 (citing 423.505(k)(3)).)

Relator's theory of causation thus focuses on whether Caremark caused Aetna and SilverScript to submit for payment false PDE and DIR reports.  See United States v. Lagerbusch, 361 F.2d 449, 449-50 (3d Cir. 1966) (internal citations omitted) (discussing the situation whereby one party causes another to submit the false or fraudulent claim to the Government and holding, "[w]e have no doubt that the False Claims Act covers such an indirect mulcting of the government."); see also United States ex rel. Schmidt v. Zimmer, Inc., 386 F.3d 235, 244 (3d Cir. 2004) (holding that if a defendant's actions resulted in the submission by a third party "certifications required by Medicare that [the defendant] knew would be false . . . this conduct and this knowledge [if] proven at trial, [could allow] a jury [to] conclude that [the defendant] knowingly caused . . . false claims to be filed.").

At summary judgment, I explained the causation standard as follows:

> The False Claims Act reaches any person who "causes to be presented[] a false or fraudulent claim for payment." 31 U.S.C. § 3729(a)(1)(A). The causation element entails "ordinary [proximate] causation principles from negligence law," which, in turn, ask whether the defendant's conduct was a "substantial factor" in causing the submission of a false claim. United States ex rel. Schmidt v. Zimmer, Inc., 386 F.3d 235, 244 (3d Cir. 2004). "[T]o say that one event was a proximate cause of another means that it was not just any cause, but one with a sufficient connection to the result." Paroline v. United States, 572 U.S. 434, 444 (2014). This is a "flexible concept" that "defies easy summary," but generally requires a "direct relation between the injury asserted and the injurious conduct alleged." Id. (quotation marks omitted).

(S.J. Op. at 81.)

With respect to SilverScript, I found that because Caremark itself "(1) submitted PDE records on SilverScript's behalf, (2) provided SilverScript draft DIR reports in a 'CMS-ready format,' and (3) certified to SilverScript that these reports included all reportable price concessions," there was no genuine dispute that the "normal consequence" of Caremark's actions

"was that SilverScript would submit price reports listing individual sale prices rather than guaranteed average prices, which were false." (S.J. Op. at 83.)

      *i.    Normal Consequence*

At that time, I could not find the same as it relates to Aetna. Instead, and "[b]ecause it [was] not clear from Relator's statement of facts that Caremark provided price reports to Aetna with the intention that they be forwarded to CMS unmodified," there remained a genuine dispute as to whether the "'normal consequence' of Caremark's conduct was the submission of false claims." (Id.) Specifically, I did not determine what it meant for Aetna to "implement Caremark's instructions on its system." (Id. (internal quotations omitted).)

At trial, Relator presented the testimony of Aetna 30(b)(6) witness Clifford Passuello.[18] Passuello testified that Aetna had its own "automated" system for producing both PDE and DIR reports. (N.T. Mar. 18, 2025 at 56:14-57:7 (discussing Aetna's APMCAS system).) Aetna relied on Caremark to provide pricing instructions which informed Aetna "exactly how [to] calculate the dollar amount to be paid to the pharmacy, and . . . reported in the PDE data to CMS." (Id. at 56:24-57:3; id. at 59:15-23 (Passuello explaining that Aetna relied on Caremark to submit "PDE . . . amounts that [Aetna] then . . . reported to CMS").)

A similar process took place as it relates to DIR reporting. Caremark was responsible for reporting to Aetna certain categories of DIR. Specifically, Aetna relied on Caremark to report certain DIR—such as DIR #9—the existence of which was understood only by Caremark and thus

---

[18] Passuello's testimony was presented via deposition designation. At trial, while the video designations played, Caremark's counsel objected that certain questions and answers went outside the scope of Passuello's 30(b)(6) capacity. (N.T. Mar. 18, 2025 at 35-37.) Caremark "wanted it to be clear that for [] particular questions and answers [Passuello was] speaking on behalf of himself rather than [Aetna]." (Id. at 37:1-8.) I neither sustained nor overruled the objection but "preserved" Caremark's "observation" for the record. (Id. at 38:2-4.) Caremark agreed with this preservation and did not reraise its objection later, even though I offered the opportunity. (Id. at 38:1-6; 123:3-10.) Regardless, Mr. Passuello was familiar with the facts and I find his testimony relevant.

entirely under Caremark's control.  Caremark recorded its DIR in an excel "template" provided by CMS.  (Id. at 51:3-5.)  Caremark then produced these templates to Aetna, which would "copy and paste" the data into its "master template [which was then sent] to [CMS]."  (Id. at 51:4-7.)  Aetna relied on the DIR data provided by Caremark.  (Id. at 52:1-5.)

Caremark knew that Aetna would rely on that data, a fact made clear by Caremark's attestations to Aetna.  (Id. at 45:15-46:23, 59:10-23; N.T. Mar. 12, 2025 at 32:15-18 (Aetna employee Jean Walker confirming that during the relevant time period, Aetna relied on Caremark's attestations regarding the accuracy of its pricing information); see also PTX-0104 (2011 Caremark attestation to Aetna certifying that the data provided to Aetna was complete and accurate); PTX-0078 (same for 2012); PTX-0079 (same for 2013); PTX-0094 (same for 2014).)  Because Aetna did not have access to Caremark's pricing contracts with the pharmacies or its reconciliation spreadsheets, Aetna did not know that the attestations and data were false.  (See N.T. Mar. 18, 2025 at 52:11-16; see also N.T. Mar. 13, 2025 at 101:17-20 (Caremark Corporate witness James Margiotta explaining that from 2010 to 2016 Aetna did not have access to Caremark's contracts with the pharmacies).)

Caremark urges that, despite these facts, a finding of causation would be improper because "under Medicare regulations, a 'Part D sponsor' like Aetna 'maintains ultimate responsibility' for compliance, '[n]otwithstanding any relationship(s) that [it] may have' with a PBM like Caremark." (Caremark COL at 9 (quoting 42 C.F.R. § 423.505(i)(1)).)  Even if this is true, Caremark knew that Aetna relied on Caremark-provided data to adjudicate claims.  Furthermore, it is clear—based on Caremark's attestations—that Caremark expected Aetna to use Caremark's pricing instructions and DIR data in an unmodified fashion to generate PDE and DIR reports.  Aetna's later submission of such false reports was thus a normal consequence of Caremark's conduct.

ii.     *Superseding Cause*

Caremark also argues that Aetna's independent judgment, preparation of DIR reports, and government inaction represents a superseding cause that breaks the causal chain. I disagree.

Under the ordinary principles of negligence law, an intervening act, "'which is a normal consequence of a situation created by the actor's . . . conduct is not a superseding cause of harm which such conduct has been a substantial factor in bringing about.'" Schmidt, 386 F.3d at 244 (quoting Restatement (Second) of Torts § 443). The burden rests on Caremark to show an intervening or superseding cause. See Hill v. Reederei F. Laeisz G.M.B.H., Rostock, 435 F.3d 404, 421 (3d Cir. 2006) (explaining that the district court properly instructed on superseding cause in negligence action where the instruction read, "in terms of this superseding cause, the defendant has the burden of proof by a preponderance of the evidence"). Although "intervening cause" is not an affirmative defense, Caremark must still prove by a preponderance of the evidence that Aetna's actions broke the causal chain.

Although it is true that Aetna had the ultimate responsibility to submit the claims, I disagree that this responsibility absolves Caremark of culpability. In an indirect presentment case, such as this, the "paradigmatic" example of liability "occurs when the non-submitting party takes advantage of an unwitting intermediary, thereby causing that party to submit a false claim." United States *ex rel.* Tran v. Computer Sciences Corp., 53 F. Supp. 3d 104, 126 (D.D.C. 2014). I thus consider the knowledge and independent agency with which Aetna acted in submitting claims to CMS.

Again, Caremark points to Aetna's internal investigation as evidence that Aetna was aware of Caremark's pricing practices yet continually reported Caremark-provided data. But again, because Caremark omitted material information from Aetna during the investigation, Aetna did

not have actual knowledge of Caremark's pricing scheme and Caremark's reliance is thus misplaced.

In these circumstances, I find that Relator has proven causation as to Aetna by a preponderance of the evidence.

### D. Scienter

To prove scienter, Relator must show that Caremark "knowingly" presented a false claim to the government. 31 U.S.C. § 3729(a)(1)(A). Knowingly is defined as "actual knowledge," "deliberate ignorance," or "reckless disregard." § 3729(b)(1)(A). Relator need not prove a "specific intent to defraud." § 3729(b)(1)(B). "Actual knowledge refers to whether a person is aware of information." Supervalu, Inc., 2024 WL 4351951, at *6 (internal quotations and citations omitted). "Deliberate ignorance encompasses defendants who are aware of a substantial risk that their statements are false, but intentionally avoid taking steps to confirm the statements' truth or falsity." Id. (internal quotations and citations omitted). Finally, "reckless disregard relates to defendants who are conscious of a substantial and unjustifiable risk that their claims are false, but submit the claims anyway." Id. (internal quotations and citations omitted).

Here, my inquiry focuses on "whether Caremark subjectively understood what CMS's regulations required—namely, that they mandated reporting guaranteed average prices under the circumstances," inclusive of accurate DIR calculations. (S.J. Op. at 85.) My prior finding of falsity does not factor into the scienter inquiry, but rather, I look to "what the defendant knew when presenting the claim." United States ex rel. Schutte v. SuperValu Inc., 598 U.S. 739, 752 (2023); see also Halo Electronics, Inc. v. Pulse Electronics, Inc., 579 U.S. 93, 105 (2016) ("[C]ulpability is generally measured against the knowledge of the actor at the time of the challenged conduct.").

