IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* SARAH BEHNKE,<br><br>*Plaintiff*,<br><br>v.<br><br>CVS CAREMARK CORPORATION *et al.*,<br><br>*Defendants*. | Civil Action<br><br>No. 14-cv-824 |

Goldberg, J.                                                                                                   August 19, 2025

### MEMORANDUM OPINION

As extensively detailed in my June 25, 2025 Opinion, this case involves a whistleblower's now-proven Medicare fraud claims against Caremark, a pharmacy benefits manager.[1] (ECF No. 499 ("Op.").) Following an eight-day bench trial, post-trial submissions, and closing arguments, I found in favor of Relator Sarah Behnke and assessed pre-trebling and pre-penalty damages of $95,000,000. At that time, I deferred ruling on trebling, the number of false claims, and civil penalties. Before me are the Parties' Briefs and Responses on those issues.

For the reasons that follow, I will treble actual damages to $285,000,000, award civil penalties totaling $4,873,500, and enter final judgment against the Caremark Defendants in the amount of $289,873,500.

---

[1] I found liability only as to the Caremark Defendants: Caremark Rx, LLC, CaremarkPCS Health LLC, and CVS Caremark Part D Services, LLC. (See ECF No. 499.)

1

I.  **BACKGROUND**

Relator filed this qui tam action on behalf of the Government, alleging three counts under the False Claims Act (FCA). At trial, Relator succeeded on two of those counts, proving her presentment claim under 31 U.S.C. § 3729(a)(1)(A) and her false statement claim under 31 U.S.C. § 3729(a)(1)(B). Specifically, Relator established that Caremark knowingly caused Part D Sponsors Aetna and SilverScript to misrepresent to the Centers for Medicare and Medicaid Services the amount that Medicare Part D beneficiaries paid for prescription drugs at Walgreens and Rite Aid in 2013 and 2014.

Under the FCA, defendants are "liable to the United States Government for a civil penalty" for every false claim found and "3 times the amount of damages which the Government sustains because of the act of that person." 31 U.S.C. § 3729(a)(1). Having found liability and actual damages of $95,000,000, I instructed the Parties to brief three issues: (1) trebling; (2) the number of false claims; and (3) civil penalties.

II.  **DISCUSSION**

The Parties dispute the number of false claims, the penalty amount I should assign to each false claim, and the constitutionality of the combined trebling and civil penalties. I address each argument in turn.

**A.  Trebling**

Relator has proven actual damages of $95,000,000. Accordingly, I will treble that amount and award an additional $190,000,000 for a total of $285,000,000. See 31 U.S.C. § 3729(a)(1); Cook Cnty., Ill. v. United States ex rel. Chandler, 538 U.S. 119, 122 (2003) ("If the [FCA] claim succeeds, the defendant is liable to the Government for . . . treble damages."); United States ex rel.

2

Bassan v. Omnicare, Inc., No. 15-4179, 2025 WL 1865202, at *1 (S.D.N.Y. July 7, 2025) ("[T]he Government is statutorily entitled to treble damages.").

### B. Civil Penalties

*i. Number of False Claims*

Under the False Claims Act, a defendant is "subject to a civil penalty . . . for each false claim submitted." United States *ex rel.* Landsberg v. Argentis Medical, P.C., No. 03-1263, 2009 WL 10727191, at *5 (W.D. Pa. Mar. 12, 2009) (internal citations omitted). I have already determined that the DIR reports submitted by Caremark's Part D sponsors were false. (Op. at 100.) The Parties dispute whether the number of false claims should be measured by looking to Caremark's submissions to its Part D sponsors or from the Part D sponsors to CMS.

In determining the number of false claims, I look to the "specific conduct of the person from whom the Government seeks to collect the statutory forfeitures." United States v. Bornstein, 423 U.S. 303, 313 (1976). Pointing to this language, Caremark urges that the "specific conduct" here was its preparation and submission to Aetna and SilverScript four draft DIR summary reports in 2013 and 2014. (ECF No. 502 at 2-4.) Relator responds that the number should instead be set at 513, the number of false DIR reports Aetna and SilverScript submitted to CMS as a result of Caremark's fraudulent conduct. (ECF No. 501 at 3.) Relator has the better argument.