66

At summary judgment, and as it relates to falsity, I concluded that "as a matter of law, Aetna and SilverScript's price reports were required to reflect the prices Caremark 'actually paid' for Part D drugs, which was Caremark's negotiated average price with the pharmacy." (S.J. Op. at 68.) Because the "price reports for Caremark's Part D sponsor clients did not reflect Caremark's negotiated average prices with Walgreens and Rite Aid . . . those reports were therefore false." (Id.) I analyzed how the guaranteed average price could have been reported, addressing the question through the lens of DIR reports, and explained that because "the purpose of reporting price concessions was to arrive at the prices Caremark had 'actually incurred,' it was essential that price concessions related to Caremark's guaranteed average pricing contracts be included in end-of-year DIR reports so that CMS could calculate a correct subsidy." (Id. at 66-67.)

The question is thus whether Caremark: (1) actually knew that its reported prices for Part D drugs were not the prices it "actually paid"; (2) was aware of a substantial risk that their higher retail pharmacy prices were not the price they "actually paid" the pharmacies and "avoided learning whether their reports were accurate," or (3) was aware of such a substantial and unjustifiable risk but reported that pricing anyway. See Schutte, 598 U.S. at 757 (citing § 3729(b)(1)(A)).

Before proceeding, I note that Caremark urges that Relator attempts improperly to prove scienter by pointing to the company's "collective knowledge." Although the Third Circuit has not explicitly decided whether scienter in the false claims setting can be decided on "collective" corporate knowledge, other courts examining the issue have found such knowledge insufficient. See Int'l Brotherhood, 438 F. Supp. 3d at 380 (quoting United States v. Fadul, No. 11-385, 2013 WL 781614, at *9 (D. Md. Feb. 28, 2013)) ("'When the Government seeks to hold an entity liable under the False Claims Act, it cannot rely on the collective knowledge of the entity's agent to

establish scienter' and instead 'must prove an entity's scienter by demonstrating that a particular employee or officer acted knowingly.'"); United States v. Sci. Applications Int'l Corp., 626 F.3d 1257, 1275 (D.C. Cir. 2010) ("We know of no circuit that has applied the 'collective knowledge' theory to the FCA."); United States v. Life Care Ctrs. Of Am., Inc., 114 F. Supp. 3d 549, 567 (E.D. Tenn. 2014) ("As a general matter, federal courts have not permitted a 'collective knowledge' theory to be applied in an FCA case.").

Still, in determining whether Caremark acted recklessly or with deliberate ignorance, I must consider the corporation's systems and processes, the information that individuals had access to as a result, what the corporate interests were, and the impact such interests had on individual action.  See United States v. Educ. Mgmt. Corp., 871 F. Supp. 2d 433, 452 (W.D. Pa. 2012); Int'l Brotherhood, 438 F. Supp. 3d at 380 (explaining that although collective knowledge theory of liability is inappropriate, Relator can still make out liability through reckless disregard).

As explained below, the "actions of [Caremark] employees or [Caremark's] systems and structure" establishes that Caremark acted "recklessly or with deliberate ignorance of the truth." Sci. Applications Int'l Corp., 626 F.3d at 1276.

### i.    Caremark's Knowledge of CMS's Regulations and Guidance

In this section, I discuss what Caremark, by its own employees' admissions or through the knowledge of others in the industry, knew and understood CMS regulations and guidance to require.  I then discuss how Caremark's GER guarantees with Walgreens and Rite Aid implicated such requirements.

I note that what others in the industry knew CMS's regulations and guidance to require is relevant to the question of what Caremark employees knew.  See United States *ex rel.* Patzer v.

Sikorsky Aircraft Corp., 722 F. Supp. 3d 839, 854 (E.D. Wisc. 2024) ("[E]vidence that industry participants would not regard [an] arrangement [as violative of a federal contracting rule] is relevant to whether defendants acted with deliberate ignorance or reckless disregard."). This reasoning is why I allowed Caremark to introduce a variety of evidence which would otherwise be inadmissible hearsay. Indeed, and as discussed later, Caremark's main argument against scienter focuses on what others in the industry—including Aetna—knew or believed during the relevant time period. (See Caremark COL at 14-15 (citing Patzer, 722 F. Supp. 3d at 854).)

### 1. DIR Reporting Requirements

Part D "drug costs that counted for purposes of Medicare Part D subsidies were those that: (1) were the 'negotiated prices' between the sponsor (or PBM) and the pharmacy; (2) were 'actually incurred'; and (3) were *net of DIR*." (S.J. Op. at 13 (emphasis added).) The amount a Part D sponsor "actually paid" "had to be adjusted to account for transactions such as rebates—called 'direct and indirect remuneration' or DIR—that tended to reduce the cost of purchasing drugs." (S.J. Op. at 14.) Although certain price adjustments were reported in PDE records, CMS did not require such reports to be adjusted for all price concessions. (Id.) Instead, price concessions "not reflected in the cost of the drug on the PDE record" were to be included in a "DIR report." (See DX218.0033-34; DX220.) CMS required Part D sponsors to submit DIR reports "[w]ithin six months of year-end." (DX218.0034.)

During the relevant time period, CMS—through guidance published annually—required Part D sponsors to report eleven different categories of DIR. (Joint Stips. ¶¶ 135-36.) A key question at trial was whether Caremark knew—but failed to report as such—that its pricing contracts with Walgreens and Rite Aid resulted in reportable DIR in one of those categories.

One type of DIR guidance applicable after the 2010 rule change is of particular importance:

With the exception of adjustments to generic dispensing incentive payments and adjustments, which are reported in column DIR #8, applicable adjustments to pharmacy payments are reported in this column. These include penalties or pharmacy repayments stipulated in the Part D sponsor's contract with its network pharmacies that represent incorrect drug costs that were paid or reported by the Part D sponsor due to an error made by the pharmacy. For these types of pharmacy penalties, the portion of the penalty that is equivalent to the amount by which the drug costs paid by the Part D sponsor or reported to CMS on the PDE exceeds the correct drug costs must be reported as DIR in this column.

*Applicable pharmacy adjustments that reduce the total payments made to the pharmacy should be reported as a positive adjustment that will serve to reduce the plan's drug costs.* Applicable pharmacy adjustments that increase the total payments made to the pharmacy should be reported as a negative adjustment that increases the plan's drug costs.

(DX219.0026 (CMS Guidance for 2010 Payment Reconciliation) (emphasis added); see also DX220.0016 (final CMS Guidance regarding DIR Reporting Requirements for 2011); DX173.0004 (email from Jean Walker to Charles Klippel asking about impact of this guidance on Caremark's contracts with the pharmacies).) Caremark was certainly aware of this guidance. (See N.T. Mar. 10, 2025 at 84:6-10 (Caremark employee John Lavin—who was charged with negotiating GER guarantees with the pharmacies testified that he would have been made aware of "a final rule or regulation that affected . . . network or related activities for Medicare Part D").)

Aetna Deputy General Counsel Charles Klippel, a sophisticated industry participant, believed that the guidance here was "clear enough on its face" and was meant to "capture money flowing back from the pharmacy to the PBM on the basis of some aggregate performance metric that is not directly attributable on a claim-by-claim basis." (DX173.0003.) He testified that this guidance covered "money coming back from the pharmacies, taken back from . . . or flowing back from the pharmacies after the fact of the claim payments." (N.T. Mar. 19, 2025 at 67:1-6.)

70

Both Parties agree that this guidance applied to situations where a Part D sponsor or PBM had a two-way GER guarantee with a pharmacy.  Aetna's Head of Governmental Actuarial Underwriting Jean Walker explained the concept of a two-way GER guarantee succinctly: "in [a] two-way guarantee, if we overpaid the pharmacies, they would pay us money back. So that would appear as a positive DIR."  (N.T. Mar. 12, 2025 at 112:13-16.).

Under a two-way GER guarantee, any payments sent back from the pharmacy to the PBM or Part D sponsor for overpayments on Part D purchases served to reduce the amount actually paid on Part D drugs and thus represented reportable DIR.[19]  Indeed, when Aetna took pharmacy contracting in-house in 2015 and instituted a two-way guarantee with pharmacies, it reported as DIR any monies paid back from the pharmacies as a result of such guarantees.

A *true* one-way GER guarantee, which did not allow a PBM or Part D sponsor to offset underpayments on commercial drugs with overpayments on Part D drugs relative to the overall GER, did not create reportable DIR.  (N.T. Mar. 19, 2025 at 68:18-20 (Klippel explaining the difference between a two and one-way GER guarantee).)  Caremark expert and former Acting Director of CMS Leslie Norwalk agreed with both Klippel and Walker.  (See N.T. Mar. 18, 2025 at 155:10-13 (Norwalk agreeing that a "two-way guarantee . . . must be reported on DIR but [a] one-way guarantee does not need to be reported on DIR").)  Norwalk also explained that "industry participants" would have understood the difference between a one-way and two-way guarantee. (Id. at 156:7-23.)

---

[19] Caremark's counsel acknowledged this at various times during trial.  (See N.T. Mar. 10, 2025 at 56:20-22 ("And no one disputes that if the pharmacy is paying money to the PBM, that [] is reportable as DIR."); N.T. Mar. 14, 2025 at 114:20-24 ("What's key here is the fact that no one disputes that a two-way guarantee would need to be reported on DIR.  That's what Aetna had with Rite Aid.  Because there were times when Rite Aid would be sending a check back to Aetna.")

Accordingly, I conclude that it was understood in the industry—and thus by Caremark—that any monies flowing back to Caremark for overpayments on Part D drugs was reportable DIR.

### 2. Caremark's GER Guarantees

The next question is whether Caremark knew its overall GER guarantees with the pharmacies were, for all intents-and-purposes, akin to a two-way GER guarantee for DIR reporting purposes. In Caremark's view, its contracts with the pharmacies were one-way guarantees which did not generate reportable DIR because the pharmacy never sent Caremark a payment. That is, the pharmacy never mailed, wired, or otherwise sent money to Caremark for an overpayment.