The facts of Bornstein are instructive. There, the United States Supreme Court considered how penalties should be calculated in an indirect presentment case. In Bornstein, the subcontractor sent the prime contractor "three separately invoiced shipments" of "falsely marked" radio kits. Bornstein, 423 U.S. at 307. Thereafter, the prime contractor submitted 35 invoices to the Government related to the kits. Id. Seeking damages, the Government sought to hold the

3

subcontractor liable for 35 false claims. The Court rejected this argument, explaining that the FCA "penalizes a person for his own acts, not for the acts of someone else." Id. at 312. Citing Bornstein, Caremark contends that I must look only to Caremark's conduct, not to what Aetna and SilverScript submitted to CMS as a result. (See ECF No. 504 at 2 ("Where, as here, the defendants did not submit a claim for payment to the government directly, Supreme Court precedent requires that the Court 'focus . . . upon the specific conduct' of the defendant, not the intermediary—like Aetna and SilverScript." (citing Bornstein, 423 U.S. at 313).)

In making this argument, Caremark disregards important context from the Bornstein decision, that the prime contractor's decision to "submit 35 false claims instead of some other number was, so far as [the subcontractor] was concerned, wholly irrelevant completely fortuitous and *beyond [the subcontractor's] knowledge or control*." Bornstein, 423 U.S. at 312 (emphasis added). I agree with the United States Court of Appeals for the Ninth Circuit, which noted that Bornstein's holding "strongly suggests . . . a person [who] *knowingly* causes a specific number of false claims to be filed . . . is liable for an equal number of forfeitures." United States v. Ehrlich, 643 F.2d 634, 638 (9th Cir. 1981) (emphasis added). The question is thus whether Caremark knew its actions would cause Aetna and SilverScript to submit some 513 DIR reports to CMS for reimbursement. I have already answered this question in the affirmative. (See Op. at 100 ("I find that the DIR reports submitted by Caremark's Part D sponsors' [sic] were thus false [and that] Relator has met her burden of proof on both her § 3729(a)(1)(A) and (a)(1)(B) claims.").

My finding that Caremark knowingly caused the submission of some 513 DIR reports is further supported by Caremark's own damages expert, Mr. Brett Barlag, who explained that "Plan sponsors report DIR for each of the individual insurance plans they offer, not the plan sponsor as a whole." (Barlag Written Testimony ¶ 59.) Caremark certainly understood this. (See Op. at 54

4

n.17 (listing the various attestations in which Caremark certified that it understood the information would be used by Aetna and SilverScript for the purpose of obtaining federal reimbursement).) Moreover, CMS guidance explicitly acknowledged that "some sponsors may receive and/or record DIR at the sponsor or contract level." (PTX-0166 at 12.) As I have found, Caremark—a sophisticated industry participant—would have been aware of CMS guidance. (Op. at 70.) Indeed, Caremark admits that it understood that Part D sponsors would "submit DIR reports for each of their individual plans annually." (Caremark Damages Fact ¶ 8 (ECF No. 479).)

Next, Caremark argues that Relator has not adequately proven the number of DIR reports submitted to CMS. (See ECF No. 504 at 3 ("Relator . . . failed to introduce sufficient evidence to support her 513 penalties figure.").) I disagree. Through her damages expert, Relator introduced, without objection, PTX-0571, a table compiling DIR data from other exhibits and explaining that Aetna and SilverScript submitted 513 relevant and false DIR reports in 2013 and 2014. (See PTX-0571; see also ECF No. 475 at 7.) To the extent that Caremark now challenges the admissibility of this exhibit, I will not entertain its *post hoc* objection.

Finally, Caremark argues that counting penalties based on each individual plan's submissions—as opposed to the aggregate sponsor level—would contradict my prior rulings. I disagree.

In discussing actual damages, I explained that Dr. Smith could—consistent with CMS guidance—calculate the amount of damages by using an aggregation method. (Op. at 103-04.) The question for penalty purposes is different. Now, I must award statutory penalties for each false claim. See United States *ex rel.* Morsell v. Gen Digit., Inc., 712 F. Supp. 3d 14, 25 (D.D.C. 2024) ("[E]ach individual false claim or statement triggers the [FCA's] civil penalties." (internal quotations and citations omitted) (cleaned up)). That I allowed Relator's expert to calculate

5

damages using an aggregate methodology does not mean I am now obligated to incorrectly apply that same method to the separate issue of statutory penalties.