Although true, there is no evidence that the pharmacies "sent" a payment back to Caremark, that fact is not dispositive. Instead, I look to the form and function of Caremark's contracts with the pharmacies. These contracts contained an "offsetting" provision which is best understood through a careful examination of the contracts themselves. For example, Caremark's 2013 and 2014 agreements with Rite Aid called for a 78.6% and 80.4% overall GER, respectively, and included the following provision:

> If [Rite Aid's] reimbursement is less than the Contractual Reimbursement, Caremark will pay [Rite Aid] additional reimbursement to achieve the Contractual Reimbursement for the affected claims. Notwithstanding the foregoing, any amounts owing pursuant to this subsection [] *may be offset* against any amounts received by [Rite Aid] that exceeded the Contractual Reimbursement. If [Rite Aid's] reimbursement is greater than the contra ctual reimbursement, [Rite Aid] will not be obligated to pay Caremark the difference.

(DX046.0001, 0004 (emphasis added).) Caremark's contracts with Walgreens included the same or similar language. (See PTX-0061 at ¶ 4; PTX-0062 at ¶ 4.)

Richard Stoneking, the 30(b)(6) witness for non-party Rite Aid explained that this provision meant, "in essence, if [Rite Aid] owed [Caremark] money . . . [the amount owed] would

be offset against other groupings." (N.T. Mar. 14, 2025 at 99:11-13.) In short, any amount owed by Caremark to the pharmacy for an underpayment on commercial drugs, could be lessened by the amount that Caremark overpaid on Part D drugs. Stoneking explained how this worked:

> Counsel: So what would have Rite Aid's understanding been if Caremark had overpaid, paid more than the pharmacy GER by 5 million on Med D, and underpaid on the commercial relative to the pharmacy GER by 10 million.
> Mr. Stoneking: So we would -- they [sic] would be new deal of 5 million on the commercial side, reducing it by the amount that we were overpaid on the Part D side.
> Counsel: Okay. So Rite Aid would have been owed 10 million on commercial, but by virtue of the offset provision that we just saw in the contract, the 5 million that was overpaid on the pharmacy GER would have served to lessen the amount that Caremark had to pay Rite Aid, correct?
> Mr. Stoneking: Yes, that's correct.

(Id. at 99:24-100:13.)

As explained by Stoneking, a neutral third-party witness, the net effect of the offsetting provision was the same as if Caremark had negotiated a two-way guarantee with the pharmacies. (Id. at 126:8-128:11.) Indeed, the math is quite simple:

| Type | Overpayment on Part D | Underpayment on Commercial | Net Owed to Pharmacy |
|---|---|---|---|
| One-way guarantee with offsetting provision | $2 | $5 | $3 |
| Two-way guarantee | $2 | $5 | $3 |

The effect on Part D drug prices was the same as well. Under either guarantee, Caremark's overall indebtedness to the pharmacy for Part D drugs would only increase by the negotiated average price, not by what Caremark paid at the point of sale.

Based on a careful review of the entire record, I disagree with Caremark's theory that its pharmacy contracts did not create the same reportable DIR as a two-way guarantee. Whether Caremark received a credit in the form of a check or an end-of-year reconciliation deduction,

Caremark's Part D drug payments were reduced by the overpayment relative to the overall GER. Put another way, the offset reduced what Caremark paid on Part D drugs from the point-of-sale price to the overall GER.

I have neither seen nor heard evidence rebutting this concept and in fact, Caremark's own expert confirmed the similarity:

> Counsel: I owe you [] $100.  You owe me [$]50 . . . . We meet.  I give you a $100.  You hand me a $50.  That's situation 1.
> Counsel: Now suppose, situation 2, I just subtract the $50 you owe me and I just hand you $50 . . . . [W]ould you agree that those two situations are economically the same?
> . . .
> Ms. Norwalk: I ended up with $50 either way.  Is that your point?  Yes.  I ended up with $50 either way.  Economically equivalent?  I ended up with $50.

(N.T. Mar. 18, 2025 at 221:7-25.)

The belief of Klippel, Norwalk, and other sophisticated industry participants that a one-way guarantee with an offsetting provision was akin to a two-way guarantee is powerful evidence that Caremark understood such guarantees created reportable DIR.  See Patzer, 722 F. Supp. 3d at 854 (explaining that evidence regarding how industry participants would have regarded certain arrangements is "relevant to whether defendants acted with deliberate ignorance or reckless disregard").  This evidence is bolstered by Caremark's clear understanding of the impact of its offsetting provisions.  Indeed, one need only look at Caremark's contracts with Rite Aid and the relevant reconciliation spreadsheets for 2011 and 2014.

In 2011, Caremark had a one-way guarantee with Rite Aid that was not overall.  That is, Caremark negotiated one GER for commercial drugs and another for Part D.  (See DX042.0001.) In addition, unlike the 2013 and 2014 contracts, the 2011 agreement did not allow Caremark to offset underpayments on commercial drugs with overpayments on Part D drugs.  (See DX042.0004

("[E]xcept that no offsetting shall occur for the Medicare Part D Retail Network.").) At trial, Stoneking explained the financial impact on Caremark in 2011. (See N.T. Mar. 14, 2025 at 94:4-95:17 (discussing PTX-0560 at 1 of 10).) Reviewing a Caremark/Rite Aid reconciliation spreadsheet, Stoneking explained that the spreadsheet showed an overpayment on Part D drugs relative to the Part D GER of $2,658,384 and an underpayment on commercial drugs relative to the commercial GER of $22,322,637. (Id. at 93:18-94:12; PTX-0560 at 1 of 10.) Because, however, the 2011 contract did not include an offsetting provision, the overpayment did not serve to reduce the amount owed by Caremark in reconciling the underpayment. As a result, Caremark could not offset and owed Rite Aid some $22 million dollars.

The results in 2014, after Caremark negotiated and included an offsetting provision in its overall GER guarantee with Rite Aid, are illuminating. Then, Caremark underpaid on commercial drugs by some $53,526,184. (PD-002 (citing PTX-0069 at tab "2014 Proj" at cells A3:R26; PTX-0096).) Because, however, Caremark overpaid on Part D drugs relative to the overall GER by $46,110,996, it only owed $7,415,188 in reconciliation payments.

In total, from 2013 to 2014 at Rite Aid and Walgreens, Caremark underpaid on commercial drugs relative to the overall GER by some $235,000,000. (See PTX-0068; PTX-0069; PTX-0073; PTX-0074; see also PD-001; PD-002; PD-003; PD-004; PD-009.) During that same time, Caremark overpaid on Part D drugs relative to the GER by close to $159,000,000. (See generally id.) If Caremark's contracts were true one-way guarantees, Caremark would have owed some $235,000,000 in reconciliation payments and would not have been paid back for its significant overpayment on Part D drugs. Because, however, Caremark negotiated overall GER guarantees with an offsetting provision, Caremark only owed some $76,000,000 in end-of-year reconciliation payments during this time. This sequence warrants reemphasis.

In 2011, Caremark's contracts with Rite Aid specifically *disallowed* offsetting with Part D overpayments relative to the Part D GER.  In 2013, Caremark's contracts with Rite Aid specifically *allowed* offsetting with Part D overpayments relative to the overall GER.  The difference meant Caremark saved millions of dollars when it came time to reconcile with Rite Aid at the end of each year.

Individuals from Caremark tracked all of this information and clearly appreciated how the offsetting provision impacted its bottom line.  John Lavin negotiated the contracts, Jon Roberts had some hand in setting the overall GERs and determining how Part D and commercial drug purchases would be managed to hit that number, and Domenico Gugliuzza managed MAC prices throughout the year to make sure Caremark met those goals.  Other employees, discussed below, played a role in carrying out Caremark's scheme.

ii.    Concealment

Caremark argues that it "did not conceal from Aetna and CMS how its overall pharmacy GER guarantees operated [and] instead . . . *disclosed the facts necessary* for those sophisticated industry participants to understand its practices."  (Caremark Resp. to Rel. COL (ECF No. 489) at 11 (emphasis added).)  I disagree.

If Caremark had *fully* informed CMS and Aetna of its pricing contracts with the pharmacies, such evidence would weigh heavily against a finding of scienter.  See United States *ex rel.* Patzer v. Sikorsky Aircraft Corp., 730 F. Supp. 3d 856, 873 (E.D. Wisc. 2024) ("[A] defendant who intends to defraud the government is unlikely to disclose the illegal aspect of its contract to *anyone* in the government." (emphasis in original)).  The inverse is also true: if Caremark omitted or withheld a material and fraudulent aspect of its pharmacy contracts in

discussions with CMS (or Aetna), such omissions or half-truths could weigh in favor of a scienter finding.

### 1. Aetna

As discussed below, Caremark informed Aetna about its overall guarantees with the pharmacies, that Medicare MAC rates might be higher than commercial MAC prices, and that Caremark's pharmacy GER guarantees could reflect deeper aggregate discounts off AWP than Aetna's Part D plans. What Caremark failed to explain, however, was that "pursuant to the offset provision in Caremark's contracts with Rite Aid and Walgreens, money was, in fact, flowing back" to Caremark on the "Part D side." (N.T. Mar. 19, 2025 at 137:17-22 (Charles Klippel testifying that he did not know, "at the time," about the offsetting provisions or the consequences thereof); N.T. Mar. 10, 2025 at 106:11-16 (John Lavin explaining that the Part D sponsors would not have known about the end-of-year reconciliation payment Caremark made to the pharmacies).) When asked whether Caremark provided any "description of the offset language in the Rite Aid or Walgreens contract," Charles Klippel testified that he was "not even aware of what [counsel] was talking about." (N.T. Mar. 19, 2025 at 140:17-22.)

Caremark's responses to the Crowell & Moring led Aetna investigation confirms that Caremark did not disclose its offsetting provisions with the pharmacies. (See DX0005; DX0006; DX166.) Instead, Caremark misled Aetna about the nature of its contracts, telling Aetna that "Pharmacies **have not, and do not**, make true up payments to [Caremark] under a guarantee" and that Caremark's "payment is always to the pharmacy, not from the pharmacy." (DX005.0005-0006 (emphasis in original).) Caremark's willingness to share certain information about its contracts with the pharmacies, while withholding from Aetna the one contractual provision which would have revealed its fraudulent behavior, is evidence of scienter.