I thus conclude Caremark knew, that after it submitted draft DIR reports to Aetna and SilverScript, those Part D sponsors would turn around and submit DIR reports on the individual plan level. Because Relator has presented competent proof that 513 such DIR reports were submitted to CMS, the number of false claims for the purposes of civil penalties is set at 513.

        ii.    *Penalty Amount*

Both Parties agree that I must set a per-claim penalty in an amount between $5,500 to $11,000. See 31 U.S.C. § 3729(a)(1); Federal Civil Penalties Inflation Adjustment Act of 1990, Pub. L. No. 101-410, § 5, 104 Stat. 891 (1990); 28 C.F.R. § 85.3(a)(9); (ECF No. 501 at 3-4; ECF No. 502 at 6.) It is within my "discretion whether to impose the maximum, the minimum, or some intermediate penalty." United States *ex rel.* Penelow v. Janssen Prods., LP, No. 12-7758, 2025 WL 937504, at *15 (D.N.J. Mar. 28, 2025) (citing Chandler, 538 U.S. at 132). In determining this number, I examine the totality of the circumstances, including "'the seriousness of the misconduct, the scienter of the defendants, and the amount of damages suffered by the United States as a result of the misconduct.'" United States *ex rel.* Landis v. Tailwind Sports Corp., 324 F. Supp. 3d 67, 74 (D.D.C. 2018) (quoting United States v. Speqtrum, Inc., No. 10-2111, 2016 WL 5349196, at *4 (D.D.C. Sept. 23, 2016)).

Caremark's misconduct was serious. Caremark understood that "under the 2010 rule change, it could not earn spread or profit on Part D drugs which was not reported to CMS." (Op. at 84 (internal citations omitted).) In anticipation of the rule change, Caremark explained to its shareholders that it "expect[ed] these changes to reduce the profitability of [its] Medicare Part D

business beginning in 2010." (PTX-0174 at 34 of 80.)  In response, Caremark devised a scheme to earn hidden spread or indirect profit on Part D purchases, and in the process, caused CMS to over-subsidize prescription drug costs to the tune of some $95 million.  When CMS and other industry participants asked questions, Caremark consistently concealed the true nature of its scheme.  (See Op. at 76-79.)  Caremark's actions cost CMS close to $100 million and made the administration of Medicare Part D—a program aimed at lowering drug costs for a vulnerable population—more difficult.

Despite this, Caremark urges that minimum penalties should be awarded because I found liability only as to two pharmacies over a two-year period.  Relator responds that it is "absurd" to "credit [Caremark] for **not** committing fraud at the thousands of small, independent pharmacies over which Caremark had significant leverage."  (ECF No. 503 at 9 (internal quotations and citations omitted) (emphasis in original).)  I agree with Relator that Caremark should not pay less because it only committed fraud with respect to two of the largest pharmacy chains in the country.

Finally, Caremark argues that a minimum penalty is warranted because Relator proved only that Caremark acted with reckless disregard and deliberate ignorance.  Relator responds with cases in which maximum penalties were awarded based on a finding of reckless disregard.  (See ECF No. 503 at 7 (collecting cases).)

While Relator presented strong evidence establishing reckless disregard and deliberate ignorance, I did not find "actual knowledge," which seems to represent the highest level of culpability under the FCA.  Still, Relator amply proved Caremark's scienter and exposed the seriousness of Caremark's misconduct.  In these circumstances a per-claim penalty near—but not at—the top of the statutory range is warranted.

Accordingly, I will award $9,500 per false claim, resulting in a civil penalty of $4,873,500.

### C. Constitutionality of the Combined Penalty

Caremark urges that trebling, combined with a per-claim penalty, would run afoul of the Excessive Fines Clause of the Eighth Amendment and the Due Process Clause. (ECF No. 502 at 10.) I address each argument in turn.

*i. Excessive Fines Clause*

"The Excessive Fines Clause applies to civil penalties that are punitive in nature." United States v. Aleff, 772 F.3d 508, 512 (8th Cir. 2014) (internal citation omitted). Thus, the threshold question here is whether treble damages under the FCA can be considered punitive under the Eighth Amendment.