2.  CMS

A similar process played out during Caremark's conversations with CMS.  During the relevant time period, Caremark Vice President of Finance for Medicare Part D David Azzolina was responsible for "reporting on behalf of Medicare clients related to DIR year-end reconciliations and PDE reporting."  (N.T. Mar. 17, 2025 at 62:11-14.)   After the Aetna investigation began, Caremark tapped Azzolina to respond to inquiries from CMS regarding Caremark's contracts with the pharmacies.

The first interaction between CMS and Azzolina took place some time in late January 2016. Azzolina learned that CMS wanted to learn more about Caremark's GER contracts with the pharmacies and the impact thereof on DIR.  (See PTX-0711; N.T. Mar. 17, 2025 at 76:4-77:23.) On March 8, 2016, Azzolina spoke with CMS representatives on an unrecorded phone call.  (See N.T. Mar. 17, 2025 at 78:20-23.)  The main focus of the call was "on GERs and how they were reconciled if Caremark paid more to a pharmacy than the GER."  (Id. at 79:5-8.)  On May 26, 2016, Azzolina sent a follow up email to CMS answering several questions raised on the call. (PTX-0026.)  Importantly, Azzolina did not—in either the phone call or the May 26, 2016 email— explain that Caremark's pharmacy contracts contained an offsetting provision.  (See N.T. Mar. 17, 2025 at 96:15-97:9; PTX-0026.)  Instead, as it did with Aetna, Caremark stated that the situation "where the pharmacy is required to pay back to the plan a portion of the point of sale price as an adjustment is *not applicable* to [Caremark's] GER arrangements with network pharmacies." (PTX-0026 (emphasis added).)

Once again, Caremark's decision to proclaim it was not receiving any reconciliation payments from the pharmacies while omitting any details about the offsetting provisions is misleading and speaks to the scienter question.  Cf. United States *ex rel.* Williams v. Renal Care

Grp., Inc., 696 F.3d 518, 531 (6th Cir. 2012) (explaining that a defendant has not acted in reckless disregard where they have "consistently sought clarification on the issue, followed industry practice in trying to sort through ambiguous regulations, and were forthright with government officials").

        *iii.*     *Turning a Blind Eye*

Congress added the "deliberate ignorance and reckless disregard criteria for the meaning of 'knowingly' within the meaning of the FCA in 1986 . . . to address ostrich-like behavior, or the refusal to learn of information which an individual, in the exercise of prudent judgment, had reason to know." United States v. LabQ Clinical Diagnostics, LLC, No. 22-10313, 2025 WL 893722, at *35 (S.D.N.Y. Mar. 24, 2025) (internal quotations and citations omitted); see also Urquilla-Diaz v. Kaplan Univ., 780 F.3d 1039, 1058 (11th Cir. 2015) (explaining the same). "What typically matters at common law is whether the defendant made the false statement 'without belief in its truth or recklessly, careless of whether it is true or false.'" Schutte, 598 U.S. at 752 (citing Restatement (Second) of Torts § 526, Comment *e*.) "If a defendant knows that he lack[s an] honest belief in the statement's truth, that is often enough to establish scienter for fraud." Id. (internal quotations and citations omitted) (alteration in original).

Azzolina testified that Caremark was aware that "it could ask CMS for guidance regarding the propriety of a particular business practice." (N.T. Mar. 17, 2025 at 66:17-20.) Leslie Norwalk testified that there was commonly a "back-and-forth" relationship between CMS and industry participants. (N.T. Mar. 18, 2025 at 159:3-4.) She explained that if there was "a question as to how something should be interpreted, [it] was very common for someone to pick up the phone and call . . . any number of [] people at CMS who could help them understand what CMS was requiring on both the PDE side as well as the direct and indirect" remuneration side. (Id. at 159:3-10.)

Caremark certainly knew it could ask questions or submit concerns, as shown by its letter to CMS in April of 2015 regarding a separate DIR issue.  (See PTX-0726.)

Nevertheless, there is no evidence that Caremark sought clarification, submitted commentary, or in any other way reached out to CMS to inquire whether its offsetting provisions created reportable DIR.  Even if I were to accept Caremark's argument, that it did not view its one-way GER guarantees the same as a two-way GER guarantee, this does not absolve Caremark from asking CMS for guidance.  This is especially so when the economic similarities and impact on Part D drug prices were so clearly apparent to Caremark.  Under these circumstances,  Caremark's failure to seek clarification or guidance from CMS is further evidence of scienter.  See Int'l Brotherhood, 438 F. Supp. 3d at 363 (alterations in original) (internal quotations and citations omitted) ("The standard of reckless disregard represents an intent to hold liable [o]nly those who act in gross negligence, that is, those who failed to make such inquiry as would be reasonable and prudent to conduct under the circumstances.").

Next, I consider the knowledge and actions of David Azzolina—the Caremark employee charged with signing attestations for Aetna and responding to CMS inquiries.  In 2015, Azzolina signed an attestation to Aetna, certifying inter alia, that:

> 2. [Caremark] has reported to [Aetna] for DIR reporting all price concessions it obtained from pharmacies, including reporting post point of sale per claim administrative fees that network pharmacies have agreed to with PBM, directly or indirectly.
>
> 3. In connection with Part D covered drugs dispensed to [Aetna's] members, [Caremark] does not receive or retain any other remuneration from any source (excluding administrative fees paid by Aetna) that constitutes DIR that is not reported to Aetna pursuant to number 2 above.

(PTX-0094A at 5 of 5.)  But, in signing this attestation, Azzolina did not review the pharmacy contracts or the pharmacy reconciliation spreadsheets.  (N.T. Mar. 17, 2025 at 73:2-9.)  Although Azzolina said that Caremark's "subject matter experts . . . provid[ed] an understanding" such that he was "aware of what [he] needed to be aware of . . . to be comfortable to sign the attestation," he did not know or explain what the subject matter experts reviewed in advising him.  (Id. at 72:22-73:24.)  In addition, Azzolina had "no understanding" of the fact that Caremark's contracts with the pharmacies "contained an overall GER inclusive of both commercial and Medicare D lines of business" or "how those [contracts] were reconciled."  (Id. at 73:25-74:12.)  There is also no evidence that Azzolina knew about the offsetting provisions in the Walgreens and Rite Aid contracts. It is worth emphasizing that Azzolina was the person that Caremark put in charge of "CMS reporting on behalf of Medicare clients related to DIR."  (Id. at 74:20-24.)

Azzolina was similarly ill-equipped to respond to CMS when it reached out directly in 2016.  Before sending the May 26, 2016 email to CMS, Azzolina did not review the reconciliation spreadsheets or the pharmacy contracts.  (Id. at 85:8-14.)  Again, Azzolina testified that he felt comfortable submitting responses to CMS because the "subject matter experts" provided the appropriate responses to him.  (Id. at 85:14-19.)  But again, Azzolina could not explain what these "experts" reviewed before providing him with draft responses and testified that he did not know who those "experts" even were.  (Id. at 85:20-24; 86:16-20.)

Azzolina's actions, or lack thereof, when certifying that Caremark was compliant with CMS requirements constitute evidence of Caremark's scienter.  See Laymon, Jr. v. Bombardier Transp. (Holdings) USA, Inc., No. 05-169, 2009 WL 793627, at *13 (W.D. Pa. Mar. 23, 2009) ("An individual responsible for certifying the truth of a claim made to the government cannot turn a blind eye, rather, they must make the reasonable inquiries regarding claims that are being

submitted.").  Azzolina's attestations and responses to CMS, without having reviewed any of the contracts or reconciliation spreadsheets at issue was, at a minimum, reckless.  See Morsell, 651 F. Supp. 3d 95, at 182 (finding an employee's "failure to so much as send an email" or "seek[] an explanation . . . before making [the] representation" was evidence of reckless disregard and deliberate ignorance).  That Azzolina relied on unknown subject matter experts who relied upon unknown documents does not cure this deficiency, it only exacerbates it.  Especially so when, in signing attestations and communicating with CMS, Azzolina did not even know that Caremark's contracts with Rite Aid and Walgreens contained an "overall GER . . . that encompassed both the Medicare Part D and commercial lines of business" as well as an offsetting provision.  (N.T. Mar. 17, 2025 at 74:1-12; 124:7-12.)  Put simply, Mr. Azzolina did not know enough to answer the questions being posed and did not follow up to understand any better.

iv.    *Employee Belief and Caremark's Motive*

1.  Employee Belief

A majority of Relator's witnesses were under Caremark's control during the relevant time period.  Former Caremark employees John Lavin, Rebecca Justice, Domenico Gugliuzza, James Margiotta, Elenna Kinney, and David Azzolina each testified, in some form or another, that they did not believe Caremark was earning improper spread or failing to report DIR.  (See N.T. Mar. 10, 2025 at 175:20-77:15; N.T. Mar. 13, 2025 at 192:7-25; N.T. Mar. 14, 2025 at 75:17-25; N.T. Mar. 13, 2025 at 148:13-50:4; id. at 53:13-54:12; N.T. Mar. 17, 2025 at 121:15-21.)  But, as I have detailed, this testimony is belied by evidence which shows just the opposite.

Internal guidance, distributed by Caremark during the Aetna investigation in 2014, reflects that Caremark knew it was earning improper spread or failing to account for reportable DIR.  (See PTX-0270.)  There, Caremark's Senior Legal Counsel explicitly told employees: "Do not create

documents that link how increased payments to pharmacies for Medicare Part D drugs may relate to reduced payments to pharmacies for commercial drugs." (Id. at 2.)   That guidance applied to "any [] employee[] that may be involved in negotiating pricing with Part D plan sponsors and/or network pharmacies." (Id. at 1.)