Neither the Third Circuit nor the Supreme Court has explicitly answered this question. See United States ex rel. Grant v. Zorn, 107 F.4th 782, 799 (8th Cir. 2024) ("The Supreme Court has not provided guidance as to the exact division between compensatory and punitive damages in a treble damages award."). Other Courts have, however, explained that trebling serves a "partly punitive and partly remedial purpose." See Bassan, 2025 WL 1865202, at *2 (citing Chandler, 538 U.S. at 130-31 (cleaned up); see also United States ex rel. Drakeford v. Tuomey, 792 F.3d 364, 388 (4th Cir. 2015) (quoting Chandler, 538 U.S. at 130) ("[T]he treble damages provision of the statute has a compensatory aspect, in that they account for the fact that some amount of money beyond actual damages is 'necessary to compensate the Government completely for the costs, delays, and inconveniences occasioned by fraudulent claims.'"). For purposes of this case, I rely on holdings from the Eleventh, "Ninth, Eighth, and Fourth Circuits [which] accepted that FCA monetary awards[, including trebling,] are fines for the purposes of the Excessive Fines Clause . .

8

. because they are at least in part punitive." Yates v. Pinellas Hematology & Oncology, P.A., 21 F.4th 1288, 1308 (11th Cir. 2021) (collecting cases).

Still, "fines ordered pursuant to the FCA will only be found excessive infrequently." Morsell, 712 F. Supp. 3d at 27 (internal quotations and citations omitted) (cleaned up). Moreover, a fine "is excessive only if 'it is grossly disproportional to the gravity of [the] offense.'" Id. (quoting United States v. Bajakajian, 524 U.S. 321, 334 (1998)). I examine four-factors to determine whether the penalty is "grossly disproportionate to the gravity of the defendant's offense":

> (a) the essence of the defendant's crime and its relationship to other criminal activity; (b) whether the defendant was within the class of people for whom the statute of conviction was principally designed; (c) the maximum sentence, including the fine that could have been imposed; and (d) the nature of the harm resulting from the defendant's conduct.

United States ex rel. Taylor v. Healthcare Assocs. of Tx., LLC, No. 19-2486, 2025 WL 624493, at *7 (N.D. Tx. Feb. 26, 2025) (internal quotations and citations omitted). "Of course, this is not a criminal case, but these factors can be adapted to the civil penalty context." Id.; see also Bassan, 2025 WL 1865202, at *4 (applying those factors again in FCA setting).

First, a $95 million dollar fraud loss is certainly significant. Although Caremark is only liable for two years of overbilling, the evidence at trial made clear that the fraud was financially motivated, not the result of some innocent or mistaken belief. Caremark knew that the 2010 rule change would reduce its profits, and so, Caremark instituted a scheme to continue profiting from Part D drugs. Moreover, the conduct here was not simply some failure to report. Cf. Bajakajian, 524 U.S. at 337-39 (explaining that the level of culpability was "minimal" because the crime at issue "was solely a reporting offense"). Instead, time and again, Caremark was presented with an

9

opportunity to explain its scheme to CMS and other industry participants, and time and again, Caremark concealed the true nature of its pharmacy contracts.

Second, Caremark's fraud is precisely the type of conduct that the FCA is designed to prevent.

Third, although I am imposing a penalty near the top of the statutory range—$9,500 per false claim—I cannot "say the fine is grossly disproportionate to the gravity of the offense when Congress has made a judgment about the appropriate punishment." Kelly v. U.S. E.P.A., 203 F.3d 519, 524 (7th Cir. 2000). The penalty here is within the range set by Congress, below the maximum amount I am permitted to award, and the number of false claims—513—understates the extent of Caremark's fraud. See Bassan, 2025 WL 1865202, at *3 (quoting Stop Ill. Health Care Fraud, LLC v. Sayeed, 100 F.4th 899, 907 (7th Cir. 2024)) ("[P]enalties that fall 'squarely within the boundaries set by Congress' deserve a 'strong presumption of constitutionality,' because the statutory range 'reflects the considered legislative judgment as to what is excessive.'").

Fourth, putting aside the amount that was overbilled, Caremark's fraud harms the United States in another way: its actions cause "'a diminution of the public's confidence in the government.'" Yates, 21 F.4th at 1316 (quoting United States v. Killough, 848 F.2d 1523, 1532 (11th Cir. 1988)); see also United States v. Mackby, 339 F.3d 1013, 1019 (9th Cir. 2003) ("Fraudulent claims make the administration of Medicare more difficult, and widespread fraud would undermine public confidence in the system."). CMS relies on companies like Caremark to truthfully and accurately report Part D drug prices. Caremark's conduct broke CMS's trust, and as a result, the public's trust in CMS.