Caremark explains that this policy pertained to Caremark's compliance with the federal Anti-Kickback statute, not the False Claims Act. (Caremark Resp. to Rel. Materiality Fact ¶ 10.) But, regardless of why the guidance was created, the unmistakable message was that: Caremark employees should stop creating internal documents which show that Caremark is giving deeper discounts on commercial drugs, shallower discounts for Part D drugs, and using the subsequent overpayments on Part D drugs to offset the amount underpaid on commercial drugs.

Caremark employees appear to have heeded this message.   Whereas in 2012, Caremark and CVS Health Corp. employees internally discussed offsetting in corporate slideshows, no such evidence exists after the 2014 internal guidance.   (See PTX-0312A at 7 (Slide titled "Rates that are needed" "In Order to Hit Budget" and showing that in 2013 and 2014, Caremark planned to pay deeper discounts on commercial drugs and shallower discounts for Part D drugs relative to the overall GER with Rite Aid); see also PTX0095A at 8 of 14 (discussing profitability of offsetting practices).)   Caremark's instruction to cease discussions about this practice is thus evidence of its knowledge.  See United States ex rel. Strunck v. Mallinckrodt Ard LLC, No. 12-175, 2020 WL 362717, at *4 (E.D. Pa. Jan. 22, 2020) (citing as evidence of scienter internal emails showing an awareness that certain activities were illegal).

### 2.   Motive

Relator need not prove motive to make out scienter.  See Int'l Brotherhood, 5 F.4th at 350 (citing United States ex rel. Harrison v. Westinghouse Savannah River Co., 352 F.3d 908, 921 (4th

Cir. 2003) ("To 'establish[ ] liability under the FCA, a plaintiff need not prove the defendant had a financial motive to make a false statement relating to a claim seeking government funds.'"). Still, a motive to gain financially from its overall GER could be relevant to the question of whether Caremark "knew, deliberately ignored, or recklessly disregarded that average price reporting was required." (S.J. Op. at 85.)

Caremark understood that under the 2010 rule change, it could not earn spread or profit on Part D drugs which was not reported to CMS. (See N.T. Mar. 13, 2025 at 223:22-224:2 (Domenico Gugliuzza agreeing that "Caremark could not earn any spread or locked margin from [Part D] plans that was not reported to CMS").) Indeed, in the 2010 press release regarding the rule change, CMS made clear that although plans could continue to use the "lock-in model with their PBMs, . . . they must report to CMS the price actually paid to the pharmacy as the negotiated price. Any difference between the price paid by the plan to the PBM and the price paid by the PBM to the pharmacy must be reported as an administrative cost." (PTX-0192 at 1-2 of 3.) In a 2009 annual report, Caremark described the impact of this change to its shareholders:

> These changes impact our ability to offer Medicare Part D plan sponsors pricing for 2010 that includes the use of retail network "differential" or "spread," and *we expect these changes to reduce profitability of our Medicare Part D business beginning in 2010.*

(PTX-0174 at 34 of 80 (emphasis added).)

Perhaps this prediction would have come true had Caremark maintained separate GERs for commercial and Part D drugs. But instead, Caremark negotiated *overall* GER guarantees with Walgreens and Rite Aid. The natural result of doing so was that Caremark continued to profit— albeit in an indirect way—from Part D drug purchases.

This "indirect profit" or "hidden spread" concept warrants careful review. Under Caremark's overall GER guarantees with the pharmacies, the more Caremark paid pharmacies on Part D drugs, the less it had to pay on commercial drugs relative to the overall GER. (N.T. Mar. 14, 2025 at 82:13-25 (Caremark employee Domenico Gugliuzza agreeing that the "more [Caremark paid] on a Med D pass-through plan the less [Caremark had] to pay the pharmacy on commercial spread plans")).) That is so because every dollar spent on Part D drugs in excess of the overall GER guarantee was a dollar less Caremark had to pay for commercial drugs. Importantly, the less Caremark paid on commercial drugs relative to the overall GER, the greater the spread it could earn on such purchases. Caremark witness John Lavin explained that "[s]pread is just markup," like when a customer goes to "Costco [and] pay[s] a thousand dollars for a television, [Costco] didn't . . . pay a thousand dollars. [Costco] paid somewhere less than a thousand dollars." (N.T. Mar. 10, 2025 at 179:5-16.)

Caremark clearly understood this. Indeed, Caremark internally forecasted the "value" of offsetting, or managing MAC prices so that Caremark paid more on Part D drugs and less on commercial, and how this would impact its bottom line. (See PTX-0095A at 8 of 14.) Caremark discussed the impact of offsetting on EBIT—a measure of profit—and predicted profits at Rite Aid of $79.5 million in 2013 and $159 million in 2014. (See id.; see also id. at 6 of 14 (showing CVS Health Corp. executive Jon Roberts's target GER guarantee with offsetting of Part D and commercial drugs).) Caremark employee John Lavin agreed that "Caremark understood that if the overall GER was achieved, while overpaying on the [Part D] line and underpaying on the commercial line, . . . Caremark would profit $159 million." (N.T. Mar. 10, 2025 at 146:16-21.) He also agreed that "a portion of the $159 million [profit] included the spread." (Id. at 146:22-24.)

John Lavin was not the only Caremark employee to understand this concept. Albeit in the context of the CVS Pharmacy Budgeted GER, Caremark employee Elena Kinney agreed that if Caremark increased commercial drug prices, Caremark would make less spread. (See N.T. Mar. 17, 2025 at 27:1-4.) In addition, in 2013, when Caremark negotiated with Aetna to provide more competitive Part D prices, Caremark employees discussed the impact of doing so internally. (See PTX-0249.) Indeed, James Margiotta agreed that if Caremark acceded to an Aetna request for better Part D prices, doing so would "cost" Caremark some $24 million dollars. (See N.T. Mar. 13, 2025 at 109:4-10; see also PTX-0249; N.T. Mar. 13, 2025 at 101:5-8 (Margiotta explaining that by decreasing Part D prices, there would be a "financial cost to Caremark").)

Caremark's 2013 price negotiations with Aetna are also evidence of scienter. In emails sent during Aetna's 2013 discussions with Caremark, Aetna employee Jean Walker explained that Caremark "told [Aetna] that if [Caremark] modif[ies] Generic MACs to improve [Aetna's] competitive position it will come out of [Caremark's] pocket." (PTX-0237.) This made no sense to Aetna because, in a pass-through environment, changes in what Caremark paid for Part D drugs should not have impacted Caremark's bottom line. (See N.T. Mar. 12, 2025 at 144:5-19 (Sarah Behnke explaining Allison Brown's see-saw comments).) Moreover, in July of 2013, Caremark offered to "magically improve the pharmacy rates" on Part D drugs without renegotiating rates with the pharmacies. (See id. at 160:16-162:21 (Sarah Behnke discussing an excel document from Caremark showing that Caremark could, without renegotiating with the pharmacies, provide a ".15 percent improvement in [Aetna's] GER").) The only reason Caremark could have done so was because it understood that its overall GER guarantee was the price it was actually paying and, as long as it continued to price Part D drugs above that guarantee, it could continue to hit or get close to its negotiated average with the pharmacies, and thus continue to profit on the increased spread.

Taken together, the above facts demonstrate two key concepts: (1) Caremark knew its overall GER guarantees represented the price it actually paid; and (2) it had a financial motive to recklessly disregard the risk that its scheme created reportable DIR.

In an effort to minimize evidence of motive, Caremark disputes the very notion that the GER guarantees were its idea. In support, John Lavin—a former Caremark employee responsible for pharmacy contracting—testified that the pharmacies were the ones pushing for GER provisions in their contracts with Caremark. (N.T. Mar. 10, 2025 at 96:17-18.) He testified that Walgreens requested a GER in 2010 so that it could "get some certainty around [its] reimbursement," adding that Walgreens was "aggressive" about renegotiating. (Id. at 99:2-5.) Lavin explained that if Caremark did not renegotiate, Walgreens would "take [itself] out of [Caremark's] future networks and clients." (Id. at 99:12-14.) Still, at least as it relates to Rite Aid, Lavin testified that it was Caremark's idea and "proposal to Rite Aid that Med D be included in an overall GER." (Id. at 113:1-5.) He explained that if he was forced to have a GER guarantee, it was more beneficial to Caremark that the guarantee be overall because "fewer GERs" were "easier to manage." (Id. at 184:2-3.) Lavin further explained that there was no overall strategy in negotiating with the pharmacies. Instead, whether the pharmacy had separate GERs or an overall GER "just depended on the negotiations with the pharmacy." (Id. at 189:11-13.) Caremark witness Domenico Gugliuzza shared this sentiment, explaining that the pharmacy GERs did not create any "upside for Caremark" because such contracts place all the "risk" on Caremark. (N.T. Mar. 14, 2025 at 63:24-64:18.)

Both statements deserve little weight in the absence of any supporting evidence. Although the pharmacies may have asked Caremark to institute GERs, it was Caremark who masterminded the concept of an overall GER guarantee. (N.T. Mar. 10, 2025 at 97:16-98:17 (John Lavin agreeing

that he was "one of the architects" of the overall pharmacy GER and that Caremark's 2010 overall GER guarantee with Walgreens was "one of the first [of its kind] . . . for any pharmacy anywhere that [Caremark did].").)  I again note that the only evidence of overall GER guarantees comes from Caremark's contracts with Rite Aid and Walgreens.

To recap, I conclude that Relator has proven that: (1) Caremark knew it was managing MAC prices to pay more for Part D drugs and less for commercial drugs; (2) Caremark knew that the more it paid for Part D drugs, the less it had to pay for commercial drugs; (3) Caremark knew that if it paid less on commercial drugs, it could earn more spread; (4) Caremark knew that if it earned more spread, it earned more profit; and (5) Caremark knew that any profit earned on the commercial side was thus enabled by inflating the price of Part D drugs.