10

Under these circumstances, $4,873,500 in statutory penalties and $190,000,000 in treble damages satisfies the excessive fines proportionality test.

    ii.    *Due Process*

Caremark next argues that because actual damages—$95 million—are substantial, trebling and per-claim penalties should not exceed $95 million. (ECF No. 504 at 8.) Caremark urges that according to due process "principles" set forth in the Supreme Court's decision in State Farm Mutual Automobile Insurance Company v. Campbell, 538 U.S. 408 (2003), "a 1:1 ratio of penalties to actual damages is all the Constitution allows." (ECF No. 502 at 11.)

State Farm dealt with "discretionary jury awards of punitive damages rather than a fixed statutory-damage provision" like the one found in the FCA. Vanderbilt Mortg. & Fin., Inc. v. Flores, 692 F.3d 358, 374 (5th Cir. 2012). Accordingly, although State Farm is "instructive . . . it is not controlling." Bassan, 2025 WL 1865202, at *3. Under State Farm, I analyze three guideposts in determining the propriety of a damages award: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded . . . and the civil penalties authorized or imposed in comparable cases." 538 U.S. at 418.

First, for the reasons already explained and as set out in my June 25, 2025 Opinion, I find that Caremark's fraud was significant and weighs in favor of the penalties I impose today.

Second, although State Farm "decline[d] . . . to impose a bright-line ratio which a punitive damages award cannot exceed," the Court explained that a single digit ratio is "more likely to comport with due process." 538 U.S. at 425. The Court went on to explain that "[w]hen compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory

11

damages, can reach the outermost limit of the due process guarantee." Id. Nevertheless, this "passing reference . . . to 'perhaps' a 1:1 punitive-to-compensatory damages ratio where 'compensatory damages are substantial' hardly qualifies as a ruling that any higher ratio is automatically excessive in a case where actual damages are substantial." Bassan, 2025 WL 1865202, at *4. Indeed, Caremark fails to cite a single FCA case where penalty damages were reduced to a 1:1 ratio. (See ECF No. 502 at 12 (collecting cases but clarifying those "cases are not specific to reducing treble damages in the FCA context"); see also (ECF No. 504 at 8 (citing defamation and breach of contract cases).)

Here, the ratio of trebling and statutory penalty damages to actual damages is about 2:1 ($194,873,500 to $95,000,000). That is lower than the 4:1 ratio in Bassan, the 10:1 ratio in Penelow, and the 3.6:1 ratio in Drakeford. I thus find that the penalty awarded in this case does not offend due process. Cf. Grant, 107 F.4th at 799 (finding that the district court erred by imposing "a punitive sanction twenty-six times the amount of treble damages and seventy-eight times the amount of actual damages awarded"). Rather, the penalty imposed is the appropriate measure of damages in light of Caremark's fraud and concealment.

### D. Joint and Several Liability and Post Judgment Interest

Relator contends, and Caremark does not dispute, that all Caremark Defendants—Caremark Rx, LLC, CaremarkPCS Health LLC, CVS Caremark Part D Services, LLC—are jointly and severally liable. (ECF No. 501 at 7.) I agree. See Mortgages, Inc. v. U.S. Dist. Ct. for Dist. of Nev., 934 F.2d 209, 212 (9th Cir. 1991) ("Where one or more persons have committed a fraud upon the government in violation of the FCA, each is joint and severally liable for the treble damages and statutory penalty.").

I also agree with Relator that I must impose an award of post-judgment interest. Post-judgment interest in the false claims setting is allowed under 28 U.S.C. § 1961. See <u>United States v. Uzzell</u>, 648 F. Supp. 1362, 1368 (D.D.C. 1986). Interest is calculated "from the date of the entry of the judgment, at a rate equal to the weekly average 1-year constant maturity Treasury yield, as published by the Board of Governors of the Federal Reserve System, for the calendar week preceding the date of the judgment." 28 U.S.C. § 1961.

### III.    CONCLUSION

Based on the foregoing, I will treble damages to $285,000,000 and award civil penalties totaling $4,873,500. A Judgment consistent with this Opinion follows.