Caremark attempts to dispute this evidence by pointing to witnesses who testified, in substantially the same manner, that Caremark did not intentionally set MAC prices higher for Part D drugs and lower for commercial drugs.  (N.T. Mar. 19 at 181:25-182:7 (Allison Brown had no reason to "believe that [Caremark] was increasing prices for Medicare Part D in order to decrease prices on commercial."); N.T. Mar. 10, 2025 at 188:14-189:16 (John Lavin explaining the same); N.T. Mar. 13, 2025 at 198:8-13 (Rebecca Justice saying the same); N.T. Mar. 14, 2025 at 64:19-65:3 (Domenico Gugliuzza explaining the same); N.T. Mar. 13, 2025 at 125:10-126:14, 138:11-20 (James Margiotta explaining that he was unaware of anyone violating Caremark's internal policy which prohibited Caremark employees from seeking to increase the plan's pass-through drug price for the purpose of decreasing the price for commercial drugs).  In support of this testimony, Caremark introduced what it considered to be other, non-spread or profit related considerations, which it urges explain its pricing practices for the years in question.  As set forth below, I have carefully considered Caremark's "market factor" contentions.

First, Caremark presented testimony which provided a different explanation for why Part D drugs were priced higher than commercial drugs during the years in question.  As an initial matter, several witnesses explained that Part D drugs involve a different "utilization mix" than commercial lines.  (N.T. Mar. 14, 2025 at 60:2-61:2 (Domenico Gugliuzza explaining that Part D beneficiaries are typically older and require more prescriptions which can change the drug "utilization mix").)  Caremark employees explained that some drugs, depending on this "utilization mix," are "deeply discounted."  (Id. at 60:2-9.)  Moreover, whether the drug had one manufacturer, or multiple, impacted Caremark's ability to offer deeper discounts.  (Id. at 61:14-62:2.)  Caremark's Director of Retail Network Strategies during the relevant time period, Elena Kinney, agreed that "limited competition" among manufacturers could impact the MAC prices as well.  (N.T. Mar. 17, 2025 at 37:3-15.)

Finally, Caremark's expert Leslie Norwalk provided another competition-based theory on why Part D prices were higher than commercial: because the Part D regulations required Part D sponsors or PBMs to offer their pharmacy networks to all pharmacies wishing to participate, and because no such requirement existed for the commercial line of business, Caremark could not negotiate better prices on Part D drugs.  (N.T. Mar. 18, 2025 at 132:17-133:5.)  In essence, Caremark was able to be more selective for commercial lines of business, which in turn, provided Caremark the opportunity to offer pharmacies a larger volume of commercial drugs (at the exclusion of other pharmacies) in exchange for a deeper discount.  (Id. at 133:1-5.)

Ms. Norwalk provided a series of other explanations which were unconvincing.  First, she pointed to a Part D benefit design called "the doughnut hole."  (Id. at 125:17-24.)  She explained that the design included four phases: (1) the beneficiary pays in full to meet a certain deductible; (2) the Part D benefit kicks in and the drugs are covered; (3) the beneficiary enters a second

89

deductible period, also known as the doughnut hole; and (4) the beneficiary reaches catastrophic coverage and pays nothing. (See id. at 126:25-28:3.) She opined that because this process was so confusing, pharmacists had to spend more time explaining which benefit phase the Part D recipient was in. (Id. at 128:1-17.) This could mean that the "same drug cost[s] a different amount at the pharmacy counter for a beneficiary of Medicare Part D and a commercial recipient." (Id. at 128:9-17.) For her second explanation, Ms. Norwalk testified that Medicare beneficiaries are "far more likely to have a very long list of drugs" which would result in "a lot more time and effort" from the pharmacist and thus, it would "not surprise [her] for the pharmacist to want more money." (Id. at 131:5-21.)

In a nutshell, Ms. Norwalk opined that because it takes more time for a pharmacist to deal with a Medicare beneficiary, it is reasonable that Part D drug prices are higher. Ms. Norwalk's explanations are refuted by one of Caremark's other experts, Joseph Zavalishin, who testified that Caremark sets the MAC price and "[i]t was irrelevant to the pharmacy whether a patient was a commercial or Medicare beneficiary." (Zavalishin Written Direct Exam. ¶¶ 34, 40.) I also note that Ms. Norwalk has never "worked for a retail pharmacy as an employee" and could provide no basis for her theory that pharmacists are essentially billing by the minute for Part D drugs. (N.T. Mar. 18, 2025 at 206:12-15.) I thus assign little weight to these two opinions.

Relator presented convincing evidence to rebut Caremark's market factor contentions. Caremark witnesses explained that despite the above "market factors," Caremark consistently managed MAC prices to hit the overall GER. (See N.T. Mar. 17, 2025 at 58:20-25 (Elena Kinney explaining that "market factors" did not play a role in end-of-year contractual adjustments to hit the CVS pharmacy "commitment."); N.T. Mar. 14, 2025 at 79:7-10 (Domenico Gugliuzza

explaining that "despite [] market factors, [he] and [his] team were able to manage the MAC . . . prices to get very close to the overall pharmacy GERs").)

Moreover, Caremark's internal documents did not evince any consideration of market factors when setting the MAC prices for each line of business. Instead, certain documents showed a premeditated plan—without mention of market factors—to pay more for Part D drugs and less for commercial drugs. An internal slideshow shows that Caremark's "strategy . . . in connection with Rite Aid [for its] 2013, '14, '15 contracts . . . reflects the need to have Caremark pay more to Rite Aid for Medicare Part D than the [overall] GER . . . and less on the commercial side than the pharmacy [overall] GER." (N.T. Mar. 10, 2025 at 114:14-21; PTX-0313A at 12 of 23; see also N.T. Mar. 10, 2025 at 113:19-114:21 (Caremark employee John Lavin explaining that in 2013, Caremark internally discussed setting an "overall GER of 77.6 percent" with Rite Aid, which necessitated a "Part D . . . GER of [AWP-]74.8 percent" and a "commercial [GER] of [AWP-]80.6" percent).) John Lavin put it succinctly, agreeing that it "was Caremark's intention to overpay Rite Aid on the Med D line and underpay on the commercial line in terms of achieving the overall GER." (Id. at 117:7-14.)

In these circumstances, and because Caremark set MAC prices without regard to so-called "market factors," Caremark's market factor defense fails to move the needle.

### v.    *Others in the Industry*

Caremark's main argument against scienter concerns Aetna's investigation into Caremark's pricing terms with the pharmacies. Caremark presses that Aetna's investigation into, and absolution of, Caremark's pricing scheme is strong evidence that Caremark did not know it was doing anything wrong. Caremark relies on a sophisticated industry participant theory. That is, if Aetna—a sophisticated player in this field—reviewed Caremark's pricing scheme and

decided there was nothing wrong, than Caremark in turn could not have had the requisite scienter. See Patzer, 722 F. Supp. 3d at 854.

Although I have previously discussed the Aetna investigation, I do so now in a separate context. That is, whether Caremark can rely, in good faith, on Aetna's investigation. For the reasons that follow, I place little weight on this evidence.

There are two possible reasons Aetna's investigation of Caremark's pricing practices could be relevant to scienter. First, the investigation and resultant memos *could* stand for the proposition that the regulations were not clear. Second, that Aetna investigated and cleared Caremark of wrongdoing *could* indicate that Aetna, like Caremark, did not believe Caremark's pricing practices were fraudulent. Caremark appears only to focus on the second proposition. (See Caremark COL at 14 (internal citations omitted) ("Instead, industry-practice evidence at trial corroborated Caremark employees' sincere belief that they were doing nothing wrong.").)

Most of the Aetna investigation was introduced through the testimony of Charles Klippel— Aetna's former Deputy General Counsel. Klippel took Ms. Behnke's concerns seriously and relied on a well-regarded lawyer in Art Lerner to investigate Caremark's pricing scheme. (See N.T. Mar. 19, 2025 at 23:1-4.) That investigation, however, relied entirely upon half-truths and misleading representations from Caremark.

The compliance portion of Aetna's investigation was split into two parts: (1) did Caremark's contracts with the pharmacies create reportable DIR; and (2) was Aetna receiving pass-through pricing. The first part was assigned to Art Lerner and his team at Crowell and Moring. The second was handled by the Burchfield Group, a third-party auditor. (See DX191.)

Art Lerner handled the DIR prong of the investigation because it was an "interpretive issue" aimed at determining whether "the regulations or the instructions require certain things to be reported or not." (N.T. Mar. 19, 2025 at 78:18-23.) Because Caremark and Aetna had been and could have become competitors, Caremark did not share its pharmacy contracts or reconciliation spreadsheets with Aetna. (Id. at 77:18-21.) As a result, Aetna relied entirely upon representations made to it by Caremark and Caremark's counsel. Those representations were not corroborated by Aetna or Mr. Lerner. (See DX003.0005 ("We have not made any independent confirmation of the foregoing representations and attestations by [Caremark].").)

From 2013 to 2015, Caremark and its outside counsel provided three responses to questions posed by Relator, Klippel, and Lerner. The first response—from sometime in April of 2013—did not disclose Caremark's offsetting provisions nor did it explain that it had overall GER guarantees with the pharmacies. (See DX162.[20])

On February 9, 2015, Caremark submitted its second written response, which explained that the pharmacies did not make "true up payments" back to Caremark. (DX005.) This response did not satisfy Aetna's DIR concerns and Aetna requested additional clarification. (DX004.)

On March 13, 2015, Caremark—through counsel—submitted its third response. (DX006.) Caremark explained that the "extent to which CMS has issued annual guidance and the sheer number of enumerated examples of DIR and price concessions strongly suggests that CMS would have explicitly included a PBM pharmacy guarantee covering both commercial and Medicare Part D rates as an example of DIR." (DX0006.0007.) I understand this to mean that, if CMS wanted

---

[20] This exhibit, and most of the documents associated with Aetna's internal investigation, were admitted for a limited non-truth purpose, that is, Aetna's state of mind and thus Caremark's state of mind. See Patzer, 722 F. Supp. 3d at 854 (explaining that evidence a sophisticated industry participant investigated the conduct and found no wrongdoing is relevant to scienter); (See N.T. Mar. 12, 2025 at 23:24-24:5.)

Part D sponsors to report as DIR the impact on Part D drugs from an overall GER guarantee, they would have said so.  This response and Caremark's reliance thereon carries little weight because there is no evidence that any other industry participant maintained an overall GER guarantee at the relevant time.  (See N.T. Mar. 18, 2025 at 202:6-14 (Leslie Norwalk agreeing that as of her deposition, she could not identify "a single example, outside this case, of a pharmacy GER that covered both Med D and commercial"); N.T. Mar. 20, 2025 at 73:2-15, 80:10-18 (Joseph Zavalishin testifying that although he is "extremely certain" that such contracts existed, he could not identify "any other contract between a PBM and a pharmacy . . . that contained an overall GER encompassing both Medicare Part D and commercial lines of business").)

Klippel testified that he was "satisfied" with these responses because, in his mind, they were "complete and well-reasoned."  (N.T. Mar. 19, 2025 at 95:5-8.)  As Klippel acknowledged, however, these responses contained no mention of Caremark's offsetting provisions.

Regarding the Burchfield Group audit, that analysis focused on whether Aetna was receiving pass-through pricing on its members' Part D purchases.  Although the Burchfield group had access to Caremark's contracts with the pharmacies—and thus theoretically could have reviewed the offsetting provisions—that audit was never "meant to address DIR reporting."  (N.T. Mar. 19, 2025 at 78:10-12; see also DX191.0005 ("[T]he scope of the audit did not encompass Direct and Indirect Remuneration . . . reporting provided by Caremark to Aetna.").)  The audit concluded that the price Caremark paid the pharmacies on Part D drugs at the point of sale matched what Caremark charged Aetna.  But again, this audit did not apprise Aetna of Caremark's offsetting practices.

As already explained, the omission of the offsetting provision, in the face of questions about DIR, is evidence of concealment and thus scienter. The omission also serves to undercut Caremark's reliance on the Aetna investigation and its results.

### vi.    Government Knowledge

Caremark's final argument against scienter relates to its interactions with CMS. If CMS actually knew of Caremark's pricing scheme and approved subsequent claims despite this knowledge, CMS's inaction could bolster Caremark's purported belief that it was complying with CMS regulations and guidance.

The extent of what Caremark informed CMS is encapsulated in an un-recorded March 8, 2016 phone call and a May 26, 2016 email. (See PTX-0026.) In that email, Azzolina informed CMS that Caremark:

> has agreed to a Generic Effective Rate (GER) with a few pharmacies . . . . [Caremark's] GER's establish a pricing commitment to pay a minimum guaranteed amount, generally across the pharmacy book of business . . . . Pharmacies do not make true up payments to CVS Caremark under a GER should their reimbursement be more than the minimum guaranteed amount. The GER is also not associated with additional arrangements that reduce the price, such as DIR arrangements with pharmacies where there may be an agreed upon incentive payment and/or discount based on pharmacy performance. Thus, the example discussed where the pharmacy is required to pay back to the plan a portion of the point of sale price as an adjustment is not applicable to our GER arrangements with network pharmacies.

(Id.)

Although the email does not state that the GERs covered both commercial and Part D lines of business, Caremark urges that CMS would have understood Azzolina as saying as much. He testified that the term "book of business . . . is understood within the industry" to mean "everything that the PBM transacts with the pharmacy." (N.T. Mar. 17, 2025 at 82:6-8; 91:19-23.)

To be clear, the issue here is not whether Caremark disclosed its overall GER guarantees with the pharmacies, but rather, whether Caremark disclosed how those guarantees worked. That was the focus of CMS's call with Azzolina. As previously noted, the evidence simply does not support the position that Azzolina's responses sufficiently explained the impact of Caremark's overall GER guarantees.

I conclude that Azzolina never explained the offsetting provisions to CMS and thus, CMS was left with an incomplete picture. On the one hand, CMS was told that the pharmacies did not make true up *payments* to Caremark. But on the other, Caremark did not explain that the offsetting provisions had the same economic effect as a true-up payment. In these circumstances, it is of no moment that CMS did not ask follow up questions, impose fines, or otherwise find Caremark at fault. CMS thought its questions were answered, when in reality, it was misled.

### E.  CVS Health Corporation's Liability[21]

"It is a general principle of corporate law deeply ingrained in our economic and legal systems that a parent corporation . . . is not liable for the acts of its subsidiaries." United States v. Bestfoods, 524 U.S. 51, 61 (1998) (internal quotations and citations omitted). This general rule applies in False Claims Act cases. See United States v. Tenet Healthcare Corp., No. 22-11590, 2024 WL 3926474, at *6 (E.D. Mich. Aug. 23, 2024) (internal citations omitted). A parent company may, however, "be held liable for acts of subsidiaries when an 'alleged wrong can seemingly be traced to the parent through the conduit of its own personnel and management,' and when the parent has interfered with the subsidiaries' operations in a way that surpasses control

---

[21] Throughout this Opinion, I have referred to Defendants collectively as Caremark. For this Section only, I refer to Defendants CVS Health Corp. and its Caremark subsidiaries as "Defendants."

intrinsic to ownership." United States v. Planned Parenthood Fed'n of Am. Inc., 601 F. Supp. 3d 97, 116 (N.D. Tex. 2022) (quoting Bestfoods, 524 U.S. at 64-65).

Relator's theory of liability against CVS Health Corp.—the parent company—relies on the organization's alleged direct involvement with Defendants' alleged pricing scheme. (See ECF No. 490 at 14-15.) Defendants counter that CVS Health Corp. cannot be held liable because it was not directly involved in causing the submission of false claims. (Caremark COL at 19 (citing United States v. Exec. Health Res., Inc., 196 F. Supp. 3d 477, 513 (E.D. Pa. 2016)).) Rather, Defendants assert that Relator has proven only that certain individuals with roles at both CVS Health Corp. and its subsidiaries had some hand in the submission of these false claims.

Relator must rebut the presumption that "directors are wearing their subsidiary hats and not their parent hats when acting for the subsidiary." United States ex rel. Baker v. Cmty. Health Sys., Inc., No. 05-279, 2014 WL 10212574, at *26 (D.N.M. May 16, 2014) (internal quotations and citations omitted). In an attempt to do so, Relator points to the following evidence: (1) CVS Health Corp. was the signatory on each attestation submitted by subsidiary SilverScript to CMS. (PTX-0210; PTX-0211; PTX-0212; PTX-0213); (2) CVS Health Corp.'s Executive Vice President assisted Caremark in setting the overall GER guarantees at Rite Aid in 2013 and 2015 (See PTX-0312A at 8 of 9; N.T. Mar. 10, 2025 at 141:18-21); (3) David Azzolina, who was Vice President for finance at CVS Health but worked in the "Caremark business unit" from 2010 to 2018 was responsible for "CMS reporting on behalf of Medicare clients related to DIR"; (4) Azzolina signed an attestation to Aetna reporting that prices were accurate; and (5) Azzolina made misleading representations to CMS and then updated CVS Health executives on those conversations. (ECF No. 490 at 14-15.)

Caremark urges this evidence is not enough to prove CVS Health Corp.'s direct involvement. I agree. I start by noting that the best evidence for finding CVS Health Corp. liable comes from an internal slideshow where CVS Health Corp. executive Jon Roberts assisted in setting the Rite Aid overall GER guarantees for 2013 and 2014. (See PTX-0312A at 8 of 9.) That evidence, however, is undercut by another internal slide show, where Jon Roberts is listed as a "Caremark" key decision-maker. (See PTX-0095A at 10 of 14.) I also note that SilverScript attestations were signed by representatives of CVS Health Corp. This fact is not determinative, however, because Todd Meek—one of the signatories during the years in question—explained that he signed those documents in his role as a SilverScript employee.

Finally, Relator argues that David Azzolina's actions were made on behalf of CVS Health Corp. This contention is not persuasive. Although Azzolina was a CVS Health Corp. executive, Relator concedes that he signed the 2014 attestation to Aetna and communicated to CMS on behalf of Caremark, not the parent company. (See Rel. Scienter Fact ¶ 25.)

This evidence is simply not enough to find that Relator has rebutted the presumption that Roberts, Azzolina, Meek, and other employees were acting on behalf of Caremark as opposed to CVS Health Corp. Accordingly, I conclude that Relator has not made out liability against CVS Health Corp.

### F.  FCA CLAIMS PROVEN

The final liability question concerns whether Relator has proven each of her FCA claims under 31 U.S.C. § 3729.

Caremark urges Relator has failed to prove her presentment and false statement claims (Counts I and II) under 31 U.S.C. § 3729(a)(1)(A) and (a)(1)(B) because Relator did not show that individual PDE and DIR reports were themselves false.  I disagree.

At summary judgment, I "conclude[d] that Aetna and SilverScript were required to submit PDE records and DIR reports that, collectively, reflected the prices Caremark 'actually paid'— i.e., Caremark's guaranteed average prices."  (S.J. Op. at 63.)  I explained that "[t]o the extent Aetna and SilverScript's PDE records reflected only individual sale prices, Aetna and SilverScript were required to account for the difference in their DIR reports."  (S.J. Op. at 68.)  Because Caremark's Part D sponsor clients' PDE and DIR reports "did not reflect Caremark's negotiated average prices with Walgreens and Rite Aid . . . those reports were therefore false."  (Id.)

To be clear, I will not speculate as to which report—PDE or DIR—Aetna and SilverScript would have used to disclose the average negotiated price had it known about Caremark's offsetting provisions and the effect thereof.  I will, however, credit the undisputed testimony that Aetna continued to, and accurately reported, point-of-sale prices in PDE reports but reported the monies paid back from the pharmacies as DIR when it took over pharmacy contracting in 2015.  (Caremark Scienter Fact ¶ 25.)  Both Parties appear to agree that when the price concession was accurately reported in an end-of-year DIR report, the PDEs—which reported point-of-sale prices—were accurate.  As Caremark explains, "[t]here was no failure to report pharmacy GER guarantees unless and until the DIR reports did not reflect those guarantees."  (Caremark COL at 17.)

Because this is how sophisticated industry participants accurately reported two-way GER guarantees, I find that the DIR reports submitted by Caremark's Part D sponsors' were thus false. Accordingly, Relator has met her burden of proof on both her § 3729(a)(1)(A) and (a)(1)(B) claims.

As to Relator's reverse FCA claim (Count III), Relator was required to show that Caremark knowingly made or caused to be made a "false record or statement material to an obligation to pay or transmit money or property to the Government," knowingly concealed, or knowingly and improperly avoided or "decrease[d] an obligation to pay or transmit money or property to the Government." 31 U.S.C. § 3729(a)(1)(G). Relator's reverse false claim theory rests on an understanding of the effect Caremark's conduct had on "risk-corridor" payments Aetna and SilverScript were obligated to make at the end of each year. I explained the concept of risk-corridor payments in my Summary Judgment Opinion:

> CMS used risk corridor payments to limit the aggregate amount of gain or loss a Part D plan could incur throughout the year. (See Norwalk Opening Report ¶ 67; Craft Second Amended Opening Report ¶ 73.) At the end of the year, CMS would calculate the gain or loss by comparing the total amount the plan spent on prescription drugs (adjusted for any reinsurance or LICS subsidies received) to its predicted expenditure. 42 C.F.R. §§ 423.336(a) (effective March 22, 2005); 423.308 (effective June 7, 2010). Spending in excess of the prediction was a loss; spending below the prediction was a gain. If the magnitude of the gain or loss was less than a certain amount (called the "first threshold"), the plan would bear the entire risk and no adjustments would be made. 42 C.F.R. § 423.336(b)(1). If, on the other hand, the magnitude of the gain or loss exceeded the threshold, the government would share a portion of it.

(S.J. Op. at 17-18.) The key, for purposes of Relator's reverse FCA claim is that, "if the plan made a gain over the threshold, the plan would be obligated to return some of that gain to the government,

and if the plan suffered a loss above the threshold, the government would repay the plan for a portion of that loss." (Id. at 18 (internal citation omitted).)

At trial, Dr. Smith explained that if a Part D sponsor's initial bid to CMS "for the cost of their plan . . . is higher than what actually happens at the end of the year, [the plan has] to pay back some of the subsidy they . . . received through the year to the Government." (N.T. Mar. 17, 2025 at 172:12-16.) Smith showed, that by failing to report accurate prices to Part D sponsors (who then reported that amount to CMS), Caremark caused the Part D sponsors to pay less to the government in risk corridor payments at the end of each year. (See id. at 172:17-25.)

Relator relies on the same evidence, regulations, and guidance to make out all three theories. Moreover, her damages calculation—which relies on the impact on risk-corridor payments had Caremark accurately reported price concessions—would be the same regardless of her theory on liability. I thus find the reverse FCA claim a "redundant 'flip-side' of the claims made in the preceding counts." United States ex rel. Sobek v. Educ. Mgmt. LLC, No. 10-131, 2013 WL 2404082, at *29 (W.D. Pa. May 31, 2013); see also Hawaii ex rel. Torricer v. Liberty Dialysis-Hawaii LLC, 512 F. Supp. 3d 1096, 1119 (D. Haw. 2021) ("[T]he court agrees with the substantial authority holding that an actionable reverse false claim cannot be based on a defendant's failure to refund the same payment that was obtained by an actionable false claim. Such a claim under § 3729(a)(1)(G) would be redundant of the original claim.").

Accordingly, I find liability only as two Counts I and II.

### G. DAMAGES

For the reasons discussed above, I find damages exist only as to the plan-year combinations Relator presented regarding Rite Aid and Walgreens. I make the following findings and conclusions regarding Dr. Smith's damages calculations.

"In calculating FCA damages, the fact-finder seeks to set an award that puts the government in the same position as it would have been if the defendant's claims had not been false." Sci. Applications Int'l Corp., 626 F.3d at 1278 (internal citations omitted). Although damages must be proven "with reasonable certainty, proof of the amount of damages may be based on a *reasonable estimate*." United States *ex rel.* Landis v. Tailwind Sports Corp., No. 10-976, 2017 WL 5905509, at *5 (D.D.C. Nov. 28, 2017) (emphasis added) (internal quotations and citations omitted).

Relator has proven damages with reasonable certainty. As outlined above, Caremark's conduct inflated the prices of Part D drugs and thus caused CMS to over-subsidize drug costs. The question here is whether Relator has provided a reasonable estimate for damages. Relator's expert, Dr. Loren Smith calculated damages as the difference between: (1) the subsidies CMS actually paid, in the aggregate, for Part D drug claims; *less* (2) the subsidies CMS would have paid for Part D drug claims had prices equal in the aggregate to Caremark's overall GERs with the pharmacies been reported.

I find that Dr. Smith's DIR-based damages calculation, using the "average discount price discrepancy" model, represents a reasonable estimate of damages in this case. I do so for two reasons. First, had Caremark accurately reported DIR, its PDE records would have been compliant. (See S.J. Op. at 63 (concluding that "Aetna and SilverScript were required to submit PDE records and DIR reports that, collectively, reflected the prices Caremark 'actually paid'—

i.e., Caremark's guaranteed average prices").)  Again, I cannot predict what Caremark would have done—that is reporting through PDE records or DIR reports.  But I can point to the only other evidence in the record showing how industry participants reported DIR generated in substantially the same manner.  When Aetna maintained a two-way GER with the pharmacies and money flowed back to Aetna, it reported such payments in end-of-year DIR reports and continued to report the point-of-sale price in PDE records.  Both Parties agree that this practice was appropriate and Aetna's PDE records were compliant with CMS regulations.  Accordingly, I find that the DIR reports are a better indicator of Caremark's false claims in this case.  It appears that Caremark agrees.  (See Caremark COL at 17 ("There was no failure to report pharmacy GER guarantees unless and until the DIR reports did not reflect those guarantees.").)

Second, I only rely on Smith's "average discount price discrepancy method," and not his "Plan GER price discrepancy method," in determining damages.  As explained supra, the average discount method—which is based on actual PRS data provided by CMS—is a more accurate measure of the pricing discrepancy.

Caremark's main argument against Dr. Smith's DIR based damages calculation is that Smith "relie[d] on aggregate calculations at the plan-sponsor level when plan sponsors actually report DIR separately for each Part D plan." (Caremark COL at 18.)  This, Caremark urges, results in excess damages for plan-year combinations where the plan reported "*better*" pricing than the applicable pharmacy GER guarantee.  (Id. (emphasis in original).)  By doing so, Caremark contends, Dr. Smith "over-allocated the pricing discrepancy essential to his damages calculations." (Id.)  This argument holds no water.

As explained above, Smith allocated DIR amongst individual Aetna and SilverScript plans consistent with CMS guidance, and, CMS subsidized Aetna and SilverScript in the aggregate, not

on a plan-by-plan basis.  (See PTX-0166 at 12; Joint Stips. ¶ 47.)  That Smith allocated some DIR to plans which outperformed the pharmacy GER guarantee is of no moment.  Indeed, if the GER was AWP-80%, it would make sense that some individual plans would be above, and others below, that mark.  (See Smith Written Rebuttal Testimony ¶ 2 ("Mr. Barlag ignores that any decrease in pricing discrepancy for a given group of Aetna (or SilverScript) Part D Plans must be equally offset by an increase in pricing discrepancy at other Aetna (or SilverScript) Part D Plans.").)[22]

Next, Caremark argues that Relator's damages calculation for Rite Aid and Walgreens "does not reflect that Caremark paid Walgreens over $12.2 million *less* for Aetna and SilverScript's Part D claims in 2011 and 2012," and accordingly, "$12.2 million should be deducted from any damages award."  (Caremark Resp. to Rel. COL at 14 (emphasis in original).)  The gist of this argument is that Dr. Smith should have reduced his damages calculation by any "negative pricing discrepancy."  Caremark points to portions of Dr. Smith's workpapers which originally calculated damages at Walgreens for 2011 and 2012.  (See Caremark Damages Fact ¶ 19.)  Relator contends that the discrepancy should not be deducted from overall damages because: (1) that data was outside the scope of Smith's damages calculation and (2) that amount does not reflect that CMS would only subsidize about 60%-70% of reported drug costs.

I will not reduce damages by $12.2 million or the proposed subsidized amount.  Those plan, year, pharmacy combinations are not at issue in this case.  Moreover, and noting that the

---

[22] Caremark furthered—and I rejected—a similar argument at summary judgment.  (See S.J. Op. at 76 ("Caremark has not identified a requirement, either under the False Claims Act or Medicare Part D, to allocate damages to individual PDE records or DIR reports, particularly given the evidence that CMS made subsidy payments on an aggregate basis."); see also id. ("In addition, while Caremark's expert faults Relator's expert for allocating price concessions to Part D plans whose individual sale prices were lower than Caremark's guaranteed average prices, Caremark has not cited authority that such an allocation would have been inconsistent with CMS's reporting rules, which permitted some kinds of allocation.").)  Caremark has not changed my mind.

burden remains on Relator, Caremark has not explained *how* a negative pricing discrepancy would reduce damages.

Accordingly, and based on Dr. Smith's expertise and testimony, I find pre-trebling and pre-penalty damages of $95 million.

## VII.    CONCLUSION

For the foregoing reasons, I find in favor of Relator.  I make no ruling at this time regarding the number of false claims, trebling, or civil penalties.  A briefing schedule will follow as will an Order consistent with this Opinion.